**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TPC GROUP INC., *et al.*,[1] | Case No. 22-10493 (CTG) |
| Debtors. | Jointly Administered |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P., | |
| Plaintiffs, | Adv. Pro. No. 22-50372 |
| v. | |
| TPC GROUP INC., | |
| Defendant. | |

**AD HOC GROUP OF NON-CONSENTING NOTEHOLDERS'
MOTION FOR SUMMARY JUDGMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

UNDISPUTED MATERIAL FACTS ......................................................................................3

APPLICABLE LEGAL STANDARD .....................................................................................12

ARGUMENT ...........................................................................................................................13

I.  TPC BREACHED SECTION 9.02(D)(10) OF THE ORIGINAL INDENTURE
    BY NOT OBTAINING THE CONSENT OF EACH SENIOR NOTEHOLDER
    BEFORE CHANGING THE APPLICATION OF PROCEEDS OF
    COLLATERAL. ............................................................................................................13

II. TPC BREACHED SECTION 9.02 OF THE ORIGINAL INDENTURE BY
    FAILING TO OBTAIN *ANY* VALID CONSENTS BEFORE AMENDING THE
    ORIGINAL INDENTURE AND THE 2019 INTERCREDITOR AGREEMENT ..........19

CONCLUSION .........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................................12

*Audax Credit Opportunities Offshore v. Tmk Hawk Parent*,
    150 N.Y.S.3d 894 (Sup. Ct. 2021)...........................................................................16, 17, 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................12

*Delaware & Hudson Ry. v. Consol. Rail Corp.*,
    902 F.2d 174 (2d Cir. 1990)........................................................................................13

*Palmieri v. Allstate Ins. Co.*,
    445 F.3d 179 (2d Cir. 2006)........................................................................................13

Bayside Capital, Inc. ("Bayside") and Cerberus Capital Management, L.P. ("Cerberus," and together with Bayside, the "Ad Hoc Group of Non-Consenting Noteholders") respectfully state as follows in support of this motion (the "Motion"):

## PRELIMINARY STATEMENT

1. This case involves the straightforward application of the plain terms of an indenture. In 2019, TPC issued senior secured notes (the "Senior Secured Notes," with holders of such notes, "Senior Noteholders") pursuant to an indenture (the "Original Indenture"), and subject to an intercreditor agreement (the "2019 Intercreditor Agreement") that gave Senior Secured Notes first priority access to the proceeds of certain collateral and second priority access to the proceeds of other collateral. The Original Indenture prohibits TPC from making any changes in the provisions of the Original Indenture or the 2019 Intercreditor Agreement "dealing with the application of proceeds" of collateral in a way that "would adversely affect" the Senior Noteholders, unless TPC first obtained the consent of "each Holder affected thereby."

2. In 2021, TPC issued $153 million in principal of new notes (the "Usurping Notes," with holders of such notes, "Usurping Noteholders"), and in anticipation of its bankruptcy filing, issued in 2022 approximately $51.5 million in additional Usurping Notes.

3. In connection with the issuance of the Usurping Notes in 2021, TPC issued a supplemental indenture (the "Supplemental Indenture") that purported to amend the Original Indenture in ways adverse to the Senior Noteholders with respect to the application of proceeds of collateral. Specifically, the Supplemental Indenture purported to amend the Original Indenture to (i) except the Usurping Notes from an obligation to be subject to the 2019 Intercreditor Agreement and (ii) cause the Senior Secured Notes to be subject to a new intercreditor agreement (the "2021 Intercreditor Agreement") purporting to subordinate the Senior Secured Notes to the Usurping Notes with respect to the application of proceeds of

collateral.  In addition, the 2021 Intercreditor Agreement had the purported effect of amending the 2019 Intercreditor Agreement's waterfall scheme with respect to collateral.  These purported amendments to the Original Indenture, and the issuance of the 2021 Intercreditor Agreement, would have changed the application of proceeds of collateral in a way adverse to all Senior Noteholders—namely, by subordinating the Senior Secured Notes to approximately $205 million in principal of Usurping Notes with respect to payments from proceeds of collateral securing the Senior Secured Notes.

4.      Notwithstanding the Original Indenture's unanimous consent requirements for changes dealing with the application of proceeds of collateral in a manner adverse to the Senior Noteholders, TPC did not obtain the consent of each Senior Noteholder before implementing these changes.  Thus, the issuance of both the Supplemental Indenture and the 2021 Intercreditor Agreement breached the Original Indenture.

