# EXHIBIT C

**10.875% Senior Secured Notes Indenture**

**Execution Version**

---

**TPC Group Inc.**

10.875% Senior Secured Notes due 2024

INDENTURE

Dated as of February 2, 2021

U.S. Bank National Association

Trustee & Collateral Agent

---

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ................................. 1

Section 1.01    Definitions.................................................................................... 1
Section 1.02    Other Definitions ...................................................................... 36
Section 1.03    Incorporation by Reference of Trust Indenture Act.................. 37
Section 1.04    Rules of Construction ............................................................... 37
Section 1.05    Divisions ................................................................................... 37

ARTICLE 2 THE NOTES ........................................................................................ 38

Section 2.01    Form and Dating ...................................................................... 38
Section 2.02    Execution and Authentication................................................... 39
Section 2.03    Registrar and Paying Agent ..................................................... 39
Section 2.04    Paying Agent to Hold Money in Trust...................................... 40
Section 2.05    Holder Lists............................................................................... 40
Section 2.06    Transfer and Exchange ............................................................. 40
Section 2.07    Replacement Notes ................................................................... 52
Section 2.08    Outstanding Notes .................................................................... 52
Section 2.09    Treasury Notes .......................................................................... 53
Section 2.10    Temporary Notes ...................................................................... 53
Section 2.11    Cancellation .............................................................................. 53
Section 2.12    Defaulted Interest ..................................................................... 53
Section 2.13    CUSIP Numbers........................................................................ 54

ARTICLE 3 REDEMPTION AND PREPAYMENT.................................................... 54

Section 3.01    Notices to Trustee .................................................................... 54
Section 3.02    Selection of Notes to Be Redeemed.......................................... 54
Section 3.03    Notice of Redemption ............................................................... 55
Section 3.04    Effect of Notice of Redemption................................................. 56
Section 3.05    Deposit of Redemption Price .................................................... 56
Section 3.06    Notes Redeemed in Part ........................................................... 56
Section 3.07    Optional Redemption ................................................................ 57
Section 3.08    Mandatory Redemption ............................................................ 58
Section 3.09    Calculation of Redemption Price .............................................. 58

ARTICLE 4 COVENANTS ....................................................................................... 58

Section 4.01    Payment of Notes ..................................................................... 58
Section 4.02    Maintenance of Office or Agency.............................................. 58
Section 4.03    Reports ...................................................................................... 59
Section 4.04    Compliance Certificate ............................................................. 62
Section 4.05    Restricted Payments.................................................................. 62
Section 4.06    Dividend and Other Payment Restrictions Affecting Subsidiaries........... 66
Section 4.07    Incurrence of Indebtedness and Issuance of Preferred Equity................. 68
Section 4.08    Asset Sales; Casualty Events ................................................... 74
Section 4.09    Transactions with Affiliates...................................................... 78

Section 4.10    Liens...................................................................................................... 80
Section 4.11    Claims Settlements and Payments. .................................................... 80
Section 4.12    Offer to Repurchase Upon Change of Control ......................................... 81
Section 4.13    [Reserved].............................................................................................. 83
Section 4.14    Additional Note Guarantees................................................................ 83
Section 4.15    Unrestricted Subsidiary........................................................................ 84
Section 4.16    Changes in Covenants upon Notes being Rated Investment Grade.......... 84
Section 4.17    Further Assurances, Instruments and Acts.............................................. 84
Section 4.18    Real Property ........................................................................................ 85
Section 4.19    Post-Closing Matters........................................................................... 85
Section 4.20    [Reserved].............................................................................................. 86
Section 4.21    Business of Holdings ........................................................................... 86
Section 4.22    Limited Condition Transactions; Measuring Compliance....................... 86

ARTICLE 5 SUCCESSORS .......................................................................................... 88

Section 5.01    Consolidation, Amalgamation, Merger, or Sale of Assets...................... 88
Section 5.02    Successor Substituted........................................................................... 90
Section 5.03    Evidence to Be Given to Trustee .......................................................... 90

ARTICLE 6 DEFAULTS AND REMEDIES..................................................................... 90

Section 6.01    Events of Default and Remedies............................................................ 90
Section 6.02    Acceleration ......................................................................................... 93
Section 6.03    Other Remedies .................................................................................... 95
Section 6.04    Waiver of Past Defaults ........................................................................ 95
Section 6.05    Control by Majority .............................................................................. 95
Section 6.06    Limitation on Suits................................................................................ 95
Section 6.07    Rights of Holders to Receive Payment ................................................. 96
Section 6.08    Collection Suit by Trustee .................................................................... 96
Section 6.09    Trustee or Collateral Agent May File Proofs of Claim........................... 96
Section 6.10    Priorities............................................................................................... 97
Section 6.11    Undertaking for Costs ........................................................................... 97

ARTICLE 7 TRUSTEE ................................................................................................... 97

Section 7.01    Duties of Trustee.................................................................................. 97
Section 7.02    Rights of Trustee................................................................................... 98
Section 7.03    Individual Rights of Trustee ............................................................... 100
Section 7.04    Trustee's Disclaimer ........................................................................... 100
Section 7.05    Notice of Defaults ............................................................................... 101
Section 7.06    [Reserved]............................................................................................ 101
Section 7.07    Compensation and Indemnity .............................................................. 101
Section 7.08    Replacement of Trustee. ...................................................................... 102
Section 7.09    Successor Trustee by Merger, etc. ....................................................... 103
Section 7.10    Eligibility; Disqualification ................................................................ 103

ARTICLE 8 LEGAL DEFEASANCE AND COVENANT DEFEASANCE........................... 103

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance................. 103
Section 8.02    Legal Defeasance and Discharge ......................................................... 103

Section 8.03    Covenant Defeasance............................................................................ 104
Section 8.04    Conditions to Legal or Covenant Defeasance....................................... 105
Section 8.05    Deposited Money to be Held in Trust; Other Miscellaneous
                Provisions........................................................................................... 106
Section 8.06    Repayment to the Issuer...................................................................... 107
Section 8.07    Reinstatement..................................................................................... 107

ARTICLE 9 AMENDMENT, SUPPLEMENT AND WAIVER ............................................. 107

Section 9.01    Without Consent of Holders ............................................................... 107
Section 9.02    With Consent of Holders .................................................................... 108
Section 9.03    Intentionally Omitted ......................................................................... 110
Section 9.04    Revocation and Effect of Consents..................................................... 110
Section 9.05    Notation on or Exchange of Notes...................................................... 111
Section 9.06    Trustee to Sign Amendments, etc. ...................................................... 111

ARTICLE 10 NOTE GUARANTEES .............................................................................. 111

Section 10.01   Guarantee ........................................................................................... 111
Section 10.02   Limitation on Guarantor Liability....................................................... 112
Section 10.03   Intentionally Omitted ......................................................................... 113
Section 10.04   Guarantors May Consolidate, etc., on Certain Terms.......................... 113
Section 10.05   Releases.............................................................................................. 114

ARTICLE 11 SATISFACTION AND DISCHARGE.............................................................. 114

Section 11.01   Satisfaction and Discharge.................................................................. 114
Section 11.02   Application of Trust Money................................................................ 115

ARTICLE 12 COLLATERAL AND SECURITY ................................................................. 116

Section 12.01   Security Documents; Additional Collateral; Intercreditor Agreement ... 116
Section 12.02   Intentionally Omitted ......................................................................... 117
Section 12.03   Release of Collateral .......................................................................... 117
Section 12.04   Form and Sufficiency of Release ........................................................ 118
Section 12.05   Possession and Use of Collateral ........................................................ 118
Section 12.06   Intentionally Omitted ......................................................................... 118
Section 12.07   Collateral Agent ................................................................................. 118
Section 12.08   Purchaser Protected............................................................................ 124
Section 12.09   Authorization of Actions to Be Taken by the Collateral Agent Under
                the Security Documents ...................................................................... 124
Section 12.10   Authorization of Receipt of Funds by the Trustee Under the Security
                Agreement........................................................................................... 124
Section 12.11   Powers Exercisable by Receiver or Collateral Agent ........................... 124
Section 12.12   Compensation and Indemnification ..................................................... 125

ARTICLE 13 [Reserved] .............................................................................................. 125

ARTICLE 14 MISCELLANEOUS ................................................................................... 125

Section 14.01   Intentionally Omitted ......................................................................... 125
Section 14.02   Notices ............................................................................................... 125
Section 14.03   [Reserved] .......................................................................................... 127

Section 14.04  Certificate and Opinion as to Conditions Precedent ............................... 127
Section 14.05  Statements Required in Certificate or Opinion ...................................... 127
Section 14.06  Rules by Trustee and Agents ............................................................... 127
Section 14.07  No Personal Liability of Directors, Officers, Employees and Stockholders ...................................................................................... 128
Section 14.08  Governing Law .................................................................................. 128
Section 14.09  Successors ........................................................................................ 128
Section 14.10  Severability ....................................................................................... 129
Section 14.11  Counterpart Originals.......................................................................... 129
Section 14.12  Table of Contents, Headings, etc. ........................................................ 129
Section 14.13  Waiver of Immunity ............................................................................ 129
Section 14.14  Waiver of Jury Trial............................................................................ 130
Section 14.15  U.S.A. Patriot Act ............................................................................. 130

EXHIBITS

Exhibit A1      Form of 144A Note
Exhibit A2      Form of Regulation S Global Note
Exhibit B       Form of Certificate of Transfer
Exhibit C       Form of Certificate of Exchange
Exhibit D       Form of Supplemental Indenture

INDENTURE dated as of February 2, 2021 among TPC Group Inc., a Delaware corporation (the "*Issuer*"), the Guarantors (as defined herein) and U.S. Bank National Association, a national banking association, as Trustee and Collateral Agent.

The Issuer, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined herein) of (a) the $153,000,000 aggregate principal amount of the Issuer's 10.875% Senior Secured Notes due 2024 issued on the date hereof (the "*Initial Notes*") and (b) any Additional Notes (as defined herein) that may be issued after the date hereof (all such securities in clauses (a) and (b) being referred to collectively as the "*Notes*"):

ARTICLE 1

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    <u>Definitions</u>.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A1 hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*ABL Facility Collateral Agent*" means the collateral agent under the Credit Agreement, which, on the Issue Date, was Bank of America, N.A., or if the Credit Agreement is no longer outstanding, the "Successor ABL Facility Collateral Agent".

"*ABL Facility Priority Collateral*" has the meaning ascribed to such term in the ABL Intercreditor Agreement.

"*ABL Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of August 2, 2019, by and among the Issuer, the other grantors party thereto, the ABL Facility Collateral Agent, the Existing Notes Collateral Agent and the Collateral Agent, as amended, modified, restated, supplemented or replaced from time to time.

"*ABL Liens*" means all Liens in favor of the ABL Facility Collateral Agent on Collateral securing the ABL Obligations.

"*ABL Obligations*" means (i) the Indebtedness under the Credit Agreement and other Obligations under the Credit Agreement incurred under Section 4.07(b)(1), including any interest, fees, expenses or indemnification obligations related thereto and (ii) certain Bank Products obligations owed to an agent, an arranger or a lender or an affiliate of an agent, an arranger or a lender under the Credit Agreement (or who was such a person at the time of the incurrence thereof) which are Secured Bank Product Obligations (as defined in the Credit Agreement).

"*ABL Security Documents*" means one or more security agreements, pledges, mortgages, deeds of trust, pledge agreements, collateral assignments, trust deeds or other security

documents or instruments evidencing or creating or purporting to create any security interests in favor of the ABL Facility Collateral Agent under the Credit Agreement.

"*Acquired Debt*" means, with respect to any specified Person:

(1)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Assets*" means:

(1)    capital expenditures by the Issuer or a Restricted Subsidiary of the Issuer in a Permitted Business;

(2)    the Capital Stock of a Person that becomes a Restricted Subsidiary of the Issuer as a result of the acquisition of such Capital Stock by the Issuer or another Restricted Subsidiary of the Issuer; <u>provided</u>, that such Person becomes a Guarantor promptly upon such acquisition; or

(3)    Capital Stock constituting a Minority Interest in any Person that at such time is a Restricted Subsidiary of the Issuer.

*provided*, *however*, that, in the case of clauses (2) and (3), such Subsidiary is primarily engaged in a Permitted Business.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.02, 4.07, and 4.10 hereof, as part of the same series as the Initial Notes, whether or not they bear the same "CUSIP" number.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

"*Agent*" means any Registrar, co–registrar, Paying Agent or other agent appointed hereunder.

"*Applicable Premium*" means, with respect to any Note on any redemption date:

(A) occurring prior to August 2, 2022, the greater of:

2

(1)      1.0% of the principal amount of the Note; and

(2)      the excess of: (a) the present value at such redemption date of (i) the redemption price of the Note at August 2, 2022, (such redemption price being set forth in clause (B) below) *plus* (ii) all required interest payments due on the Note through August 2, 2022 (excluding accrued but unpaid interest to the applicable redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; <u>over</u> (b) the principal amount of the Note;

(B)      occurring on or after August 2, 2022 but prior to February 2, 2023, 8.1563% of the principal amount of the Note; and

(C)      occurring on or after February 2, 2023 but prior to August 2, 2023, 4.0781% of the principal amount of the Note.

The Issuer will calculate, or cause to be calculated, the Applicable Premium and deliver it and the calculation thereof to the Trustee in reasonable detail.

"*Applicable Premium Event*" means (a) any voluntary or mandatory redemption of the Notes of all, or any part, of the principal balance of any Notes whether before or after (i) the occurrence of a Default or an Event of Default or (ii) the commencement of any proceeding under any debtor relief law and notwithstanding any acceleration (for any reason) of the Notes; (b) the acceleration of all of the Notes for any reason, including, but not limited to, acceleration following or pursuant to an Event of Default, including as a result of the commencement of a proceeding under any debtor relief law; (c) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Notes in any proceeding under any debtor relief law, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any proceeding under any debtor relief law to the holders (whether directly or indirectly, including through the Trustee or any other distribution agent), in full or partial satisfaction of the Notes; and (d) the termination of the Indenture for any reason (other than as a result of the payment in full in cash of the principal of the Notes and accrued and unpaid interest thereon at stated maturity of the Notes in a manner in accordance with this Indenture).

If an Applicable Premium Event occurs under clause (b), (c) or (d) above, the entire outstanding shall be deemed to be subject to the Applicable Premium Event on the date on which such Applicable Premium Event occurs.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary that apply to such transfer or exchange.

"*Asset Acquisition*" means:

(1)      an Investment by the Issuer or any Restricted Subsidiary of the Issuer in any other Person pursuant to which such Person shall become a Restricted Subsidiary of

the Issuer or any Restricted Subsidiary of the Issuer, or shall be merged with or into or consolidated with the Issuer or any Restricted Subsidiary of the Issuer; or

(2)      the acquisition by the Issuer or any Restricted Subsidiary of the Issuer of the assets of any Person (other than a Restricted Subsidiary of the Issuer) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"*Asset Sale*" means:

(1)      the sale, lease, conveyance or other disposition of any assets or rights of the Issuer and its Subsidiaries (including by way of a division or a Sale/Leaseback Transaction); *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Issuer and its Subsidiaries taken as a whole will be governed by Section 4.12 hereof and/or Section 5.01 hereof and not by Section 4.08 hereof; and

(2)      the issuance or sale of Equity Interests in any of the Issuer's Subsidiaries (other than preferred stock of Subsidiaries issued in compliance with Section 4.07 and directors' qualifying shares or shares required by applicable law to be held by a Person other than the Issuer or a Subsidiary).

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)      any single transaction or series of related transactions that involves assets or Equity Interests of any Restricted Subsidiary of the Issuer having a Fair Market Value of less than $3.0 million;

(2)      a transfer of assets between or among the Issuer and any Restricted Subsidiary of the Issuer that is a Guarantor;

(3)      an issuance or sale of Equity Interests by a Restricted Subsidiary of the Issuer to the Issuer or to another Restricted Subsidiary of the Issuer that is a Guarantor;

(4)      the sale or lease of inventory, products or services or the lease, assignment or sub−lease of any real or personal property, in each case, in the ordinary course of business;

(5)      the sale or discounting of accounts receivable in the ordinary course of business;

(6)      any sale or other disposition of damaged, worn−out, obsolete or no longer useful assets or properties;

(7)      any sale of assets received by the Issuer or any of its Restricted Subsidiaries upon the foreclosure, condemnation or similar action on a Lien;

(8)      the sale or other disposition of cash or Cash Equivalents;

(9)      [reserved];

(10)     [reserved];

(11)     a Restricted Payment that does not violate Section 4.05 hereof or a Permitted Investment;

(12)     [reserved];

(13)     the granting of Liens not otherwise prohibited by this Indenture;

(14)     the surrender, or waiver of contract rights, leases or settlement, release or surrender of contract, tort or other claims;

(15)     the grant in the ordinary course of business of any license of patents, trademarks, know−how and any other intellectual property;

(16)     the early termination or unwinding of any Hedging Obligations;

(17)     sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements or similar binding arrangements;

(18)     the lapse, cancellation or abandonment of intellectual property rights in the ordinary course of business, which in the reasonable good faith determination of the Issuer are not material to the conduct of the business of the Issuer and the Restricted Subsidiaries taken as a whole; and

(19)     the sale of any property in a Sale/Leaseback Transaction within six months of the acquisition of such property;

For the avoidance of doubt, (I) any disposition of (x) Excluded Pipelines, (y) the real property upon which Excluded Pipelines disposed of pursuant to subclause (x) are located or (z) any Unrestricted Subsidiary and (II) receipt of cash or other property by Holdings, the Issuer or any of its Restricted Subsidiaries from any of the Unrestricted Subsidiaries other than in the ordinary course of business shall, in each case, constitute an Asset Sale.

In the event that a transaction (or any portion thereof) meets the criteria of a permitted Asset Sale and would also be a permitted Restricted Payment or Permitted Investment, the Issuer, in its sole discretion, will be entitled to divide and classify such transaction (or any portion thereof) as an Asset Sale and/or one or more of the types of permitted Restricted Payments or Permitted Investments.

"*Bank Products*" means any of the following products, services or facilities extended to the Issuer or any Subsidiary of the Issuer: (a) Cash Management Services; (b)

products under Interest Rate Agreements, Currency Agreements or Commodity Agreements; (c) commercial credit card and merchant card services; and (d) other banking products or services as may be requested by the Issuer or any Subsidiary of the Issuer, other than loans or letters of credit.

"*Bankruptcy Law*" means Title 11, United States Bankruptcy Code of 1978, as amended, or any similar U.S. federal or state law relating to bankruptcy, insolvency, receivership, winding−up, liquidation, reorganization or relief of debtors or any amendment to, succession to or change in any such law.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d−3 and Rule 13d−5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Board of Directors*" means:

(1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(3)     with respect to a limited liability company, the board of directors or other governing body, and in the absence of the same, the manager or board of managers or the managing member or members or any controlling committee thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which a place of payment is closed or on which banking institutions are authorized or required by law to close in New York State.

"*Capital Lease Obligation*" means, at the time any determination is to be made, the amount of the liability in respect of a lease that would at that time be required to be capitalized on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; *provided* that any obligations of the Issuer or its Restricted Subsidiaries, or of a special purpose or other entity not consolidated with the Issuer and its Restricted Subsidiaries, either existing on the Issue Date or created prior to any recharacterization described below (or any refinancings thereof) (i) that were not included on the consolidated balance sheet of the Issuer as capital lease obligations and (ii) that are subsequently recharacterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Issuer and its Restricted Subsidiaries, due to a change in accounting treatment or otherwise, shall for all purposes not be treated as Capital Lease Obligations or Indebtedness.

6

"*Capital Stock*" means:

(1)      in the case of a corporation, corporate stock;

(2)      in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Cash Equivalents*" means:

(1)      Canadian dollars, Euros, U.S. dollars or such local currencies held by the Issuer and any of its Restricted Subsidiaries from time to time in the ordinary course of business;

(2)      securities issued or directly and fully guaranteed or insured by the government of the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of such government is pledged in support of those securities) having maturities of not more than one year from the date of acquisition;

(3)      certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with any lender party to the Credit Agreement having combined capital and surplus and undivided profits of not less than $500.0 million, whose debt has a rating, at the time as of which any investment made therein is made of at least A−1 by S&P or at least P−1 by Moody's or having capital and surplus in excess of $500.0 million and a Thomson Bank Watch Rating of "B" or better;

(4)      repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)      commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within one year after the date of acquisition;

(6)      securities issued or fully guaranteed by any state or commonwealth of the United States, or by any political subdivision or taxing authority thereof having one of the two highest ratings obtainable from Moody's or S&P, and, in each case, maturing within one year after the date of acquisition;

7

(7)      money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (5) of this definition; and

(8)      Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A−2" from Moody's with maturities of 24 months or less from the date of acquisition.

"*Cash Management Services*" means any services provided from time to time by any lender under the Credit Agreement or any of its affiliates to the Issuer or any Subsidiary of the Issuer in connection with operating, collections, payroll, trust, or other depository or disbursement accounts or similar cash management arrangements, including automated clearinghouse, e-Payables, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

"*Casualty Event*" means any event after the Issue Date with respect to the Collateral that gives rise to the receipt by the Issuer or any of its Subsidiaries of any insurance proceeds (including, without limitation, business interruption insurance) or amounts in respect of any condemnation, eminent domain or similar proceeding relating to any property of the Issuer or any of its Subsidiaries; *provided* that Casualty Event shall not include any Casualty Event related to the Port Neches Incident.

"*Change of Control*" means the occurrence of any of the following:

(1)      the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Issuer and its Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d) of the Exchange Act), other than the Permitted Holders;

(2)      the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" (as defined above), other than the Permitted Holders, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Issuer, measured by voting power rather than number of shares; or

(3)      the Issuer consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, the Issuer, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of the Issuer or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the Voting Stock of the Issuer outstanding immediately prior to such transaction constitutes or is converted into or exchanged for a majority of the outstanding shares of the Voting Stock of such surviving or transferee Person (immediately after giving effect to such transaction).

Notwithstanding the preceding, a conversion of the Issuer or any of its Restricted Subsidiaries from a limited liability company, corporation, limited partnership or other form of entity to a limited liability company, corporation, limited partnership or other form of entity or an exchange of all of the outstanding Capital Stock in one form of entity for Capital Stock for

another form of entity shall not constitute a Change of Control, so long as following such conversion or exchange the "persons" (as that term is used in Section 13(d)(3) of the Exchange Act) who Beneficially Owned the Capital Stock of the Issuer immediately prior to such transactions continue to Beneficially Own in the aggregate more than 50% of the Voting Stock of such entity, or continue to Beneficially Own sufficient Equity Interests in such entity to elect a majority of its directors, managers, trustees or other persons serving in a similar capacity for such entity, and in either case no "person" Beneficially Owns more than 50% of the Voting Stock of such entity.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means all of the assets and properties subject (or purported to be subject) to the Liens created by the Security Documents.

"*Collateral Agent*" means U.S. Bank National Association, acting in its capacity as collateral agent under this Indenture and the Security Documents, or any successor thereto.

"*Commodity Agreements*" means, in respect of any Person, any forward contract, commodity swap agreement, commodity option agreement or other similar agreement or arrangement and designed to protect such Person against fluctuation in commodity prices.

"*Consolidated Adjusted EBITDA*" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period (A) *plus*, without duplication to the extent the same was deducted in calculating Consolidated Net Income:

(1)     provision for taxes based on income, profits or capital, including without limitation federal, state, local and foreign franchise and similar taxes, of such Person and its Restricted Subsidiaries, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; *plus*

(2)     the Fixed Charges of such Person and its Restricted Subsidiaries for such period (including net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, to the extent included in Fixed Charges), to the extent that such Fixed Charges were deducted in computing such Consolidated Net Income; *plus*

(3)     depreciation, amortization (including the amortization of turnaround costs, goodwill and other intangibles, amortization of deferred financing fees, catalyst amortization and any amortization included in pension, OPEB or other employee benefit expenses, but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non−cash expenses (including without limitation write−downs and impairment of property, plant, equipment and intangibles and other long−lived assets (including pursuant to the application of ASC 350 and ASC 360) and the impact of purchase accounting, but excluding any such non−cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization

9

and other non−cash expenses were deducted in computing such Consolidated Net Income; *plus*

(4)     the amount of any restructuring charges (which, for the avoidance of doubt, shall include retention, severance, integration, business optimization, systems establishment cost or excess pension, OPEB, curtailment or other excess charges); *plus*

(5)     the minority expense relating to any partner in a joint venture which is consolidated with the Issuer for accounting purposes and the minority interest expense consisting of subsidiary income attributable to minority equity interests of third parties in any non−Wholly-Owned Restricted Subsidiary in such period or any prior period, except to the extent of dividends declared or paid on Equity Interests held by third parties; *plus*

(6)     [reserved]; *plus*

(7)     accretion of asset retirement obligations in accordance with SFAS No. 143, Accounting for Asset Retirement Obligations, and any similar accounting in prior periods, to the extent that such charges were deducted in computing such Consolidated Net Income; *plus*

(8)     to the extent not otherwise included, the proceeds of any business interruption insurance received during such period; *plus*

(9)     any adjustments that result from timing differences between the purchase of crude C4 in one period and the sale of finished butadiene in a later period, caused by monthly butadiene price changes, to the extent such adjustments are calculated in a manner consistent with the calculation of such adjustments as required under the Existing Notes Indenture; *plus*

(10)     any adjustments related to any impact from supplier plant shut downs, other than in the ordinary course of business; *plus*

(11)     any adjustments related to any impact from turnarounds other than in the ordinary course of business; *minus*

(B) (1) non−cash items increasing such Consolidated Net Income for such period, other than (i) any items which represent the reversal of any accrual of, or cash reserve for, anticipated charges in any prior period where such accrual or reserve is no longer required and (ii) any items which represent the impact of purchase accounting; and (2) the minority interest income consisting of subsidiary losses attributable to the minority equity interests of third parties in any non−Wholly-Owned Restricted Subsidiary.

"*Consolidated Net Income*" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis; *provided* that:

(1)     any net after−tax extraordinary, unusual or nonrecurring gains or losses or income or expense or charge (including, without limitation, income, expenses and

charges from litigation and arbitration settlements, severance, relocation and other restructuring costs), any severance or relocation expense, pre−operating expenses that are expensed and not capitalized, and fees, expenses or charges related to any offering of Equity Interests of such Person, any Investment, acquisition, disposition or incurrence or repayment of Indebtedness or other obligations permitted to be incurred hereunder (in each case, whether or not successful), including all fees, expenses and charges, and any financing charges, including penalty interest and bank charges, related to any Indebtedness or other obligations, in each case, shall be excluded;

(2)     any net after−tax income or loss from disposed, abandoned, transferred, closed or discontinued operations and any net after−tax gain or loss on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(3)     any net after−tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Issuer) shall be excluded;

(4)     any net after−tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness and Hedging Obligations or other derivative instruments shall be excluded;

(5)     (A) the Net Income for such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments in respect of equity that are actually paid in cash (or to the extent converted into cash) by the referent Person to the Issuer or a Restricted Subsidiary thereof in respect of such period and (B) the Net Income for such period shall include any dividend, distribution or other payments in respect of equity paid in cash by such Person to the Issuer or a Restricted Subsidiary thereof in excess of the amount included in clause (A);

(6)     any increase in depreciation or amortization or any one−time non−cash charges (such as purchased in−process research and development or capitalized manufacturing profit in inventory) resulting from purchase accounting in connection with any acquisition that is consummated prior to or after the Issue Date shall be excluded;

(7)     accruals and reserves that are established within 12 months after an acquisition's closing date and that are so required to be established as a result of such transaction in accordance with GAAP or as a result of a modification of accounting policies shall be excluded;

(8)     any impairment charges resulting from the application of ASC 350 and ASC 360 and the amortization of intangibles pursuant to ASC 805  or asset write−offs shall be excluded;

(9)     any long−term incentive plan accruals and any compensation expense realized from grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such Person or any of its Restricted Subsidiaries shall be excluded;

(10)    any asset impairment writedowns or writeoffs under GAAP or SEC guidelines shall be excluded;

(11)    (A) any unrealized non−cash gains or losses or charges in respect of Hedging Obligations (including those resulting from the application of Financial Accounting Standards Codification No. 815−Derivatives and Hedging (or such successor provision)), (B) any foreign exchange gains and losses and (C) any adjustments for financial instruments, derivatives or Hedging Obligations required by GAAP shall be excluded except for any realized exchange gains or losses on derivative instruments which are included as offsets to operating items as part of a designated hedging relationship;

(12)    [reserved];

(13)    the cumulative effect of a change in accounting principles shall be excluded; and

(14)    any non−cash compensation expense realized from employee benefit plans or post−employment benefit plans, grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such Person or any of its Restricted Subsidiaries shall be excluded.

