# Exhibit C

**to the Ad Hoc Group of Non-Consenting Noteholders' Letter to The Honorable Craig T. Goldblatt from Aaron L. Renenger regarding Discovery Disputes**

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                  .   Chapter 11
3    IN RE:                        .
                                  .   Case No. 14-10614 (BLS)
4    THE DOLAN COMPANY, et al,     .
                                  .   Courtroom No. 1
5                                  .   824 Market Street
                     Debtors.      .   Wilmington, Delaware 19801
6    . . . . . . . . . . . . . .   .   Friday, May 2, 2014
7                  TRANSCRIPT OF TELEPHONIC CONFERENCE
8            BEFORE THE HONORABLE BRENDAN L. SHANNON
                    UNITED STATES BANKRUPTCY JUDGE
9
     APPEARANCES VIA TELEPHONE:
10
     For the Debtors:          Laura Davis Jones, Esq.
11                             Michael R. Seidl, Esq.
                               Timothy P. Cairns, Esq.
12                             PACHULSKI, STANG, ZIEHL
                                & JONES, LLP
13
                               Marc Kieselstein, Esq.
14                             Judson Brown, Esq.
                               Jeffrey D. Pawlitz, Esq.
15                             Joseph Graham, Esq.
                               KIRKLAND & ELLIS, LLP
16
     For the U.S. Trustee:     David Buchbinder, Esq.
17                             OFFICE OF THE U.S. TRUSTEE
18
19   (Appearances Continued)
20   Audio Operator:           Electronically Recorded
                               by Nickita Barksdale, ECRO
21
     Transcription Company:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

Case 22-50372-CTS   Doc 26-3   Filed 06/09/22   Page 3 of 40

```
 1   APPEARANCES: (Continued)

 2   For Bayside Finance:          David B. Stratton, Esq.
                                   PEPPER HAMILTON, LLP
 3
                                   Michael S. Stamer, Esq.
 4                                 Sean E. O'Donnell
                                   Sarah Link Schultz, Esq.
 5                                 AKIN, GUMP, STRAUSS, HAUER
                                    & FELD, LLP
 6
     For the Official
 7   Equity Committee:             Neil Glassman, Esq.
                                   BAYARD, PA
 8
                                   Andrew Dash, Esq.
 9                                 Steven B. Levine, Esq.
                                   BROWN RUDNICK, LLP
10
     For James E. Albertelli,
11   PA, d/b/a Albertelli Law:     Brett D. Fallon, Esq.
                                   MORRIS JAMES, LLP
12
                                   Stephanie E. Ambs, Esq.
13                                 SMITH, HALSEY & BUSEY

14   For US Bank:                  James Langton, Esq.
                                   DORSEY & WHITNEY, LLP
15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings commence at 11:33 a.m.)

2        THE COURT:  Good morning, Counsel.  I understand from

3    the operator that all necessary parties are on the call today.

4        This is a teleconference in the <u>Dolan Company</u> family

5    of cases; Case No. 14-10614.  It's my understanding that this

6    is a status conference and a discovery discussion that we're

7    going to have today about hearings that are coming up for the

8    end of this month.

9        I believe that the secured lenders have asked for this

10   teleconference.  I will hear from them first, but I will, of

11   course, hear from everybody in due course.

12       Counsel?

13       MR. O'DONNELL:  Hi.  Good morning, Your Honor.  This

14   is Sean O'Donnell at Akin Gump.  Thank you very much for making

15   time for us this morning, we're very appreciative.

16       I'm sorry to burden the Court with this, but shortly

17   after our last conference call with you, in fact, it was that

18   same day, we did have a meet-and-confer with Brown Rudnick

19   regarding the scope of the requests that were served upon our

20   client, and unfortunately, no progress was made.

21       The only development that's happened since then was,

22   last night -- I'm not sure if you saw or not, we weren't

23   expecting it, but there was a claim objection filed by the

24   equity committee related to Bayside's claims.  And had we known

25   that was going to be filed, I think, frankly, probably might

Case 23-50372-CTS   Doc 276-3   Filed 08/04/23   Page 5 of 40

4

1  have thought to have rescheduled this call simply because, at

2  least with regard to one category of requests, which basically

3  concerned the credit agreement, the RSA, and the plan, we're

4  going to need to revisit with our clients, the debtors, and

5  with the equity committee, as to whether or not it makes sense

6  to at least produce some of the documents that they're asking

7  for.

8       The claim objection itself basically boils down to an

9  allegation that we are -- our claim should be disallowed based

10  upon our negotiations with the lender under the credit

11  agreement.  So while we completely believe that the claims are

12  completely without merit, that may require some level of

13  discovery, unfortunately.

14      And so what we advised Brown Rudnick this morning is

15  that we're going to confer with our clients, confer with the

16  debtors.  We haven't had the claim objection for -- we had it

17  for less than 24 hours so far.

18      THE COURT:  I would note --

19      MR. O'DONNELL:  And the --

20      THE COURT:  This is Judge Shannon.  I would note that

21  I have not seen the claim objection, I had matters this

22  morning.  So I have not studied the docket, but hopefully we

23  can still have a productive discussion, at least on some points

24  today, but I appreciate you bringing it up.

25      MR. O'DONNELL:  Thank you, Judge.  And that was --

Case 22-50372-CTS    Doc 376-3    Filed 06/09/22    Page 6 of 40

1    that's my hope, as well.

2            So that really leaves, other than the category of

3    documents that speak to the RSA, the credit agreement, and the

4    plan -- and I think those are three or four requests -- what we

5    view as being three categories of document requests.

6            The next category of documents, the good new is I

7    think there's no dispute at all.  The equity committee has

8    understandably asked for copies of any documents that we intend

9    to introduce at trial, as well as copies of any expert reports

10   that we're going to submit at trial, and of course the

11   underlying documents that would be required under Rule 26.  And

12   we have no objection to providing those materials.  We expect

13   it to be reciprocal, and Brown Rudnick has told us that it will

14   be.

15           So as not to disappoint anybody, however, at least at

16   this point, and as I've explained to Mr. Dash from Brown

17   Rudnick we're not anticipating putting on expert testimony as

18   to value at this point.  We believe the debtors will be doing

19   it, and that should be sufficient for the Court.  But

20   certainly, if we do seek to introduce testimony as to value,

21   we'll give them the expert report, and any and all of the

22   underlying documents.