5.      In addition, the consents TPC did obtain are invalid because they were obtained only from beneficial noteholders, not the registered noteholders, as required by the Original Indenture.

6.      Accordingly, in its complaint filed simultaneously herewith (the "Complaint"), the Ad Hoc Group of Non-Consenting Noteholders seeks, *inter alia*, an order declaring that (i) TPC breached the Original Indenture, (ii) TPC's attempts to change the relative priority of the Senior Secured Notes *vis-à-vis* the Usurping Notes with respect to the application of proceeds of collateral is invalid as to non-consenting Senior Noteholders, and (iii) the application of proceeds of the collateral with respect to the Senior Secured Notes held by members of the Ad Hoc Group of Non-Consenting Noteholders is to be determined solely by the Original Indenture and the 2019 Intercreditor Agreement.

7.      Each of the Complaint's causes of action can be resolved by the Court now, without any need for discovery, because the allegations are based purely on the language of the governing documents and what the Ad Hoc Group of Non-Consenting Noteholders believes to be an undisputed course of conduct.  The Ad Hoc Group of Non-Consenting Noteholders is entitled at this time to judgment in its favor as a matter of law.

## UNDISPUTED MATERIAL FACTS

### a.   The Issuance of the Senior Secured Notes

8.      On or about August 2, 2019, TPC issued $930 million in principal of Senior Secured Notes, which were subject to a 10.5% interest rate, pursuant to the Original Indenture, with U.S. Bank National Association ("U.S. Bank") as trustee and collateral agent.  *See* Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions [ECF No. 27] ("Del Genio Decl.") ¶ 38; Declaration of Aaron L. Renenger in Support of the Motion, dated June 1, 2022 ("Ren. Decl."), Ex. A.

9.      On or about the same date, the 2019 Intercreditor Agreement was entered into between U.S. Bank, as trustee and collateral agent for the Senior Noteholders, and Bank of America, N.A., as administrative agent and collateral agent for certain asset-based lenders (the "ABL Lenders").  Ren. Decl., Ex. B.

10.     Section 4.1(a) of the 2019 Intercreditor Agreement, entitled "Application of Proceeds of Senior Collateral," provides that the Senior Noteholders get paid first out of the proceeds of certain collateral (the "Notes Priority Collateral"), subject only to the prior payment of certain costs and expenses related to the exercise of remedies with respect to the collateral.  *See* Ren. Decl., Ex. B.  With respect to the proceeds of certain other collateral (the "ABL Facility Priority Collateral," and together with the Notes Priority Collateral, the "Collateral"), section

4.1(a) provides that Senior Noteholders get paid second only to the ABL Lenders, again subject to the aforementioned costs and expenses. *Id.*

11.     The Original Indenture is governed by New York law.  Ren. Decl., Ex. A § 14.08.

12.     The Ad Hoc Group of Non-Consenting Noteholders holds approximately 10% of the principal amount of outstanding Senior Secured Notes.

### b.  The Subsequent Issuance of the Usurping Notes

13.     Eighteen months after the issuance of the Senior Secured Notes, on or about February 2, 2021, TPC issued $153 million in principal of the Usurping Notes, which were subject to a 10.875% interest rate, pursuant to a new indenture, with U.S. Bank as trustee and collateral agent.  Del Genio Decl. ¶ 35; Ren. Decl., Ex. C.

14.     In 2022, TPC issued approximately $51.5 million in face amount of additional Usurping Notes (the "2022 Usurping Notes").  Del Genio Decl. ¶ 3.

15.     On or about February 2, 2021, in connection with issuance of the Usurping Notes, TPC and U.S. Bank entered into the Supplemental Indenture, purporting to amend the Original Indenture.  Ren. Decl., Exs. D (Supplemental Indenture) and E (Redline of Supplemental Indenture against Original Indenture).  At the same time, the parties entered into the 2021 Intercreditor Agreement, purporting to subject all Senior Noteholders to the priority scheme outlined therein.  Ren. Decl., Ex. F.

16.     The members of the Ad Hoc Group of Non-Consenting Noteholders do not hold any Usurping Notes.

### c.  TPC's Changes to the Application of Proceeds of Collateral

17.     The Supplemental Indenture and the 2021 Intercreditor Agreement (together, the "2021 Transaction Documents") purport to change the application of proceeds of Collateral under the Original Indenture and the 2019 Intercreditor Agreement in at least three ways.