"*Consolidated Total Indebtedness*" means, as at any date of determination, an amount equal to the sum of (1) the aggregate amount of all outstanding Indebtedness of the Issuer and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money and debt obligations evidenced by promissory notes and similar instruments, as determined in accordance with GAAP (excluding for the avoidance of doubt all undrawn amounts under revolving credit facilities and letters of credit and all obligations under all Hedging Obligations and all Capital Lease Obligations) and (2) the aggregate amount of all outstanding Disqualified Stock of the Issuer and its Restricted Subsidiaries on a consolidated basis, with the amount of such Disqualified Stock equal to the greater of their respective voluntary or involuntary liquidation preferences and maximum fixed repurchase prices, in each case determined on a consolidated basis in accordance with GAAP. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were purchased on any date on which Consolidated Total Indebtedness shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the Fair Market Value of such Disqualified Stock, such Fair Market Value shall be determined reasonably and in good faith by the Issuer. The U.S. Dollar−Equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the U.S. Dollar−Equivalent principal amount of such Indebtedness.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any performance, leases, dividends, taxes or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person in any manner, whether

directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

   (1) to purchase any such primary obligation or any property constituting direct or indirect security thereof;

   (2) to advance or supply funds (a) for the purchase or payment of any such primary obligation or (b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

   (3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such obligation against loss in respect thereof.

   "*Corporate Trust Office of the Trustee*" means the designated office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 13737 Noel Road Suite 800, Dallas, Texas 75240, Attention: Global Corporate Trust Services, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the designated corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Issuer).

   "*Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of August 2, 2019 (as amended or supplemented on or prior to the date hereof), by and among TPC Holdings, Inc., a Delaware corporation, the Issuer, the other borrowers party thereto from time to time, Bank of America, N.A., as administrative agent and collateral agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Bank N.A., as joint lead arrangers, joint bookrunners and syndication agents, and the lenders party thereto from time to time, providing for revolving credit borrowings and letters of credit, including any related notes, Guarantees, collateral documents, instruments and agreements executed in connection therewith, and, in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

   "*Currency Agreement*" means, in respect of a Person, any foreign exchange contract, currency swap agreement, futures contract, option contract or other similar agreement as to which such Person is a party or a beneficiary.

   "*Custodian*" means the custodian appointed by the Depository with respect to any Global Notes, or any successor entity thereto.

   "*Debt Facilities*" means one or more debt facilities (including, without limitation, the Credit Agreement), indentures or commercial paper facilities, in each case with banks or other institutional lenders or investors providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), letters of credit or other indebtedness, in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of

debt securities to institutional investors) in whole or in part from time to time, including any agreement or indenture extending the maturity thereof or otherwise restructuring all or any portion of the indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated, non−global Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A1 or A2 hereto, as applicable, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Designated Non−cash Consideration*" means the Fair Market Value of non−cash consideration received by the Issuer or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as "Designated Non−cash Consideration" pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of such Designated Non−cash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of the Issuer or any direct or indirect parent of the Issuer (other than Disqualified Stock) that is issued for cash (other than to the Issuer or any of its Subsidiaries or an employee stock ownership plan or trust established by the Issuer or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issuance date thereof, the cash proceeds of which are excluded from the calculation set forth in Section 4.05(a)(C)(ii) hereof.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Notes mature. Notwithstanding the preceding sentence, any Capital Stock will not constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Issuer to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Issuer and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Investors*" means each of FR XII Alpha AIV, LP, FR XII-A Alpha AIV, LP, FR XII Charlie AIV, LP, FR XII-A Charlie AIV, LP. and SK Capital Partners III, L.P., and their respective Affiliates.

"*Equity Offering*" means (i) an offer and sale of Capital Stock (other than Disqualified Stock) of the Issuer or (ii) an offer and sale of Capital Stock (other than Disqualified Stock) of a direct or indirect parent of the Issuer (to the extent the net proceeds therefrom are contributed to the equity capital of the Issuer) pursuant to (x) a registration statement that has been declared effective by the SEC pursuant to the Securities Act (other than a registration statement on Form S−8 or otherwise relating to equity securities issuable under any employee benefit plan of the Issuer or such direct or indirect parent), or (y) a private issuance exempt from registration under the Securities Act.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Pipelines*" means (i) the Lubrizol pipeline, which runs from the TPC plant to Lubrizol; (ii) the Ellington pipeline, which runs from the TPC plant to the Ellington natural gas field; and (iii) the related structures, fixtures, buildings, equipment, easements, pipelines, piping, vehicles, rolling stock, trailers and other tangible personal property reasonably related to such pipelines; *provided* that, solely with respect to clause (iii), such property or other assets are not material to the Collateral or the business operations of the Issuer and its Restricted Subsidiaries taken as a whole.

"*Excluded Subsidiary*" shall mean, any (a) Unrestricted Subsidiary, (b) Subsidiary that is not a Material Subsidiary, (c) Subsidiary that is a captive insurance company, (d) not-for-profit Subsidiary, (e) Subsidiary that is prohibited by applicable law or regulation from providing a Guarantee of the Obligations (for so long as such restrictions or any replacement or renewal thereof is in effect), (f) Subsidiary that is prohibited by an enforceable contractual obligation existing on the Issue Date (or applicable date of acquisition or formation) from providing a Note Guarantee and (g) Subsidiary to the extent providing a Guarantee of the notes would result in material adverse tax consequences to the Issuer or any Subsidiary as reasonably determined by the Issuer.

"*Existing Notes Collateral Agent*" means U.S. Bank National Association, as collateral agent for the Existing Senior Notes.

"*Existing Notes Indenture*" means the indenture, dated as of August 2, 2019 by and among the Issuer, the guarantors thereunder, the Existing Notes Trustee and the Existing Notes Collateral Agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"*Existing Notes Trustee*" means U.S. Bank National Association, as trustee  under the Existing Notes Indenture.

15

"*Existing Senior Notes*" means the 10.50% Senior Secured Notes due 2024 issued by the Issuer pursuant to the Existing Notes Indenture.

"*Fair Market Value*" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by (i) the principal financial officer of the Issuer for transactions less than $50.0 million and (ii) the Board of Directors of the Issuer (unless otherwise provided in this Indenture) for transactions valued at, or in excess of, $50.0 million.

"*Fixed Charge Coverage Ratio*" means with respect to any specified Person for any period, the ratio of the Consolidated Adjusted EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, Guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than (i) ordinary working capital borrowings and (ii) in the case of revolving credit borrowings, in which case interest expense will be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems preferred equity subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Calculation Date*"), then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect to such incurrence, assumption, Guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred equity, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four−quarter reference period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio, Asset Acquisitions, dispositions, mergers, consolidations and discontinued operations (as determined in accordance with GAAP), and any related financing transactions, that the specified Person or any of its Restricted Subsidiaries has both determined to make and made after the Issue Date and during the four−quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a pro forma basis assuming that all such Asset Acquisitions, dispositions, mergers, consolidations and discontinued operations (and the change of any associated Fixed Charges and the change in Consolidated Adjusted EBITDA resulting therefrom) had occurred on the first day of the four−quarter reference period, including any pro forma expense and cost reductions and other operating improvements that have occurred or are reasonably expected to occur, in the reasonable judgment of the chief financial officer of the Issuer (regardless of whether these cost savings or operating improvements could then be reflected in pro forma financial statements in accordance with Regulation S−X promulgated under the Securities Act or any other regulation or policy of the SEC related thereto); *provided*, that any expense and cost reductions or savings or operating improvements (x) may only be included in Consolidated Adjusted EBITDA to the extent reasonably expected to result within 18 months of such Asset Acquisition, disposition, merger, consolidation and discontinuation of operations and (y) may not exceed 10% of Consolidated Adjusted EBITDA (calculated prior to giving effect to such run-rate amounts). Any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such four−quarter period, and if, since the beginning of the four−quarter reference period, any Person that subsequently became a Restricted Subsidiary or

was merged with or into the Issuer or any of its other Restricted Subsidiaries since the beginning of such period shall have made any acquisition, Investment, disposition, merger, consolidation or discontinued operation, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be adjusted giving pro forma effect thereto for such period as if such Asset Acquisition, disposition, discontinued operation, merger or consolidation had occurred at the beginning of the applicable four−quarter reference period. Any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four−quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capital Lease Obligation. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a pro forma basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate. Any such pro forma calculation may include adjustments appropriate, in the reasonable determination of the Issuer as set forth in an Officer's Certificate, to reflect operating expense reductions reasonably expected to result from any acquisition or merger.

"*Fixed Charges*" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, excluding amortization of deferred financing fees, debt issuance costs and commissions, fees and expenses and the expensing of any bridge, commitment or other financing fees, commissions, discounts, yield and other fees and charges (including any interest expense) related to any receivables facility but including original issue discount, non−cash interest payments, the interest component of any deferred payment obligations (classified as Indebtedness under this Indenture), the interest component of all payments associated with Capital Lease Obligations and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; *plus*

(2)     the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; *provided* that for purposes of calculating consolidated interest expense, no effect shall be given to the discount and/or

premium resulting from the bifurcation of derivatives under Standards Codification No. 815—Derivatives and Hedging and related interpretations as a result of the terms of the Indebtedness to which such consolidated interest expense relate; *plus*

(3)     all cash dividend payments or other cash distributions on any series of preferred equity of such Person and all other dividend payments or other distributions on the Disqualified Stock of such Person; *less*

(4)     interest income; *less*

(5)     non−cash interest expense attributable to movement in mark to market valuation of Hedging Obligations or other derivatives under GAAP; *less*

(6)     accretion or accrual of discounted liabilities not constituting Indebtedness; and *less*

(7)     any expense resulting from the discounting of Indebtedness in connection with the application of purchase accounting in connection with any acquisition.

"*GAAP*" means generally accepted accounting principles in the United States, set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect on the Issue Date. At any time after the Issue Date, the Issuer may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Indenture); *provided* that any such election, once made, shall be irrevocable; *provided*, *further*, any calculation or determination in this Indenture that requires the application of GAAP for periods that include fiscal quarters ended prior to the Issuer's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP. The Issuer shall give notice of any such election made in accordance with this definition to the Trustee.

"*Global Note Legend*" means the legend set forth in Section 2.06(f)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A1 or A2 hereto, as applicable, and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(b)(4), 2.06(d)(2) or 2.06(d)(3).

"*Guarantee*" means a guarantee, other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner, including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep−well, to purchase assets,

goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"*Guarantors*" means (x) TPC Holdings, Inc., a Delaware corporation, and (y) the Subsidiary Guarantors.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person under Interest Rate Agreements, Currency Agreements or Commodity Agreements.

"*Holder*" means a Person in whose name a Note is registered in the register maintained by the Registrar.

"*Holder Agreement*" means that certain Agreement, dated the Issue Date, by and among the Issuer and the Holders from time to time party thereto.

"*Indebtedness*" means, with respect to any specified Person, any indebtedness of such Person, whether or not contingent:

(1)     in respect of borrowed money;

(2)     evidenced by (A) bonds, notes, debentures or similar instruments or (B) letters of credit (or reimbursement agreements in respect thereof), *provided* that the underlying obligation in respect of which the letter of credit was issued would, under one or more of clauses (1) above or (3) through (7) below, be treated as being Indebtedness;

(3)     in respect of banker's acceptances;

(4)     representing Capital Lease Obligations;

(5)     representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed;

(6)     to the extent not otherwise included in this definition, net obligations of such Person under Commodity Agreements, Currency Agreements and Interest Rate Agreements (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such obligation that would be payable by such Person at such time); or

(7)     to the extent not otherwise included, with respect to the Issuer and its Restricted Subsidiaries, the amount then outstanding (i.e., advanced, and received by, and available for use by, the Issuer or any of its Restricted Subsidiaries) under any receivables financing (as set forth in the books and records of the Issuer or any Restricted Subsidiary of the Issuer and confirmed by the agent, trustee or other representative of the institution or group providing such receivables financing),

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes (i) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person); *provided, however*, that the amount of such Indebtedness shall be the lesser of (x) the Fair Market Value of such asset as such date of determination and (y) the amount of such Indebtedness of such other Person; and (ii) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

Notwithstanding the foregoing, "Indebtedness" shall not include (a) accrued expenses, royalties and trade payables; (b) Contingent Obligations; (c) asset retirement obligations and obligations in respect of reclamation and workers' compensation (including pensions and retiree medical care) that are not overdue by more than 90 days; or (d) any obligations under Currency Agreements, Commodity Agreements and Interest Rate Agreements; *provided* that such Agreements are entered into for bona fide hedging purposes of the Issuer or its Restricted Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Issuer, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of Currency Agreements or Commodity Agreements, such Currency Agreements or Commodity Agreements are related to business transactions of the Issuer or its Restricted Subsidiaries entered into in the ordinary course of business and, in the case of Interest Rate Agreements, such Interest Rate Agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to Indebtedness of the Issuer or its Restricted Subsidiaries incurred without violation of this Indenture.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" has the meaning assigned to it in the preamble to this Indenture.

"*Initial Mortgaged Property*" means each parcel of real property designated as being subject to a Mortgage on Schedule C to the Purchase Agreement dated the Issue Date, among the Issuer and the initial Holders, and the improvements and fixtures located thereon.

"*Intercreditor Agreement*" means the ABL Intercreditor Agreement and the Notes Intercreditor Agreement.

"*Interest Rate Agreement*" means with respect to any Person any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"*Investment Grade Rating*" means a Moody's rating of Baa3 (or the equivalent) or higher and an S&P rating of BBB− (or the equivalent) or higher or, if either such Rating Agency ceases to rate the Notes for reasons outside of the Issuer's control, the equivalent investment grade credit rating from any other Rating Agency.

"*Investment Grade Securities*" means:

(1)    securities issued or directly and fully Guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents) and in each case with maturities not exceeding two years from the date of acquisition;

(2)    investments in any fund that invests exclusively in investments of the type described in clause (1) which fund may also hold immaterial amounts of cash pending investment and/or distribution; and

(3)    corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"*Issue Date*" means February 2, 2021.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"Material Subsidiary" shall mean any Restricted Subsidiary of the Issuer whose gross assets or earnings before interest, tax, depreciation or amortization on a consolidated basis (calculated on a basis consistent with the calculations used in preparing the Issuer's consolidated financial statements) (excluding intra-group items) are equal to or exceed 5% of the Total Assets or Consolidated Adjusted EBITDA of the Issuer and its Restricted Subsidiaries; provided that any Restricted Subsidiary shall be deemed a Material Subsidiary if either (a) the Total Assets of such Subsidiary would cause the Total Assets of all Subsidiaries which are not Material Subsidiaries to exceed 7.5% of the Total Assets or (b) the Consolidated Adjusted EBITDA of such Subsidiary would cause the Consolidated Adjusted EBITDA of all Subsidiaries which are not Material Subsidiaries to exceed 7.5% of the Consolidated Adjusted EBITDA.

"*Minority Interest*" means the percentage interest represented by any class of Capital Stock of a Restricted Subsidiary that is not owned by the Issuer or a Restricted Subsidiary.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Mortgage*" means each mortgage, deed of trust or deed to secure debt creating a Lien on the Mortgaged Property granted by the Issuer or any Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties securing the Notes Obligations, in each case as amended, modified, restated, supplemented or replaced from time to time.

"*Mortgaged Property*" means all right, title and interest of the Issuer and the Guarantors in and to (i) the Initial Mortgaged Property and (ii) each additional parcel of real property (and the improvements and fixtures located thereon) that becomes subject to a Mortgage pursuant to Section 4.19 hereof.

"*Net Income*" means, with respect to any Person for any period, the net income (loss) of such Person for such period, determined in accordance with GAAP and before any reduction in respect of dividends on preferred interests, excluding, however, (a) any gain or loss, together with any related provision for taxes on such gain or loss, realized in connection with (1) any Asset Sale (including, without limitation, dispositions pursuant to Sale/Leaseback Transactions) or (2) the disposition of any securities by such Person or any of its Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Subsidiaries and (b) any extraordinary or nonrecurring gain or loss, together with any related provision for taxes on such extraordinary or nonrecurring gain or loss.

"*Net Proceeds*" means:

(a) with respect to any Asset Sale, the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect thereof (including, without limitation, any cash received upon the sale or other disposition of any Designated Non−cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any non−cash form), net of the direct costs relating to such Asset Sale and the sale of such Designated Non−cash Consideration, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, amounts paid in connection with the termination of Hedging Obligations repaid with Net Proceeds, and amounts required to be applied to the repayment of Indebtedness secured by a Lien on the asset or assets that were the subject of such Asset Sale, all distributions and other payments required to be made to Minority Interest holders in Subsidiaries or joint ventures or to holders of royalty or similar interests as a result of such Asset Sale and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, including without limitation, pension and post−employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; and

(b)      with respect to any Casualty Event, the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries received under any casualty insurance policy in respect of a covered loss of assets thereunder or as a result of the taking of any assets of the Issuer or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise or pursuant to a sale of any such assets to a purchaser with such power under threat of such taking, net of (i) any actual and reasonable costs incurred by the Issuer or any of its Restricted Subsidiaries in connection with the adjustment or settlement of any claims of the Issuer or any such Subsidiary in respect thereof, and (ii) the direct costs relating to such Casualty Event, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Casualty Event, taxes paid or payable as a result of the Casualty Event, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness secured by a Lien on the asset or assets that were the subject of such Casualty Event, all distributions and other payments required to be made to Minority Interest holders in Subsidiaries or joint ventures or to holders of royalty or similar interests as a result of such Casualty Event and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, including without limitation, pension and post−employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Non−U.S. Person*" means a Person who is not a U.S. Person.

"*Note Documents*" means this Indenture, the Notes, the Note Guarantees and the Security Documents.

"*Note Guarantee*" means the Guarantee by each Guarantor of the Issuer's obligations under this Indenture and the Notes, executed pursuant to the provisions of this Indenture.

"*Notes Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of the Issue Date, by among the Issuer, the other grantors party thereto, the Existing Notes Collateral Agent and the Collateral Agent, as amended, modified, restated, supplemented or replaced from time to time.

"*Note Liens*" means all Liens in favor of the Collateral Agent on Collateral securing the Notes Obligations.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"*Notes Obligations*" means the Indebtedness incurred and Obligations (including the Applicable Premium and the Redemption Premium) under this Indenture, the Notes and the other Note Documents.

"*Notes Priority Collateral*" has the meaning ascribed to the term "Notes First Priority Collateral" in the ABL Intercreditor Agreement.

"*Obligations*" means any principal, interest (including Post Petition Interest), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice−President of such Person.

"*Officer's Certificate*" means a certificate signed by an Officer of the Issuer or any other Person, as the case may be, who must be a manager or director, the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer (or of a Subsidiary of the Issuer acting in such capacity for the Issuer and its Subsidiaries, as determined by the Issuer) or such other Person, that meets the requirements set forth in this Indenture and is provided to the Trustee.

"*OID Legend*" means the legend set forth in Section 2.06(f)(3) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*Opinion of Counsel*" means an opinion from legal counsel that meets the requirements of Section 14.05 hereof and is provided to the Trustee. Such counsel may be an employee of or counsel to the Issuer or any Subsidiary of the Issuer.

"*Participant*" means, with respect to the Depositary, a Person who has an account with the Depositary.

"*Permitted Business*" means the businesses of the Issuer and its Subsidiaries engaged in on the Issue Date and any other activities that are similar, ancillary or reasonably related to, or a reasonable extension, expansion or development of, such businesses or ancillary thereto.

"*Permitted Employee Stock Purchase Loans*" means loans, in an aggregate amount outstanding at any time (together with Permitted Investments incurred pursuant to clause (8) of the definition thereof) not to exceed $10.0 million, whether made by the Issuer or any third party (other than any Affiliate of the Issuer), to employees of the Issuer and its Subsidiaries who become participants in the Issuer's stock purchase program to enable such employees to purchase Equity Interests in the Issuer or any of its parent entities.

"*Permitted Holders*" means (i) the Equity Investors and Related Parties and (ii) any Permitted Parent. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

24

"*Permitted Investments*" means:

(1)     any Investment in the Issuer or in a Restricted Subsidiary of the Issuer that is a Guarantor;

(2)     any Investment in cash, Cash Equivalents or Investment Grade Securities;

(3)     any Investment by the Issuer or any Restricted Subsidiary of the Issuer in a Person, if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary of the Issuer and a Guarantor; or

(b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer that is a Guarantor;

(4)     any Investment made as a result of the receipt of non−cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.08 hereof;

(5)     any acquisition of assets or Capital Stock solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Issuer or a direct or indirect parent of the Issuer;

(6)     any Investments received (i) in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Issuer or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes; or (ii) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)     Investments represented by Hedging Obligations;

(8)     loans or advances to officers, directors and employees made in the ordinary course of business or consistent with the past practice of the Issuer or any Restricted Subsidiary of the Issuer and Permitted Employee Stock Purchase Loans or Guarantees thereof in an aggregate principal amount at any time outstanding not to exceed $10.0 million;

(9)     repurchases of the Notes;

(10)    [reserved];

(11)    [reserved];

(12)    additional Investments made in Unrestricted Subsidiaries in the ordinary course of business for *bona fide* business purposes by the Issuer or any Restricted Subsidiary having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (12) that are at the time outstanding not to exceed $15.0 million;

(13)    (A) Guarantees issued in accordance with Section 4.07 and Section 4.14 hereof and (B) Guarantees of performance or other obligations (other than Indebtedness) arising in the ordinary course of business or consistent with past practice;

(14)    any Investment existing on the Issue Date and any Investment that replaces, refinances or refunds an existing Investment; *provided*, that the new Investment is in an amount that does not exceed the amount replaced, refinanced or refunded, and is made in the same Person as the Investment replaced, refinanced or refunded;

(15)    Investments consisting of purchases and acquisitions of parts, buildings, inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(16)    additional Investments made in Restricted Subsidiaries that are not Guarantors for purposes of establishing and maintaining joint ventures having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (16) that are at the time outstanding not to exceed $25.0 million;

(17)    Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Issuer or any of its Restricted Subsidiaries; and

(18)    pledges or deposits made in the ordinary course of business.

*provided*, *however*, that with respect to any Investment, the Issuer may, in its sole discretion, allocate all or any portion of any Investment to one or more of the above clauses (1) through (18) so that the entire Investment would be a Permitted Investment.

"*Permitted Liens*" means:

(1)    Liens securing Indebtedness and other Obligations under Debt Facilities incurred pursuant to Section 4.07(b)(1) hereof and/or securing Bank Products obligations related thereto; *provided* that such Liens are subject to the provisions of the ABL Intercreditor Agreement (including with respect to the relative priority of the ABL Facility Priority Collateral and Notes Priority Collateral);

(2)    Liens in favor of the Issuer or any of its Restricted Subsidiaries;

(3)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Issuer or any Restricted Subsidiary of the Issuer; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with the Issuer or the Subsidiary;

(4)     Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Issuer or any Restricted Subsidiary of the Issuer; *provided* that such Liens were in existence prior to, such acquisition, and not incurred in contemplation of, such acquisition;

(5)     Liens or deposits to secure the performance of statutory or regulatory obligations, or surety, appeal, indemnity or performance bonds, warranty and contractual requirements or other obligations of a like nature incurred in the ordinary course of business and Liens over cash deposits in connection with an acquisition, lease, disposition or investment;

(6)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other assets relating to such letters of credit and products and proceeds thereof and any cash cover relating to a letter of credit or bank guarantee;

(7)     Liens to secure Indebtedness (including Capital Lease Obligations) permitted to be incurred pursuant to Section 4.07(b)(4) hereof covering only the assets acquired with or financed by such Indebtedness; *provided* that such Lien (i) extends only to the assets and/or Capital Stock, the acquisition, lease, design, construction, installation, repair, replacement or improvement of which is financed thereby and any proceeds or products thereof, accessions thereto, upgrades thereof and improvements thereto or (ii) does not extend to any assets or property that constitute Collateral;

(8)     Liens securing Indebtedness permitted to be incurred pursuant to Section 4.07(b)(15) hereof; *provided*, that any Indebtedness incurred by the Issuer or any Guarantor pursuant to Section 4.07(b)(15) that is secured shall be secured by Liens solely on the Collateral on a junior basis to the Liens securing the Notes Obligations pursuant to the Notes Intercreditor Agreement;

(9)     Liens existing on the Issue Date;

(10)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(11)     Liens incurred or deposits made in the ordinary course of business to secure payment of workers' compensation or to participate in any fund in connection with workmen's compensation, unemployment insurance, old−age pensions or other social security programs;

27

(12)    Liens imposed by law, such as carriers', warehousemen's, landlord's, lessor's, suppliers, banks, repairmen's and mechanics' Liens, and Liens of landlords securing obligations to pay lease payments that are not yet due and payable or in default, in each case, incurred in the ordinary course of business;

(13)    leases or subleases granted to others that do not materially interfere with the ordinary conduct of business of the Issuer or any of its Restricted Subsidiaries;

(14)    (A) survey exceptions, easements, rights of way, zoning and similar restrictions, reservations or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Issuer or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Issuer and its Restricted Subsidiaries and (B) access agreements, easements, leases, licenses, use agreements, utility agreements, service agreements, and other like encumbrances granted by the Issuer or a Restricted Subsidiary of the Issuer to any other third party in connection with the disposition of the Excluded Pipelines to, or the use or ownership of the Excluded Pipelines by, such third party so long as such encumbrances do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Issuer or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Issuer and its Restricted Subsidiaries;

(15)    Liens created for the benefit of (or to secure) the Notes issued on the Issue Date and the Note Guarantees with respect thereto;

(16)    Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under this Indenture; *provided*, *however*, that:

(a) the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to, such property or proceeds or distributions thereof);

(b) the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the outstanding principal amount, or, if greater, committed amount, of the Permitted Refinancing Indebtedness and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge; and

(c) the new Lien shall have no greater priority relative to the Notes Obligations of the Liens securing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged;

(17)    Liens arising from precautionary Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(18)    judgment Liens not giving rise to an Event of Default so long as any appropriate legal proceedings that may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such legal proceedings may be initiated shall not have expired;

(19)    Liens securing Indebtedness or other obligations of the Issuer or any Subsidiary of the Issuer with respect to obligations that do not exceed $5.0 million at any one time outstanding; *provided* that, to the extent the Liens incurred under this clause (19) secure Indebtedness for borrowed money of the Issuer or any Guarantor, such Liens shall extend solely to the Collateral and shall secure such Indebtedness on a junior basis to the Liens securing the Notes Obligations pursuant to the Notes Intercreditor Agreement;

(20)    [reserved];

(21)    non-exclusive licenses of intellectual property in the ordinary course of business;

(22)    [reserved];

(23)    leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Issuer and its Restricted Subsidiaries;

(24)    Liens to secure a defeasance trust;

(25)    Liens on equipment of the Issuer or any Restricted Subsidiary of the Issuer granted in the ordinary course of business to clients of which such equipment is located;

(26)    Liens securing insurance premium financing arrangements, *provided* that such Lien is limited to the applicable insurance contracts;

(27)    [reserved];

(28)    Liens arising under retention of title, hire purchase or conditional sale arrangements arising under provisions in a supplier's standard conditions of supply in respect of goods or services supplied to the Issuer or any Restricted Subsidiary in the ordinary course of business and on arm's length terms;

(29)    Liens arising by way of set−off or pledge (in favor of the account holding bank) arising by operation of law or pursuant to standard banking terms or conditions, provided that the relevant bank account has not been set up nor has the relevant credit balance arisen in order to implement a secured financing;

(30)    Liens securing Indebtedness permitted to be incurred pursuant to Section 4.07(b)(3);

(31)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(32)    Liens securing Hedging Obligations;

(33)    any (a) interest or title of a lessor or sublessor under any lease; (b) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to (including, without limitation, ground leases or other prior leases of the demised premises, mortgages, mechanics' Liens, tax Liens and easements); (c) subordination of the interest of the lessee or sublessee under such lease to any restrictions or encumbrance referred to in the preceding subclause (b) or (d) Liens over rental deposits with a lessor pursuant to a property lease entered into in the ordinary course of business;

(34)    Liens incurred under or in connection with lease and Sale/Leaseback Transactions and novations and any refinancings thereof (and Liens securing obligations under lease transaction documents relating thereto), including, without limitation, Liens over the assets which are the subject of such lease, sale and leaseback, novations, refinancings, assets and contract rights related thereto (including, without limitation, the right to receive rental rebates or deferred sale payments), sub−lease rights, insurances relating thereto and rental deposits;

(35)    Liens to secure Indebtedness and any related Guarantees on assets constituting Collateral that are junior in priority to the Liens on the Collateral securing the Notes;

(36)    (x) Liens on the Collateral granted in favor of the Existing Notes Collateral Agent; *provided* that such Liens are subject to the Notes Intercreditor Agreement; and (y) Liens on the Collateral granted under the Security Documents in favor of the Collateral Agent to secure the Notes and the Note Guarantees; and

(37)    Liens arising under this Indenture in favor of the Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred under this Indenture, *provided*, *however*, that such Liens are solely for the benefit of the trustees, agents or representatives in their capacities as such and not for the benefit of the holders of such Indebtedness.