23           That segues into the next category of documents, which

24   is where it becomes problematic.  And that category of

25   documents have to do with documents that relate to value that

6

1  may or may not be in our client's possession, regardless of

2  whether or not we are seeking to introduce evidence at trial

3  concerning the value of the debtors.

4          While this Court's opinion as to value is certainly

5  relevant, as is any expert's that would be opining before the

6  Court, our internal analysis of value we believe to be, not

7  only irrelevant, but proprietary information that we shouldn't

8  be forced to share with our competitors.

9          So, on that ground, we object to producing documents

10  responsive to a number of documents where they ask for things

11  like anything relating to an analysis of value of the debtors,

12  things like investments in companies that are comparable to the

13  debtors and the like.

14          THE COURT:  Okay.  And what's the third category?

15          MR. O'DONNELL:  So the third category is a broader

16  version of the same.  I don't know if you have the subpoena in

17  front of you or not, Your Honor --

18          THE COURT:  I actually was handed --

19          MR. O'DONNELL:  -- but if you were to look --

20          THE COURT:  It was handed to me as I walked in, so I -

21  -

22      (Laughter.)

23          THE COURT:  So I'm just taking a look at it right now.

24          MR. O'DONNELL:  Well, the -- sure.  So if you were to

25  scroll down to Request 12 --

1          THE COURT:  Okay.

2          MR. O'DONNELL:  -- it's on Page 8.

3          THE COURT:  All right.  I see.

4          MR. O'DONNELL:  And what I'll -- I call this the

5    "catch-all category," which is all documents concerning any

6    investment by Bayside in any company other than the debtors

7    that engages in business activities similar to what is

8    comparable by the business activities of the debtors.

9          THE COURT:  Right.

10          MR. O'DONNELL:  I mean, in fairness, I think you could

11    really break it down into three categories of documents.  The

12    first category is the one we have to reconsider, which relates

13    to the RSA, the plan, and the credit agreement.  Based upon the

14    objection that was filed last night, we're going to circle back

15    with Brown Rudnick and see if we can either agree or agree to

16    disagree on those request.

17          The next is anything that's going to go into trial as

18    to value or otherwise, of course, we're going to give them.

19          And then that third is the broad category, which would

20    be our internal analyses, not only of the value of the debtors,

21    but anybody that is found to be comparable to the debtors, and

22    we just think that's wholly improper.

23          THE COURT:  Okay.  I understand.

24          All right.  Response.

25          MR. GLASSMAN:  Your Honor, it's Neil Glassman of

Case 22-50372-CTS    Doc 276-3    Filed 06/09/22    Page 9 of 40

1  Bayard for the equity committee.

2       THE COURT:  Good morning.

3       MR. GLASSMAN:  Good morning.  Thank you for hearing

4  us.  With me on the phone is Andrew Dash, and I think Mr. Dash

5  is going to address matters from the equity committee

6  perspective.

7       THE COURT:  Okay.  Mr. Dash --

8       MR. GLASSMAN:  You admitted him *pro hac vice*.

9       THE COURT:  Great.  Good morning, Mr. Dash.

10      MR. DASH:  Good morning, Your Honor.  And we also

11 thank the Court for the time this morning.

12      Your Honor, Bayside is not a simple creditor here, as

13 I'm sure the Court is aware.  Bayside is now the debtors' main

14 lender under its prepetition credit agreement.  It's installed

15 itself as the agent under that agreement.  It is a DIP lender,

16 it is a proposed exit financier.  And in essence, under the

17 plan, it's going to get the keys and all the upside upon

18 emergence.  We believe it is a driving force, the driving force

19 behind the highly expedited schedule here that debtors are

20 seeking to confirm their plan proposal under the RSA.

21      In that context, we think that the documents in

22 Bayside's possession that relate to the value of the company

23 are entirely appropriate targets of discovery, and certainly

24 within the ambit of a reasonable calculation to lead to the

25 admissible evidence, if not inherently admissible and relevant

1  on their own basis.

2         Your Honor, we received, essentially, a blanket

3  refusal from Bayside to provide these documents.  I know that

4  counsel mentioned today a concern regarding disclosing

5  proprietary information.  If he -- I don't believe he raised

6  that earlier with me.

7         But I should point out that the parties are very close

8  to finalizing a confidentiality agreement that will be

9  presented to the Court for so ordering that will protect those

10  documents, to the extent that there really are proprietary

11  materials there.

12         These are central issues to this case.  You know, the

13  valuation of the company and the good faith of the plan

14  proposal will be key at the hearing.  We think that Bayside

15  really shouldn't be allowed to hide the ball here.  They may

16  well have in their files valuation materials that can

17  contradict what has been presented to the Court, or otherwise

18  provide information that will be useful in analyzing and

19  critiquing that valuation.

20         THE COURT:  Let me ask you a question, Mr. Dash.  I

21  understand -- I don't know that I've dealt with this question

22  in precisely this context, but I've certainly seen it a number

23  of times in a sale context, where parties want to get a buyer's

24  information, and particularly, perhaps more importantly, a

25  buyer's allocation of the value that it's proposing to certain

1  different assets, for reasons that we don't need to go into,

2  but sometimes there's a reason.

3       And the approach that at least I've taken, and I

4  believe courts have typically taken, is that, in that

5  situation, the buyer's assessment or determination of value is

6  not an appropriate area of inquiry, particularly given that the

7  burden that's before the Court -- and in this case, the burden

8  would be a plan confirmation burden, that would obviously

9  embrace valuation, but that the burden rests with the debtor,

10 not with Bayside.

11      I understand the point that, obviously, Bayside is not

12 sitting in this as a third-party, disconnected bidder that's

13 simply come to an auction table and put cash on it.  But given

14 that the burden rests with the debtor, is Bayside's

15 information, frankly -- its analysis, I can understand why you

16 may want it.  But it is really, in fact, appropriate to the

17 inquiry that we have?