18.    First, the Supplemental Indenture purports to amend the Original Indenture to cause the Senior Secured Notes to be subject to the 2021 Intercreditor Agreement, including its waterfall scheme with respect to Collateral, as described below.  Specifically, section 12.01(c) of the Original Indenture states, in part:

> Notwithstanding anything to the contrary, (i) the liens and security interests granted to the Collateral Agent pursuant to the Security Documents and all rights and obligations of the Trustee and Collateral Agent hereunder in respect of the Collateral are expressly subject to the [2019 Intercreditor Agreement] and (ii) the exercise of any right or remedy by the Trustee and the Collateral Agent hereunder in respect of the Collateral is subject to the limitation and provisions of the [2019 Intercreditor Agreement].

Ren. Decl., Ex. A.

19.    The Supplemental Indenture purports to amend section 12.01(c) of the Original Indenture to replace the reference to the 2019 Intercreditor Agreement with the new term "Intercreditor Agreements," which is defined by the Supplemental Indenture to mean the 2019 Intercreditor Agreement and the 2021 Intercreditor Agreement.  Ren. Decl., Ex. D.  This change, if given effect, would cause the Senior Secured Notes to be subject to the provisions and limitations of the 2021 Intercreditor Agreement, including the section therein entitled "Application of Proceeds," which prioritizes payments to the Usurping Notes on account of proceeds of Collateral before payment on the Senior Secured Notes.  Below is an excerpt of a redline of the Supplemental Indenture against the Original Indenture showing the aforementioned changes to section 12.01(c):

> (c)    *Intercreditor Agreements.* The Trustee, the Collateral Agent and the Holders are bound by the terms of the Intercreditor Agreement and each Holder of a Note, by accepting such Note, agrees to all the terms and provisions of the Intercreditor Agreement and the other Security Documents. Notwithstanding anything to the contrary, (i) the liens and security interests granted to the Collateral Agent pursuant to the Security Documents and all rights and obligations of the Trustee and Collateral Agent hereunder in respect of the Collateral

are expressly subject to the Intercreditor ~~Agreement~~**Agreements** and (ii) the exercise of any right or remedy by the Trustee and the Collateral Agent hereunder in respect of the Collateral is subject to the limitation and provisions of the Intercreditor ~~Agreement~~**Agreements**. In the event of any conflict or inconsistency between the terms of the Intercreditor ~~Agreement~~**Agreements** and the terms of this Indenture or any Security Document, the terms of the Intercreditor ~~Agreement~~**Agreements**, shall govern.

Ren. Decl., Ex. E.

20.      While this change alone would cause the Senior Secured Notes to be subject to a new and detrimental waterfall scheme, the 2021 Intercreditor removes any doubt about the intended interplay of the 2019 Intercreditor Agreement and the 2021 Intercreditor Agreement with respect to the application of proceeds of Collateral.  The 2021 Intercreditor Agreement provides that, as between the Senior Noteholders and the Usurping Noteholders, where there is a conflict between the 2019 Intercreditor Agreement and the 2021 Intercreditor Agreement, the 2021 Intercreditor Agreement "shall control."  Ren. Decl., Ex. F § 8.17(b).

21.      Second, the Supplemental Indenture purports to amend the Original Indenture's definition of "Permitted Liens" to except at least $113 million of the Usurping Notes from the requirement that they be subject to the 2019 Intercreditor Agreement.  Ren. Decl., Ex. D § 1.01.

22.      Specifically, section 4.07(d) of the Supplemental Indenture states that $113 million in aggregate principal of the Usurping Notes shall be treated as indebtedness incurred under section 4.07(b)(1), and cannot later be reclassified.  *See* Ren. Decl., Ex. D.  Under the Original Indenture, any liens securing debt issued under section 4.07(b)(1), one of the Original Indenture's permitted debt baskets, are required to be "subject to the provisions of" the 2019 Intercreditor Agreement, which includes a waterfall giving the Senior Secured Notes senior access to the proceeds of the Notes Priority Collateral and junior access to the proceeds of the ABL Facility Priority Collateral.  Ren. Decl., Ex. A § 1.01.  The Supplemental Indenture purports to amend the definition of "Permitted Liens" such that the liens securing the Usurping