"*Permitted Parent*" means any direct or indirect parent of the Issuer formed not in connection with, or in contemplation of, a transaction that, assuming such parent was not so formed, after giving effect thereto would constitute a Change of Control and any direct or indirect parent of the Issuer formed in connection with an underwritten public Equity Offering.

"*Permitted Payments to Parent*" means, without duplication as to amounts:

(1)    payments to any parent companies of the Issuer in amounts equal to the amounts required for any direct payment of the Issuer to pay fees and expenses (including

franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to officers and employees of any direct parent of the Issuer and general corporate overhead expenses of any direct parent of the Issuer to the extent such fees and expenses are attributable to the ownership or operation of the Issuer and its Subsidiaries; and

(2)      for so long as the Issuer is a member of a group filing a consolidated or combined tax return with such parent companies, payments to such parent companies in respect of an allocable portion of the tax liabilities of such group that is attributable to the Issuer and its Subsidiaries ("*Tax Payments*"). The Tax Payments shall not exceed the lesser of (i) the amount of the relevant tax (including any penalties and interest) that the Issuer would owe if the Issuer were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of the Issuer and such Subsidiaries from other taxable years and (ii) the net amount of the relevant tax that such parent companies actually owe to the appropriate taxing authority. Any Tax Payments received from the Issuer shall be paid over to the appropriate taxing authority within 30 days of such parent companies' receipt of such Tax Payments or refunded to the Issuer.

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge other Indebtedness of the Issuer or any of the Issuer's Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)      the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus any premium required to be paid on the Indebtedness being so renewed, refunded, replaced, defeased or discharged, plus the amount of all fees and expenses incurred in connection therewith);

(2)      such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; *provided* that this clause (2) shall not apply to debt under Debt Facilities;

(3)      if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Notes, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Notes on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; and

(4)      such Permitted Refinancing Indebtedness shall not include Indebtedness of the Issuer or any Subsidiary of the Issuer that was not an obligor of the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint−stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*Port Neches Incident*" means the explosion of the Issuer's chemical plant in Port Neches, Texas in November, 2019.

"*Port Neches Proceeds*" means any and all insurance proceeds (including, without limitation, from business interruption, property or casualty policies and any settlements with insurance carriers) received by Holdings, the Issuer and its Subsidiaries after the Issue Date in connection with the Port Neches Incident (excluding up to $50.0 million of insurance proceeds received under the combined Property Damage/Business Interruption policy and $25.0 million of insurance proceeds received under liability and inventory policies).

"*Port Neches Allocable Proceeds*" means all Port Neches Proceeds in excess of $475.0 million.

"*Port Neches Company Allocation of Proceeds*" means 50% of all Port Neches Allocable Proceeds.

"*Post-Petition Interest*" means any interest or entitlement to fees or expenses or other charges that accrue after the commencement of any bankruptcy proceeding, whether or not allowed or allowable in any such bankruptcy proceeding.

"*Private Placement Legend*" means the legend set forth in Section 2.06(f)(1) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Rating Agency*" means each of S&P and Moody's, or if S&P or Moody's or both shall not make a rating on the Notes publicly available, a nationally recognized statistical rating organization or organizations, within the meaning of Section 3(a)(62) under the Exchange Act, selected by the Issuer as a replacement agency or agencies for S&P or Moody's, or both, as the case may be.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Global Note substantially in the form of Exhibit A2 hereto deposited with or behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance of Regulation S.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Permitted Business; *provided* that any assets received by the Issuer or a Restricted Subsidiary of the Issuer in exchange for assets transferred by the Issuer or a Restricted Subsidiary of the Issuer shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary of the Issuer.

"*Related Party*" means:

(1)    any controlling stockholder, partner, member, 50% (or more) owned Subsidiary (other than any portfolio company), or immediate family member (in the case of an individual) of any Equity Investor;

(2)    any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a 50% or more controlling interest of which consist of any one or more Equity Investors and/or such other Persons referred to in the immediately preceding clause; or

(3)    any Person with whom an Equity Investor or a Related Party (under clause (1) or (2) of this definition of Related Party) may be deemed as part of a "group" within the meaning of Section 13(d)(3) of the Exchange Act.

"*Responsible Officer*" when used with respect to the Trustee, means any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, trust officer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other person to whom such matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend.

"*Restricted Global Note*" means a Global Note bearing the Private Placement Legend.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Period*" means the 40−day distribution compliance period as defined in Regulation S, as notified to the Trustee by the Issuer in writing.

"*Restricted Subsidiary*" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary. Unless otherwise indicated, when used herein, the term "Restricted Subsidiary" shall refer to a Restricted Subsidiary of the Issuer.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*S&P*" means S&P Global Ratings and any successor to its rating agency business.

"*Sale/Leaseback Transaction*" means an arrangement relating to property now owned or hereafter acquired by the Issuer or a Restricted Subsidiary of the Issuer whereby the Issuer or a Restricted Subsidiary of the Issuer transfers such property to a Person and the Issuer or such Restricted Subsidiary leases it from such Person, other than leases between the Issuer and a Restricted Subsidiary of the Issuer or between Restricted Subsidiaries of the Issuer.

"*SEC*" means the Securities and Exchange Commission.

"*Secured Indebtedness*" means any Indebtedness secured by a Lien.

"*Secured Parties*" means (i) the Holders of the Notes, (ii) the Trustee, (iii) the Collateral Agent and (iv) any successors, indorsees, transferees and assigns of each of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Security Agreement*" means the pledge and security agreement dated as of the Issue Date among the Collateral Agent, for its benefit and for the benefit of the Trustee and the Holders of the Notes, the Issuer and the Subsidiary Guarantors, as amended, modified, restated, supplemented or replaced from time to time in accordance with its terms.

"*Security Documents*" means the Security Agreement, any mortgages, the Intercreditor Agreements and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of the Collateral Agent for its benefit and for the benefit of the Trustee and the Holders of the Notes, in all or any portion of the Collateral, in each case as amended, modified, restated, supplemented or replaced from time to time.

"*Significant Subsidiary*" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1−02 of Regulation S−X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the Issue Date.

"*Specified Settlement Amount*" means $64,947,000.

"*Stated Maturity*" means, with respect to any installment of principal on any series of Indebtedness, the date on which the final payment of principal was scheduled to be paid in the documentation governing such Indebtedness as of the Issue Date, and will not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"*Subsidiary*" means, with respect to any specified Person:

(1)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)    any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa−77bbbb).

"*Subsidiary Guarantors*" means (1) the Subsidiaries of the Issuer that execute a Note Guarantee on the Issue Date and (2) any other Subsidiary of the Issuer that executes a Note Guarantee in accordance with the provisions of this Indenture.

"*Total Assets*" means the total consolidated assets of the Issuer and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Issuer

"*Treasury Rate*" means, as of any redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H. 15(519) that has become publicly available at least two Business Days prior to the redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to August 2, 2022; *provided*, *however*, that if the period from the redemption date to August 2, 2022, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trustee*" means U.S. Bank National Association until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"*U.S. Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" on the date two Business Days prior to such determination.

"*U.S. Person*" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

"*Unrestricted Definitive Note*" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Subsidiary*" means TPC Pipeline Holding Company LLC and TPC Pipeline Company LLC; *provided* that, for the avoidance of doubt, (i) TPC Pipeline Company LLC shall not own any material assets other than the Excluded Pipelines and Investments made pursuant to clause (12) of the definition of Permitted Investments and (ii) TPC Pipeline Holding Company LLC shall not own any material assets other than the Equity Interests of TPC Pipeline Company LLC.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)     the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one−twelfth) that will elapse between such date and the making of such payment; by

(2)     the then outstanding principal amount of such Indebtedness.

Section 1.02     Other Definitions.

| **Term** | **Defined in Section** |
| --- | --- |
| "Affiliate Transaction" | 4.09 |
| "After−Acquired Real Property" | 4.18 |
| "Alternate Offer" | 4.12 |
| "Applicable Premium Deficit" | 8.04 |
| "Asset Sale Offer" | 4.08 |
| "Authentication Order" | 2.02 |
| "Change of Control Offer" | 4.12 |
| "Change of Control Payment" | 4.12 |
| "Change of Control Payment Date" | 4.12 |
| "Covenant Defeasance" | 8.03 |
| "DTC" | 2.03 |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.08 |
| "Fall−Away Period" | 4.16 |
| "Flood Insurance Laws" | 4.19 |

| Term | Defined in Section |
|------|-------------------|
| "incur" | 4.07(a) |
| "Issuer" | Preamble |
| "Legal Defeasance" | 8.02 |
| "Limited Condition Transaction" | 4.22 |
| "Mortgage Policies" | 4.19 |
| "Offer Period" | 4.08 |
| "Paying Agent" | 2.03 |
| "Payment Default" | 6.01 |
| "Permitted Debt" | 4.07(b) |
| "Registrar" | 2.03 |
| "Restricted Payments" | 4.05 |
| "Suspended Covenants" | 4.16 |
| "Title Company" | 4.19 |
| "Transaction Agreement Date" | 4.22 |

Section 1.03    <u>Incorporation by Reference of Trust Indenture Act</u>.

This Indenture is not and shall not be qualified by the TIA and no provisions of the TIA are incorporated by reference in and made a part of this Indenture.

Section 1.04    <u>Rules of Construction</u>.

Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(iii)    "or" is not exclusive;

(iv)    words in the singular include the plural, and in the plural include the singular;

(v)    "will" shall be interpreted to express a command;

(vi)    provisions apply to successive events and transactions; and

(vii)    references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

Section 1.05    <u>Divisions</u>. For all purposes hereunder, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or

liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE 2

THE NOTES

Section 2.01    <u>Form and Dating</u>.

(a)    *General*. The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibits A1 and A2 hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authentication. The Notes shall be in denominations of $1.00 and integral multiples of $1.00 in excess of $1.00.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*. Notes issued in global form will be substantially in the form of Exhibits A1 or A2 hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Definitive Notes will be substantially in the form of Exhibit A1 hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the written direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(c)    None of the Trustee or any Agent shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, a member of, or a Participant or Indirect Participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any Participant or Indirect Participant in, or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Participant, Indirect Participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the

registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary subject to the Applicable Procedures of the Depositary. The Trustee and each Agent may conclusively rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, Participants, Indirect Participants and any beneficial owners. Neither the Trustee nor any Agent shall have any responsibility or liability for actions take or not taken by the Depositary.

Section 2.02    Execution and Authentication.

(a)    At least one Officer must sign the Notes for the Issuer by manual, electronic or facsimile signature.

(b)    If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

(c)    A Note will not be valid until authenticated by the manual or electronic signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

(d)    The Trustee will, upon receipt of a written order of the Issuer signed by two Officers of the Issuer (an "*Authentication Order*"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Issuer pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof. Subject to compliance with Sections 4.07 and 4.10 of this Indenture, the Issuer may issue an unlimited amount of Additional Notes under this Indenture from time to time after the Issue Date having identical terms and conditions as the Initial Notes other than the issue date, issue price, the first interest payment date and the first date from which interest will accrue; *provided* that if any Additional Notes are not fungible with the Initial Notes for U.S. federal income tax purposes, such Additional Notes will be issued as a separate series under this Indenture and will have a separate CUSIP number and ISIN from the Initial Notes.

(e)    The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

Section 2.03    Registrar and Paying Agent.

(a)    The Issuer will maintain a register of Notes at its registered office in which the Holders of the Notes will be registered.

(b)    The Issuer will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar will keep a register of the

Holders and the Notes and of their transfer and exchange. The Issuer may appoint one or more co−registrars and one or more additional Paying Agents. The term "Registrar" includes any co−registrar and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without notice to any Holder.  The Issuer will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. The Issuer or any of the Issuer's Restricted Subsidiaries may act as Paying Agent or Registrar.

(c)     The Issuer initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

(d)     The Issuer initially appoints the Trustee to act as the Registrar and Paying Agent with respect to the Global Notes.

Section 2.04     Paying Agent to Hold Money in Trust.

The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, Applicable Premium, any other premium or interest on the Notes, and will notify the Trustee in writing of any default by the Issuer in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Issuer or a Subsidiary of the Issuer) will have no further liability for the money. If the Issuer or a Subsidiary of the Issuer acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee will serve as Paying Agent for the Notes.

Section 2.05     Holder Lists.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders. If the Trustee is not the Registrar, the Issuer will furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

Section 2.06     Transfer and Exchange.

(a)     *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Issuer for Definitive Notes if:

(1)     the Issuer delivers to the Trustee written notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is

not appointed by the Issuer within 120 days after the date of such notice from the Depositary; or

(2)    there has occurred and is continuing an Event of Default with respect to the Notes and the Trustee has requested that the Global Notes be exchanged for Definitive Notes as a result thereof.

Upon the occurrence of either of the preceding events in clauses (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee in writing. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b) or (c) hereof.

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either clause (1) or (2) below, as applicable, as well as one or more of the other following clauses, as applicable:

(1)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend.

(2)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar either:

(A)    both:

(i)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)    instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

41

(B)    both:

(i)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)    instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in clause (1) above.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(3)    *Transfer of Beneficial Interests to Another Restricted Global Note.* A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives:

(A)    if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)    if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(4)    Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(B)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery

42

thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(b)(4), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to Section 2.06(b)(4) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to Section 2.06(b)(4) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)    Transfer or Exchange of Beneficial Interests for Definitive Notes.

(1)    *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes*. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such beneficial interest is being transferred to a Non−U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

43

(E)      if such beneficial interest is being transferred to the Issuer or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)      if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof;

and the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Issuer shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2)      *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

(A)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(B)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(c)(2), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3)    *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(2) hereof, the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Issuer will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will not bear the Private Placement Legend.

(d)    *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

(1)    *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred to a Non−U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

45

(E)      if such Restricted Definitive Note is being transferred to the Issuer or any of the Issuer's Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)      if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof;

and the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, and in the case of clause (C) above, the Regulation S Global Note.

(2)      *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A)      if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(B)      if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(d)(2), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the clauses in this Section 2.06(d)(2), the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3)      *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to Section 2.06(d)(2), or 2.06(d)(3) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)    *Transfer and Exchange of Definitive Notes for Definitive Notes*. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1)    *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(2)    *Restricted Definitive Notes to Unrestricted Definitive Notes*. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A)    if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(B)    if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an

Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(e)(2), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3)    *Unrestricted Definitive Notes to Unrestricted Definitive Notes*. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)    *Legends*. The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)    *Private Placement Legend*.

(A)    Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(A) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (B) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (C) PURSUANT TO AN EXEMPTION FROM

48

REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (D) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER IF THE ISSUER SO REQUESTS), (2) TO THE ISSUER OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.

EACH HOLDER OF THE SECURITY (OR INTEREST HEREIN) SHALL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT EITHER (A) NO PORTION OF THE ASSETS USED BY SUCH HOLDER TO ACQUIRE OR HOLD THE SECURITY (OR INTEREST HEREIN) CONSTITUTES ASSETS OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO TITLE I OF THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN, INDIVIDUAL RETIREMENT ACCOUNT, KEOGH PLAN OR OTHER ARRANGEMENT THAT IS SUBJECT TO SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR PROVISIONS UNDER ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAWS OR REGULATIONS THAT ARE SIMILAR TO SUCH PROVISIONS OF ERISA OR THE CODE (COLLECTIVELY, "SIMILAR LAWS") OR (B) THE PURCHASE AND HOLDING OF THE SECURITY (OR INTEREST HEREIN) BY SUCH HOLDER WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR SIMILAR VIOLATION UNDER ANY APPLICABLE SIMILAR LAWS, AND NONE OF THE ISSUER, THE GUARANTORS NOR ANY OF THEIR RESPECTIVE AFFILIATES IS A FIDUCIARY OF SUCH HOLDER IN CONNECTION WITH THE PURCHASE AND HOLDING OF THE SECURITY (OR INTEREST HEREIN)."

      (B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to clauses (b)(4), (c)(2), (c)(3), (d)(2), (d)(3), (e)(2) or (e)(3) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

    (2)    *Global Note Legend*. Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT

TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.01 AND SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(3)     *OID Legend*. Each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear a legend in substantially the following form:

"THIS SECURITY HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. UPON WRITTEN REQUEST, THE ISSUER WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS SECURITY THE FOLLOWING INFORMATION: (1) THE ISSUE PRICE AND ISSUE DATE OF THE SECURITY, (2) THE AMOUNT OF OID ON THE SECURITY AND (3) THE YIELD TO MATURITY OF THE SECURITY. HOLDERS SHOULD CONTACT THE ISSUER AT TPC GROUP INC., ONE ALLEN CENTER, 500 DALLAS STREET, SUITE 2000, HOUSTON, TEXAS 77002, ATTN: CHIEF FINANCIAL OFFICER."

(g)     *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a

Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)    *General Provisions Relating to Transfers and Exchanges.*

(1)    To permit registrations of transfers and exchanges, the Issuer will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(2)    No service charge will be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 4.08, 4.12 and 9.05 hereof).

(3)    The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)    Neither the Registrar nor the Issuer will be required:

(A)    to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the giving of a notice of redemption of Notes to be redeemed under Section 3.02 hereof or purchased pursuant to an offer to purchase and ending at the close of business on the day such notice of redemption is given;

(B)    to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C)    to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

51

(6)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(7)     The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8)     All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(9)     Neither the Trustee nor any Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any tax or securities laws with respect to any restrictions on transfer imposed under this Indenture or under applicable law (including any transfers between or among Depositary Participants, Indirect Participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.07     Replacement Notes.

(a)     If any mutilated Note is surrendered to the Trustee or the Issuer and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Issuer will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. An indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Issuer may charge for its expenses in replacing a Note.

(b)     Every replacement Note is an additional obligation of the Issuer and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08     Outstanding Notes.

(a)     The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note; however, Notes held by the Issuer or a Subsidiary of the Issuer shall not be deemed to be outstanding for purposes of Section 3.07(a), Section 9.02(a) and Section 9.02(e) hereof.

(b)     If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

(c)     If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

(d)     If the Paying Agent (other than the Issuer, a Subsidiary of the Issuer or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09    Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer or any Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or any Guarantor, will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned will be so disregarded.

Section 2.10    Temporary Notes.

(a)     Until certificates representing Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

(b)     Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such canceled Notes in its customary manner (subject to the record retention requirement of the Exchange Act). Certification of the disposition of all canceled Notes will be delivered to the Issuer at the Issuer's written request. The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    Defaulted Interest.

If the Issuer defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof. The Issuer will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Issuer will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than ten days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) will mail or cause to be mailed, or otherwise deliver notice in accordance with the applicable procedures of DTC, to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.13   CUSIP Numbers.

The Issuer in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer will promptly notify the Trustee in writing of any change in the "CUSIP" numbers.

## ARTICLE 3

## REDEMPTION AND PREPAYMENT

Section 3.01   Notices to Trustee.

If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, or such shorter notice period as the Trustee and Issuer shall agree, an Officer's Certificate setting forth:

(1)   the clause of this Indenture pursuant to which the redemption shall occur;

(2)   the redemption date;

(3)   the principal amount of Notes to be redeemed;

(4)   the redemption price; and

(5)   the applicable CUSIP Numbers.

Section 3.02   Selection of Notes to Be Redeemed.

(a)     If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption on a *pro rata* basis (or, in the case of notes in global form, the notes represented thereby will be selected in accordance with DTC's prescribed method), and in any case in accordance with DTC procedures to the extent applicable.

(b)     In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption date by the Trustee from the outstanding Notes not previously called for redemption.

(c)     The Trustee will promptly notify the Issuer in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed. Notes and portions of Notes selected will be in amounts of $1.00 or whole multiples of $1.00 in excess of $1.00; *provided* that no Notes of $1.00 or less shall be redeemed in part. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

Section 3.03    Notice of Redemption.

(a)     At least 15 days but not more than 60 days before a redemption date, the Issuer will mail or cause to be mailed, by first class mail or otherwise deliver in accordance with the applicable procedures of DTC, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or otherwise delivered in accordance with the applicable procedures of DTC more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles 8 or 11 hereof.

(b)     The notice will identify the Notes (including CUSIP Numbers) to be redeemed and will state:

(1)     the redemption date;

(2)     the redemption price;

(3)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note;

(4)     the name and address of the Trustee;

(5)     that Notes called for redemption must be surrendered to the Trustee to collect the redemption price;

(6)     that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)    the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)    any condition to the related redemption, if any.

(c)    At the Issuer's written request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five Business Days prior to delivery of the notice of redemption (or such shorter period of time that is agreed upon by the Issuer and the Trustee), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in Section 3.03(b).

Section 3.04    Effect of Notice of Redemption.

Once notice of redemption is sent in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price, except as provided for in Section 3.07(e) hereof. The notice, if sent in accordance with Section 3.03 hereof, shall be conclusively presumed to have been given, whether or not the Holder receives such notice. In any case, failure to send such notice or any defect in the notice to the Holder designated for redemption in whole or in part shall not affect the validity of the proceedings for the redemption of any other Note.

Section 3.05    Deposit of Redemption Price.

(a)    Notwithstanding the requirements of Section 4.01, one Business Day prior to the redemption date, the Issuer will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest on all Notes to be redeemed on that date. The Trustee or the Paying Agent will promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption price of, and accrued interest on, all Notes to be redeemed.

(b)    If the Issuer complies with the provisions of Section 3.05(a), on and after the redemption date, interest will cease to accrue on the Notes or the portions of Notes called for redemption. If a Note is redeemed on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption is not so paid upon surrender for redemption because of the failure of the Issuer to comply with Section 3.05(a), interest shall be paid on the unpaid principal, from the redemption date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06    Notes Redeemed in Part.

Upon surrender of a Note that is redeemed in part, the Issuer will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of

the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered, *provided* that each new Note will be in a principal amount of $1.00 or an integral multiple of $1.00 in excess of $1.00.  It is understood that, notwithstanding anything in this Indenture to the contrary, only an Authentication Order and not an Opinion of Counsel or Officer's Certificate is required for the Trustee to authenticate such new Note.

Section 3.07    Optional Redemption.

(a)    At any time prior to August 2, 2023, the Issuer may redeem all or a part of the Notes, at a redemption price equal to 100% of the aggregate principal amount thereof plus the Applicable Premium as of, and accrued and unpaid interest, if any, on the Notes to be redeemed to, but not including, the date of redemption (subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date).  Except pursuant to this Section 3.07(a), the Notes will not be redeemable at the Issuer's option prior to August 2, 2023. The Issuer will not, however, be prohibited from acquiring the Notes by means other than a redemption, whether pursuant to a tender offer, open market purchase or otherwise, so long as the acquisition does not violate the terms of this Indenture.

(b)    At any time on or after August 2, 2023, the Issuer may redeem all or a part of the Notes, at a redemption price equal to 100% of the aggregate principal amount thereof, and accrued and unpaid interest, if any, on the Notes to be redeemed to, but not including, the date of redemption (subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date).

(c)    Any redemption pursuant to this Section 3.07 shall be made pursuant to and in compliance with the provisions of Sections 3.01 through 3.06 hereof.

(d)

(A)    Any notice of redemption made in connection with a related transaction or event (including an Equity Offering, contribution, Change of Control, Asset Sale, Casualty Event or other transaction) may, at the Issuer's discretion, be given prior to the completion or the occurrence thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, the completion or occurrence of the related transaction or event, as the case may be.

(B)    The Issuer may redeem Notes pursuant to one or more of the relevant provisions hereof, and a single notice of redemption may be delivered with respect to redemptions made pursuant to different provisions. Any such notice may provide that redemptions made pursuant to different provisions will have different redemption dates. In addition, if such redemption is subject to satisfaction of one or more conditions precedent, such notice will describe each such condition, and if applicable, will state that, in the Issuer's discretion, the redemption date may be delayed until such time (including more than 60 days after the date the notice of redemption was mailed or delivered, including by electronic transmission) as any or all such conditions are satisfied (or waived by

the Issuer in its sole discretion), or that such redemption may not occur and such notice may be rescinded in the event that any or all such conditions are not satisfied (or waived by the Issuer in its sole discretion) by the redemption date, or by the redemption date as so delayed, or that such notice may be rescinded at any time in the Issuer's discretion if in the good faith judgment of the Issuer any of all of such conditions will not be satisfied. In addition, the Issuer may provide in such notice that payment of the redemption price and performance of the Issuer's obligations with respect to such redemption may be performed by another Person.

(C)    In no event will the Trustee be responsible for monitoring, or charged with knowledge of, the maximum aggregate amount of Notes eligible under this Indenture to be redeemed. Notes will remain outstanding until redeemed, notwithstanding that they have been called for redemption or are subject to a notice of redemption.

Section 3.08    <u>Mandatory Redemption</u>.

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

Section 3.09    <u>Calculation of Redemption Price</u>

Neither the Trustee nor any Agent shall have an obligation to calculate the redemption price of any Notes.

ARTICLE 4

COVENANTS

Section 4.01    <u>Payment of Notes</u>.

(a)    The Issuer will pay or cause to be paid the principal of, the Applicable Premium, if any, any other premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, the Applicable Premium, if any, any other premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Issuer or a Subsidiary of the Issuer, holds as of 10:00 a.m. New York City Time on the Business Day immediately preceding the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal of, the Applicable Premium, if any, any other premium, if any, and interest, then due.

(b)    The Issuer will pay interest on overdue principal, Applicable Premium, if any, and any other premium, if any, and overdue installments of interest at the same rate borne by the Notes to the extent lawful.

Section 4.02    <u>Maintenance of Office or Agency</u>.

(a)    The Issuer will maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee,

Registrar or co−registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer (other than the type contemplated by Section 14.13) in respect of the Notes and this Indenture may be served. The Issuer will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

(b)     The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission will in any manner relieve the Issuer of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York for such purposes. The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c)     The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer in accordance with Section 2.03 hereof.

Section 4.03    Reports.