18      MR. DASH:  We believe it is, Your Honor, both as

19 evidence relating to the confirmation hearing, and in

20 connection with the claim objection that was filed yesterday.

21      You know, Bayside is clearly the driving force behind

22 the RSA.  Bayside clearly positioned itself to demand that this

23 plan be proposed and the schedule on which it is to be heard by

24 the Court came out of it.

25      You know, Your Honor, the -- as set forth in some

1   detail in the claim objection, through the series of recent

2   amendments, Bayside was instrumental in severely limiting the

3   debtors' liquidity and, in fact, was a driving force behind the

4   departure of senior management and the replacement of senior

5   management with a designee of Bayside.  We think, in this case,

6   they are more than just a bidder or a third party or a simply

7   creditor.  They are part and parcel, and, if not formally, in

8   effect, a co-proponent or, potentially, the proponent of the

9   plan.  So we do think that that's important -- that it's

10  important that we see this material.

11          THE COURT:  Mr. Dash, can you --

12          MR. DASH:  Certainly --

13          THE COURT:  Hang on, Mr. Dash.  Can you -- this is

14  Judge Shannon.  Can you -- I simply don't have it in front of

15  me right now, but my recollection is that Bayside -- I'm aware

16  of the role that they play and their -- and the significance of

17  their stake in this process.  Is Bayside a co-proponent of the

18  plan?  I just don't know the answer.

19          MR. DASH:  No, Your Honor.  I'm told that, as a formal

20  matter, they are not.

21          THE COURT:  Okay.  All right.  I understand.  And I

22  understand your take on it, but I just -- I wanted to get at

23  least an answer on that discrete, simple question as we move

24  forward.  Okay?

25          MR. DASH:  Your Honor, how and what Bayside thinks

Case 22-50872-CTS    Doc 376-1    Filed 06/04/25    Page 13 of 40

1    about valuation, I think is directly relevant here.  For

2    example, if Bayside's internal valuation assessment is

3    materially different from that contained in the Peter J.

4    Solomon valuation that the debtors will be presenting, I think

5    that goes to the good faith of the plan proposal.  It deals --

6    you know, it suggests that we have a situation where there's an

7    anticipated National Gypsum result coming along.  And we think

8    that all will be relevant to the hearing on confirmation, and

9    will also be relevant to our objection to Bayside's claim.

10    We think that the -- you know, we're not talking about

11    an overly burdensome request here.  We would assume that any

12    valuation materials they've got are, you know, rather discrete

13    and easily available to Bayside and its professionals.  And we

14    think we should be given access to it.  And to the extent that

15    Bayside has confidentiality concerns, I think it will be easily

16    dealt with, with the confidentiality agreement that is about to

17    be in place.

18    THE COURT:  Mr. Dash, let me ask you another question.

19    And I appreciate your points about the valuation issue, and

20    we'll obviously deal with that in a moment.  But as -- again, I

21    appreciate getting this, and I do like to get on the phone for

22    these discussions.  Obviously, it's moving very quickly.  And

23    as I said a few moments ago, I did just get the subpoena, so,

24    you know, I have not had a chance to study it.

25    But Mr. O'Donnell touched on a separate category or

1  stripe of objection -- not "objection," but request for

2  information regarding proposed investments or actual

3  investments that Bayside may have made as to other companies in

4  similar industries.  And I think I'd like -- and as I

5  understand Mr. O'Donnell, he's not inclined to produce them,

6  he's questioned the significance and relevance.  And I'd like

7  to understand the equity committee's thoughts on those

8  requests.

9          MR. DASH:  Your Honor, Andy Dash again.  Thank you.

10          I can provide a hypothetical that may explain our

11  thinking in this regard, Your Honor.  If, for example, Bayside

12  is or is proposing or is considering making an investment in a

13  similar company at a market multiple materially higher than

14  what they're proposing to be the valuation here or the

15  valuation that's being relied on here, and the plan that will

16  turn the company over to them.

17          And we think that's quite relevant and would provide

18  information, not only relating to Bayside's good faith, but

19  will provide information that will allow our financial advisors

20  to include in its, you know, comparable transaction analysis

21  for the company.

22          You know, the test for discoverable material, of

23  course, is very broad, Your Honor.  And Your Honor, as now

24  Justice Alito said in the Pachecki case (phonetic), you know,

25  it is well recognized that federal rules allow broad and

Case 23-51817-CTS    Doc 376-1    Filed 08/04/25    Page 15 of 40

14

1   liberal discovery.

2          And as the District Court said in <u>Cash Today of Texas</u>

3   case [sic], only if it is, quote:

4          "-- palpable that the evidence sought can have no

5          possible bearing upon the issues."

6          Should the Court deny discovery by quashing a

7   subpoena.  We think those basic standards of federal discovery

8   should govern here, and that the discovery should be allowed.

9          THE COURT:  Okay.  I understand.

10          Before I hear from Mr. O'Donnell in response, does the

11   debtor or any other party have anything to add?

12          MR. DASH:  Your Honor, Andy Dash.  I just want to

13   reserve when we conclude the discussion of Bayside.  We do have

14   an issue relating to our -- to the debtors, and I did want to

15   report to the Court, generally, on two other discovery matters.

16          THE COURT:  Okay.  All right.  Anyone else before Mr.

17   O'Donnell again?

18          MR. BROWN:  Yes, Your Honor.  Judson Brown from

19   Kirkland & Ellis on behalf of the debtors.

20          I was going to say that we don't have anything to add

21   to the dispute between Bayside and the equity committee, though

22   we're happy to give you an update as to the discovery that the

23   equity -- the voluminous discovery that the equity committee

24   seeks from the debtor, and address whatever dispute it is that

25   Mr. Dash intends to raise that, frankly, we weren't quite aware

1   of, but we're happy to address that once this dispute is

2   resolved, Your Honor.

3           THE COURT:  Okay.  I understand.

4           All right.  Mr. O'Donnell?

5           MR. O'DONNELL:  Hi.  I apologize, Your Honor.  I had

6   the phone on mute, still.  Okay.  So just a couple of quick

7   responses --

8           THE COURT:  Actually --

9           MR. O'DONNELL:  -- and reply.

10          THE COURT:  Actually, hang on.  Hang on.  I have a

11  question, for starters, and then I definitely want to hear your

12  specific responses.