Notes issued under section 4.07(b)(1) are excepted from the requirement to be subject to the 2019 Intercreditor Agreement.  Ren. Decl., Ex. D § 1.01.  Below is an excerpt of a redline of the Supplemental Indenture against the Original Indenture, showing the aforementioned changes to the definition of Permitted Liens:

> *"Permitted Liens"* means:
>
> ~~53~~
>
> _____
>
> (1)    Liens securing Indebtedness and other Obligations under Debt Facilities incurred pursuant to Section 4.07(b)(1) hereof and/or securing Bank Products obligations
>
> related thereto; *provided* that ~~so long as the Credit Agreement is outstanding,~~ such Liens (other than Liens securing the New Notes) are subject to the provisions of the ABL Intercreditor Agreement (including with respect to the relative priority of the ABL Facility Priority Collateral and Notes Priority Collateral) as an ABL Agreement;

Ren. Decl., Ex. E.

23.    In addition to the $113 million in principal of Usurping Notes referenced above, on information and belief, TPC issued the approximately $51.5 million in principal amount of 2022 Usurping Notes pursuant to section 4.07(b)(1) of the Supplemental Indenture.

24.    Third, even if there had been no changes to the Original Indenture, the 2021 Intercreditor Agreement purports to change the Senior Secured Notes' priority with respect to proceeds of Collateral relative to the Usurping Notes.  Section 2.1 of the 2021 Intercreditor Agreement provides that any lien on "Common Collateral," inclusive of the Notes Priority Collateral and the ABL Facility Priority Collateral, securing the Usurping Notes "shall have

priority over and be senior in all respects and prior to" any liens on the "Common Collateral" securing the Senior Secured Notes.  *See* Ren. Decl., Ex. F.  Further, section 4.1 of the 2021 Intercreditor Agreement (titled "Application of Proceeds") provides that proceeds of collateral, inclusive of the Notes Priority Collateral and the ABL Facility Priority Collateral, shall be applied to the Senior Secured Notes only after discharge of the Usurping Notes.  *Id.*  These changes would effectively amend section 4.1(a) of the 2019 Intercreditor Agreement by subordinating the Senior Secured Notes to the Usurping Notes with respect to the proceeds of Collateral.

### d.  The Original Indenture's Unanimous Consent Requirement

25.     Article 9 of the Original Indenture describes the varying levels of consent required to amend documents relevant to the Senior Secured Notes, including the Original Indenture and the 2019 Intercreditor Agreement.  *See* Ren. Decl., Ex. A.  Certain amendments can be made without consent, while other amendments require consent from a majority of holders, from a supermajority of holders, or from ***each*** Senior Noteholder affected thereby.  *Id.* Those amendments that require unanimous consent are commonly referred to as "sacred rights."

26.     Section 9.02(d) of the Original Indenture identifies ten such sacred rights—each of which concerns Senior Noteholders' rights to or priority of payment—in which a change is prohibited absent the consent of "each Holder affected thereby."  *See* Ren. Decl., Ex. A.

27.     As is relevant here, section 9.02(d)(10) of the Original Indenture provides:

> [W]ithout the consent of each Holder affected thereby, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any [Senior Secured] Notes held by a non-consenting Holder):
> . . .
>
> (10) make any change in the provisions in the [2019 Intercreditor Agreement] or this Indenture dealing with the application of

proceeds of Collateral that would adversely affect the Holders.

*Id.*

28.     TPC did ***not*** obtain the consent of all Senior Noteholders before issuing the 2021 Transaction Documents or the Usurping Notes.  Ren. Decl. ¶ 9.  Rather, TPC only sought and obtained consents from certain majority holders of the Senior Secured Notes (the "Ad Hoc Group of Cross-Holders"), the members of which now hold a majority of the Senior Secured Notes and the Usurping Notes.

### e.  The Original Indenture's Requirement that Consents Be Obtained from Registered Holders

29.     Further, where consent is required, section 9.02 of the Original Indenture requires the consent of "Holders."  *See* Ren. Decl., Ex. A.  "Holder" is defined by the Original Indenture as the registered holder, *i.e.*, a "Person in whose name a Note is registered in the register maintained by the Registrar."  Ren. Decl., Ex. A § 1.01.  On information and belief, the Holder is Cede & Co., as nominee for the Depository Trust Company.

30.     In connection with issuance of the 2021 Transaction Documents and the Usurping Notes, TPC obtained consents on form letters which stated, ███████████████

███████████████████████████████████████████████

███████████████████████████████████████ Ren.