(a)     So long as any Notes are outstanding, the Issuer shall make available without cost to the Trustee:

(1)     as soon as available but within 90 days after the end of each financial year of the Issuer, all annual financial statements that would be required to be contained in a filing with the SEC on Form 10-K of the Issuer, plus a "Management's Discussion and Analysis of Financial Condition and Results of Operations", a presentation of EBITDA and Adjusted EBITDA of the Issuer substantially consistent with the presentation thereof required under the Existing Notes Indenture and derived from such financial information and a report on the annual financial statements by the Issuer's independent registered public accounting firm;

(2)     as soon as available but within 45 days after the end of each of the first three fiscal quarters of each financial year of the Issuer, all quarterly financial statements that would be required to be contained in a filing with the SEC on Form 10- Q of the Issuer, plus a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and a presentation of EBITDA and Adjusted EBITDA of the Issuer substantially consistent with the presentation thereof required under the Existing Notes Indenture and derived from such financial information; and

(3)     promptly from time to time after the occurrence of an event required to be therein reported, such other reports (in each case, without exhibits) containing substantially the same information required to be contained in a Current Report on Form 8-K under Item 1.01 (Entry into a Material Definitive Agreement), 1.03 (Bankruptcy or Receivership), 2.01 (Completion of Acquisition or Disposition of Assets), 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance

Sheet Arrangement of a Registrant), 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), 5.01 (Changes in Control of Registrant), 5.02(a)(1) and (c)(1) (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers) and 5.03(b) (Changes in Fiscal Year); *provided, however*, that no report in this clause (3) shall be required to be furnished if the Issuer determines in its good faith judgment that such event is not material to the Holders or the business, assets, operations, financial position or prospects of the Issuer and the Restricted Subsidiaries of the Issuer.

(b)     With respect to the reports required to be furnished by Section 4.03(a):

(1)     no such reports referenced under clause (iii) above will be required to include as an exhibit or summary of terms of, any employment or compensatory arrangement agreement, plan or understanding between the Issuer (or any of its Subsidiaries) and any director, manager or executive officer, of the Issuer (or any of its Subsidiaries);

(2)     in no event will such reports be required to comply with Section 302, Section 404 or Section 906 of the Sarbanes-Oxley Act of 2002 (or any successor provisions), or related Items 307 and 308 of Regulation S-K (or any successor provisions) promulgated by the SEC;

(3)     in no event will such report be required to comply with Item 302 of Regulation S-K (or any successor provisions) promulgated by the SEC;

(4)     in no event will such reports be required to comply with Rule 3-10 of Regulation S-X promulgated by the SEC (or such other rule or regulation that amends, supplements or replaces such Rule 3-10, including for the avoidance of doubt, Rules 13-01 or 13-02 of Regulation S-X promulgated by the SEC) or contain separate financial statement for the Issuer, the Guarantors or other Subsidiaries the shares of which may be pledged to secure the notes or any Guarantee that would be required under (i) Section 3-09 of Regulation S-X (or such other rule or regulation that amends, supplements or replaces such Rule 3-09) or (ii) Section 3-16 of Regulation S-X (or such other rule or regulation that amends, supplements or replaces such Rule 3-16), respectively, promulgated by the SEC;

(5)     in no event will such reports be required to comply with Regulation G under the Exchange Act or Item 10(e) of Regulation S-K (or any successor provision) promulgated by the SEC with respect to any non-GAAP financial measures contained therein;

(6)     no such reports referenced under clause (iii) above will be required to be furnished if the Issuer determined in its good faith judgment that such event is not material to the holders or the business, assets, operations or financial position of the Issuer and its Restricted Subsidiaries, taken as a whole;

(7)     in no event will such reports be required to comply with Item 601 of Regulation S-K (or any successor provision) promulgated by the SEC (with respect to exhibits) or, with respect to reports reference in clause (iii) above, to include as an exhibit copies of any agreements, financial statements or other items that would be required to be filed as exhibits to a current report on Form 8-K;

(8)     trade secrets and other confidential information that is competitively sensitive in the good faith and reasonable determination of the Issuer may be excluded from any disclosure;

(9)     such information will not be required to include information that is not otherwise similar to information required to be delivered under the Existing Notes Indenture;

(10)     to the extent that the Issuer is not a reporting company under the Exchange Act, in no event will such reports be required to be presented in compliance with the requirements of the Public Company Accounting Oversight Board; and

(11)     in no event will such reports contain compensation or beneficial ownership information.

(c)     The Issuer will hold a quarterly conference call for the Holders of the Notes, securities analysts and prospective investors to discuss financial information for the previous fiscal quarter or previous fiscal year, as applicable, to be held as soon as reasonably practicable after furnishing or posting the financial information as set forth in 4.03(a). No fewer than three days prior to the conference call, the Issuer shall post on its website the time and date of such conference call and provide instructions for Holders of Notes, securities analysts and prospective investors to obtain access to such call.

(d)     For so long as any Notes remain outstanding, if at any time they are not required furnish the information required by Section 4.03(a), the Issuer and the Guarantors will furnish to the Holders and to prospective purchasers of the Notes or beneficial owner of the Notes in connection with any sale thereof, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(e)     In the event that any direct or indirect parent of the Issuer becomes a Guarantor of the Notes, the Issuer may satisfy its obligations under this Section 4.03 with respect to financial information relating to the Issuer by furnishing financial information relating to such parent; *provided* that the same is accompanied by information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to the Issuer and its Restricted Subsidiaries on a standalone basis, on the other hand.

(f)     Notwithstanding the foregoing, the requirements of this Section 4.03 shall be deemed satisfied by posting reports on the (i) Issuer's website (or on the publicly available website of any of its parent companies or Subsidiaries) or (ii) a password-protected online data system that will require a confidentiality acknowledgment, including Intralinks, SyndTrak or

ClearPar provided that access shall also be granted to any bona fide prospective investor, any securities analyst (to the extent providing analysis of investment in the notes) or any market maker in the notes who agrees to treat such information as confidential) containing the financial information (including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" section) that would be required to be included in such reports, subject to exceptions consistent with the presentation of financial information required under the Existing Notes Indenture.

(g)       It is understood that the Trustee shall have no obligation whatsoever to determine whether or not such information, documents or reports have been posted on the Issuer's website, other online data system or filed with the SEC.  The posting or delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

(h)       The Trustee has no duty or obligation to monitor the occurrence of a Purchase Option Triggering Event as defined in the ABL Intercreditor Agreement or give notice thereof to any Person.

Section 4.04       Compliance Certificate.

(a)       The Issuer shall deliver to the Trustee within 120 days after the end of each fiscal year of the Issuer (beginning with the fiscal year ended December 31, 2021) an Officer's Certificate stating that in the course of the performance by the signers of their duties as Officers they would normally have knowledge of any Default and whether or not the signers know of any Default that occurred during such period. If they do, the certificate shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect thereto.

(b)       So long as any of the Notes are outstanding, the Issuer will deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Issuer is taking or propose to take with respect thereto.

Section 4.05       Restricted Payments.

(a)       The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)       declare or pay any dividend or make any other payment or distribution on account of the Issuer's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Issuer or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Issuer's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other

than Disqualified Stock) of the Issuer and other than dividends or distributions payable to the Issuer or a Restricted Subsidiary of the Issuer);

(2)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Issuer) any Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

(3)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness of the Issuer or any Guarantor that is contractually subordinated to the Notes or to any Note Guarantee (excluding (x) any intercompany Indebtedness between or among the Issuer and any of its Restricted Subsidiaries or (y) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinated to the Notes or to any Note Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition), except a payment of interest or principal at the Stated Maturity thereof; or

(4)    make any Restricted Investment (all such payments and other actions set forth in these clauses (1) through (4) above being collectively referred to as "*Restricted Payments*").

(b)    The provisions of Section 4.05(a) hereof will not prohibit:

(1)    the payment of any dividend or distribution or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if, at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Indenture;

(2)    the making of any Restricted Payment in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Issuer) of, Equity Interests of the Issuer or any direct or indirect parent of the Issuer (other than Disqualified Stock) or from the substantially concurrent contribution of common equity capital to the Issuer;

(3)    the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Issuer or any Restricted Subsidiary of the Issuer that is contractually subordinated to the Notes or to any Note Guarantee with the net cash proceeds from a substantially concurrent incurrence of Permitted Refinancing Indebtedness;

(4)    the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Issuer to the holders of its Equity Interests on a *pro rata* basis;

(5)    the repurchase, redemption or other acquisition or retirement (or dividends or distributions to any direct or indirect parent of the Issuer to finance any such repurchase, redemption or other acquisition or retirement) for value of any Equity

Interests of the Issuer or any Restricted Subsidiary of the Issuer or any direct or indirect parent of the Issuer held by any current or former officer, director, consultant or employee of the Issuer or any of its Restricted Subsidiaries or any direct or indirect parent of the Issuer pursuant to any equity subscription agreement, stock option agreement, shareholders' or members' agreement or similar agreement, plan or arrangement; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed $1.0 million in any calendar year (which shall increase to $2.0 million subsequent to the consummation of an underwritten public Equity Offering by the Issuer or any of its direct or indirect parent entities) (with unused amounts in any calendar year being permitted to be carried over for the next two succeeding calendar years); *provided, further*, that the amount in any calendar year may be increased by an amount not to exceed:

(i)      the cash proceeds received by the Issuer or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer that occurs after the Issue Date; *plus*

(ii)      the cash proceeds of key man life insurance policies received by the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) and its Restricted Subsidiaries after the Issue Date;

*provided* that the Issuer may elect to apply all or any portion of the aggregate increase contemplated by (i) and (ii) above in any single calendar year;

(6)      the repurchase of Equity Interests deemed to occur upon the exercise of stock options or warrants to the extent such Equity Interests represent a portion of the exercise price of those stock options or warrants;

(7)      the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Stock of the Issuer or any Restricted Subsidiary of the Issuer issued on or after the Issue Date in accordance with Section 4.07(a) hereof; *provided* the aggregate amount of dividends declared and paid pursuant to this clause (7) does not exceed the net cash proceeds actually received by the Issuer (including any such proceeds contributed to the Issuer by any direct or indirect parent of the Issuer) from any such sale of Disqualified Stock of the Issuer issued after the Issue Date;

(8)      Permitted Payments to Parent;

(9)      [reserved];

(10)      the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date and the declaration and payment of dividends to any direct or indirect parent of the Issuer, the proceeds of which will be used to fund the payment of dividends

64

or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Issuer issued after the Issue Date; *provided*, *however*, that (A) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a pro forma basis, the Issuer could incur an additional $1.00 of Indebtedness pursuant to the Fixed Charge Coverage Ratio, and (B) the aggregate amount of dividends declared and paid pursuant to this clause (10) does not exceed the net cash proceeds actually received by the Issuer (including any such proceeds contributed to the Issuer by any direct or indirect parent of the Issuer) from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date;

(11)    [reserved];

(12)    [reserved];

(13)    [reserved];

(14)    the satisfaction of change of control obligations and asset sale obligations once the Issuer has fulfilled its obligations under this Indenture with respect to a Change of Control or an Asset Sale;

(15)    the repayment of intercompany debt that was permitted to be incurred under this Indenture;

(16)    [reserved]; and

(17)    the payment of dividends or distributions on the Issuer's common equity (or the payment of dividends or distributions to a direct or indirect parent of the Issuer to fund the payment by such parent of dividends or distributions on its common equity) of up to 6.0% per calendar year of the net proceeds received by the Issuer from any public Equity Offering or contributed to the Issuer by a direct or indirect parent of the Issuer from any public Equity Offering; *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (C)(ii) of Section 4.05(a) hereof;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (7), (10) and (17) of this Section 4.05(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

(c)    The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Issuer or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. In the event that a Restricted Payment meets the criteria of more than one of the exceptions described in (1) through (17) above or is entitled to be made pursuant to Section 4.05(a), the Issuer shall, in its sole discretion, classify such Restricted Payment (or

portion thereof) on the date made or later reclassify such Restricted Payment (or portion thereof) in any manner that complies with this Section 4.05.

(d)    The Issuer shall not permit the Unrestricted Subsidiaries to make any Restricted Payments, except to the Issuer or any of its Restricted Subsidiaries.

Section 4.06    <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>.

(a)    The Issuer will not, and will not permit any of its Restricted Subsidiaries that is not a Guarantor to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of the Issuer or any Restricted Subsidiary that is not a Guarantor to:

(1)    pay dividends or make any other distributions on its Capital Stock to the Issuer or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Issuer or any of its Restricted Subsidiaries;

(2)    make loans or advances to the Issuer or any of its Restricted Subsidiaries; or

(3)    sell, lease or transfer any of its properties or assets to the Issuer or any of its Restricted Subsidiaries.

(b)    The restrictions in Section 4.06(a) hereof will not apply to encumbrances or restrictions existing under or by reason of:

(1)    agreements governing Indebtedness outstanding on the Issue Date, including pursuant to the Credit Agreement and Hedging Obligations and the related documentation;

(2)    this Indenture, the Notes, the Note Guarantees (and any Additional Notes and related Guarantees under this Indenture) and the Security Documents;

(3)    applicable law, rule, regulation, order, approval, license, permit or similar restriction;

(4)    any instrument governing Indebtedness or Capital Stock of a Person acquired by the Issuer or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred;

(5)    non−assignment provisions or subletting restrictions in contracts, leases and licenses entered into in the ordinary course of business;

66

(6)     purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 4.06(a)(3) hereof;

(7)     any agreement for the sale or other disposition of the Capital Stock or assets of a Restricted Subsidiary of the Issuer that restricts distributions by that Restricted Subsidiary pending closing of the sale or other disposition;

(8)     Permitted Refinancing Indebtedness; *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

(9)     Liens permitted to be incurred under Section 4.10 hereof that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(10)     provisions limiting the disposition or distribution of assets or property or transfer of Capital Stock in joint venture agreements, asset sale agreements, sale−leaseback agreements, stock sale agreements, limited liability company organizational documents, and other similar agreements entered into in the ordinary course of business, consistent with past practice or with the approval of the Issuer's Board of Directors, which limitation is applicable only to the assets, property or Capital Stock that are the subject of such agreements;

(11)     [reserved];

(12)     restrictions on cash, Cash Equivalents or other deposits or net worth imposed by customers or lessors under contracts or leases entered into in the ordinary course of business;

(13)     other Indebtedness of Restricted Subsidiaries that is incurred subsequent to the Issue Date pursuant to Section 4.07 hereof;

(14)     encumbrances on property that exist at the time the property was acquired by the Issuer or a Restricted Subsidiary of the Issuer;

(15)     contractual encumbrances or restrictions in effect on the Issue Date;

(16)     customary provisions in master limited partnership agreements, joint venture agreements or arrangements and other similar agreements or arrangements relating solely to such master limited partnership or joint venture;

(17)     [reserved];

(18)     any encumbrance or restriction contained in the terms of any Indebtedness or any agreement pursuant to which such Indebtedness was incurred if either (x) the encumbrance or restriction applies only in the event of a payment default or a default

with respect to a financial covenant in such Indebtedness or agreement or (y) the Issuer determines that any such encumbrance or restriction will not materially affect the Issuer's ability to make principal or interest payments on the Notes, as determined in good faith by the Issuer, whose determination shall be conclusive;

(19)     provisions with respect to the receipt of a rebate on an operating lease until all obligations due to a lessor on other operating leases are satisfied or other customary restrictions in respect of assets or contract rights acquired by a Restricted Subsidiary of the Issuer in connection with a Sale/Leaseback Transaction;

(20)     Secured Indebtedness otherwise permitted to be incurred pursuant to Sections 4.07 and 4.10 hereof that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(21)     encumbrances and restrictions contained in contracts entered into in the ordinary course of business, not relating to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of the Issuer or any Restricted Subsidiary of the Issuer or the ability of the Issuer or such Restricted Subsidiary to realize such value, or to make any distributions relating to such property or assets in each case in any material respect; and

(22)     any encumbrances or restrictions imposed by any amendments or refinancings of the contracts, instruments or obligations referred to above in clauses (1) through (21); *provided* that such encumbrances and restrictions contained in such amendments or refinancings are not materially more restrictive, taken as a whole, than such encumbrances and restrictions prior to such amendment or refinancing.

(c)     For purposes of determining compliance with this Section 4.06, (i) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on ordinary shares shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Issuer or a Restricted Subsidiary of the Issuer to other Indebtedness incurred by the Issuer or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

Section 4.07     Incurrence of Indebtedness and Issuance of Preferred Equity.

(a)     The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt), and the Issuer will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any Disqualified Stock or any shares of preferred equity; *provided*, *however*, that the Issuer may incur Indebtedness (including Acquired Debt) or issue Disqualified Stock, and the Issuer or any Restricted Subsidiary of the Issuer may incur Indebtedness (including Acquired Debt), issue Disqualified Stock or issue preferred equity, if on the date thereof the Fixed Charge Coverage Ratio for the Issuer's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding

the date on which such additional Indebtedness is incurred or such Disqualified Stock or such preferred equity is issued, as the case may be, would have been at least 2.0 to 1.0, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred or the Disqualified Stock or the preferred equity had been issued, as the case may be, at the beginning of such four−quarter period; *provided*, *further*, that Restricted Subsidiaries of the Issuer that are not Guarantors may not incur Indebtedness or issue any Disqualified Stock or shares of preferred equity pursuant to this clause (a).

(b)    The provisions of Section 4.07(a) hereof will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "*Permitted Debt*"):

(1)    the incurrence under Debt Facilities by the Issuer or any of its Restricted Subsidiaries that are Guarantors of Indebtedness and letters of credit and bankers' acceptances thereunder in an aggregate principal amount under this clause (1) (with letters of credit deemed to have a principal amount equal to the maximum potential liability of the Issuer and its Restricted Subsidiaries thereunder) not to exceed 200.0 million *less* the aggregate principal amount of any such Debt Facilities prepaid (to the extent, solely in the case of any Debt Facility that is a revolving Debt Facility, there shall be a corresponding commitment reduction) other than from the proceeds of long term Debt Facilities pursuant to a refinancing thereof;

(2)    the incurrence by the Issuer and its Restricted Subsidiaries of Indebtedness to the extent outstanding on the Issue Date (other than Indebtedness incurred pursuant to clauses (1), (3) and (16) of Permitted Debt);

(3)    the incurrence by the Issuer and its Restricted Subsidiaries (including any future Guarantor) of Indebtedness represented by the Notes and the related Note Guarantees to be issued on the Issue Date (but excluding any Additional Notes issued after the Issue Date);

(4)    Indebtedness (including Capital Lease Obligations), Disqualified Stock and preferred stock incurred by the Issuer or any Restricted Subsidiary of the Issuer, to finance the purchase, lease, design, construction, installation, repair, replacement or improvement of property (real or personal) or equipment that is used or useful in a Permitted Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets and Indebtedness arising from the conversion of the obligations of the Issuer or any Restricted Subsidiary of the Issuer under or pursuant to any "synthetic lease" transactions to on-balance sheet Indebtedness of the Issuer or such Restricted Subsidiary, in an aggregate principal amount which, when aggregated with the principal amount of all other Indebtedness, Disqualified Stock and preferred stock incurred pursuant to this clause (4), does not exceed the greater of (x) $20.0 million and (y) 2.5% of Total Assets at the time of incurrence; *provided* that Capital Lease Obligations incurred by the Issuer or any Restricted Subsidiary of the Issuer pursuant to this clause (4) in connection with a Sale/Leaseback Transaction shall not be subject to the foregoing limitation so long as the proceeds of such Sale/Leaseback Transaction are used by the Issuer or such Restricted Subsidiary to permanently repay outstanding Indebtedness of the Issuer and the Restricted Subsidiaries that was secured by a Lien on

69

the assets subject to any such Capital Lease Obligations immediately prior to the entry into such Sale/Leaseback Transaction; provided, however, that the aggregate principal amount of Indebtedness outstanding under this clause (4), together with Indebtedness incurred under clause (18), in each case, by Restricted Subsidiaries that are not Guarantors, together with any Permitted Refinancing Indebtedness in respect thereof, shall not at any time exceed $5.0 million;

(5)    the incurrence by the Issuer or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be incurred under Section 4.07(a) hereof or clauses (2), (3), (4), (5), (12), (16) or (17) of this Section 4.07(b);

(6)    the incurrence by the Issuer or any of its Restricted Subsidiaries of intercompany Indebtedness and cash management pooling obligations and arrangements between or among the Issuer and any of its Restricted Subsidiaries; provided, however, that:

(A)    if the Issuer or any Guarantor is the obligor on such Indebtedness (other than cash management pooling obligations) and the payee is not the Issuer or a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Issuer, or the Note Guarantee, in the case of a Guarantor;

(B)    if the Issuer or any Guarantor is the payee on such Indebtedness (other than cash management pooling obligations), such Indebtedness must be pledged to the Collateral Agent; and

(C)    (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Issuer or a Restricted Subsidiary of the Issuer, and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Issuer or a Restricted Subsidiary of the Issuer, will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Issuer or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7)    the issuance by any of the Issuer's Restricted Subsidiaries to the Issuer or to any of its Restricted Subsidiaries of shares of preferred equity; provided, however, that:

(A)    any subsequent issuance or transfer of Equity Interests that results in any such preferred equity being held by a Person other than the Issuer or a Restricted Subsidiary of the Issuer, and

(B)    any sale or other transfer of any such preferred equity to a Person that is not either the Issuer or a Restricted Subsidiary of the Issuer,

will be deemed, in each case, to constitute an issuance of such preferred equity by such Restricted Subsidiary that was not permitted by this clause (7);

(8)    the incurrence by the Issuer or any of its Restricted Subsidiaries that are Guarantors of Hedging Obligations other than for speculative purposes;

(9)    the Guarantee by the Issuer or any of its Restricted Subsidiaries that are Guarantors of Indebtedness and cash management pooling obligations and arrangements of the Issuer or a Restricted Subsidiary of the Issuer that was permitted to be incurred by another provision of this Section 4.07 (including Section 4.07(a) hereof); *provided* that if the Indebtedness being guaranteed is subordinated to or *pari passu* with the Notes, then the Guarantee shall be subordinated or *pari passu*, as applicable, to the same extent as the Indebtedness guaranteed;

(10)    the incurrence by the Issuer or any of its Restricted Subsidiaries that are Guarantors of Indebtedness in respect of workers' compensation claims, payment obligations in connection with health or other types of social security benefits, unemployment or other insurance or self−insurance obligations, reclamation, statutory obligations, bankers' acceptances, bid, performance, surety or similar bonds and letters of credit or completion or performance guarantees (including without limitation, performance guarantees pursuant to flying contracts, supply agreements or equipment leases), or other similar obligations in the ordinary course of business or consistent with past practice;

(11)    the incurrence by the Issuer or any of its Restricted Subsidiaries that are Guarantors of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds and other obligations in respect of Bank Products;

(12)    Indebtedness, Disqualified Stock or preferred equity of the Issuer or any Restricted Subsidiary of the Issuer that is a Guarantor incurred or issued to finance an acquisition or of Persons that are acquired by the Issuer or any of its Restricted Subsidiaries that are Guarantors or merged into a Restricted Subsidiary of the Issuer that is a Guarantor in accordance with the terms of this Indenture; *provided, however*, that after giving effect to such acquisition and the incurrence of such Indebtedness, Disqualified Stock and preferred equity the Issuer would be permitted to incur at least $1.00 of additional Indebtedness pursuant to Section 4.07(a) hereof;

(13)    [reserved];

(14)    the incurrence of Indebtedness arising from agreements of the Issuer or a Restricted Subsidiary of the Issuer that is a Guarantor providing for indemnification, adjustment of purchase price, earn outs, or similar obligations, in each case, incurred or assumed in connection with the disposition or acquisition of any business, assets or a Subsidiary in accordance with the terms of this Indenture, other than Guarantees of Indebtedness incurred or assumed by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

71

(15)    the incurrence by the Issuer or any of its Restricted Subsidiaries that are Guarantors of additional Indebtedness or the issuance of Disqualified Stock or preferred equity in an aggregate principal amount (or accreted value, as applicable) or having an aggregate liquidation preference at any time outstanding not to exceed $10.0 million (it being understood that any Indebtedness, Disqualified Stock or preferred equity incurred pursuant to this clause (15) shall cease to be deemed incurred or outstanding for purposes of this Section 4.07 from and after the date on which the Issuer could have incurred such Indebtedness or Disqualified Stock or preferred equity under Section 4.07(a) hereof without reliance upon this clause (15)); *provided*, that any Indebtedness incurred by the Issuer or any Guarantor pursuant to this clause (15) that is secured shall be secured by liens solely on the Collateral on a junior basis to the Liens securing the Notes Obligations pursuant to the Notes Intercreditor Agreement;

(16)    the incurrence by the Issuer and the Guarantors (including any future Guarantor) of Indebtedness represented by the Existing Senior Notes and the related guarantees by the Guarantors thereof in an aggregate principal amount, together with Permitted Refinancing Indebtedness in respect thereof, not to exceed $930.0 million *less* the aggregate principal amount of Existing Senior Notes (or any Permitted Refinancing Indebtedness in respect thereof) prepaid (including, without limitation, pursuant to redemptions, offers to purchaser or open market purchases) other than from the proceeds of long term Indebtedness; *provided*, that any Liens securing such Indebtedness shall extend solely to the Collateral and shall be junior to the Liens securing the Notes Obligations pursuant to the Notes Intercreditor Agreement;

(17)    [reserved];

(18)    Indebtedness of the Issuer or any Restricted Subsidiary of the Issuer supported by a letter of credit or bank guarantee issued pursuant to a Debt Facility, in a principal amount not in excess of the stated amount of such letter of credit or bank guarantee; provided, however, that the aggregate principal amount of Indebtedness outstanding under this clause (18), together with Indebtedness incurred under clause (4), in each case, by Restricted Subsidiaries that are not Guarantors, together with any Permitted Refinancing Indebtedness in respect thereof, shall not at any time exceed $5.0 million; and

(19)    Indebtedness of the Issuer or any Restricted Subsidiary of the Issuer that is a Guarantor consisting of (x) the financing of insurance premiums or (y) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business.

(c)    The Issuer will not incur, and will not permit any Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Issuer or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the applicable Note Guarantee on substantially identical terms; *provided*, *however*, that no Indebtedness shall be deemed to be contractually subordinated in right of payment to any other Indebtedness solely by virtue of being unsecured or by virtue of being secured on a first or junior Lien basis.

(d)     For purposes of determining compliance with this Section 4.07, in the event that an item of proposed Indebtedness, Disqualified Stock or preferred equity meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (19) above or is entitled to be incurred pursuant to Section 4.07(a) hereof, the Issuer will be permitted to classify such item of Indebtedness, Disqualified Stock or preferred equity on the date of its incurrence and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or preferred equity in one of the above clauses, although the Issuer may divide and classify an item of Indebtedness, Disqualified Stock or preferred equity in one or more of the types of Indebtedness, Disqualified Stock or preferred equity and may later reclassify all or a portion of such item of Indebtedness, Disqualified Stock or preferred equity, in any manner that complies with this Section 4.07; *provided* that all Indebtedness outstanding under the Credit Agreement shall be incurred solely under Section 4.07(b)(1) and shall not later be reclassified.

(e)     The accrual of interest or dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred equity as Indebtedness due to a change in accounting principles, the payment of dividends on Disqualified Stock or preferred equity in the form of additional shares of the same class of Disqualified Stock or preferred equity and unrealized losses or charges in respect of Hedging Obligations (including those resulting from the application of Standards Codification No. 815—Derivatives and Hedging) will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock or preferred equity for purposes of this Section 4.07; *provided*, in each such case (other than preferred stock that is not Disqualified Stock), that the amount of any such accrual, accretion or payment is included in Fixed Charges of the Issuer as accrued.  Notwithstanding any other provision of this Section 4.07, the maximum amount of Indebtedness that the Issuer or any Restricted Subsidiary of the Issuer may incur pursuant to this Section 4.07 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(f)     For purposes of determining compliance with any U.S. dollar denominated restriction on the incurrence of Indebtedness where the Indebtedness incurred is denominated in a different currency, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the establishment of the facility or instrument under which such Indebtedness was incurred; *provided*, *however*, that if such Indebtedness denominated in a different currency is subject to a Currency Agreement with respect to U.S. dollars, covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be as provided in such Currency Agreement. The principal amount of any refinancing Indebtedness incurred in the same currency as the Indebtedness being refinanced will be the U.S. Dollar Equivalent of the Indebtedness refinanced, except to the extent that (i) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the refinancing Indebtedness will be determined in accordance with the preceding sentence, and (ii) the principal amount of the refinancing Indebtedness exceeds the principal amount of the Indebtedness being refinanced, in which case the U.S. Dollar Equivalent of such excess, as appropriate, will be determined on the date such refinancing Indebtedness is incurred.