13          MR. O'DONNELL:  Sure.

14          THE COURT:  But I'd like you to respond, if you would,

15  as -- just as a general proposition, to the points made by Mr.

16  Dash at the end, that what we're talking about is discovery,

17  that it is not about the admissibility of evidence or

18  relevance, or particular relevance, but maybe we circle back to

19  that.  But a question of, if we start from the proposition that

20  discovery is broad, and if the question is valuation, you're

21  clearly -- your client is clearly an interested party.  If we

22  apply simply that broad principle of, you get it, and we'll

23  sort it out later, why does that drive the analysis here?

24          MR. O'DONNELL:  Your Honor, thank you very much.

25  That's exactly, actually, where I wanted to start.  And I think

1  coupled with that point is Mr. Dash's suggestion that a

2  proposed confi fixes the problem, as well.

3          I don't dispute the law as it relates to the relevancy

4  or scope of a request, but that doesn't end the analysis.  As

5  Your Honor knows, there's still a burdensome analysis.  And

6  when you start to factor in the time and the expense associated

7  with gathering documents responsive to these requests, it's

8  considerable.  And I take issue with Mr. Dash's description of

9  these requests as being discrete.  So the value requests, I

10  think, are 6, 7, 8, 12, and 13.  And even a cursory review of

11  them, Your Honor, shows that they're anything but discrete.

12  I'm going to start with 7:

13          "All documents concerning any effort to sell or

14          otherwise hypothecate any company that engages in

15          business activities similar or comparable to the

16          business activities of the debtors; including, without

17          limitation, ALM Media Properties, LLC, or any

18          affiliate or subsidiary thereof.

19          "8:  All documents concerning any consideration by

20          Bayside providing financing to any company that

21          engages in business activities similar or comparable

22          to business activities of the debtors; including,

23          without limitation, ALM Media Properties, LLC, or any

24          affiliate or subsidiary thereof."

25  I can go on.  12 and 13 are even broader.

1           This isn't a Rule 2004 fishing expedition.  And while,

2   maybe, there is some slight relevancy as to what Bayside or,

3   frankly, what I think of the company, it's certainly outweighed

4   by the cost and the burden that's imposed on the estate to

5   comply with the request.

6           Contrary to what Mr. Dash suggested to the Court,

7   we're not trying to hide the eight ball.  I began by saying

8   that we're giving him anything and everything that relates to

9   value that we would intend to introduce in court.

10          They're going -- there's going to be expert testimony

11  on this.  Presumably, Mr. Dash's clients are going to have

12  their own experts that are going to speak to value.  They're

13  getting discovery from the debtors on the issues that speak to

14  value.  All of that, they're getting.

15          As it relates to their complaints against Bayside,

16  which, again, we saw for the first time last night, and wasn't

17  expecting it.  But all that has to do with is with regard to

18  the negotiation of the credit agreement.  And I began the call

19  by explaining, while we certainly take issue with the merits of

20  those allegations, that may, in fact, given the broad discovery

21  that people are entitled to, mean that we have to roll up our

22  sleeves and spend some time and money that, unfortunately, is

23  going to be a burden on the estate, responding to Requests 1,

24  2, 3, and 4, which are, similarly, in no way discrete:

25          "All documents concerning the plan.

1          "All documents concerning the restructuring agreement.

2          "All documents concerning any proposed or effectuated

3          amendment or modification of prepetition credit

4          agreement."

5          It goes on, Your Honor.  So I'm not suggesting that

6   the rules for discovery aren't broad; I think we all know that.

7   But they're not limitless.  And it's certainly within the

8   Court's discretion to decide what the proper scope is, as it

9   relates to the issues that are going to be presented to the

10  Court.

11         And that segues into the confi issue.  Again, I

12  definitely raised the proprietary information with Dash during

13  our call.  But regardless, even if we enter into a confi, that

14  doesn't change the time and expense associated with responding

15  to the requests.

16         And more importantly, Your Honor, you know, I've been

17  in your courtroom.  We're not going to close the courtroom for

18  a hearing.  So, to the extent that the documents are relevant

19  or are going to be used at trial, the confi is not going to do

20  anything about it.

21         So, again, Your Honor, I think you made the point, if

22  we were the buyer of the assets of the company, or if we were

23  somehow a co-proponent of the plan, maybe that would alter the

24  analysis.  But as it relates to the allegations that concern

25  us; credit agreement, the RSA, we're likely to be giving over

1    documents on that, I'm going to confer against with Mr. Dash.

2         But on the other stuff, I think it's just simply

3    unfair and unnecessary to impose that type of expense and

4    burden on the estate and on our client in responding to what

5    are very, very broad discovery requests.

6         THE COURT:  Okay.  I understand.

7         All right.  Here's what we're going to do.  As I

8    understand it, I -- as I said, I have not seen the claim

9    objection, so, of course, I'm not going to be dealing with that

10   issue.

11        With respect to the documents, I would note the

12   following:

13        First, I think, as a general proposition, the

14   principle that Bayside's analysis or evaluation of the -- or

15   valuation, prepetition or otherwise, of the debtor, I don't

16   believe is an appropriate area of inquiry.  I'm -- so I will

17   tell you that that is my strong instinct right now.

18        And again, I appreciate getting on the phone with

19   parties.  I have not had an opportunity to have the issue

20   briefed, and I'm not necessarily inviting that right now.  I

21   will tell you what my thoughts are.

22        I don't believe that inquiry into Bayside's valuation

23   and assessment of the value of this company and its various

24   components -- first of all, I agree with Mr. O'Donnell; I don't

25   believe that it is a discrete or narrowly focused inquiry; and

1  that, as a practical matter, it would be both extensive and

2  expensive, and that is part of the analysis.