Decl., Ex. G.  Each signatory of such letters then purported to consent, ████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████ Ren. Decl., Ex. G.  These

letters did not purport to reflect the consent of registered holders of the Senior Secured Notes, and did not reflect any proxy or authorization from the registered holders to consent.

### f.  Notice of Breaches to TPC

31.     On March 31, 2022, counsel for the Ad Hoc Group of Non-Consenting Noteholders sent a notice letter to counsel for TPC asserting violations of section 9.02(d)(10) of the Original Indenture.  Ren. Decl., Ex. H.

32.     Thereafter, TPC, acting through its counsel, denied that TPC breached 9.02(d)(10) of the Original Indenture.

33.     On April 26, 2022 counsel for the Ad Hoc Group of Non-Consenting Noteholders sent a letter to the indenture trustee for the Senior Secured Notes (the "Trustee") describing the breaches and requesting that the Trustee not take instruction from the Usurping Noteholders. Ren. Decl. Ex. I.

### g.  Bankruptcy Filing

34.     TPC, along with certain affiliated debtors-in-possession, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court on June 1, 2022.  In connection therewith, TPC filed its *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 36] (the "DIP Motion"), purporting to allow $238 million of Usurping Notes to be rolled-up in to a $323 million debtor-in-possession financing.  TPC chose the proposed DIP package (the "Cross-Holder DIP Proposal") over a competing offer for DIP financing offered by the Ad Hoc Group of Non-Consenting Noteholders (the "Minority Holders DIP Proposal"), which competing offer does not include a roll-up.  On information and belief, TPC chose the

Cross-Holder DIP Proposal over the Minority Holders DIP Proposal based in part on the

mistaken belief that the Usurping Notes were senior to the Senior Notes.

35.     As set forth in the Ad Hoc Group of Non-Consenting Noteholders' objection to

the DIP Motion, if the Usurping Notes are in fact junior to the Senior Secured Notes held by the

Ad Hoc Group of Non-Consenting Noteholders, then the roll-up feature of the Cross-Holder DIP

Proposal is particularly egregious, because the Usurping Notes would leapfrog the Ad Hoc

Group's Senior Secured Notes in priority, causing massive dilution to their recoveries.  For this

reason, the Ad Hoc Group of Non-Consenting Noteholders is seeking resolution of this Motion

on an expedited basis, in advance of a decision on the permissibility of the proposed roll-up.

### h.  Complaint for Declaratory Judgment

36.     On June 1, 2022, the Ad Hoc Group of Non-Consenting Noteholders filed the

Complaint.

37.     In Count I, the Complaint asserts a cause of action for declaratory judgment,

seeking an order declaring that (i) TPC has breached section 9.02(d)(10) of the Original

Indenture, (ii) the Supplemental Indenture and the 2021 Intercreditor Agreement are of no force

and effect with respect to the Senior Secured Notes held by members of the Ad Hoc Group of

Non-Consenting Noteholders, to the extent those documents, if given effect, would change the

application of proceeds of Collateral under the Original Indenture and the 2019 Intercreditor

Agreement in a manner adversely affecting Senior Noteholders, and (iii) the application of

proceeds of Collateral securing the Senior Secured Notes held by members of the Ad Hoc Group

of Non-Consenting Noteholders, including the relative priority of the Senior Secured Notes and

the Usurping Notes, is to be determined solely by the Original Indenture and the 2019

Intercreditor Agreement.  Complaint ¶ 55.

38.     In Count II, the Complaint asserts a cause of action for declaratory judgment, seeking an order declaring that (i) the consents TPC obtained in connection with issuance of the 2021 Transaction Documents and the Usurping Notes are invalid because they were not obtained from the registered holders of the Senior Secured Notes, (ii) the purported changes to the Original Indenture and the 2019 Intercreditor Agreement with respect to the relative priority of the Senior Secured Notes caused by the 2021 Transaction Documents, and any other purported changes to the Original Indenture and the 2019 Intercreditor Agreement that required consent of some or all Holders, were invalid pursuant to section 9.02 of the Original Indenture, and (iii) the purported changes to the Original Indenture and the 2019 Intercreditor Agreement, with respect to the relative priority of the Senior Secured Notes caused by the 2021 Transaction Documents, and any other purported changes to the Original Indenture and the 2019 Intercreditor Agreement that required consent of some or all Holders pursuant to section 9.02 of the Original Indenture, are of no force and effect with respect to the Senior Secured Notes held by members of the Ad Hoc Group of Non-Consenting Noteholders.  Complaint ¶ 63.