(g)     The amount of any Indebtedness outstanding as of any date will be:

(1)    the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (2) the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(2)    in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(A)    the Fair Market Value of such assets at the date of determination; and

(B)    the amount of the Indebtedness of the other Person.

(h)    The Issuer will not permit any of its Unrestricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness (including Acquired Debt), and the Issuer will not permit any of its Unrestricted Subsidiaries to issue any Disqualified Stock or to issue any shares of preferred equity.

Section 4.08    <u>Asset Sales; Casualty Events</u>.

(a)    The Issuer will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)    the Issuer (or the Restricted Subsidiary of the Issuer, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value (such Fair Market Value to be determined on the date of contractually agreeing to such Asset Sale) of the assets or Equity Interests issued or sold or otherwise disposed of;

(2)    at least 75% of the consideration received from such Asset Sale by the Issuer or such Restricted Subsidiary is in the form of cash or Cash Equivalents, or any combination thereof. For purposes of this provision, each of the following shall be deemed to be cash:

(A)    any liabilities of the Issuer or any Restricted Subsidiary of the Issuer (other than (x) contingent liabilities and (y) liabilities that are (i) by their terms subordinated to the Notes or any Note Guarantee, (ii) unsecured or (iii) secured by any Collateral on a junior basis to the Notes (other than ABL Obligations, so long as the commitments with respect thereto are permanently reduced)) that are assumed by the transferee of any such assets and as a result of which the Issuer or such Restricted Subsidiary is released from further liability;

(B)    any securities, notes, other obligations or assets received by the Issuer or any such Restricted Subsidiary from such transferee that are converted by the Issuer or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion;

(C)    any Designated Non−cash Consideration received by the Issuer or any of its Restricted Subsidiaries in such Asset Sale; *provided* that the aggregate Fair Market Value of such Designated Non−cash Consideration, taken together with the Fair Market Value at the time of receipt of all other Designated Non−cash Consideration received pursuant to this clause (C) less the amount of Net Proceeds previously realized in cash from prior Designated Non−cash Consideration is less than $10.0 million (with the Fair Market Value of each item of Designated Non−cash Consideration being measured at the time received and without giving effect to subsequent changes in value); and

(D)    accounts receivable of a business retained by the Issuer or any of its Restricted Subsidiaries, as the case may be, following the sale of such business; *provided* that such accounts receivable (i) are not past due more than 90 days and (ii) do not have a payment date greater than 120 days from the date of the invoices creating such accounts receivable; and

(E)    any Capital Stock or assets of the kind referred to in Section 4.08(b)(1)(F), (G) or (H).

(3)    if such Asset Sale involves the disposition of Collateral, the Issuer or such Restricted Subsidiary has complied with the provisions of this Indenture and the Security Documents; and

(4)    if such Asset Sale involves the disposition of Notes Priority Collateral or, after the discharge of ABL Obligations, the disposition of ABL Facility Priority Collateral, and, if any property other than cash or Cash Equivalents is included in such Net Proceeds, such property shall be made subject to the Note Liens.

(b)    Within 90 days after the receipt of any Net Proceeds from an Asset Sale or Casualty Event, the Issuer (or the applicable Restricted Subsidiary of the Issuer, as the case may be) may:

(1)    apply such Net Proceeds, at its option:

(A)    to the extent such Net Proceeds constitute proceeds from the sale of or casualty event with respect to ABL Facility Priority Collateral, to repay Indebtedness under the Credit Agreement secured by such ABL Facility Priority Collateral;

(B)    to the extent such Net Proceeds constitute proceeds from the sale of Notes Priority Collateral, to permanently repay the Notes;

(C)    [reserved];

(D)    if the assets subject of such Asset Sale or Casualty Event do not constitute Collateral, to permanently reduce (or offer to reduce) Obligations under the Notes; *provided* that all reductions of or offers to reduce Obligations under the Notes shall be made pursuant to and in compliance with Section 3.07 or through

open−market purchases (to the extent such purchases are at or above 100.0% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100.0% of the principal amount thereof, plus the amount of accrued but unpaid interest, if any, on the amount of Notes to be repurchased;

(E)    if the assets subject of such Asset Sale or Casualty Event are the property or assets of a Restricted Subsidiary of the Issuer that is not a Guarantor, (i) to permanently reduce Indebtedness of such Restricted Subsidiary to the extent required by indebtedness of such non-Guarantor (and to correspondingly and permanently reduce commitments with respect thereto), other than Indebtedness owed to the Issuer or another Restricted Subsidiary of the Issuer or (ii) to permanently reduce (or offer to reduce) Obligations under the Notes;

(F)    to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business; *provided*, that in the case of any such acquisition of Capital Stock, such Person is or becomes a Restricted Subsidiary of the Issuer;

(G)    to acquire other short− or long−term assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business; or

(H)    to invest in Additional Assets; or

(2)    enter into a binding commitment to apply the Net Proceeds pursuant to Section 4.08(b)(1)(F), (G) or (H), *provided* that such binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment until the earlier of (x) the date on which such acquisition or expenditure is consummated, and (y) the 45th day following the expiration of the aforementioned 90 day period.

In the case of Section 4.08(b)(1)(F), (G) and (H), the assets acquired with the Net Proceeds from an Asset Sale of, or Casualty Event with respect to, assets constituting Collateral (or assets received in exchange therefor pursuant to Section 4.08(a)(2)) shall be pledged as Collateral under the Security Documents.

(c)    The Issuer shall segregate and hold any Net Proceeds pending the final application of such Net Proceeds in accordance with Section 4.08.

(d)    Any Net Proceeds from Asset Sales or Casualty Events that are not applied or invested as provided in Section 4.08(b) will constitute "*Excess Proceeds*." Not later than the 91st day (or such later date as permitted by Section 4.08(b)(2)) from the later of the date of such Asset Sale or the receipt of such Net Proceeds or receipt of Net Proceeds from any Casualty Event, if the aggregate amount of Excess Proceeds exceeds $10.0 million, within ten Business Days thereof, the Issuer will make an offer to all Holders of Notes (an "*Asset Sale Offer*") to purchase the maximum principal amount of Notes that may be purchased out of the Excess Proceeds. The offer price in any Asset Sale Offer will be equal to 100% of the principal amount plus accrued and unpaid interest, if any, to, but excluding, the date of purchase and will

be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Issuer or any Restricted Subsidiary of the Issuer may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture. If the aggregate principal amount of Notes tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the Trustee will select the Notes to be purchased on a *pro rata* basis. Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero.

(e)      The Issuer will comply with the requirements of Rule 14e−1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Asset Sale provisions of this Indenture by virtue of such compliance.

(f)      Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales and/or Casualty Events pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of this Section 4.08. Upon the expiration of the period for which the Asset Sale Offer remains open (the "*Offer Period*"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer. No later than one Business Day preceding any date of purchase, the Issuer shall deposit with the Trustee (or a Paying Agent, if not the Trustee) the purchase price for the tendered Notes and the Trustee (or a Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering Holder in the amount of the purchase price. In the event that the Excess Proceeds delivered by the Issuer to the Trustee is greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer immediately after the expiration of the Offer Period for application in accordance with this Section 4.08.

(g)      Holders electing to have a Note purchased shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Note duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. Holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note which was delivered by the Holder for purchase and a statement that such Holder is withdrawing his election to have such Note purchased. If at the end of the Offer Period more Notes are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, selection of such Notes for purchase shall be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed, or if such Notes are not so listed, on a *pro rata* basis, by lot or by such other method as the Trustee shall deem fair and appropriate (and in such manner as complies with applicable legal requirements); *provided* that no Notes of $1.00 or less shall be purchased in part.

(h)      Notices of an Asset Sale Offer shall be mailed by the Issuer by first class mail, postage prepaid, or otherwise delivered in accordance with the applicable procedures of DTC, at least 30 but not more than 60 days before the purchase date to each Holder at such Holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Security shall state the portion of the principal amount thereof that is to be purchased.

(i)      A new Note in principal amount equal to the unpurchased portion of any Note purchased in part shall be issued in the name of the Holder thereof upon cancellation of the original Note. On and after the purchase date, unless the Issuer defaults in payment of the purchase price, interest shall cease to accrue on Notes or portions thereof purchased.

Section 4.09      Transactions with Affiliates.

(a)      The Issuer will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each, an "*Affiliate Transaction*"), involving aggregate consideration in excess of $5.0 million, unless:

(1)      the Affiliate Transaction is on terms that are not materially less favorable to the Issuer or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person; and

(2)      the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $40.0 million, a resolution of the Board of Directors of the Issuer certifying that such Affiliate Transaction complies with this Section 4.09 and that such Affiliate Transaction has been approved by a majority of the disinterested members, if any, of the Board of Directors of the Issuer.

(b)      The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 4.09(a) hereof:

(1)      any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto;

(2)      transactions (including a merger) between or among the Issuer and/or any of its Restricted Subsidiaries;

(3)      [reserved];

(4)     payment of reasonable fees to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Issuer or any of its Restricted Subsidiaries or any direct or indirect parent of the Issuer;

(5)     any contribution to the capital of the Issuer or any issuance of Equity Interests (other than Disqualified Stock) of the Issuer to Affiliates of the Issuer or to any director, officer, employee or consultant of the Issuer or any direct or indirect parent of the Issuer, and the granting and performance of registration rights;

(6)     Restricted Payments and Investments that do not violate Section 4.05 hereof;

(7)     [reserved];

(8)     loans or advances to employees or consultants in the ordinary course of business or consistent with past practice;

(9)     [reserved];

(10)     [reserved];

(11)     the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, any acquisition agreements or members' or stockholders' agreement or related documents to which it is a party as of the Issue Date and any amendment thereto or similar agreements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permitted by this clause (11) to the extent that the terms of any such existing agreement, together with all amendments thereto, taken as a whole, or such new agreement are not otherwise more disadvantageous to the Holders taken as a whole than the original agreement as in effect on the Issue Date;

(12)     transactions with Unrestricted Subsidiaries, customers, clients, suppliers, joint ventures, joint venture partners or purchasers or sellers of goods or services or lessors or lessees of property, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture which are, in the aggregate (taking into account all the costs and benefits associated with such transactions), materially no less favorable to the Issuer or its Restricted Subsidiaries than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person, in the reasonable determination of the Board of Directors of the Issuer or senior management of either of them, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(13)     [reserved];

(14)     if such Affiliate Transaction is with a Person in its capacity as a holder of Indebtedness or Capital Stock of the Issuer or any Restricted Subsidiary of the Issuer

where such Person is treated no more favorably than the holders of Indebtedness or Capital Stock of the Issuer or any Restricted Subsidiary of the Issuer;

(15)    transactions effected pursuant to agreements in effect on the Issue Date and any amendment, modification or replacement of such agreement (so long as such amendment or replacement is not materially more disadvantageous to the Holders, taken as a whole);

(16)    [reserved];

(17)    [reserved];

(18)    intellectual property licenses in the ordinary course of business; and

(19)    transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer; *provided*, *however*, that such director abstains from voting as a director of the Issuer on any matter involving such other Person.

(c)    Notwithstanding the foregoing in this Section 4.09 or anything else herein to the contrary, the Issuer will not, and will not permit any Subsidiary of the Issuer to, directly or indirectly, make any payment of, management, consulting, monitoring or advisory fees to the Equity Investors.

Section 4.10    Liens.

(a)    The Issuer will not, and will not permit any Restricted Subsidiary of the Issuer to, directly or indirectly, create, incur or assume any Lien (other than Permitted Liens) on any asset or property of the Issuer or such Restricted Subsidiary that secures any Indebtedness of the Issuer or such Restricted Subsidiary or any related Guarantees.

(b)    For purposes of determining compliance with this Section 4.10, (i) a Lien need not be incurred solely by reference to one category of Permitted Liens described in the definition thereof but is permitted to be incurred in part under any combination thereof and of any other available exemption and (ii) in the event that a Lien (or any portion thereof) meets the criteria of one of more of the categories of Permitted Liens, the Issuer will, in its sole discretion, be entitled to divide, classify or reclassify, in whole or in part, any such Lien (or any portion thereof) among one or more of such categories or clauses in any manner.

Section 4.11    Claims Settlements and Payments.

(a)    Holdings and the Issuer shall not, and shall not permit any Restricted Subsidiary of the Issuer or Holdings to, directly or indirectly, settle any litigation and/or claims arising from or related to the Port Neches Incident in an amount exceeding the Specified Settlement Amount; *provided*, that such settlements may exceed the Specified Settlement Amount in an amount not to exceed the Port Neches Company Allocation of Proceeds.

(b)    Holdings and the Issuer shall not, and shall not permit any Restricted Subsidiary of the Issuer or Holdings to, directly or indirectly, make payments in respect of litigation and/or claims arising from or related to the Port Neches Incident and costs and expenses related thereto (including, without limitation, fees and expenses of counsel) in an amount exceeding the Specified Settlement Amount; *provided*, that such payments may exceed the Specified Settlement Amount in an amount not to exceed the Port Neches Company Allocation of Proceeds.

Section 4.12    Offer to Repurchase Upon Change of Control.

(a)    Upon the occurrence of a Change of Control, the Issuer will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (equal to $1.00 or an integral multiple of $1.00 in excess of $1.00) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of purchase, subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date (the "*Change of Control Payment*"). Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes in accordance with Article 3 of this Indenture, the Issuer will mail a notice to each Holder or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, describing the transaction or transactions that constitute the Change of Control and stating:

(1)    that the Change of Control Offer is being made pursuant to this Section 4.12 and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment;

(2)    the purchase price and the purchase date, which shall be no earlier than 15 days and no later than 60 days from the date such notice is mailed or otherwise delivered in accordance with the applicable procedures of DTC (the "*Change of Control Payment Date*");

(3)    that any Note not tendered will continue to accrue interest;

(4)    that, unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

(5)    that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book–entry transfer, to the Trustee at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)    that Holders will be entitled to withdraw their election if the Trustee receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes delivered for

81

purchase, and a statement that such Holder is withdrawing his election to have the Notes purchased; and

(7)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $1.00 in principal amount or an integral multiple of $1.00 in excess of $1.00.

The Issuer will comply with the requirements of Rule 14e−1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.12 hereof, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.12 by virtue of such compliance.

(b)     On the Business Day immediately preceding the Change of Control Payment Date, the Issuer will, to the extent lawful, deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes accepted for payment.

(c)     On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(1)     accept for payment all Notes or portions of Notes (in a minimum principal amount of $1.00 and integral multiples of $1.00 in excess of $1.00) properly tendered pursuant to the Change of Control Offer and not properly withdrawn; and

(2)     deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.

The Paying Agent will promptly mail or otherwise deliver in accordance with the applicable procedures of DTC to each Holder properly tendered the Change of Control Payment for such Notes, and the Trustee, upon receipt of an Authentication Order, will promptly authenticate and mail or otherwise deliver in accordance with the applicable procedures of DTC (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided*, that each new Note will be in a principal amount of $1.00 or an integral multiple of $1.00 in excess of $1.00. The Issuer will publicly announce the results of the Change of Control Offer on or as soon as reasonably practicable after the Change of Control Payment Date.

(d)     In the event that Holders of not less than 90% in aggregate principal amount of the outstanding Notes accept a Change of Control Offer, Alternate Offer or other tender offer to purchase all of the Notes and the Issuer (or any third party making such Change of Control Offer, Alternate Offer or other tender offer to purchase all of the Notes in lieu of the Issuer) purchases all of the Notes held by such Holders, the Issuer shall have the right, upon not less than 15 nor more than 60 days prior notice, given not more than 15 days following the

purchase pursuant to the Change of Control Offer, Alternate Offer or other tender offer to purchase all of the Notes, to redeem all of the Notes that remain outstanding following such purchase at a redemption price in cash equal to the price offered to each other Holder in the Change of Control Offer, Alternate Offer or other tender offer plus, to the extent not included in the Change of Control Offer, Alternate Offer or other tender offer, accrued and unpaid interest, if any on the Notes that remain outstanding, to, but excluding, to the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(e)     Notwithstanding anything to the contrary in this Section 4.12, the Issuer will not be required to make a Change of Control Offer upon a Change of Control if (1) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.12 and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer, (2) notice of redemption of all outstanding Notes has been previously or is concurrently electronically delivered or mailed pursuant to Section 3.03 hereof, unless and until there is a default in payment of the applicable redemption price or (3) in connection with or in contemplation of any Change of Control, the Issuer has made an offer to purchase (an "*Alternate Offer*") any and all Notes validly tendered at a cash price equal to or higher than the Change of Control Payment and has purchased all Notes properly tendered in accordance with the terms of the Alternate Offer.  Notwithstanding anything to the contrary contained in this Indenture, a Change of Control Offer or an Alternate Offer may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Change of Control Offer or the Alternate Offer is made.  The closing date of any such Change of Control Offer or any such Alternate Offer made in advance of a Change of Control may be changed to conform to the actual closing date of the Change of Control; *provided* that such closing date is not earlier than 15 days nor later than 60 days from the date the Change of Control Offer notice is sent as described in Section 4.12(a) hereof, subject to the extension in the event of a conditional offer.

(f)     The Issuer's obligation to make a Change of Control Offer pursuant to this Section 4.12 may be waived or modified or terminated with the written consent of the Holders of a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Notes) prior to the occurrence of such Change of Control.

Section 4.13    [Reserved].

Section 4.14    Additional Note Guarantees.

If any Restricted Subsidiary of the Issuer (other than any Excluded Subsidiary) that is not already a Guarantor Guarantees any Debt Facilities of the Issuer (or any other Restricted Subsidiary) or otherwise is or becomes a primary obligor under any Debt Facilities, then such Restricted Subsidiary will become a Guarantor and execute a supplemental indenture substantially in the form of Exhibit D hereto and the applicable Security Documents or joinders or supplements thereto and deliver an Opinion of Counsel and Officer's Certificate required by this Indenture to the Trustee within 30 days of the date on which it was acquired or created;

*provided* that this Section 4.14 shall not be applicable to any Guarantee of any Restricted Subsidiary of the Issuer that existed at the time such Person became a Restricted Subsidiary of the Issuer and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary of the Issuer.

Section 4.15    <u>Unrestricted Subsidiaries</u>.

       The Board of Directors of the Issuer may not designate any additional Subsidiary of the Issuer to be an Unrestricted Subsidiary.

Section 4.16    <u>Changes in Covenants upon Notes being Rated Investment Grade</u>.

       (a)     During any period of time and beginning on the day that (a) the Notes have an Investment Grade Rating and (b) no Default or Event of Default has occurred and is continuing under this Indenture, the Issuer and its Restricted Subsidiaries will not be subject to the covenants contained in Sections 4.05, 4.06, 4.07, 4.08, 4.09, 4.14 (but only with respect to any Person that is required to become a Guarantor after the commencement of the applicable suspension date), 4.15 and 5.01(a)(4) (collectively, the "*Suspended Covenants*") shall terminate. If the Issuer and its Restricted Subsidiaries are not subject to these covenants for any period of time as a result of the previous sentence (a "*Fall−Away Period*") and, subsequently, the ratings assigned to the Notes are withdrawn or downgraded so the Notes no longer have an Investment Grade Rating or an Event of Default (other than with respect to a Suspended Covenant) occurs and is continuing, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to these covenants. The ability of the Issuer and its Restricted Subsidiaries to make Restricted Payments after the time of such withdrawal, downgrade or Event of Default will be calculated as if the covenant governing Restricted Payments had been in effect during the entire period of time from the Issue Date. Notwithstanding the foregoing, the continued existence after the end of the Fall−Away Period of facts and circumstances or obligations arising from transactions that occurred during a Fall−Away Period shall not constitute a breach of any covenant set forth in this Indenture or cause an Event of Default hereunder.  Promptly after the commencement of the Fall-Away Period, the Issuer shall deliver to the Trustee an Officer's Certificate certifying to such event.

       (b)     Neither the Trustee nor any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire (i) as to the Issuer's or any Guarantor's compliance with any covenant under this Indenture (other than the covenant to make payment on the Notes), (ii) as to whether or not the rating of the Notes has been adjusted, or (iii) as to whether or not a Fall−Away Period has occurred or is continuing.

Section 4.17    <u>Further Assurances, Instruments and Acts</u>.

       (a)     The Issuer shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

       (b)     The Issuer and the Guarantors shall execute and deliver such additional instruments, certificates or documents, and take all such actions as may be reasonably required from time to time in order to:

      (1)      carry out more effectively the purposes of the Security Documents;

      (2)      create, grant, perfect and maintain the validity, effectiveness and priority of any of the Security Documents and the Liens created, or intended to be created, by the Security Documents; and

      (3)      ensure the protection and enforcement of any of the rights granted or intended to be granted to the Trustee under any other instrument executed in connection therewith.

Section 4.18    <u>Real Property</u>.

      The Issuer shall notify the Collateral Agent in writing within 30 days after the acquisition of any real property owned by the Issuer or any Guarantor that has a fair market value in excess of $5,000,000 that is not subject to the existing Mortgages (the "*After−Acquired Real Property*"), and, within 180 days after the acquisition of such owned real property, as such date may be extended by the Collateral Agent, deliver to the Collateral Agent, with respect to such owned real property, each of the documents described in Section 4.19 hereof and such other documents as may be reasonably necessary or requested by the Collateral Agent to evidence the Liens contemplated by this Indenture and the Mortgages.

Section 4.19    <u>Post-Closing Matters</u>.

      The Issuer and the Guarantors shall deliver to the Collateral Agent within 180 days after the Issue Date (or such longer period as the Collateral Agent shall agree), to the extent not previously provided, each of the following documents with respect to the Notes Priority Collateral, as appropriate:

      (a)      *Mortgages.* With respect to each Mortgaged Property, counterparts of a Mortgage, together with the assignments of leases and rents referred to therein, in proper form for recording in the appropriate recording office of the political subdivision where such Mortgaged Property is located, duly executed and acknowledged by the Issuer or the applicable Guarantor effective to create a valid and enforceable first-priority (with respect to Notes Priority Collateral and subject to the Notes Intercreditor Agreement and the ABL Intercreditor Agreement) mortgage Lien, subject to no Liens other than Permitted Liens, on each Mortgaged Property, except that to the extent such Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes, intangible taxes, documentary taxes or other similar fees and charges, the subject Mortgage shall only secure an amount equal to the fair market value of such Mortgaged Property as reasonably determined, in good faith, by the Issuer and such other instruments necessary to grant the interests purported to be granted by such Mortgage (and to record such Mortgage in the appropriate recording offices) under the laws of any applicable jurisdiction.

      (b)      *Title Insurance.* With respect to each Mortgage encumbering any Mortgaged Property, a policy of title insurance (or commitment to issue such a policy to be followed by the delivery of such policy of title insurance within a reasonable time) in an amount not to exceed the fair market value of such Mortgaged Property as reasonably determined, in good faith, by the Issuer (such policies collectively, the "*Mortgage Policies*") issued by any title

insurance company (the "*Title Company*"), insuring (or committing to insure) that such Mortgage constitutes a valid and enforceable first-priority (with respect to Notes Priority Collateral and subject to the Notes Intercreditor Agreement and the ABL Intercreditor Agreement) mortgage Lien on the respective Mortgaged Property, free and clear of all Liens other than Permitted Liens, which Mortgage Policies shall (A) not include the general title exception for mechanics' liens and (B) provide for such affirmative insurance as is commercially reasonable and which is available in the applicable jurisdiction at commercially reasonable rates.

(c)    *Surveys*. With respect to each Mortgaged Property, the Issuer shall deliver all surveys as reasonably necessary, certified to the Collateral Agent for its benefit, for the benefit of the Trustee, for the benefit of the Holders and for the benefit of the Title Company, prepared by an independent professional licensed land surveyor or an affidavit of "no change" executed by the Issuer with respect to any existing survey, sufficient for the Title Company to delete the survey exception  (if permitted in the relevant jurisdiction) and issue a "same-as-survey" endorsement to the Mortgage Policies to the extent such endorsement is available in the relevant jurisdiction at commercially reasonable rates.

(d)    *Fixture Filings*. With respect to each Mortgaged Property, to the extent the Mortgages are not sufficient to qualify as a fixture filing under applicable laws of the jurisdiction, a copy of a filed UCC-1 in the jurisdiction in which such Mortgaged Property is located in order to perfect the Lien on and security interest in the fixtures encumbered by the applicable Mortgage in favor of the Collateral Agent for its benefit and the benefit of the Trustee and the Holders.

(e)    *Title Insurance Documents*. With respect to each Mortgaged Property, such affidavits, certificates, information and instruments as shall be reasonably and customarily required to induce the Title Company to issue the Mortgage Policies.

(f)    *Collateral Fees and Expenses*. Evidence of payment by the Issuer of all search and examination charges, escrow charges and related charges, title insurance premiums, filing, documentary, stamp, intangible and mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgages, fixture filings and issuance of the Mortgage Policies and endorsements required pursuant to clause (b) above.

(g)    *Real Estate Opinion Letter*. The opinion of counsel to the Issuer in the jurisdiction in which a Mortgaged Property is located, dated as of the date of the Mortgages and addressed to the Collateral Agent, the Trustee and the Collateral Agent, in form and substance reasonably satisfactory to the Collateral Agent, relating to the enforceability of the Mortgages.

Section 4.20    [Reserved].

Section 4.21    Business of Holdings.

Holdings shall not engage in any business activities or have any assets or liabilities other than its ownership of the Capital Stock of the Issuer and liabilities incidental thereto and liabilities pursuant to the Credit Agreement and this Indenture.

Section 4.22    Limited Condition Transactions; Measuring Compliance.

(a)    With respect to any (i) Investment or acquisition, in each case, the consummation by the Issuer or any Restricted Subsidiary of the Issuer of which is not conditioned on availability of, or on obtaining, third-party financing for such Investment or acquisition (whether by merger, amalgamation, consolidation or other business combination or the acquisition of Capital Stock or otherwise) as applicable and (ii) redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness, Disqualified Stock or preferred stock requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment (any transaction described in clauses (i) or (ii), a "*Limited Condition Transaction*"), in each case for purposes of determining:

(1)    whether any Indebtedness (including Acquired Debt), Disqualified Stock or preferred stock that is being incurred or issued in connection with such Limited Condition Transaction is permitted to be incurred in compliance with Section 4.07;

(2)    whether any Lien being incurred in connection with such Limited Condition Transaction or to secure any such Indebtedness, Disqualified Stock or preferred stock is permitted to be incurred in accordance with Section 4.10;

(3)    whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Transaction complies with the covenants or agreements contained in this Indenture or the Notes; and

(4)    any calculation of the Fixed Charge Coverage Ratio, Net Income, Consolidated Net Income, and/or Consolidated Adjusted EBITDA and/or Total Assets and, whether a Default or Event of Default exists in connection with the foregoing,

at the option of the Issuer, the date that the definitive agreement (or other relevant definitive documentation) for such Limited Condition Transaction is entered into (the "*Transaction Agreement Date*") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio" or "Consolidated Adjusted EBITDA" and if the Issuer or the Restricted Subsidiaries could have taken such action on the relevant Transaction Agreement Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, if the Issuer elects to use the Transaction Agreement Date as the applicable date of determination in accordance with the foregoing, (a) such election may not be revoked, (b) any fluctuation or change in the Fixed Charge Coverage Ratio, Net Income, Consolidated Net Income, Consolidated Adjusted EBITDA or Total Assets of the Issuer, the target business, or assets to be acquired subsequent to the Transaction Agreement Date and prior to the consummation of such Limited Condition Transaction, will not be taken into account for purposes of determining whether any Indebtedness, Disqualified Stock, preferred stock or Lien that is being incurred or issued in connection with such Limited Condition Transaction is permitted to be incurred or issued or in connection with compliance by the Issuer or any of the Restricted Subsidiaries with any other provision of this Indenture or the Notes or any other action or transaction undertaken in connection with such Limited Condition Transaction and (c) until such Limited Condition

Transaction is consummated or the definitive agreements related thereto are terminated, such Limited Condition Transaction and all transactions proposed to be undertaken in connection therewith (including the incurrence of Indebtedness and Liens) will be given pro forma effect when determining compliance of other transactions (including the incurrence or issuance of Indebtedness, Disqualified Stock, preferred stock and Liens unrelated to such Investment, acquisition or repayment, repurchase or refinancing of Indebtedness) that are consummated after the Transaction Agreement Date and on or prior to the consummation of such Limited Condition Transaction and any such transactions (including any incurrence or issuance of Indebtedness, Disqualified Stock or preferred stock and the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and outstanding thereafter for purposes of calculating any baskets or ratios under this Indenture after the date of such agreement and before the consummation of such Limited Condition Transaction; *provided* that for purposes of any such calculation of the Fixed Charge Coverage Ratio, consolidated interest expense will be calculated using an assumed interest rate for the Indebtedness to be incurred in connection with such Limited Condition Transaction based on the indicative interest margin contained in any financing commitment documentation with respect to such Indebtedness or, if no such indicative interest margin exists, as reasonably determined by the Issuer in good faith.