3        I also think that it is of limited relevance to the

4  inquiry, as the burden rests with the debtor to demonstrate the

5  value of the company.  And while it may be appealing to use as

6  an opportunity to cross-examine, perhaps, the debtors' witness

7  some information obtained from Bayside, asking that witness,

8  well, isn't it true that your secured lender believes the

9  company is worth X or Y or more, again, I think that that is

10  less of an appropriate exercise in the -- in evaluating the

11  burden, and focusing particularly on the inquiry that we're

12  doing.  So I am not prepared to direct or require Bayside to

13  provide documents responsive to inquiries about its own

14  internal assessments of the value of the debtor.

15        I will say that I feel, perhaps, even more strongly on

16  the issue of Bayside's assessment, analysis, or thought process

17  determining -- as to determinations that would relate to other

18  businesses in the same line of inquiry.  Again, I understand or

19  appreciate as a general proposition why that might be of

20  interest.  To me, that is of only the most limited significance

21  and, again, would seem to me to raise both cost and delay

22  concerns.

23        But more significantly, that would clearly raise

24  issues regarding confidentiality and sensitive business

25  information, as to transactions that are not before the Court

1    and not relating to parties before the Court.  So I'm not

2    prepared to direct that inquiry.

3          With respect to the -- I would just observe, though,

4    and I think Mr. O'Donnell acknowledged this.  The claim

5    objection, if it goes to the claim, it seems that it would then

6    implicate the items that are identified in, I think it's 1, 2,

7    3, and 4.  But my understanding is the parties are going to

8    continue to have their discussion on those issues, and we would

9    get back.  But I at least would observe that that's a more

10   direct connection between the discovery and the issues that I

11   presume could be raised in the context of a claim objection.

12         I note, also, that Mr. Dash observed that issues

13   relating to the -- to Bayside's assessment of the value of the

14   company -- of the debtor is or may be relevant to the claim

15   objection.  And I want to be clear that I'm not ruling on that

16   question because I'm just at a loss.  Since I haven't seen the

17   claim objection, I can't make a determination about whether --

18   this stuff that I don't see as being an appropriate area of

19   inquiry in the context of the claim objection.  I make no

20   comment about whether or not it is or could be relevant to the

21   claim objection.  I don't -- and again, I don't want anybody to

22   read this one way or the other; I'm just not ruling on that at

23   this point.

24         But I think I have, in a number of instances,

25   consistently held that this type of inquiry is not appropriate

1   until and unless Bayside becomes an active participant in

2   presenting evidence and testimony to the Court regarding the

3   value of the company.  But if I'm reading Mr. O'Donnell's

4   initial comments accurately, the -- Bayside is not expecting to

5   put those witnesses on.

6           But if Bayside is going to vigorously participate in

7   this -- in a confirmation hearing and demonstrate -- and seek

8   to demonstrate with its own evidence that, in fact, the value

9   of the business is X, and here's why, and that's why the plan

10  is confirmable, then I believe inquiry into its assessment of

11  the value would be appropriate.  But at least as currently

12  postured, I will not direct that Bayside comply with those

13  requirements -- those -- I'm sorry -- those requests for

14  production and discovery requests.  Okay?

15          I believe we had a couple of other items that were to

16  be raised, or at least discussed?

17          MR. DASH:  Yes, Your Honor.  Andy Dash again.

18          Your Honor, with respect to the debtors, I first want

19  to report that we've had extraordinarily detailed and lengthy

20  discussions regarding our requests to the debtors for

21  documents, and we have worked through and reached agreements on

22  the vast majority of our issues.

23          There are -- there is, however, an issue that has

24  cropped up, that I should note something that I did alert

25  counsel to the debtors about, notwithstanding Mr. Brown's

1   comment earlier.

2          We have, Your Honor -- the committee has retained as

3   financial advisors Goldin Associates.  And our efforts to

4   arrange for a -- you know, a dialogue and an information flow

5   to Goldin have -- I don't want to say "stymied," but have been

6   impeded by the position taken by the debtors to date that any

7   information that Goldin wants can only be provided through a

8   written request to the company's -- the debtors' counsel; and

9   that our efforts to set up meetings, informational meetings,

10  between Goldin and the CRO and the heads of the two main

11  operating divisions and the person or persons responsible for

12  preparation of the debtors' projections have, to date, been

13  rejected.

14         As an example, Your Honor, Goldin wanted to know --

15  needs to know a breakdown of the projected 13.7 million exist

16  costs, and you know, what the sources -- what the uses would be

17  of that -- those funds.  When -- that -- in a case -- in my

18  experience, that normally would be the kind of factual inquiry

19  that is most efficiently and cheaply dealt with by Goldin

20  calling one of the debtors' professionals and asking.

21         Instead, we're going through this rigmarole, where

22  Goldin has to --

23         THE COURT:  No, all right.

24         MR. DASH:  -- (indiscernible) --

25         THE COURT:  I -- Mr. Dash, I get your drift.  So I'll

1  hear from the debtors on that.  Did you have other issues or

2  areas?  Obviously, I recognize that we're still early in the

3  process.  And again, I appreciate the amount of work that's

4  already been done at this point.  But I understand the point on

5  this.  Mr. Dash, any other areas before the debtor responds?

6        MR. DASH:  Your Honor, we have one issue that is

7  increasingly important.  Goldin has asked for access to the

8  valuation model supporting the P.J. Solomon valuation, either

9  in native format, preferably, or as a printout with the

10  appropriate supporting documents, so that it can assess and

11  understand that value in greater detail than is provided in the

12  report summary that we've been provided to date.

13        We've been told that we can't have that or that

14  they're still thinking about it.  And it's become a high-

15  priority issue for Goldin.  And I raise it now, in order to see

16  if we can get the Court's views as to the appropriateness of

17  that request.

18        THE COURT:  Okay.  I understand.

19        Counsel?

20        MR. BROWN:  Thank you, Your Honor.  Judson Brown from

21  Kirkland on behalf of the debtor.

22        Your Honor, Mr. Dash started by noting the lengthy,

23  detailed discussions that he and I have had over the past few

24  days.  And I just want to let Your Honor know, the reason we've

25  had those lengthy, detailed discussions is because the equity

1  committee, unfortunately, has taken a one-size-fits-all

2  approach to this case.