## APPLICABLE LEGAL STANDARD

39.     Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once a movant demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law, the non-movant has the burden of demonstrating the existence of a material factual issue requiring trial.  *See Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The non-movant must provide more than a "scintilla of

evidence" and establish more than "some metaphysical doubt as to the material facts." *Delaware & Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (citations and internal quotations omitted).

## ARGUMENT

**I.**    **TPC BREACHED SECTION 9.02(d)(10) OF THE ORIGINAL INDENTURE BY NOT OBTAINING THE CONSENT OF EACH SENIOR NOTEHOLDER BEFORE CHANGING THE APPLICATION OF PROCEEDS OF COLLATERAL.**

40.    In construing a contract, "a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (citing *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).  Further, where the language of a contract is unambiguous, a court may construe it as a matter of law and grant summary judgment accordingly.  *See id.*  "The mere assertion of an ambiguity does not suffice to make an issue of fact."  *Id.*

41.    The meaning of section 9.02(d)(10) of the Original Indenture is unambiguous. Before TPC can "make ***any*** change in the provisions in the [2019 Intercreditor Agreement] or this [Original Indenture] ***dealing with the application of the proceeds of Collateral*** that would adversely affect" the Senior Noteholders, it first must obtain the "***consent of each Holder affected thereby***."  *See* Ren. Decl., Ex. A (emphasis added).

42.    In other words, TPC must obtain the consent of each affected Senior Noteholder if TPC (i) makes any change, (ii) in any provision of the Original Indenture or the 2019 Intercreditor Agreement that deals with the application of proceeds of Collateral, (iii) where such change, if given effect, would adversely affect the Senior Noteholders.  *Id.*  TPC's actions indisputably covered each of these elements.

**(i)**    ***Any Change***

43.    First, the Supplemental Indenture changed provisions in the Original Indenture, including as discussed herein.  *See* Ren. Decl., Ex. E (Redline of Supplemental Indenture Against the Original Indenture).

44.    In addition, as detailed herein, the 2021 Intercreditor Agreement was effectively an amendment to the 2019 Intercreditor Agreement because it subverted the waterfall in the 2019 Intercreditor Agreement to the waterfall in the 2021 Intercreditor Agreement.

**(ii)**    ***The Changes Are to Provisions of the Original Indenture and the 2019 Intercreditor Agreement that Deal with the Application of Proceeds of Collateral***

45.    Second, there can be no reasonable dispute that the provisions that were amended "deal[] with the application of the proceeds of Collateral."

46.    It is difficult to conceive of a provision of the Original Indenture that deals more directly with the application of the proceeds of Collateral than section 12.01(c).  Article 12 is titled "Collateral and Security," and the effect of section 12.01(c) is to bind the parties to the 2019 Intercreditor Agreement, the purpose of which, in turn, is to establish the order of priority with respect to the application of proceeds of Collateral.  Through the Supplemental Indenture, the collateral agent and trustee purportedly became bound by the 2021 Intercreditor Agreement, which TPC acknowledges deals with the application of proceeds of collateral.  *See* Del Genio Decl. ¶ 39.  Indeed, the 2021 Intercreditor Agreement dramatically changes the priority of the Senior Secured Notes with respect to the application of the proceeds of Collateral.  Ren. Decl., Ex. D.

47.    The Permitted Liens definition also plainly deals with the application of the proceeds of Collateral.  Under the Original Indenture, any liens securing debt issued under

section 4.07(b)(1) are required to be "subject to the provisions of" the 2019 Intercreditor

Agreement.  *See* Ren. Decl., Ex. A.  Pursuant to the 2019 Intercreditor Agreement, any parties

with an entitlement to payment out of the proceeds of the Notes Priority Collateral or the ABL

Facility Priority Collateral get paid only after payment of the Senior Secured Notes and the ABL

Lenders.  The Supplemental Indenture purports to amend the definition of "Permitted Liens" in

the Original Indenture to exempt the Usurping Notes from the requirement that liens securing

those Usurping Notes be subject to the 2019 Intercreditor Agreement to the extent the liens

secure indebtedness incurred under section 4.07(b)(1) of the Original Indenture.  Ren. Decl., Ex.

D § 1.01.