(b)    Compliance with any requirement relating to absence of Default or Event of Default may be determined as of the Transaction Agreement Date and not as of any later date as would otherwise be required under this Indenture.

(c)    In the event an item of Indebtedness, Disqualified Stock or preferred stock (or any portion thereof) is incurred or issued or other transaction is undertaken on the same date that any other item of Indebtedness, Disqualified Stock or preferred stock (or any portion thereof) is incurred or issued, any other Lien is incurred or other transaction is undertaken, then the Fixed Charge Coverage Ratio will be calculated with respect to such incurrence, issuance or other transaction without regard to any other incurrence, issuance or transaction. Each item of Indebtedness, Disqualified Stock or preferred stock that is incurred or issued and each other transaction undertaken will be deemed to have been incurred, issued or taken first, to the extent available, pursuant to the relevant Fixed Charge Coverage Ratio test.

ARTICLE 5

SUCCESSORS

Section 5.01    Consolidation, Amalgamation, Merger, or Sale of Assets.

(a)    The Issuer will not, directly or indirectly: (i) consolidate, amalgamate or merge with or into another Person; or (ii) sell, assign, transfer, convey or otherwise dispose of (including by way of division) all or substantially all of the Issuer's properties or assets (determined on a consolidated basis for the Issuer and its Restricted Subsidiaries) in one or more related transactions to another Person, unless:

(1)    either:

(A)    the Issuer is the surviving entity; or

(B)    the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation, partnership (including a master limited partnership) or limited liability company organized or existing under the laws of the United States, any state of the United States or the District of Columbia;

(2)    the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Issuer under the Notes, this Indenture and the Security Documents pursuant a supplemental indenture and amendments to the Security Documents;

(3)    immediately after such transaction, no Default or Event of Default exists;

(4)    the Issuer or the Person formed by or surviving any such consolidation or merger (if other than the Issuer), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four–quarter period be permitted to incur at least $1.00 of additional Indebtedness pursuant to Section 4.07(a) hereof;

(5)    the successor entity causes such amendments, supplements or other instruments to be executed, delivered, filed and recorded, as applicable, in such jurisdictions as may be required by applicable law to preserve and protect the Lien of the Security Documents on the Collateral owned by or transferred to the successor entity;

(6)    the Collateral owned by or transferred to the successor entity shall (a) continue to constitute Collateral under this Indenture and the Security Documents, (b) be subject to the Lien in favor of the Collateral Agent for the benefit of the Trustee and the Holders, and (c) not be subject to any Lien other than Permitted Liens; and

(7)    the property and assets of the Person which is merged or consolidated with or into the successor entity, to the extent that they are property or assets of the types which would constitute Collateral under the Security Documents, shall be treated as after-acquired property and the successor entity shall take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the Security Documents in the manner and to the extent required in this Indenture; and

(8)    the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger, sale, assignment, transfer, conveyance or other disposition and such supplemental indenture and amendments comply with this Indenture and the Security Documents and that all conditions precedent therein provided for relating to such transaction have been complied with.

(b)      The Issuer shall not, directly or indirectly, lease all or substantially all of the properties and assets of it and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to any other Person.

(c)      This Section 5.01 will not apply to:

(1)      a merger of the Issuer with an Affiliate solely for the purpose of reincorporating the Issuer under the laws of Canada or any province or territory thereof or the United States, any state of the United States or the District of Columbia; and

(2)      any consolidation, amalgamation, merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets between or among the Issuer and any Guarantor.

Section 5.02    Successor Substituted.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Issuer, in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Issuer is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Issuer" shall refer instead to the successor Person and not to the Issuer), and may exercise every right and power of the Issuer under this Indenture with the same effect as if such successor Person had been named as the Issuer herein; *provided*, *however*, that the Issuer shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all or substantially all of the Issuer's properties or assets in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

Section 5.03    Evidence to Be Given to Trustee.

No consolidation, merger, sale, conveyance, transfer or lease shall be effective unless the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance, transfer or lease and any such assumption and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with the provisions of this Article 5.

## ARTICLE 6

## DEFAULTS AND REMEDIES

Section 6.01    Events of Default and Remedies.

Each of the following is an "*Event of Default*":

(1)      default for 30 days in the payment when due of interest on the Notes;

(2)     default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or Applicable Premium or any other premium, if any, on, the Notes;

(3)     failure by the Issuer or any of the Issuer's Restricted Subsidiaries for 60 days after notice to the Issuer by the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class to comply with any of the other agreements in this Indenture or the Security Documents;

(4)     default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuer or any of the Issuer's Restricted Subsidiaries that are Significant Subsidiaries or any group of the Issuer's Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary of the Issuer (or the payment of which is guaranteed by the Issuer or any of the Issuer's Restricted Subsidiaries), whether such Indebtedness or Guarantee now exists, or is created after the Issue Date (but excluding Indebtedness owing to the Issuer or a Restricted Subsidiary of the Issuer), if that default:

(A)     is caused by a failure to pay principal on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness following the Stated Maturity of such Indebtedness (a "*Payment Default*"); or

(B)     results in the acceleration of such Indebtedness prior to its Stated Maturity, and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $35.0 million or more;

(5)     failure by the Issuer or any of the Issuer's Restricted Subsidiaries that are Significant Subsidiaries, or any group of the Issuer's Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary, to pay final and non−appealable judgments entered by a court or courts of competent jurisdiction aggregating in excess of $35.0 million (net of any amounts which are covered by insurance or bonded), which judgments are not paid, waived, satisfied, discharged or stayed for a period of 60 days;

(6)     the Issuer or any of the Issuer's Restricted Subsidiaries that is a Significant Subsidiary or any group of the Issuer's Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Law:

(A)     commences a voluntary case, or proceeding (including the filing of a notice of intention in respect thereof),

(B)     consents to the entry of an order for relief against it in an involuntary case or proceeding,

(C)     consents to the appointment of a custodian, receiver, receiver−manager, administrative receiver, administrator, liquidator, trustee,

liquidation custodian, sequestrator, conservator, or similar official of it or for all or substantially all of its property, or

(D)    makes a general assignment for the benefit of its creditors;

(7)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)    is for relief against the Issuer or any of the Issuer's Restricted Subsidiaries that is a Significant Subsidiary or any group of the Issuer's Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary in an involuntary case or proceeding;

(B)    appoints a custodian, receiver, receiver−manager, administrative receiver, administrator, liquidator, trustee, liquidation custodian, sequestrator, conservator, or similar official of the Issuer or any of the Issuer's Restricted Subsidiaries that is a Significant Subsidiary or any group of the Issuer's Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary or for all or substantially all of the property of the Issuer or any of the Issuer's Restricted Subsidiaries that is a Significant Subsidiary or any group of the Issuer's Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary; or

(C)    orders the liquidation, winding up, or dissolution or a suspension of payments against the Issuer or any of the Issuer's Restricted Subsidiaries that is a Significant Subsidiary or any group of the Issuer's Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days;

(8)    except as permitted by this Indenture, any Note Guarantee of any Restricted Subsidiary of the Issuer that is a Significant Subsidiary or any group of the Issuer's Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary of the Issuer is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect (other than in accordance with the terms of such Note Guarantee and this Indenture), or any Guarantor, or any Person acting on behalf of any such Guarantor, denies or disaffirms its obligations under its Note Guarantee and such Default continues for ten days;

(9)    any (x) Security Document governing a security interest with respect to any Collateral having a Fair Market Value in excess of $35.0 million or (y) obligation under the Security Documents of the Issuer or any of the Issuer's Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Issuer that, taken together as of the latest audited consolidated financial statements for the Issuer and its Restricted Subsidiaries would constitute a Significant Subsidiary ceases to be in full force and effect (except as contemplated by the terms of this Indenture and the Note Guarantees and except for the failure of any security interest with respect to the Collateral to remain in full force and effect, which is governed by clause (10) below) or is declared

null and void in a judicial proceeding or the Issuer or any Guarantor that is a Significant Subsidiary or group of Guarantors that taken together as of the latest audited consolidated financial statements of the Issuer and its Restricted Subsidiaries would constitute a Significant Subsidiary denies or disaffirms its obligations under this Indenture, its Note Guarantee or any Security Document and the Issuer fails to cause such Guarantor or Guarantors, as the case may be, to rescind such denials or disaffirmations within 60 days;

(10)    with respect to any Collateral having a Fair Market Value in excess of $35.0 million, individually or in the aggregate, (A) the failure of the security interest with respect to such Collateral under the Security Documents, at any time, to be in full force and effect, perfected and having the priorities set forth in the Intercreditor Agreements for any reason other than in accordance with their terms and the terms of this Indenture and other than the satisfaction in full of all obligations under this Indenture and discharge of this Indenture if such failure continues for 60 days or (B) the declaration that the security interest with respect to such Collateral created under the Security Documents or under this Indenture is invalid or unenforceable, if such Default continues for 60 days or (C) the assertion by the Issuer or any Guarantor, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable;

(11)    any of the Intercreditor Agreements shall cease, for any reason (other than by reason of the express release or termination thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Issuer or any Guarantor not to be a legal, valid and binding obligation of any party thereof; and

(12)    failure by the Issuer or any of the Issuer's Subsidiaries for 30 calendar days after notice to the Issuer and the Trustee by Holders then party to the Holder Agreement representing 25% in aggregate principal amount of the Notes then outstanding voting as a single class to comply with the Holder Agreement.

Section 6.02    Acceleration.

(a)    In the case of an Event of Default specified in clause (6) or (7) of Section 6.01 hereof, with respect to the Issuer or any Restricted Subsidiary of the Issuer that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Issuer that, taken together, would constitute a Significant Subsidiary, all outstanding Notes (including the Redemption Premium) will become due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes (including the Redemption Premium) to be due and payable immediately. Upon any such declaration, the Notes (including the Redemption Premium) shall become due and payable immediately.

(b)    In the event of any Event of Default specified in clause (4) of Section 6.01, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) will be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or Guarantee that is the basis for such Event of Default has been discharged or (y) the holders

thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described in this Section 6.02 be annulled, waived or rescinded upon the happening of any such events.

(c)    If the Notes are accelerated or otherwise become due prior to their maturity date as a result of an Event of Default or by operation of law or an Applicable Premium Event occurs, the principal of, accrued and unpaid interest and premium on the Notes subject to such Applicable Premium Event shall be due and payable.  If the Notes are accelerated or otherwise become due prior to their maturity date, in each case, as a result of an Event of Default or by operation of law or any Applicable Premium Event occurs prior to August 2, 2023, the amount of principal of, accrued and unpaid interest and premium on the Notes that becomes due and payable shall equal the redemption price applicable with respect to an optional redemption of the Notes, in effect on the date of such acceleration, Applicable Premium Event or the date on which the Notes otherwise become due as if such acceleration or other circumstance causing the Notes to become due were an optional redemption of the Notes accelerated or becoming due (the "*Redemption Premium*").  In any such case, the Redemption Premium shall constitute part of the obligations payable by the Issuer (and guaranteed by the Guarantors) in respect of the Notes, which obligations are secured by the Collateral, and constitutes liquidated damages, not unmatured interest or a penalty, as the actual amount of damages to the holders as a result of the relevant Applicable Premium Event would be impracticable and extremely difficult to ascertain.  Accordingly, the Redemption Premium is provided by mutual agreement of the Issuer and the Guarantors and the holders of the Notes as a reasonable estimation and calculation of such actual lost profits and other actual damages of such holders.  Without limiting the generality of the foregoing, it is understood and agreed that upon the occurrence of any Applicable Premium Event, the Redemption Premium shall be automatically and immediately due and payable as though any Notes subject to an Applicable Premium Event were voluntarily prepaid as of such date and shall constitute part of the obligations payable by the Issuer (and guaranteed by the Guarantors) in respect of the Notes, which obligations are secured by the Collateral.  The Redemption Premium shall also be automatically and immediately due and payable if the Notes are satisfied, released or discharged by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means.  THE ISSUER AND THE GUARANTORS HEREBY EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR OTHER LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING REDEMPTION PREMIUM IN CONNECTION WITH ANY SUCH EVENTS, ANY RESCISSION OF SUCH ACCELERATION OR THE COMMENCEMENT OF ANY BANKRUPTCY OR INSOLVENCY EVENT.  The Issuer and the Guarantors expressly agree (to the fullest extent it and they may lawfully do so) that with respect to the Redemption Premium payable under the terms of the Indenture: (i) the Redemption Premium is reasonable and is the product of an arm's length transaction between sophisticated business parties, ably represented by counsel; (ii) the Redemption Premium shall be payable notwithstanding the then-prevailing market rates at the time payment is made; (iii) there has been a course of conduct between the holders of the Notes and the Issuer and the Guarantors giving specific consideration in this transaction for such agreement to pay the Redemption Premium; and (iv) the Issuer and the Guarantors shall be estopped hereafter from claiming differently than as agreed to in this

paragraph.  The Issuer and the Guarantors expressly acknowledge that their agreement to pay the Redemption Premium as herein described is a material inducement to the holders of the Notes to purchase the Notes.

Section 6.03    Other Remedies.

(a)    The Trustee may pursue any available remedy to collect the payment of principal, Applicable Premium, any other premium and interest on the Notes or to enforce the performance of any provision of the Notes, Note Guarantees or this Indenture, including giving instructions to the Collateral Agent to take enforcement action in accordance with the terms of the Security Documents.

(b)    The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04    Waiver of Past Defaults.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of the Holders of all of the Notes, rescind an acceleration or waive an existing Default or Event of Default and its consequences hereunder except a continuing Default or Event of Default in the payment of interest or Applicable Premium or any other premium on, or the principal of, the Notes. Upon any such rescission or waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05    Control by Majority.

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other Holders or that may involve the Trustee in personal liability.

Section 6.06    Limitation on Suits.

(a)    A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(1)    such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2)    Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested the Trustee in writing to pursue the remedy;

(3)      such Holder or Holders offer and, if requested, provide to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4)      the Trustee does not comply with the request within 60 days after receipt of the request and the offer of security or indemnity; and

(5)      during such 60−day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a written direction inconsistent with such request.

(b)      A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

Section 6.07      Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the contractual right of any Holder to bring suit for the payment of principal, Applicable Premium or any other premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note , shall not be amended without the consent of such Holder.

Section 6.08      Collection Suit by Trustee.

If an Event of Default specified in clauses (1) or (2) of Section 6.01 hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, Applicable Premium or any other premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09      Trustee or Collateral Agent May File Proofs of Claim.

The Trustee or the Collateral Agent is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee or the Collateral Agent (including any claim for the compensation, expenses, disbursements and advances of the Trustee or the Collateral Agent, their agents and counsel) and the Holders allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee or the Collateral Agent, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee or the Collateral Agent any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee or the Collateral Agent, their agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee or the Collateral Agent, their agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any

96

reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee or the Collateral Agent to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee or the Collateral Agent to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10    Priorities.

(a)    If the Trustee collects any money pursuant to this Article 6, it shall, subject to the Intercreditor Agreements (to the extent applicable), pay out the money in the following order:

*First*: to the Trustee, the Collateral Agent, and each of their respective agents and attorneys for amounts due hereunder or under any Security Document, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the Collateral Agent and the costs and expenses of collection;

*Second*: to Holders for amounts due and unpaid on the Notes for principal, Applicable Premium, any other premium and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, Applicable Premium, any other premium and interest, respectively; and

*Third*: to the Issuer or to such party as a court of competent jurisdiction shall direct in writing.

(b)    The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee or the Collateral Agent for any action taken or omitted by it as a Trustee or the Collateral Agent, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee or the Collateral Agent, a suit by a Holder pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

ARTICLE 7

TRUSTEE

Section 7.01    Duties of Trustee.

(a)    If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(1)    the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, with respect to certificates or opinions specifically required by any provision hereof to be furnished to it, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)    The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)    this Section 7.01(c) does not limit the effect of Section 7.01(b);

(2)    the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)    the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Sections 6.04 and 6.05 hereof, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes.

(d)    No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability.

(e)    The Trustee will not be liable for interest on or the investment of any money received by it except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)    Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to Section 7.01.

Section 7.02    Rights of Trustee.

98

(a)     The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel. The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and will not be responsible for the misconduct, negligence or failure to act of any attorney or agent appointed with due care.

(d)     The Trustee will not be liable for any action it takes, suffers or omits to take in good faith that it believes to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer or any Guarantor, as applicable, will be sufficient if signed by an Officer of the Issuer or such Guarantor, as applicable.

(f)     The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture or the Security Documents at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity or security satisfactory to it against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)     In no event shall the Trustee be responsible or liable for special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h)     The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder as Collateral Agent, Registrar and Paying Agent, and each Agent, custodian and other Person employed to act hereunder.

(j)    The Trustee may request that the Issuer and each Guarantor deliver an Officer's Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(k)    Notwithstanding any provision herein to the contrary, in no event shall the Trustee be liable for any failure or delay in the performance of its obligations under this Indenture because of circumstances beyond its control, including, but not limited to, nuclear or natural catastrophes or acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer (software and hardware) facilities, or the failure of equipment or interruption of utilities, communications or computer (software and hardware) facilities, and other causes beyond its control whether or not of the same class or kind as specifically named above.

(l)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(m)    The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(n)    The permissive rights of the Trustee hereunder shall not be construed as duties.

Section 7.03    <u>Individual Rights of Trustee</u>.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with either Issuer or any Guarantor or any Affiliate of either Issuer or any Guarantor with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest it must (i) eliminate such conflict within 90 days or (ii) resign. Any Agent may do the same with like rights and duties. The Trustee is also subject to Section 7.10 hereof.

Section 7.04    <u>Trustee's Disclaimer</u>.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of any offering materials, this Indenture, the Notes or any Note Guarantee, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the

Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes, any Note Guarantee or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05    Notice of Defaults.

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee will mail or otherwise deliver in accordance with the applicable procedures of DTC, to Holders a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, Applicable Premium, any other premium, if any, or interest on, any Note, the Trustee may and shall be protected in withholding the notice if and so long as it in good faith determines that withholding the notice is in the interests of the Holders.

Section 7.06    [Reserved].

Section 7.07    Compensation and Indemnity.

(a)    The Issuer will pay to each of the Trustee and the Collateral Agent from time to time such compensation, as agreed in writing from time to time, for its acceptance and administration of this Indenture, the Intercreditor Agreement and/or the other the Security Documents and services hereunder. The Trustee's and the Collateral Agent's compensation will not be limited by any law on compensation of a trustee of an express trust. The Issuer will reimburse each of the Trustee and the Collateral Agent promptly upon request for all reasonable and documented disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable and documented compensation, disbursements and expenses of each of the Trustee's and the Collateral Agent's agents and counsel.

(b)    The Issuer and each Guarantor, jointly and severally, will indemnify each of the Trustee, the Collateral Agent and their respective officers, agents, directors and employees and hold each of them harmless from and against any and all losses, liabilities, claims, damages, costs or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties or the exercise of their respective rights under this Indenture, the Intercreditor Agreements and/or the other the Security Documents, including the reasonable and documented costs and expenses of enforcing this Indenture, the Intercreditor Agreements and/or the other the Security Documents against the Issuer and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Issuer, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense is the result of its own gross negligence or willful misconduct. The Trustee or the Collateral Agent, as the case may be, will notify the Issuer promptly of any claim of which it or a Responsible Officer has received written notice for which it may seek indemnity. Failure by the Trustee or the Collateral Agent, as the case may be, to so notify the Issuer will not relieve the Issuer or any of the Guarantors of their obligations hereunder.

(c)     The obligations of the Issuer and the Guarantors under this Section 7.07 will survive the satisfaction and discharge of this Indenture, the payment of the Notes and/or the resignation or removal of the Trustee or the Collateral Agent.

(d)     To secure the Issuer's and the Guarantors' payment obligations in this Section 7.07, each of the Trustee and the Collateral Agent will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture, the payment of the Notes and/or the resignation or removal of the Trustee or the Collateral Agent.

(e)     When the Trustee or the Collateral Agent incurs expenses or renders services after an Event of Default specified in clause (6) or (7) of Section 6.01 hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

Section 7.08     Replacement of Trustee.

(a)     A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b)     The Trustee may resign at any time and be discharged from the trust hereby created by so notifying the Issuer in writing. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing not less than 30 days prior to the effective date of such removal. The Issuer may remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10 hereof;

(2)     the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)     a custodian or public officer takes charge of the Trustee or its property; or

(4)     the Trustee  becomes incapable of acting.

(c)     If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee within 60 days of such resignation or removal.  If a majority of Holders do not so appoint a successor Trustee within such 60 days, the Issuer may appoint a successor Trustee; *provided*, that within one year after the Issuer-appointed successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

(d)     If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring or removed Trustee, the Issuer, or the Holders of at

102

least 10% in aggregate principal amount of the then outstanding Notes may, at the expense of the Issuer, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)    If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition at the expense of the Issuer any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)    A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Holders. The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee.

(g)    The retiring Trustee shall have no responsibility or liability for any action or inaction of a successor Trustee.

Section 7.09    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including this transaction) to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.10    Eligibility; Disqualification.

There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities.

ARTICLE 8

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance.

The Issuer may at any time, at the option of the Issuer's Board of Directors evidenced by a resolution set forth in an Officer's Certificate, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes and Note Guarantees upon compliance with the conditions set forth below in this Article 8.

Section 8.02    Legal Defeasance and Discharge.

(a)        Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Issuer and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Note Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Issuer and the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Note Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all their other obligations under such Notes, the Note Guarantees and this Indenture (and the Trustee, on written demand of and at the expense of the Issuer, shall execute instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1)        the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or Applicable Premium or any other premium, if any, on, such Notes when such payments are due from the trust referred to in Section 8.05 hereof;

(2)        the Issuer's obligations with respect to such Notes under Sections 2.02, 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 2.10 and Section 4.02 hereof;

(3)        the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Issuer's and the Guarantors' obligations in connection therewith; and

(4)        this Article 8.

(b)        Subject to compliance with this Article 8, the Issuer may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03    Covenant Defeasance.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Issuer and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from each of their obligations under the covenants contained in Sections 4.03, 4.05, 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.14, 4.16, 4.17, 4.18 and 4.19 and Section 5.01(a)(3) and 5.01(a)(4) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Note Guarantees, the Issuer and the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any

other provision herein or in any other document and such omission to comply with such covenants will not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified in this Section 8.03, the remainder of this Indenture and such Notes and Note Guarantees will be unaffected thereby. In addition, upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, clauses (3) through (5) of Section 6.01 hereof will not constitute Events of Default.

Section 8.04    <u>Conditions to Legal or Covenant Defeasance</u>.

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03 hereof:

(1)    the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in U.S. dollars in such amounts as will be sufficient (without reinvestment), to pay the principal of, Applicable Premium or any other premium, if any, and interest on, the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Issuer must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date; *provided* that upon any redemption that required the payment of the Applicable Premium, the amount deposited will be sufficient for purposes of this Indenture to the extent that an amount is deposited with the Trustee equal to the Applicable Premium calculated as of the date of the notice of redemption, with any deficit as of the date of redemption (any such amount, the "*Applicable Premium Deficit*") only required to be deposited with the Trustee on or prior to the date of redemption.  Any Applicable Premium Deficit will be set forth in an Officer's Certificate delivered to the Trustee simultaneously with the deposit of such Applicable Premium Deficit that confirms that such Applicable Premium Deficit will be applied toward such redemption;

(2)    in the case of an election under Section 8.02 hereof, the Issuer must deliver to the Trustee an Opinion of Counsel (subject to customary exceptions and exclusions) confirming that:

(A)    the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling; or

(B)    since the Issue Date there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of an election under Section 8.03 hereof, the Issuer must deliver to the Trustee an Opinion of Counsel (subject to customary exceptions and exclusions) confirming that the Holders of the outstanding Notes will not recognize

income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the grant of any Lien securing such borrowing);

(5)    such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound;

(6)    the Issuer must deliver to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of preferring the Holders over the other creditors of the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or others; and

(7)    the Issuer must deliver to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05    Deposited Money to be Held in Trust; Other Miscellaneous Provisions.

(a)    Subject to Section 8.06 hereof, all money deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, Applicable Premium or any other premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

(b)    The Issuer will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

(c)    Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Issuer from time to time upon the written request of the Issuer any money held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under clause (1) of Section 8.04 hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06    <u>Repayment to the Issuer</u>.

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, Applicable Premium, any other premium or interest on, any Note and remaining unclaimed for two years after such principal, Applicable Premium, any other premium or interest has become due and payable shall be paid to the Issuer on its written request or (if then held by the Issuer) will be discharged from such trust; and the Holders will thereafter be permitted to look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, will thereupon cease; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any such repayment, shall, at the expense of the Issuer, cause to be published once, in the New York Times and The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Issuer.

Section 8.07    <u>Reinstatement</u>.

If the Trustee or Paying Agent is unable to apply any U.S. dollars in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided*, *however*, that, if the Issuer makes any payment of principal of, Applicable Premium or any other premium, if any, or interest on, any Note following the reinstatement of its obligations, the Issuer will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    <u>Without Consent of Holders</u>.

(a)    Notwithstanding Section 9.02 of this Indenture, the Issuer, the Collateral Agent and the Trustee (as applicable) may amend or supplement this Indenture or the Notes or the Note Guarantees, the Intercreditor Agreements or any other Security Document without the consent of any Holder to cure any ambiguity, omission, defect or inconsistency or to provide for the assumption by a successor corporation, partnership or limited liability company of the obligations of the Issuer under this Indenture, the Notes, the Intercreditor Agreements and the other Security Documents:

(1)    to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated notes are issued in registered form for purposes of Section 163(f) of the Code);

107

(2)    to add guarantees with respect to the Notes or to evidence the release of any Guarantor from its Note Guarantee and under the Security Documents as provided in this Indenture;

(3)    to further secure the Notes;

(4)    to add to the covenants of the Issuer for the benefit of the Holders;

(5)    to surrender any right or power conferred upon the Issuer;

(6)    to make any change that does not adversely affect the rights of any Holder;

(7)    to evidence or provide for the acceptance of appointment under this Indenture of a successor Trustee;

(8)    [reserved];

(9)    to make certain changes to this Indenture to provide for the issuance of Additional Notes; or

(10)    to provide for the release of Collateral from the Liens of this Indenture, the Intercreditor Agreements and the other Security Documents when permitted or required by the Intercreditor Agreements, the other Security Documents or this Indenture .