3      They served us with 57 different document requests, seeking

4  all sorts of documents on issues ranging far beyond valuation.

5  That's, frankly, more document requests than the same firm has

6  served in their 2004 motion in that forty-million-dollar case

7  in front of Judge Sontchi, Your Honor.  So it's taken us an

8  extensive number of hours to try and whittle down the request

9  to valuation issues, and we're working hard, as Mr. Dash said.

10      Let me address the two issues he raised.  The first

11  issue, with respect to Goldin's access.  Mr. Dash has asked for

12  Goldin to have access to the CRO and the individual who has

13  developed a budget, or kind of lengthy efforts to develop the

14  budget and projections, and that's the same person.  It's the

15  CFO -- or sorry, CRO.  And he's asked, also, for Goldin to have

16  access to the heads of my two business units.

17      Your Honor, the issue that we have is we're not

18  willing to give Goldin free access to free discovery from our

19  business units or our CRO that they are going to obtain and can

20  obtain through depositions.  Mr. Dash, in fact, and I had

21  already been talking about depositions of individuals, we'll

22  make people available for depositions when Mr. Dash is ready

23  for them, at an appropriate location.  That's the way for the

24  committee to get this discovery.  And unfettered access to my

25  businesspeople is not the appropriate mechanism.

1      I don't want to impede Goldin and the equity

2  committee's investigation here, though, and so what we proposed

3  as a work-around is that, look, if Goldin wants to put their

4  questions in writing, or, frankly, pick up the call -- the

5  phone and call us, all they have to do is put them in writing.

6      And so Mr. Dash referenced one particular request

7  about 13.7 in exit costs.  He sent that request this morning,

8  Your Honor, ten minutes before 11.  While we have been on the

9  phone, Your Honor, I have received the information responding

10  to that request.  I'll be able to pass that on to Mr. Dash

11  shortly after our call ends, Your Honor.

12      So there's no -- frankly, there's no lag time here.  I

13  routed that request to the appropriate people, and we've got an

14  answer.  So there's absolutely no detriment to Goldin or the

15  equity committee's access to information.  It just allows the

16  debtors to monitor what sort of discovery is being obtained

17  from their witnesses and their business people.

18      THE COURT:  Well, let's talk about the valuation

19  model.

20      MR. BROWN:  Yes, the second issue, Your Honor.  What

21  we have told the equity committee that we're willing to provide

22  is what's required under Federal Rule 26:  Expert report,

23  documents that our expert considers and relies upon in drawing

24  and reaching his conclusions.  That's what we're willing to

25  provide.

1    A valuation model is far beyond that.  This is a Peter

2   J. Solomon that they used to do a valuation analysis, the same

3   sort of model that Goldin & Associates will prepare, to do

4   their valuation analysis, Your Honor.  That's not the sort of

5   information that Rule 26 requires parties to disclose from

6   experts.

7        So I didn't even know we had a dispute on it yet, Your

8   Honor.  But to the extent we do, or to the extent we need your

9   views, that's our position:  That the valuation model is a PJS

10  model, it's not required to be disclosed under the rules; and,

11  therefore, it shouldn't be disclosed.

12       THE COURT:  Okay.  All right.  Here's what I want to -
13  -

14       MR. DASH:  Your Honor, may --

15       THE COURT:  Yeah --

16       MR. DASH:  May I respond, Your Honor?

17       THE COURT:  Yeah, on the valuation model question.  I

18  don't need any response on the other issue.

19       MR. DASH:  Well, I -- my response was to the other

20  issue, Your Honor, so I will defer to the Court's desires.

21       THE COURT:  Okay.  Okay.  All right.  With respect to

22  the informational meetings, here's what I'm going to do.

23  Obviously, I don't think it's -- I don't want to say "it's not

24  within my power," but it would not typically be the sort of

25  thing that I would direct that there be an opportunity for

1  informal meetings, which I think is what's request -- which has

2  been requested.  Mr. Brown characterized them as "unfettered

3  access" to senior management.  I'm -- to the extent that's

4  what's being requested, that would, obviously, be

5  inappropriate.  But I don't think that's what's being

6  requested.

7          The -- what is, I think, typical in these cases is

8  that there is, clearly, a line of communication usually between

9  financial advisors and -- you know, and the debtors' financial

10  professionals or CROs.  And to the extent that someone, whoever

11  is leading this up for Goldin, wants the opportunity to have a

12  sit-down, starting with the CRO, that seems, to me, that that

13  would be productive, and I'll tell you why in a moment.  But

14  I'm going to get to the heads of units question.

15          Obviously, again, I don't -- I'm not suggesting that

16  there ought to be unfettered access to heads of units.  But the

17  opportunity for a scheduled get-together outside of the

18  depositions seems, to me, to be, one, not remarkable; and, two,

19  appropriate, in the context of this case.

20          And where I start is that I realize that we've

21  adjourned confirmation to later this month.  But it's not lost

22  upon me -- and the fact that we're on the call today is

23  indicative -- that there's a lot of work that needs to be done

24  to get to that hearing, and I'm aware of it.  And it is the

25  debtor that has asked that we move this matter on an expedited

Case 23-51837-CTS    Doc 376-1    Filed 08/04/23    Page 30 of 40

1   basis, and I've accommodated that.

2        But the fact of the matter remains that, having made

3   that requested, and having proposed or starting us on this

4   schedule, it is, frankly, incumbent upon the debtor to do what

5   it can to ensure that we're ready for the hearing, and that

6   this exercise, the discovery and the analysis and the

7   litigation process, has been given a sufficient opportunity to

8   play itself out.  And so, again, it does seem to me that it

9   would be productive and helpful to afford an opportunity for

10  that meeting.

11       I am not suggesting that somebody from Goldin ought to

12  be able to email directly -- either with CC's or without CC's,

13  directly to business heads or heads of the units.  I can

14  understand the debtors' concern and reluctance.  But as it

15  relates to the idea that every question and inquiry should be

16  in writing, to me, that seems perhaps a little bit burdensome.