48.     In addition, as described above, sections 2.1 and 4.1 of the 2021 Intercreditor

Agreement operate to purportedly subordinate the Senior Secured Notes to the Usurping Notes

with respect to the proceeds of Collateral.  *See* Ren. Decl., Ex. F.  Thus, the issuance of the 2021

Intercreditor Agreement, if given effect, would have the effect of amending the waterfall scheme

prescribed in section 4.1(a) of the 2019 Intercreditor Agreement.  TPC cannot be allowed to

achieve indirectly, through issuance of the 2021 Intercreditor Agreement, what it could not

achieve directly through purported amendment of the 2019 Intercreditor Agreement.

49.     Each of the aforementioned provisions deals with the application of the proceeds

of Collateral.

**(iii)    *The Changes Adversely Affect the Senior Noteholders***

50.     Finally, the above-described changes to the application of proceeds of Collateral,

if given effect, would clearly "adversely affect" the Senior Noteholders.

51.     Merriam-Webster defines "adverse" to mean "acting against or in a contrary

direction," "opposed to one's interests," and "causing harm."  *Adverse*, *Merriam-Webster.com*

*Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/adverse.  The above-described changes easily meet these definitions.

52.    The change to section 12.01(c) of the Original Indenture, if given effect, would cause the Senior Secured Noteholders to be subject to the waterfall scheme set forth in the 2021 Intercreditor Agreement.  It cannot be reasonably disputed that subordinating the Senior Secured Notes to approximately $205 million in face amount of Usurping Notes, plus interest, fees, and any applicable premiums, adversely affects the Senior Secured Noteholders who did not consent to the issuance of the Usurping Notes.

53.    Similarly, the change to the definition of Permitted Liens allowed a total of more than $164 million in face amount of Usurping Notes to be issued without meeting the requirement in the Original Indenture that it be subject to the 2019 Intercreditor Agreement, thereby priming the Senior Noteholders.  And the issuance of the 2021 Intercreditor Agreement harms the Senior Noteholders by purportedly subordinating the Senior Secured Notes to the Usurping Notes.

54.    Thus, the issuance of the Supplemental Indenture, with its purported amendments to section 12.01(c) and the definition of Permitted Liens, and the issuance of the 2021 Intercreditor Agreement, clearly violated section 9.02(d)(10) to the extent that these changes were not made with the consent of all affected Senior Noteholders.

55.    A recent New York decision involved interpreting a credit agreement with language similar to section 9.02(d)(10) the Original Indenture here, and strongly supports the plain language interpretation discussed herein.  *See Audax Credit Opportunities Offshore v. Tmk Hawk Parent*, 150 N.Y.S.3d 894, at *34-35 (Sup. Ct. 2021) ("*TriMark*").

56.    In *TriMark*, an amendment to a credit agreement effectively subordinated

plaintiffs, a group of first lien lenders, without their consent, to the interests of defendants,

another group of first lien lenders. *Id.* at *2. The defendants worked with the borrower,

TriMark, to swap defendants' first lien loans for a new category of "super senior" debt that,

pursuant to the amended credit agreement, was to be repaid in full before the remaining first lien

loans. *Id.* at *2-3.

57.    The credit agreement stated in relevant part:

> "[N]o such agreement shall . . . without the written **consent of each Lender
> directly and adversely affected thereby**: . . . (D) waive, amend, or modify . . .
> (ii) Section 4.02 of the [collateral agreement] in a manner that would **by its terms
> alter the order of application of proceeds**; . . ."

*Id.* at *31-32.

(quoting section 9.02(b)(i)(D) of the credit agreement) (emphasis added).

58.    Section 4.02 of the collateral agreement, in turn, established a waterfall among

three separate constituents to the credit arrangement, providing that the proceeds of Collateral

were to be applied to the constituents in a prescribed order "subject to the terms of the

Intercreditor Agreements." *Id.* at *32. Although no amendments were made to section 4.02, the

definition of "Intercreditor Agreements" in the credit agreement was changed to include the

intercreditor agreement issued with the new super-priority tranche of debt, and that modified

definition was expressly incorporated into the amended collateral agreement. *Id.* at *32. Thus,

although the order of application of Collateral in section 4.02 of the collateral agreement was not

changed on its face, the revision of the definition of "Intercreditor Agreements" and

incorporation of that definition into the collateral agreement had the impact of subordinating the

plaintiffs' liens to the defendants' new super-priority liens. *Id.* at *32-33.