(b)    Upon the request of the Issuer accompanied by a resolution of its Board of Directors authorizing the execution of any such amendment or supplemental indenture, and upon receipt by the Trustee or Collateral Agent of the documents described in Section 9.06 hereof, the Trustee or Collateral Agent, as applicable, will join with the Issuer and the Guarantors in the execution of any amendment or supplemental indenture authorized or permitted by the terms of this Indenture, the Intercreditor Agreements and the other Security Documents and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and Collateral Agent will not be obligated to enter into such amendment or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02    <u>With Consent of Holders</u>.

(a)    Except as provided in this Section 9.02, the Issuer, the Guarantors and the Trustee and, if applicable, the Collateral Agent, may amend or supplement this Indenture (including, without limitation, Sections 4.08 and 4.12 hereof) and the Notes or the Note Guarantees, the Intercreditor Agreements or the other Security Documents with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, Applicable Premium or any other premium, if any, or interest on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Intercreditor Agreements, any other

Security Documents or the Notes or the Note Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes). Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

(b)    Upon the written request of the Issuer accompanied by a resolution of its Boards of Directors authorizing the execution of any such amendment or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee or Collateral Agent of the documents described in Section 9.06 hereof, the Trustee and Collateral Agent, as applicable, will join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's or Collateral Agent's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee or Collateral Agent may in its discretion, but will not be obligated to, enter into such amendment or supplemental Indenture.

(c)    It is not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

(d)    After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer will mail (or otherwise deliver pursuant to the procedures of DTC) to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment, supplement or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Issuer or any Guarantor with any provision of this Indenture, the Intercreditor Agreements, the other the Security Documents or the Notes or the Note Guarantees. However, without the consent of each Holder affected thereby, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non−consenting Holder):

(1)    reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal of or extend the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (for the avoidance of doubt, repurchases of the Notes by the Issuer pursuant to Sections 4.08 and 4.12 hereof are not redemptions of the Notes);

(3)    reduce the rate of or extend the time for payment of interest, including default interest, or Applicable Premium or any other premium on any Note;

(4)    waive a Default or Event of Default in the payment of principal of, or Applicable Premium or any other premium, if any, or interest on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate

principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(5)     make any Note payable in money other than that stated in the Notes;

(6)     make any change in the provisions of this Indenture relating to waivers of past Defaults or impair the rights of Holders of Notes to receive payments of principal of, or interest or Applicable Premium or any other premium, if any, on the Notes;

(7)     waive a redemption payment with respect to any Note (for the avoidance of doubt, any payment required by Sections 4.08 or 4.12 hereof is not a redemption payment);

(8)     release any Guarantor that is a Significant Subsidiary of the Issuer from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture;

(9)     make any change in the preceding amendment and waiver provisions; or

(10)    make any change in the provisions in the Intercreditor Agreements or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders.

(e)     Any amendment to, or waiver of, the provisions of this Indenture, any Security Document that has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes or otherwise modifies the Intercreditor Agreements or other Security Documents in any manner adverse in any material respect to the Holders will require the consent of the holders of at least 66- 2/3% in aggregate principal amount of the Notes then outstanding.

(f)     Notwithstanding the foregoing in this Section 9.02, no amendment, supplement or waiver to the Indenture or any other Note Document shall subordinate the Lien securing the Notes Obligations to any other Lien (and the Trustee shall not enter into any intercreditor agreement providing for such subordination) without the consent of the holders of at least 66- 2/3% in aggregate principal amount of the Notes then outstanding.

Section 9.03    <u>Intentionally Omitted</u>.

Section 9.04    <u>Revocation and Effect of Consents</u>.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. After an amendment, supplement or waiver becomes effective in accordance with its terms, it thereafter binds every Holder.

110

Section 9.05    <u>Notation on or Exchange of Notes</u>.

        The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

        Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    <u>Trustee to Sign Amendments, etc.</u>

        The Trustee and Collateral Agent will sign any amendment or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee or Collateral Agent. The Issuer may not sign an amendment or supplemental indenture pursuant to this Article 9 until the Issuer's Board of Directors approves it. In executing any such amendment or supplemental indenture, the Trustee and Collateral Agent, as applicable, will be provided with and (subject to Section 7.01 hereof) will be fully protected in conclusively relying upon, in addition to the documents required by Section 14.04 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amendment or supplemental indenture is authorized or permitted by this Indenture, the Intercreditor Agreements and the other Security Documents, as applicable, and, with respect to such Opinion of Counsel, that such amendment or supplemental indenture is the legal, valid and binding obligation of the Issuer or Guarantor, as applicable, enforceable against the Issuer or the Guarantor, as applicable, in accordance with its terms.

## ARTICLE 10

## NOTE GUARANTEES

Section 10.01  <u>Guarantee</u>.

        (a)    Subject to this Article 10, each of the Guarantors hereby, jointly and severally, unconditionally Guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and the Collateral Agent and their respective successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:

        (1)    the principal of, Applicable Premium or any other premium, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Issuer to the Holders or the Trustee or the Collateral Agent hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

        (2)    in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or

111

performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a Guarantee of payment and not a Guarantee of collection.

(b)      The Guarantors hereby agree that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of either Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenant that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c)      If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guarantors, any amount paid by either to the Trustee or the Collateral Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)      Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders, the Collateral Agent and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors will have the right to seek contribution from any non−paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantee.

Section 10.02   <u>Limitation on Guarantor Liability</u>.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal, state or provincial law in any jurisdiction to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, the Collateral Agent, the Holders and the Guarantors hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount

that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 10, result in the obligations of such Guarantor under its Note Guarantee not constituting a fraudulent transfer or conveyance.

Section 10.03  Intentionally Omitted.

Section 10.04  Guarantors May Consolidate, etc., on Certain Terms.

(a)    Except as otherwise provided in this Section 10.04, a Guarantor may not sell or otherwise dispose of (including by way of division) all or substantially all of its assets to, or consolidate with or merge or amalgamate with or into (whether or not such Guarantor is the surviving Person) another Person, other than the Issuer or another Guarantor, unless:

(1)    immediately after giving effect to such transaction, no Default or Event of Default exists; and

(2)    either:

(A)    the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger assumes all the obligations of that Guarantor under this Indenture, its Note Guarantee, the Intercreditor Agreements and the other Security Documents, pursuant to, in the case of this Indenture and the relevant agreements, a supplemental indenture ; or

(B)    the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Indenture.

In case of any such consolidation, merger, amalgamation, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Issuer and delivered to the Trustee. All the Note Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

(b)    Except as set forth in Articles 4 and 5 hereof, and notwithstanding Sections 10.04(a)(2)(A) and 10.04(a)(2)(B) above, nothing contained in this Indenture or in any of the Notes will prevent any consolidation, merger or amalgamation of a Guarantor with or into the Issuer or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to the Issuer or another Guarantor.

Section 10.05  <u>Releases</u>.

(a)    The Note Guarantee of a Guarantor will be automatically released and discharged:

(1)    in connection with any sale, disposition or transfer of all or substantially all of the assets of that Guarantor (including by way of merger, amalgamation, or consolidation) to a Person that is not (either before or after giving effect to such transaction) the Issuer or a Restricted Subsidiary of the Issuer, if the sale, disposition or transfer does not violate Section 4.08 hereof;

(2)    in connection with any sale, disposition or transfer of all of the Capital Stock of that Guarantor to a Person that is not (either before or after giving effect to such transaction) the Issuer or a Restricted Subsidiary of the Issuer, if the sale, disposition or transfer does not violate Section 4.08 hereof;

(3)    [reserved];

(4)    upon Legal Defeasance in accordance with Article 8 hereof or satisfaction and discharge of this Indenture in accordance with Article 11 and Article 8 hereof; or

(5)    upon such Guarantor becoming an Excluded Subsidiary, so long as such Guarantor does not Guarantee any Debt Facilities of the Issuer or any of its Restricted Subsidiaries.

(b)    Any Guarantor not released from its obligations under its Note Guarantee as provided in this Section 10.05 will remain liable for the full amount of principal of and interest and Applicable Premium or any other premium, if any, on the Notes and for the other obligations of any Guarantor under this Indenture as provided in this Article 10.

ARTICLE 11

SATISFACTION AND DISCHARGE

Section 11.01  <u>Satisfaction and Discharge</u>.

(a)    This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1)    either:

(A)    all Notes that have been authenticated and, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer, have been delivered to the Trustee for cancellation; or

(B)    all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing (or delivery in accordance with the

procedures of DTC) of a notice of redemption or otherwise or will become due and payable within one year or may be called for redemption within one year and the Issuer or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, in such amounts as will be sufficient (without reinvestment) to pay and discharge the entire Indebtedness (including all principal and interest) on the Notes not delivered to the Trustee for cancellation; *provided* that (i) upon any redemption that requires the payment of the Applicable Premium, the amount deposited will be sufficient for purposes of this Indenture to the extent that an amount is deposited with the Trustee equal to the Applicable Premium calculated as of the date of the notice of redemption, with any Applicable Premium Deficit only required to be deposited with the Trustee on or prior to the date of redemption and (ii) any Applicable Premium Deficit will be set forth in an Officer's Certificate delivered to the Trustee simultaneously with the deposit of such Applicable Premium Deficit that confirms that such Applicable Premium Deficit will be applied toward such redemption;

(2)     the Issuer or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture (other than contingent obligations for which no claim has been asserted); and

(3)     the Issuer has delivered irrevocable written instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be.

(b)     In addition, an Officer's Certificate and an Opinion of Counsel have been delivered to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

(c)     Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to Section 11.01(a)(1)(B), the provisions of Sections 11.02 and 8.06 hereof will survive such satisfaction and discharge. In addition, nothing in this Section 11.01 will be deemed to discharge those provisions of Section 7.07 hereof, or any other provision hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 11.02  Application of Trust Money.

(a)     Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 11.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and Applicable Premium or any other premium, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

(b)      If the Trustee or Paying Agent is unable to apply any money in accordance with Section 11.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes and Note Guarantees, as applicable, shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.01 hereof; *provided* that if the Issuer has made any payment of principal of, Applicable Premium or any other premium, if any, or interest on, any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 12

COLLATERAL AND SECURITY

Section 12.01   Security Documents; Additional Collateral; Intercreditor Agreements.

(a)      *Security Documents*. In order to secure the due and punctual payment of the Notes Obligations, the Issuer, the Subsidiary Guarantors, the Collateral Agent and the other parties thereto have simultaneously with the execution of this Indenture entered or, in accordance with the provisions of Section 4.14, Section 4.17, Section 4.19 and this Article 12, will enter into the Security Documents. In the event of a conflict or inconsistency between the terms of this Indenture and the Security Documents, the Security Documents shall control. The Issuer shall, and shall cause each of its Restricted Subsidiaries to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and take all other actions as are reasonably necessary or required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Restricted Subsidiaries) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest subject only to Permitted Liens.

(b)      *Additional Collateral*. With respect to assets acquired after the Issue Date, the Issuer or the applicable Subsidiary Guarantor will take the actions required by the Security Agreement or Section 4.18 of this Indenture.

(c)      *Intercreditor Agreement.* The Trustee, the Collateral Agent and the Holders are bound by the terms of the Intercreditor Agreements and each Holder of a Note, by accepting such Note, agrees to all the terms and provisions of the Intercreditor Agreements and the other Security Documents. Notwithstanding anything to the contrary, (i) the liens and security interests granted to the Collateral Agent pursuant to the Security Documents and all rights and obligations of the Trustee and Collateral Agent hereunder in respect of the Collateral are expressly subject to the Intercreditor Agreements and (ii) the exercise of any right or remedy by the Trustee and the Collateral Agent hereunder in respect of the Collateral is subject to the limitation and provisions of the Intercreditor Agreements. In the event of any conflict or inconsistency between the terms of the Intercreditor Agreements and the terms of this Indenture or any Security Document, the terms of the Intercreditor Agreements, shall govern.

Section 12.02  <u>Intentionally Omitted</u>.

Section 12.03  <u>Release of Collateral</u>.

The Liens securing the Notes and the Guarantees will, automatically and without the need for any further action by any Person be released:

(a)      in whole or in part, as applicable, as to all or any portion of the property subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances in accordance with the terms of Section 4.08;

(b)      in whole upon:

(1)      payment in full of the principal of, together with accrued and unpaid interest, if any, on the Notes and all other Obligations under this Indenture, the Note Guarantees and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, if any, are paid;

(2)      satisfaction and discharge of this Indenture as set forth under Article 11; or

(3)      a legal defeasance or covenant defeasance of this Indenture as set forth under Article 8;

(c)      in part, as to any property that (i) is sold, transferred or otherwise disposed of by the Issuer or any Subsidiary Guarantor (other than to the Issuer or another Subsidiary Guarantor) in a transaction not prohibited by this Indenture at the time of such transfer or disposition, including, without limitation, as a result of a transaction of the type permitted under Sections 4.08 and 5.01 or (ii) is owned or at any time acquired by a Subsidiary Guarantor that has been released from its Guarantee, concurrently with the release of such Guarantee;

(d)      as to property that constitutes all or substantially all of the Collateral securing the Notes, with the consent of each Holder of the Notes outstanding;

(e)      as to property that constitutes less than all or substantially all of the Collateral securing the Notes, with the consent of the Holders of at least 66 2/3% of the aggregate principal amount of Notes (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, Notes) outstanding;

(f)      as to any Excluded Pipelines subject to a security interest granted under a mortgage, security agreement or other security interest in favor of the Collateral Agent, upon the disposition of such Excluded Pipeline, in a transaction not prohibited by this Indenture at the time of such sale, transfer or disposition;

(g)      as to real property upon which any Excluded Pipelines are situated, upon the Collateral Agent's receipt from the Issuer of an Officer's Certificate certifying that the release of the Collateral Agent's Liens on such real property does not materially adversely affect or impair (1) the business operations of the Issuer and its Restricted Subsidiaries as a whole or

117

(2) the validity or priority of the Lien of the Collateral Agent pursuant to the Security Documents on the balance of the Mortgaged Property;

(h)    in part, in accordance with the applicable provisions of the Intercreditor Agreements and the other Security Documents; and

(i)    as described under Article 9.

Any release of Collateral permitted by this Section 12.03 shall be deemed not to impair the remaining Liens under this Indenture and the Security Documents in contravention thereof.

Section 12.04    <u>Form and Sufficiency of Release</u>.

In the event that either the Issuer or any Subsidiary Guarantor requests the Trustee or the Collateral Agent, as applicable, in writing to furnish a written disclaimer, release or quitclaim of any interest in such property under this Indenture, the applicable Guarantee and the Security Documents as permitted by Section 12.03, upon receipt of an Officer's Certificate and Opinion of Counsel to the effect that such release complies with Section 12.03 and specifying the provision in Section 12.03 pursuant to which such release is being made (upon which the Trustee may exclusively and conclusively rely), the Trustee or the Collateral Agent, as applicable, shall execute, acknowledge and deliver to the Issuer or such Subsidiary Guarantor (such an instrument in the form provided by the Issuer, and providing for release without recourse and shall take such other action as the Issuer or such Subsidiary Guarantor may reasonably request and as necessary to effect such release.

Section 12.05    <u>Possession and Use of Collateral</u>.

Subject to the provisions of the Security Documents, the Issuer and the Guarantors shall have the right to remain in possession and retain exclusive control of and to exercise all rights with respect to the Collateral (other than monies deposited pursuant to Article 8 or Article 11, and other than as set forth in the Security Documents and this Indenture), to freely operate, manage, develop, lease, use, consume and enjoy the Collateral (other than monies deposited pursuant to Article 8 or Article 11 and other than as set forth in the Security Documents and this Indenture), to alter or repair any Collateral so long as such alterations and repairs do not materially impair the Lien of the Security Documents thereon, and to collect, receive, use, invest and dispose of the reversions, remainders, interest, rents, lease payments, issues, profits, revenues, proceeds and other income thereof and to effect transactions permitted under Sections 4.08 and 5.01.

Section 12.06    <u>Intentionally Omitted</u>.

Section 12.07    <u>Collateral Agent</u>.

(a)    The Trustee and each of the Holders by acceptance of the Notes hereby appoint the Collateral Agent as the Trustee's and Holders' collateral agent under this Indenture and the Security Documents and the Trustee and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Collateral Agent to take such action on its behalf under the

provisions of this Indenture and the Security Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Indenture and the Security Documents, together with such powers as are reasonably incidental thereto. The Collateral Agent agrees to act as such on the express conditions contained in this Section 12.07. The provisions of this Section 12.07 are solely for the benefit of the Collateral Agent and none of the Trustee, any of the Holders, the Issuer or any of the Guarantors shall have any rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in Section 12.03 or in this Section 12.07. Notwithstanding any provision to the contrary contained elsewhere in this Indenture and the Security Documents, the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the Security Documents to which it is a party, nor shall the Collateral Agent have or be deemed to have any fiduciary relationship with the Trustee, any Holder, the Issuer or any Guarantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture and the Security Documents or otherwise exist against the Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent shall not be construed to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Indenture and the Security Documents, the Collateral Agent is entitled (but not obligated) to exercise or refrain from exercising any discretionary rights or taking or refraining from taking any actions which the Collateral Agent is expressly entitled to take or assert under this Indenture and the Security Documents, including the exercise of remedies pursuant to Article 6, and any action so taken or not taken shall be deemed consented to by the Trustee and the Holders.

(b)     The Collateral Agent may execute any of its duties under this Indenture and the Security Documents by or through agents, employees or attorneys−in−fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Collateral Agent shall not be responsible for the negligence or misconduct of any agent, employee or attorney−in−fact that it selects as long as such selection was made with due care.

(c)     None of the Collateral Agent or any of its agents or employees shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own gross negligence or willful misconduct) or under or in connection with any Security Document or the transactions contemplated thereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Issuer or any Guarantor, contained in this Indenture or any indenture, or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture, any other indenture or the Security Documents, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture, any other indenture or the Security Documents, or for any failure of the Issuer or any Guarantor or any other party to this Indenture or the Security Documents to perform its obligations hereunder or thereunder. None of the Collateral Agent or any of its agents or employees shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the

agreements contained in, or conditions of, this Indenture, any other indenture or the Security Documents or to inspect the properties, books or records of the Issuer or any Guarantor.

(d)     The Collateral Agent shall not be deemed to have actual knowledge or notice of the occurrence of any Default or Event of Default, unless the Collateral Agent shall have received written notice from the Trustee or the Issuer referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default." The Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article 6 (subject to this Section 12.07); *provided*, *however*, that unless and until the Collateral Agent has received any such request, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

(e)     A resignation or removal of the Collateral Agent and appointment of a successor Collateral Agent shall become effective only upon the successor Collateral Agent's acceptance of appointment as provided in this Section 12.07(e). The Collateral Agent may resign in writing at any time by so notifying the Issuer and the Trustee at least 30 days prior to the proposed date of resignation. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Collateral Agent by so notifying the Trustee and the Collateral Agent and the Issuer in writing not less than 30 days prior to the effective date of such removal.  The Issuer may remove the Collateral Agent if: (i) the Collateral Agent fails to meet the requirements for being a Trustee under Section 7.10 (prior to the discharge or defeasance of this Indenture); (ii) the Collateral Agent is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Collateral Agent under any Bankruptcy Law; (iii) a custodian or public officer takes charge of the Collateral Agent or its property; or (iv) the Collateral Agent becomes incapable of acting. If the Collateral Agent resigns or is removed or if a vacancy exists in the office of Collateral Agent for any reason, the Issuer shall promptly appoint a successor Collateral Agent which complies with the eligibility requirements contained in this Indenture. If the Collateral Agent resigns or is removed or if a vacancy exists in the office of the Collateral Agent for any reason, Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Collateral Agent within 60 days of such resignation or removal.  If a majority of Holders do not so appoint a successor Collateral Agent within such 60 days, the Issuer may appoint a successor Collateral Agent; *provided*, that within one year after the Issuer-appointed successor Collateral Agent takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Collateral Agent to replace the successor Collateral Agent appointed by the Issuer.  If a successor Collateral Agent does not take office within the time periods set forth in the preceding sentences, the Issuer or the holders of at least 10% in principal amount of the then outstanding principal amount of the Notes may petition any court of competent jurisdiction, at the expense of the Issuer for the appointment of a successor Collateral Agent. A successor Collateral Agent shall deliver a written acceptance of its appointment to the retiring Collateral Agent and to the Issuer. Thereupon, the resignation or removal of the retiring Collateral Agent shall become effective, and the successor Collateral Agent shall have all the rights, powers and the duties of the Collateral Agent under this Indenture and the Security Documents. The successor Collateral Agent shall mail a notice of its succession to the Trustee. The retiring Collateral Agent shall promptly transfer all property held by it as Collateral Agent to the successor Collateral Agent, provided that all sums owing to the Collateral Agent hereunder have been paid. Notwithstanding replacement of the Collateral

Agent pursuant to this Section 12.07(e), the Issuer's obligations under this Section 12.07 and Section 12.12 shall continue for the benefit of the retiring Collateral Agent.

(f)        Except as otherwise explicitly provided herein or in the Security Documents, neither the Collateral Agent nor any of its officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own willful misconduct, gross negligence or bad faith.

(g)        The Trustee and the Collateral Agent are authorized and directed in writing by the Holders and the Holders by acquiring the Notes are deemed to have authorized the Trustee or the Collateral Agent, as applicable, to (i) enter into the Security Documents, (ii) bind the Holders on the terms as set forth in the Security Documents and (iii) perform and observe their respective obligations under the Security Documents.

(h)        Neither the Collateral Agent nor the Trustee shall have any obligation whatsoever to assure that the Collateral exists or is owned by the Issuer and the Guarantors or is cared for, protected or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all of the Grantor's property constituting collateral intended to be subject to the Lien and security interest of the Security Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent pursuant to this Indenture or any Security Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion given the Collateral Agent's own interest in the Collateral, and that neither the Collateral Agent nor the Trustee shall have any other duty or liability whatsoever as to any of the foregoing.

(i)        The Collateral Agent (i) shall not be liable for any action it takes or omits to take in good faith it believes to be authorized or within its rights or powers, or for any error of judgment made in good faith by an authorized officer, unless it is proved that the Collateral Agent was grossly negligent in ascertaining the pertinent facts, (ii) shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Issuer (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law), and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel. The grant of permissive rights or powers to the Collateral Agent shall not be construed to impose duties to act. In no event shall the Collateral Agent be responsible or liable for special, indirect, punitive or consequential loss

or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(j)        Notwithstanding anything to the contrary in this Indenture (including this Article 12), in the event of a foreclosure on the Mortgaged Property and/or the exercise of its remedies under the Security Documents, the Trustee and Collateral Agent agree that they shall not take any action that results in the disturbance, extinguishment or termination of any Permitted Liens granted pursuant to clause 14(B) of the definition thereof. Upon the request of the Issuer, the Collateral Agent shall enter into (x) in the case of any such Permitted Lien that is a lease, a subordination non−disturbance and attornment agreement and (y) in the case of any such other Permitted Lien, a nondisturbance agreement, consent or such other agreement which, in each case, confirms that in the event of a foreclosure on the Mortgaged Property and/or exercise of remedies under the Security Documents, the Collateral Agent (and its successors and assigns) will not disturb, extinguish or terminate any such Permitted Liens (or the rights thereunder). Any request by the Issuer pursuant to the preceding sentence shall be evidenced by a certificate from an officer of the Issuer which certificate shall certify that (1) the Permitted Liens in question do not materially adversely affect or impair (A) the business operations of the Issuer and its Restricted Subsidiaries as a whole or (B) the validity or priority of the Lien of the Mortgages on the balance of the Mortgaged Property and (2) the applicable non−disturbance agreement, consent or other agreement provides that the Permitted Liens in question are subordinate to the Lien in favor of the Collateral Agent on the Mortgaged Property.

(k)        The Trustee and the Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in their possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any Collateral, by reason of the act or omission of any carrier, forwarding agent or other agent or bailee selected by the Trustee or the Collateral Agent in good faith. Neither the Trustee nor the Collateral Agent shall be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.

(l)        Except as otherwise provided in this Indenture or the Security Documents, the Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture, the Security Documents or the Intercreditor Agreements unless it shall first receive such advice or concurrence of the Trustee or the Holders of a majority in aggregate principal amount of the Notes as it determines and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Except as otherwise provided in this Indenture or the Security Documents, the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture, the Security Documents or the Intercreditor Agreements in accordance with a request, direction, instruction or consent of the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders. Notwithstanding anything to the contrary contained in this Indenture, the Intercreditor Agreements or the Security Documents, in the event the Collateral Agent is entitled

or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, the Collateral Agent shall not be required to commence any such action or exercise any remedy or to inspect or conduct any studies of any property under the mortgages or take any such other action if the Collateral Agent has determined that the Collateral Agent may incur personal liability as a result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances.  The Collateral Agent shall at any time be entitled to cease taking any action described in this clause if it no longer reasonably deems any indemnity, security or undertaking from the Issuers or the Holders to be sufficient.

(m)    The parties hereto and the Holders hereby agree and acknowledge that neither the Collateral Agent nor the Trustee shall assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments, expenses and costs (including but not limited to, any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture, the Intercreditor Agreements, the other Security Documents or any actions taken pursuant hereto or thereto.  Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture, the Intercreditor Agreements and the other Security Documents, the Collateral Agent or the Trustee may hold or obtain indicia of ownership primarily to protect the security interest of the Collateral Agent or the Trustee in the Collateral and that any such actions taken by the Collateral Agent or the Trustee shall not be construed as or otherwise constitute any participation in the management of such Collateral.  In the event that the Collateral Agent or the Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Collateral Agent's or the Trustee's sole discretion may cause the Collateral Agent or the Trustee to be considered an "owner or operator" under the provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("*CERCLA*"), 42 U.S.C. §9601, et seq., or otherwise cause the Collateral Agent or the Trustee to incur liability under CERCLA or any other federal, state or local law, the Collateral Agent and the Trustee reserves the right, instead of taking such action, to either resign as the Collateral Agent or the Trustee or arrange for the transfer of the title or control of the asset to a court-appointed receiver.  Neither the Collateral Agent nor the Trustee shall be liable to the Issuer, the Guarantors or any other Person for any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Agent's or the Trustee's actions and conduct as authorized, empowered and directed hereunder or relating to the discharge, release or threatened release of hazardous materials into the environment.  If at any time it is necessary or advisable for property to be possessed, owned, operated or managed by any Person (including the Collateral Agent or the Trustee) other than the Issuers or the Guarantors, subject to the terms of the Security Documents, a majority in interest of Holders shall direct the Collateral Agent or the Trustee to appoint an appropriately qualified Person (excluding the Collateral Agent or the Trustee) who they shall designate to possess, own, operate or manage, as the case may be, the property.

(n)    The Collateral Agent, in executing and performing its duties hereunder and under the Security Documents, shall be entitled to all of the rights, protections, immunities

and indemnities granted to it hereunder, including after the satisfaction and discharge of this Indenture or the payment in full of the Notes.

(o)      For the avoidance of doubt, the rights, privileges, protections, immunities and benefits given to the Trustee hereunder shall apply to the Collateral Agent as well and the rights, privileges, protections, immunities and benefits given to the Collateral Agent hereunder, including, without limitation, its right to be indemnified prior to taking action, shall survive the satisfaction, discharge or termination of this Indenture or earlier termination, resignation or removal of the Collateral Agent.

(p)      The Trustee and Collateral Agent shall be under no obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Issuer or any Guarantor, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

(q)      In no event shall the Collateral Agent be required to execute and deliver any landlord lien waiver, estoppel or collateral access letter, or any account control agreement or any instruction or direction letter delivered in connection with such document that the Collateral Agent determines adversely affects it or otherwise subjects it to personal liability, including without limitation, agreements to indemnify any contractual counterparty.

Section 12.08  <u>Purchaser Protected</u>.

No purchaser or grantee of any property or rights purporting to be released shall be bound to ascertain the authority of the Collateral Agent or Trustee to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority so long as the conditions set forth in Section 12.04 have been satisfied.