17  And the idea that there be a meeting might allow for a great

18  deal of progress and background analysis that -- or

19  information-gathering that Goldin and the equity committee will

20  need to do, can occur in a more efficient fashion.

21       So my recommendation and preference would be that

22  there be a more open process for inquiry, and that, presumably,

23  the parties have scheduled, or may be scheduling a meeting.

24  And again, I think it would be appropriate to allow that to

25  happen because I think that, while depositions will likely

1    occur, some of those meetings are going to be valuable because

2    understanding the information that's in the heads of the --

3    particularly the businesspeople, and also the CRO, is valuable

4    to Goldin and to the equity committee, to understand the --

5    some of the fundamental premises that underlie the debtors'

6    characterization and understanding of its business.  So I would

7    ask that the parties endeavor to permit a meeting of some sort.

8          But again, I'm aware of the burdens that are on

9    management of a -- particularly, non-bankruptcy professional

10   management types, not your CRO.  I'm aware of the burdens on

11   those folks in operating a company that is in Chapter 11, and

12   I'm not suggesting that they ought to be on the phone at the

13   beck and call of Goldin or the equity committee.  I'm not

14   getting the sense that that's what's being requested.  And

15   again, it seems to me that that's not an unusual or

16   inappropriate request, so that would be my admonishment.

17         With respect to the valuation model, I'm sorry, but I

18   think I'm going to have to punt on that with the following

19   observation:

20         I'm not a hundred percent certain exactly what's being

21   asked of me in the context of the valuation model.  And I've

22   had this discussion before, and the discussion of whether you

23   get something in native format or in printout form, et cetera.

24   Clearly, the equity committee is going to need to be able to

25   deal with the debtors' valuation and its analysis, and that

1  necessarily anticipates an appropriate inquiry into the

2  methodology and the tools used to value the company.  I don't

3  think that that's an issue that's in dispute.

4       I don't know enough now, and I'm not going to ask that

5  the lawyers on the phone explain to me what the distinction is

6  between the valuation model that's used, that I think I gather

7  from the debtor would be regarded by P.J. Solomon as a, you

8  know, proprietary tool that everybody in this business has,

9  that everybody has got different tweaks to it, and the

10 important consideration is the report at the end of the day.

11      So I'm not going to answer that question today, and I

12 apologize.  I'm going to give the parties an opportunity to

13 confer a little bit more.  But I, frankly, think that I'd want

14 a better sense of what it is P.J. Solomon is concerned about

15 than -- before I would be able to say, sure, go ahead and get

16 it.

17      This is not an issue, similarly, that's resolved by

18 confidentiality considerations, at least not by my assessment

19 at the outset.  So I want to let that evolve through discussion

20 between the professionals and, importantly, between the

21 financial advisors.  And I'd want an explanation of exactly

22 what it is that Goldin believes it needs, in order to

23 evaluation and, frankly, respond to or counter the valuation

24 provided by P.J. Solomon.

25      The other point that I would make, again, is in the

1  context of the timing that we have, and that is that, again, I

2  think it's incumbent upon the debtor to make the discovery

3  process as streamlined and smooth as possible.  And it seems to

4  me -- so before I -- before the debtor starts explaining or

5  responding or feeling like they need to further develop the

6  record.  It does seem to me that the debtor has made

7  substantial and robust steps to provide information to the

8  equity committee.  We haven't ticked off everything that

9  everybody has done, but it does seem to me that there's been a

10 substantial exchange of information, and this is an ongoing

11 process.  So, for that, I would commend all of the parties.

12         But clearly, to the extent that there are issues where

13 important discovery -- important information is not being

14 provided, that obviously -- if there's material delay with it,

15 and then I find that, in fact, it was necessary to bring it --

16 to bring that out, then, obviously, that puts in peril the time

17 line created by the debtor.  So that should inform, at least to

18 some extent, the debtors' evaluation of what would be an

19 appropriate and what would be an inappropriate area of inquiry.

20         So, again, I apologize for not being able to give you

21 more guidance on the valuation model, but I'm not a hundred

22 percent comfortable with precisely what's being asked.  And so

23 I'll let that flesh out.  And if you can resolve it, then

24 great.  And if you need me on it, then I'd ask that you be

25 prepared to give me some more guidance on it.  And obviously,

Case 23-51387-CTS   Doc 376-1   Filed 08/04/25   Page 34 of 40

33

1    I'll do what I can to make myself available.  Okay?

2             MR. DASH:  Your Honor, Andy Dash.  May I have -- may I

3    ask one point of clarification?

4             THE COURT:  Yeah.

5             MR. DASH:  Your Honor, I'm not -- I think that the

6    Court addressed the question of access to the CRO and

7    businesspeople in a meeting context.  There's a broader issue

8    about some day-to-day, purely informational requests, that

9    normally would be handled by communications between the

10   committee's financial advisor and the financial advisors to the

11   debtors.  That's the issue that we -- that's an issue that we

12   think could materially facilitate everybody's work, and reduce

13   costs, in particularly legal fees, if it were allowed, on

14   purely informational issues, for Goldin to reach out to Zolfo

15   or P.J. Solomon and ask their questions.  For example, and

16   (indiscernible) --

17            THE COURT:  I don't need an example.  I don't need an

18   example.

19            Mr. Brown, what's your response?

20            MR. BROWN:  Your Honor, I understood your concern,

21   like mine, that this not be this nonstop back-and-forth between

22   Goldin and my heads of business units or my CRO.  I understand

23   the admonishment that we need to provide information, that's

24   certainly what we're trying to do, Your Honor.  And we'll

25   follow the Court's direction.  We'll make the heads of

1  businesses available for an interview, the CRO available for an

2  interview.  I'm just concerned about the constant back-and-

3  forth that's unmonitored.

4         Now, if it stays at the CRO and FA level, and doesn't

5  begin to interfere with my businesspeople running businesses, I

6  think that's a separate issue, Your Honor, that, you know,

7  perhaps we can address differently.  But the business -- the

8  heads of businesses or businesspeople is a very big deal, a

9  very big concern for the debtor.

10        THE COURT:  Yeah.  And I think I can answer that

11 question.  As I've said, I believe that it would be appropriate

12 to give Goldin an opportunity to communicate directly and meet,

13 presumably, or get on the phone with the heads of businesses,

14 at a point that is, you know, scheduled and convenient, and

15 where, obviously, counsel or the debtors other professionals

16 can be there.  Because I can easily imagine that there is a log

17 list of questions or clarifications that Goldin may ultimately

18 conclude they have and they want that can only be gotten from

19 somebody that really is in the business, rather than a

20 professional.

21        My experience has been that the professionals, and

22 particularly at the FA and CRO level, that there is ongoing,

23 regular communication between, you know, a committee's

24 professionals and those folks.  And to me, that's not

25 remarkable, and that should be -- that should be -- unless

1  there's some reason that it should be curtailed, the

2  expectation is that we've hired able and experienced people

3  that can -- you know, that can be trusted to deal with the

4  other side, with -- and that we don't have to go through

5  counsel and in writing all the time.

6         If it gets burdensome, then, you know, we can deal

7  with it.  But I think that, again, this is not an unusual

8  topic.  And it seems to me that somebody from Goldin should not

9  be restrained in their ability to give a call to somebody at --

10  and again, I haven't gone back and looked at who the debtors'

11  CRO or financial advisor, other than P.J. Solomon is.  But

12  again, those kind of communications seem to me to be very

13  routine, and particularly appropriate in the context of a case

14  that is gearing up for a disputed hearing.  So I don't think

15  that that's controversial, and I'm confident the parties can

16  proceed appropriately.  Okay?

17         MR. BROWN:  Thank you, Your Honor.

18         THE COURT:  All right.

19         MR. DASH:  Thank you, Your Honor.

20         THE COURT:  Mr. Brown, I think you had asked, or had

21  suggested that you would have some comments or something to

22  sort of report to the Court.  I don't know if we've already

23  covered that ground, but I wanted to afford you that

24  opportunity.

25         MR. BROWN:  Thank you, Your Honor, for the

1   opportunity.  Thank you for hearing us today, Your Honor.  But

2   I had already covered that.  I just wanted to bring you up to

3   speed on kind of the state of our discovery negotiations.

4          And just so Your Honor is aware, the debtors have made

5   quite a number of document productions to the equity committee.

6   We've opened up the -- a very extensive and voluminous data

7   room, with a substantial amount of documents and

8   (indiscernible) to the equity committee.  Just so Your Honor

9   knows that the parties are trying to work cooperatively, and

10  the debtors are trying to provide the equity committee with all

11  of the information that they're going to need to do their

12  analysis here, Your Honor.

13      THE COURT:  Okay.  All right.  Anything else this

14  afternoon?  I do have one thing I wanted to at least touch on.

15  But anything else from the parties?

16      (No verbal response.)

17      THE COURT:  Okay.  All right.  So, as I said, we're

18  gearing up for a hearing toward the end of this month, and I'm

19  confident that there's, you know, a great deal of information

20  that needs to be exchanged in preparation.  And as I've said

21  many, many times, one of the luxuries I have is experienced

22  counsel and professionals that have done this sort of thing

23  before me and my colleagues before.

24          So I do see substantial progress between the parties,

25  and that -- in these, obviously, recent days, and I appreciate

1   that.  And I would encourage the parties to continue to

2   coordinate with each other, as best as possible, to provide for

3   as efficient a process as possible.

4        It's implicit, I think, from Mr. O'Donnell's comments

5   that -- and from the debtors, but you know, I'm aware that, you

6   know, this is an expensive process.  But it is a process that

7   the debtors embarked upon, and the committee has

8   responsibilities.

9        I would make one observation, and I would ask that the

10  parties not read too much into it.  And maybe it's just me -- I

11  don't know if it's venting or commenting.  But the last time I

12  had one of these, I remember sitting on the bench, several days

13  into a valuation trial, which is -- which I think everybody on

14  the phone has been through before, in one form or another, so I

15  don't need to tell you the -- of what a pleasure the whole

16  exercise is.  And it crossed my mind that I would swear to

17  myself that I would never do this again, but, if faced with

18  valuation, would just put the whole thing up for auction,

19  either as a sale or to auction the plan sponsor position, to

20  determine value through a market process.

21        It doesn't seem to me that that's something that the

22  circumstances of this case afford, but -- and so, when I look

23  at it, I will go through the valuation process.  But we do an

24  awful lot of sales here, and it often seems to me that the sale

25  model is -- provides at least a more comfortable model.

1     I don't think that there's an opportunity to do that

2     here.  And I ask, again, that you not overstate the

3     significance of my comments.  I'm just observing on a Friday

4     afternoon, looking at my calendar, what I have coming up with

5     you folks about three and a half or four weeks from today, so

6     ...

7     But I am not the only judge that has expressed, you

8     know, the challenges associated with conducting, you know, this

9     kind of an inquiry.  You folks are, obviously, doing the heavy

10    lifting.  But it's just an observation that I made that I would

11    share with you, from my experience in dealing with this several

12    years ago, in a similar context.

13    That much having been said, I believe that we've

14    covered the issues that the parties had.  I hope I've been able

15    to provide some guidance to the parties.  And to the extent I

16    can be of assistance in the future, I would invite you to first

17    endeavor mightily to resolve the issues amongst yourselves; and

18    then, if necessary, you can get me on the phone.

19    Have a good weekend, Counsel.

20    COUNSEL:  Thank you, Your Honor.  Thank you, Judge.

21    Thank you, Your Honor.  Thank you, Your Honor.  Thank you, Your

22    Honor.

23    (Proceedings concluded at 12:27 p.m.)

24                              * * * * *

25

39

<pre>
 1                        <u>CERTIFICATION</u>

 2           I certify that the foregoing is a correct transcript

 3    from the electronic sound recording of the proceedings in the

 4    above-entitled matter to the best of my knowledge and ability.

 5

 6

 7

 8    _____    May 5, 2014

 9    Coleen Rand, AAERT Cert. No. 341

10    Certified Court Transcriptionist

11    For Reliable

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>