59.    Plaintiffs brought an action seeking, *inter alia*, a declaratory judgment that the

failure to obtain plaintiffs' consent before consummating the transaction breached the original

credit agreement. *Id.* at *4. Defendants moved to dismiss arguing, among other grounds, that plaintiffs' consent was not required. *Id.*

60.     In assessing whether the plaintiffs' consent was required, the court concluded that plaintiffs stated a claim for declaratory judgment because section 9.02(b)(i)(D) of the credit agreement could reasonably be read to "prohibit defendants from placing any tranche of debt above plaintiffs' place in the waterfall . . . ." *Id.* at *33 (cleaned up).

61.     The amendments of the Original Indenture described herein were substantially more egregious than those at issue in *TriMark*.  In *TriMark*, no amendments were made to the text of the specific, narrow provisions covered by the unanimous consent requirement.  The court there nevertheless found that plaintiffs had stated a claim that amendments to other provisions had the effect of ***indirectly*** amending the provisions listed in the unanimous consent provision. Here, by contrast, the Original Indenture broadly prohibited ***any adverse amendments*** to ***any section*** of the Original Indenture that merely ***dealt with*** the application of proceeds of Collateral. TPC thus purported to ***directly*** amend provisions that were covered by the Original Indenture's unanimous consent provision, in plain breach of section 9.02(d)(10).

62.     The relevant provisions of the Original Indenture are unambiguous, and their interpretation is purely a question of law for the Court.  Moreover, there is no genuine disputed issue of material fact as to TPC's issuance of the Usurping Notes, the Supplemental Indenture or the 2021 Intercreditor Agreement.  To the contrary, the Ad Hoc Group of Non-Consenting Noteholders believes all facts here are undisputed.  Accordingly, no discovery is needed; this Court should enter judgment in favor of the Ad Hoc Group of Non-Consenting Noteholders as a matter of law.

## II.    TPC BREACHED SECTION 9.02 OF THE ORIGINAL INDENTURE BY FAILING TO OBTAIN *ANY* VALID CONSENTS BEFORE AMENDING THE ORIGINAL INDENTURE AND THE 2019 INTERCREDITOR AGREEMENT

63.     Where the consent of Senior Noteholders is required, section 9.02 of the Original Indenture requires that TPC obtain the consent of "Holders."  *See* Ren. Decl., Ex. A.  "Holder" is defined by the Original Indenture as a "Person in whose name a Note is registered in the register maintained by the Registrar."  Ren. Decl., Ex. A § 1.01.

64.     Thus, consent to transactions under section 9.02 must be obtained from the registered holder of a Senior Secured Note.  The consent of beneficial holders of the Senior Secured Notes is not sufficient.

65.     Notwithstanding this requirement, TPC did not obtain consents of the registered holders of the Senior Secured Notes beneficially held by members of the Ad Hoc Group of Cross-Holders.  Ren. Decl. ¶ 4.  Instead, as explained above, TPC obtained "consents" only from beneficial holders of the Senior Secured Notes, without any proxy or authorization from the registered holders.  *Id.*  Accordingly, the consents TPC obtained were not valid, and the above-described purported changes to the application of the proceeds of Collateral, and any other purported amendments requiring consent of the Holders, were invalid pursuant to section 9.02 of the Original Indenture and are ineffective as to Minority Noteholders.

66.     The Original Indenture unambiguously requires that, where consent is needed, it must be obtained from the registered noteholders.  There is no genuine dispute that TPC failed to obtain consents from registered Senior Noteholders; consequently, no discovery is needed, and this Court should find in favor of the Ad Hoc Group of Non-Consenting Noteholders as a matter of law.

## **<u>CONCLUSION</u>**

WHEREFORE, the Ad Hoc Group of Non-Consenting Noteholders respectfully request that this Court grant this Motion and enter an order granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:  June 2, 2022            **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

- and -

**MILBANK LLP**

Gerard Uzzi (*pro hac vice* pending)
Nelly Almeida (*pro hac vice* pending)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: guzzi@milbank.com
        nalmeida@milbank.com

Aaron L. Renenger (*pro hac vice* pending)
John P. Estep (*pro hac vice* pending)
1850 K Street NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586
Email: arenenger@milbank.com
        jestep@milbank.com

*Counsel for the Ad Hoc Group of*
*Non-Consenting Noteholders*