Section 12.09  <u>Authorization of Actions to Be Taken by the Collateral Agent Under the Security Documents</u>.

The Holders agree that the Collateral Agent shall be entitled to the rights, privileges, protections immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents. Furthermore, each holder of a Note, by accepting such Note, consents to the terms of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Security Documents in each of its capacities thereunder.

Section 12.10  <u>Authorization of Receipt of Funds by the Trustee Under the Security Agreement</u>.

The Trustee is authorized to receive any funds for the benefit of Holders distributed under the Security Documents to the Trustee, to apply such funds as provided in Section 6.10 hereof.

Section 12.11  <u>Powers Exercisable by Receiver or Collateral Agent</u>.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article 12 upon the Issuer or any Guarantor, as applicable, with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or any Guarantor, as applicable, or of any officer or officers thereof required by the provisions of this Article 12.

Section 12.12   Compensation and Indemnification.

The Collateral Agent shall be entitled to the compensation and indemnification set forth in Section 7.07 (with the references to the Trustee therein being deemed to refer to the Collateral Agent).

ARTICLE 13

[RESERVED]

ARTICLE 14

MISCELLANEOUS

Section 14.01   Intentionally Omitted.

Section 14.02   Notices.

(a)      Any notice, direction, request, instruction, document, or communication by the Issuer, any Guarantor or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission electronically in PDF format or overnight air courier guaranteeing next day delivery, to the others' address:

If to either Issuer and/or any Guarantor:

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002
Facsimile: (832) 415-0456
Attention: Marilyn Moore Basso
Email: Marilyn.MooreBasso@tpcgrp.com

With a copy to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Facsimile: (212) 455-2502

Attention: David Azarkh, Esq.
Email: dazarkh@stblaw.com

If to the Trustee or the Collateral Agent:

U.S. Bank National Association
Global Corporate Trust Services
13737 Noel Road, Suite 800
Dallas, Texas 75240
Facsimile: (972) 581-1670

The Issuer, any Guarantor, the Trustee or the Collateral Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications; *provided, however*, that notices to the Trustee shall only be effective upon actual receipt.

(b)     All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five calendar days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; when sent, if sent electronically in PDF format and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

(c)     Notwithstanding any other provision hereof or of any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption) to any holder of an interest in a Global Note (whether by email or otherwise), such notice shall be sufficiently given if given to DTC or other applicable Depositary for such note (or its designee) according to the applicable procedures of DTC or such Depositary. Any notice or communication to a Holder of a Definitive Note will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar. Failure to send a notice or communication to a Holder as provided herein or any defect in it will not affect its sufficiency with respect to other Holders.

(d)     If a notice or communication is sent in the manner provided in this Section 14.02 within the time prescribed, it is duly given, whether or not the addressee receives it.

(e)     If the Issuer sends a notice or communication to Holders, it will send a copy to the Trustee and each Agent at the same time.

(f)     In respect of this Indenture, the Trustee and Collateral Agent shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by electronic transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such electronic transmission; and neither the Trustee nor the Collateral Agent shall have any liability for any losses, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with

126

such instructions, directions, reports, notices or other communications or information. Each other party agrees to assume all risks arising out of the use of electronic methods to submit instructions, directions, reports, notices or other communications or information to the Trustee and the Collateral Agent, including without limitation the risk of the Trustee and the Collateral Agent acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties.

Section 14.03  [Reserved].

Section 14.04  Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer to the Trustee to take any action under this Indenture, the Intercreditor Agreements or the other Security Documents (other than in connection with the Authentication Order, dated the date hereof, and delivered to the Trustee in connection with the issuance of the Initial Notes, in which case only an Officer's Certificate shall be furnished), the Issuer shall furnish to the Trustee:

(1)    an Officer's Certificate (which must include the statements set forth in Section 14.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, *provided* for in this Indenture relating to the proposed action have been satisfied; and

(2)    an Opinion of Counsel (which must include the statements set forth in Section 14.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 14.05  Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include substantially:

(1)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 14.06  Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Agents may make reasonable rules and set reasonable requirements for its functions.

Section 14.07  <u>No Personal Liability of Directors, Officers, Employees and Stockholders</u>.

To the extent permitted by law, no past, present or future director, manager, officer, employee, incorporator, stockholder or member of the Issuer, any parent of the Issuer or any Subsidiary, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 14.08  <u>Governing Law</u>.

(a)     THIS INDENTURE, THE NOTES, AND THE NOTE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)     Each party hereto irrevocably and unconditionally submits to the jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan, New York County and of the United States District Court of the Southern District of New York sitting in the Borough of Manhattan, and any appellate court from any jurisdiction thereof, in any action or proceeding arising out of or relating to this Indenture, the Notes or the Note Guarantees, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Indenture shall affect any right that any party hereto or any Secured Party may otherwise have to bring any action or proceeding relating to this Indenture against any party hereto or its properties in the courts of any jurisdiction.

(c)     Each party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Indenture in any court referred to in Section 14.08(b) hereto.  Each party hereto irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 14.02 hereof, such service to be effective upon receipt.

Nothing in this Indenture will affect the right of any party hereto or any Secured Party to serve process in any other manner permitted by law.

Section 14.09  <u>Successors</u>.

All agreements of the Issuer in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors. All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 10.04.

Section 14.10   Severability.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 14.11   Counterpart Originals.

The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes. In furtherance of the foregoing, the words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Indenture or any document to be signed in connection with this Indenture and the transactions contemplated hereby or thereby shall be deemed to include electronic signatures (including .pdf file, .jpeg file or any electronic signature complying with the U.S. federal ESIGN Act of 2000, including Orbit, Adobe Sign, DocuSign, or any other similar platform identified by the Company and reasonably available at no undue burden or expense to the Trustee), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act, and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

Section 14.12   Table of Contents, Headings, etc.

The Table of Contents, Cross−Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 14.13   Waiver of Immunity.

To the extent that any of the Issuer or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution or execution, on the ground of sovereignty or otherwise) with respect to itself or its property, it hereby irrevocably waives, to the fullest extent permitted by applicable law, such immunity in respect of its obligations under this Indenture, Note and/or Note Guarantees.

Section 14.14  <u>Waiver of Jury Trial</u>.

ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES, THE SECURITY DOCUMENTS, THE INTERCREDITOR AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 14.15  <u>U.S.A. Patriot Act</u>.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act.

[Signatures on following page]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed and attested, all as of the date first above written.

**TPC GROUP INC.**

By: _____
      Name:    Andrew Grygiel
      Title:    Vice President and Treasurer

**TPC HOLDINGS, INC.**

By: _____
      Name:    Andrew Grygiel
      Title:    Vice President and Treasurer

**TPC GROUP LLC**

By: _____
      Name:    Andrew Grygiel
      Title:    Vice President and Treasurer

**TP CAPITAL CORP.**

By: _____
      Name:    Andrew Grygiel
      Title:    Vice President and Treasurer

**TEXAS BUTYLENE CHEMICAL CORPORATION**

By: _____
      Name:    Andrew Grygiel
      Title:    Vice President and Treasurer

**TEXAS OLEFINS DOMESTIC-INTERNATIONAL SALES CORPORATION**

By: _____
      Name:    Andrew Grygiel
      Title:    Vice President and Treasurer

*[Signature Page to Indenture]*

**PORT NECHES FUELS, LLC**

By: _____

     Name:   Andrew Grygiel
     Title:    Vice President and Treasurer

**TPC PHOENIX FUELS LLC**

By: _____

     Name:   Andrew Grygiel
     Title:    Vice President and Treasurer

*[Signature Page to Indenture]*

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee

By: _____

     Name:   Michael K. Herberger
     Title:    Vice President

**U.S. BANK NATIONAL ASSOCIATION,**
as Collateral Agent

By: _____

     Name:   Michael K. Herberger
     Title:    Vice President

*[Signature Page to Indenture]*

EXHIBIT A1

[Face of 144A Global Note]

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the OID Legend, if applicable pursuant to the provisions of the Indenture]*

CUSIP/ISIN [●][1] / [●][2]

10.875% Senior Secured Notes due 2024

No.                                                                                              $

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002

promise to pay to CEDE & CO. or registered assigns,

the principal sum of _____ DOLLARS on August 1, 2024.

Interest Payment Dates: February 1, May 1, August 1 and November 1

Record Dates: January 15, April 15, July 15 and September 15

Dated: [●], 2021

---

[1] 144A CUSIP: 89236Y AC8.
IA CUSIP: 89236Y AD6.

[2] 144A ISIN: US89236YAC84.
IA ISIN: US89236YAD67.

TPC GROUP INC.

By: _____
    Name:
    Title:


        This is one of the Notes referred to
in the within−mentioned Indenture:

  U.S. BANK NATIONAL ASSOCIATION,
  as Trustee


  By: _____
            Authorized Signatory


  Date:

[Back of 144A Global Note]
10.875% Senior Secured Notes due 2024

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)     *INTEREST*. TPC Group Inc., a Delaware corporation (the "*Issuer*"), promises to pay interest on the principal amount of this Note at 10.875% per annum from [●] until maturity; *provided* that upon the occurrence of, and solely during the continuation of, an Event of Default, the interest rate shall be increased by 2.00% per annum. The Issuer will pay interest quarterly in arrears on February 1, May 1, August 1 and November 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from February 2, 2021 until the principal hereof is due. The first Interest Payment Date shall be May 1, 2021. The Issuer will pay interest on overdue principal, Applicable Premium, if any, and any other premium, if any, at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful. Interest will be computed on the basis of a 360−day year of twelve 30−day months.

(2)     *METHOD OF PAYMENT*. The Issuer will pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the January 15, April 15, July 15 or September 15 immediately preceding the Interest Payment Date (whether or not a Business Day), even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payments in respect of Notes represented by Global Notes (including principal, Applicable Premium or any other premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Company or any successor depositary. The Issuer will make all payments in respect of a Definitive Note (including principal, Applicable Premium or any other premium, if any, and interest), at the office of each Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each Holder thereof; *provided*, *however*, that payments on the Notes may also be made in the case of a Holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or a Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion). Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3)     *PAYING AGENT AND REGISTRAR*. Initially, U.S. Bank National Association, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to any Holder. The Issuer or any of the Issuer's Subsidiaries may act in any such capacity.

(4)     *INDENTURE*. The Issuer issued the Notes under an Indenture dated as of February 2, 2021 (the "*Indenture*") among the Issuer, the Guarantors, the Trustee and the

A1-3

Collateral Agent. The terms of the Notes include those stated in the Indenture. Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all the terms and provisions of the Indenture, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

The Notes are senior secured obligations of the Issuer. This Note is one of the Notes referred to in the Indenture. The Notes include the Initial Notes and any Additional Notes. The Initial Notes and any Additional Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or incur Liens and make asset sales. The Indenture also imposes limitations on the ability of the Issuer and each Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture, the Notes and the Security Documents when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, (x) Holdings has unconditionally guaranteed the Obligations of the Issuer under the Notes on a senior unsecured basis pursuant to the terms of the Indenture and (y) the Subsidiary Guarantors have, jointly and severally, unconditionally guaranteed the Obligations of the Issuer under the Notes on a senior secured basis pursuant to the terms of the Indenture.

The Notes shall be secured by Liens and security interests, subject to Permitted Liens, in the Collateral on the terms and conditions set forth in the Indenture, the Intercreditor Agreement and the other Security Documents. The Collateral Agent holds the Collateral in trust for the benefit of the Holders of the Notes Obligations and the Trustee and the Holders, in each case pursuant to the Security Documents. The Collateral will also secure Indebtedness and other Obligations permitted under the Indenture to be secured.

Each Holder by accepting this Note consents and agrees to the terms of the Intercreditor Agreement and the other Security Documents as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture authorizes and directs the Collateral Agent and the Trustee, as applicable, to enter into the Intercreditor Agreement and the other Security Documents and to perform its obligations and exercise its rights thereunder in accordance therewith.

(5)    *OPTIONAL REDEMPTION*.  The Issuer may redeem all or a part of the Notes in accordance with the terms of Article III of the Indenture.

(6)    *MANDATORY REDEMPTION*. The Issuer is not required to make mandatory redemption or sinking fund payments with respect to the Notes.

(7)     *NOTICE OF REDEMPTION*. Notice of redemption will be mailed, or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, at least 15 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date, or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $1.00 may be redeemed in part but only in whole multiples of $1.00 in excess of $1.00.

(8)     *REPURCHASE AT THE OPTION OF HOLDER*.

(a)     If there is a Change of Control, the Issuer will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (equal to $1.00 or an integral multiple of $1.00 in excess of $1.00) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest on the Notes repurchased to, but not including, the date of purchase, subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will mail a notice to each Holder or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(b)     If the Issuer or a Restricted Subsidiary of the Issuer consummates any Asset Sales or receives Net Proceeds from Casualty Events, the Issuer shall be subject to the provisions of Section 4.08 of the Indenture.

(9)     *DENOMINATIONS, TRANSFER, EXCHANGE*. The Notes are in registered form without coupons in denominations of $1.00 and integral multiples of $1.00 in excess of $1.00. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(10)     *PERSONS DEEMED OWNERS*. The registered Holder may be treated as its owner for all purposes.

(11)     AMENDMENT, SUPPLEMENT AND WAIVER. The provisions governing amendment, supplement and waiver of any provision of the Indenture, the Notes or the Note Guarantees are set forth in Article 9 of the Indenture.

(12)    *DEFAULTS AND REMEDIES*. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture.

(13)    *DISCHARGE AND DEFEASANCE*. Subject to certain conditions, the Issuer at any time may terminate some or all of its obligations under the Notes, the Note Guarantees and the Indenture if the Issuer deposits with the Trustee money for the payment of principal of and interest on the Notes to redemption or maturity, as the case may be.

(14)    *TRUSTEE DEALINGS WITH ISSUER*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not the Trustee.

(15)    *NO RECOURSE AGAINST OTHERS*. A director, manager, officer, employee, incorporator, member or stockholder of the Issuer or any of the Guarantors, as such, will not have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Note Guarantees or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

(16)    *AUTHENTICATION*. This Note will not be valid until authenticated by the manual or electronic signature of the Trustee or an authenticating agent.

(17)    *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18)    *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes, and CUSIP numbers may be used in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19)    *GOVERNING LAW*. THE INDENTURE, THIS NOTE AND THE NOTE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note

to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____

(Print or type assignee's name, address and zip code)

and irrevocably

appoint _____

to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.08 or 4.12 of the Indenture, check the appropriate box below:

☐ Section 4.08          ☐ Section 4.12

If you want to elect to have only part of the Note purchased by the Issuer pursuant to Section 4.08 or Section 4.12 of the Indenture, state the amount you elect to have purchased:

$

Date:

Your Signature: _____
(Sign exactly as your name appears on the
face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF TRANSFERS AND EXCHANGES OF INTERESTS IN THE 144A GLOBAL
NOTE*

The following exchanges of a part of this 144A Global Note for an interest in
another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or
Definitive Note for an interest in this 144A Global Note, have been made:

| Date of Transfer or Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized signatory of Trustee or Custodian |
|---|---|---|---|---|

*This schedule should be included only if the Note is issued in global form*

EXHIBIT A2

[Face of Regulation S Global Note]

*[Insert the Global Note Legend]*

*[Insert the Private Placement Legend]*

*[Insert the OID Legend]*

---

CUSIP/ISIN U8925W AE1 / USU8925WAE13

10.875% Senior Secured Notes due 2024

No.                                                                                          $

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002

promise to pay to CEDE & CO. or registered assigns,

the principal sum of _____ DOLLARS on August 1, 2024.

Interest Payment Dates: February 1, May 1, August 1 and November 1

Record Dates: January 15, April 15, July 15 and September 15

Dated: [●], 2021

TPC GROUP INC.

By: _____
        Name:
        Title:

      This is one of the Notes referred to
in the within−mentioned Indenture:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
          Authorized Signatory

Date:

[Back of Regulation S Global Note]
10.875% Senior Secured Notes due 2024

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)      *INTEREST*. TPC Group Inc., a Delaware corporation (the "*Issuer*"), promises to pay interest on the principal amount of this Note at 10.875% per annum from [●] until maturity; *provided* that upon the occurrence of, and solely during the continuation of, an Event of Default, the interest rate shall be increased by 2.00% per annum. The Issuer will pay interest quarterly in arrears on February 1, May1, August 1 and November 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from February 2, 2021 until the principal hereof is due. The first Interest Payment Date shall be May 1, 2021. The Issuer will pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful. Interest will be computed on the basis of a 360−day year of twelve 30−day months.

(2)      *METHOD OF PAYMENT*. The Issuer will pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the January 15, April 15, July 15 or September 15 immediately preceding the Interest Payment Date (whether or not a Business Day), even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payments in respect of Notes represented by Global Notes (including principal, Applicable Premium or any other premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Company or any successor depositary. The Issuer will make all payments in respect of a Definitive Note (including principal, Applicable Premium or any other premium, if any, and interest), at the office of each Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each Holder thereof; *provided*, *however*, that payments on the Notes may also be made in the case of a Holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or a Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion). Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3)      *PAYING AGENT AND REGISTRAR*. Initially, U.S. Bank National Association, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to any Holder. The Issuer or any of the Issuer's Subsidiaries may act in any such capacity.

(4)      *INDENTURE*. The Issuer issued the Notes under an Indenture dated as of February 2, 2021 (the "*Indenture*") among the Issuer, the Guarantors, the Trustee and the

Collateral Agent. The terms of the Notes include those stated in the Indenture. Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all the terms and provisions of the Indenture, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

The Notes are senior secured obligations of the Issuer. This Note is one of the Notes referred to in the Indenture. The Notes include the Initial Notes and any Additional Notes. The Initial Notes and any Additional Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or incur Liens and make asset sales. The Indenture also imposes limitations on the ability of the Issuer and each Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture, the Notes and the Security Documents when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, (x) Holdings has unconditionally guaranteed the Obligations of the Issuer under the Notes on a senior unsecured basis pursuant to the terms of the Indenture and (y) the Subsidiary Guarantors have, jointly and severally, unconditionally guaranteed the Obligations of the Issuer under the Notes on a senior secured basis pursuant to the terms of the Indenture.

The Notes shall be secured by Liens and security interests, subject to Permitted Liens, in the Collateral on the terms and conditions set forth in the Indenture, the Intercreditor Agreement and the other Security Documents. The Collateral Agent holds the Collateral in trust for the benefit of the Holders of the Notes Obligations and the Trustee and the Holders, in each case pursuant to the Security Documents. The Collateral will also secure Indebtedness and other Obligations permitted under the Indenture to be secured.

Each Holder by accepting this Note consents and agrees to the terms of the Intercreditor Agreement and the other Security Documents as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture authorizes and directs the Collateral Agent and the Trustee, as applicable, to enter into the Intercreditor Agreement and the other Security Documents and to perform its obligations and exercise its rights thereunder in accordance therewith.

(5)    *OPTIONAL REDEMPTION*.  The Issuer may redeem all or a part of the Notes in accordance with the terms of Article III of the Indenture.

(6)    *MANDATORY REDEMPTION*. The Issuer is not required to make mandatory redemption or sinking fund payments with respect to the Notes.

(7)     *NOTICE OF REDEMPTION*. Notice of redemption will be mailed, or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, at least 15 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date, or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1.00 in excess of $1.00.

(8)     *REPURCHASE AT THE OPTION OF HOLDER*.

(a)     If there is a Change of Control, the Issuer will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (equal to $1.00 or an integral multiple of $1.00 in excess of $1.00) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest on the Notes repurchased to, but not including, the date of purchase, subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will mail a notice to each Holder or otherwise deliver notice in accordance with the applicable procedures of DTC, with a copy to the Trustee, setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(b)     If the Issuer or a Restricted Subsidiary of the Issuer consummates any Asset Sales or receives Net Proceeds from Casualty Events, the Issuer shall be subject to the provisions of Section 4.08 of the Indenture.

(9)     *DENOMINATIONS, TRANSFER, EXCHANGE*. The Notes are in registered form without coupons in denominations of $1.00 and integral multiples of $1.00 in excess of $1.00. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(10)     *PERSONS DEEMED OWNERS*. The registered Holder may be treated as its owner for all purposes.

(11)     *AMENDMENT, SUPPLEMENT AND WAIVER*. The provisions governing amendment, supplement and waiver of any provision of the Indenture, the Notes or the Note Guarantees are set forth in Article 9 of the Indenture.

(12)    *DEFAULTS AND REMEDIES*. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture.

(13)    *DISCHARGE AND DEFEASANCE*. Subject to certain conditions, the Issuer at any time may terminate some or all of its obligations under the Notes, the Note Guarantees and the Indenture if the Issuer deposits with the Trustee money for the payment of principal of and interest on the Notes to redemption or maturity, as the case may be.

(14)    *TRUSTEE DEALINGS WITH ISSUER*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not the Trustee.

(15)    *NO RECOURSE AGAINST OTHERS*. A director, manager, officer, employee, incorporator, member or stockholder of the Issuer or any of the Guarantors, as such, will not have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Note Guarantees or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

(16)    *AUTHENTICATION*. This Note will not be valid until authenticated by the manual or electronic signature of the Trustee or an authenticating agent.

(17)    *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18)    *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes, and CUSIP numbers may be used in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19)    *GOVERNING LAW*. THE INDENTURE, THIS NOTE AND THE NOTE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note

to: _____
(Insert assignee's legal name)

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably

appoint _____
to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:

Your Signature: _____
(Sign exactly as your name appears on the
face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.08 or 4.12 of the Indenture, check the appropriate box below:

☐ Section 4.08          ☐ Section 4.12

If you want to elect to have only part of the Note purchased by the Issuer pursuant to Section 4.08 or Section 4.12 of the Indenture, state the amount you elect to have purchased:

$

Date:

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

\* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## SCHEDULE OF TRANSFERS AND EXCHANGES OF INTERESTS IN THE REGULATION S GLOBAL NOTE*

The following exchanges of a part of this Regulation S Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Regulation S Global Note, have been made:

| Date of Transfer or Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized signatory of Trustee or Custodian |
| --- | --- | --- | --- | --- |

* *This schedule should be included only if the Note is issued in global form*

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002

U.S. Bank National Association,
as Trustee and Registrar
Global Corporate Trust Services
13737 Noel Road, Suite 800
Dallas, Texas 75240
Facsimile: (972) 581-1670

Re: <u>10.875% Senior Secured Notes due 2024</u>

Reference is hereby made to the Indenture, dated as of February 2, 2021 (the "*Indenture*"), among TPC Group Inc. (the "*Issuer*"), the Guarantors and U.S. Bank National Association, as trustee and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $ _____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.  ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2.  ☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the

Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3. ☐ **Check if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S.**

(a) ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act; or

(b) ☐ such Transfer is being effected to the Issuer or a subsidiary of the Issuer thereof; or

(c) ☐ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4. ☐ **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a) ☐ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b) ☐ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky

securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c) ☐ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

_____

[Insert Name of Transferor]

By: _____

Name:
Title:

Dated:

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

### [CHECK ONE OF (a) OR (b)]

(a)      ☐ a beneficial interest in the:

   (i)      ☐ 144A Global Note (CUSIP _____), or

   (ii)      ☐ Regulation S Global Note (CUSIP _____), or

(b)      ☐ a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

### [CHECK ONE]

(a)      ☐ a beneficial interest in the:

   (i)      ☐ 144A Global Note (CUSIP _____), or

   (ii)      ☐ Regulation S Global Note (CUSIP _____), or

   (iii)      ☐ Unrestricted Global Note (CUSIP _____), or

(b)      ☐ a Restricted Definitive Note.

(c)      ☐ an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002

U.S. Bank National Association,
as Trustee and Registrar
Global Corporate Trust Services
13737 Noel Road, Suite 800
Dallas, Texas 75240
Facsimile: (972) 581-1670

Re: 10.875% Senior Secured Notes due 2024

(CUSIP _____)

Reference is hereby made to the Indenture, dated as of February 2, 2021 (the "*Indenture*"), among TPC Group Inc. (the "*Issuer*"), the Guarantors and U.S. Bank National Association, as trustee and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $ _____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

1.    **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

(a)    ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

C-1

(b)  ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)  ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)  ☐ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2.  **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)  ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b)    ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE]  (a) ☐ 144A Global Note, ☐ Regulation S Global Note with an equal principal amount, the Owner hereby certifies the beneficial interest is being acquired for the Owner's own account without transfer and such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

_____
[Insert Name of Transferor]

By:  _____
      Name:
      Title:

Dated:

C-3

EXHIBIT D

[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS]

SUPPLEMENTAL INDENTURE (this "*Supplemental Indenture*"), dated as of _____, 20__, among _____ (the "*New Guarantor*"), TPC Group Inc. (the "*Issuer*"), each other existing Guarantor under the Indenture referred to below and U.S. Bank National Association, as trustee (in such capacity, the "*Trustee*") and collateral agent (in such capacity, the "*Collateral Agent*") under the Indenture referred to below.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

W I T N E S E T H

WHEREAS, the Issuer and the existing Guarantors have heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise modified, the "*Indenture*"), dated as of February 2, 2021 providing for the issuance of 10.875% Senior Secured Notes due 2024 (the "*Notes*");

WHEREAS, Section 4.14 of the Indenture provides that under certain circumstances the New Guarantor shall execute and deliver to the Trustee a supplemental indenture pursuant to which the New Guarantor shall unconditionally Guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "*Note Guarantee*"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee, the Collateral Agent, the Issuer and the existing Guarantors are authorized to execute and deliver this Supplemental Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Issuer, the other Guarantors, the Trustee and the Collateral Agent mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1.     DEFINED TERMS. Defined terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.     AGREEMENT TO GUARANTEE. The New Guarantor hereby agrees, jointly and severally with all existing Guarantors (if any), to provide an unconditional Note Guarantee on the terms and subject to the conditions set forth in Article 10 of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture.

3.     NO RECOURSE AGAINST OTHERS. To the extent permitted by law, no past, present or future director, manager, officer, employee, incorporator, stockholder or member of the Issuer, any parent of the Issuer or any Subsidiary, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Supplemental Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or

D-1

their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

4. NOTICES. All notices or other communications to the New Guarantor shall be given as provided in Section 14.02 of the Indenture.

5. RATIFICATION OF INDENTURE; SUPPLEMENTAL INDENTURES PART OF INDENTURE. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

6. GOVERNING LAW. THE INDENTURE, THIS SUPPLEMENTAL INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

7. ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS SUPPLEMENTAL INDENTURE, THE INDENTURE, THE NOTES, THE NOTE GUARANTEES, THE SECURITY DOCUMENTS, THE INTERCREDITOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

8. COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes. In furtherance of the foregoing, the words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Supplemental Indenture or any document to be signed in connection with this Supplemental Indenture and the transactions contemplated hereby or thereby shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act, and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

9. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

10.    TRUSTEE AND COLLATERAL AGENT MAKE NO REPRESENTATION. The Trustee and Collateral Agent make no representation as to the recitals contained in this Supplemental Indenture or any representation as to the validity or sufficiency of this Supplemental Indenture.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____, 20

[NEW GUARANTOR]

By: _____
      Name:
      Title:

**ISSUER:**

**TPC GROUP INC.**

By: _____
      Name:
      Title:

**EXISTING GUARANTORS:**

**TPC HOLDINGS, INC.**

By: _____
      Name:
      Title:

**TP GROUP LLC**

By: _____
      Name:
      Title:

**TP CAPITAL CORP.**

By: _____
      Name:
      Title:

**TEXAS BUTYLENE CHEMICAL CORPORATION**

By: _____
      Name:
      Title:

**TEXAS OLEFINS
DOMESTIC-INTERNATIONAL SALES
CORPORATION**

By: _____
      Name:
      Title:

**PORT NECHES FUELS, LLC**

By: _____
      Name:
      Title:

**TPC PHOENIX FUELS LLC**

By: _____
      Name:
      Title:

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee and Collateral Agent

By: _____
      Name:
      Title: