**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TPC GROUP INC., *et al.*,[1] | Case No. 22-10493 (CTG) |
| Debtors. | Jointly Administered |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P., | |
| Plaintiffs, | Adv. Pro. No. 22-50372 |
| v. | |
| TPC GROUP INC., | |
| Defendant, | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| Intervenor Defendant. | |

**THE AD HOC NOTEHOLDER GROUP'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248).  Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................ **Error! Bookmark not defined.**

JURISDICTION AND VENUE ........................................................................................ 3

STATEMENT OF UNDISPUTED FACTS ...................................................................... 3

    A.    Issuance of the 10.5% Notes and Entry Into the ABL ICA ........................................... 3

    B.    Issuance of the 10.875% Notes and Entry into the Supplemental Indenture and the Noteholder ICA ................................................................................................................ 4

    C.    Provisions of the 10.5% Notes Indenture Relevant to the Issuance of the 10.875% Notes and Entry into the Supplemental Indenture and the Noteholder ICA.................................... 7

        (1)    Amendment Provisions........................................................................................ 7

        (2)    Secured Debt Capacity........................................................................................ 8

    D.    Additional Provisions of the ABL ICA Relevant to the Issuance of the 10.875% Notes and Entry into the Supplemental Indenture and the Noteholder ICA ......................................... 9

    E.    Certain Additional Provisions of the Supplemental Indenture Relevant to the Cross-Motion and Plaintiffs' Motion ...................................................................................................... 9

    F.    Certain Additional Provisions of the Noteholder ICA Relevant to the Cross-Motion and Plaintiffs' Motion ...................................................................................................... 10

    G.    The Chapter 11 Cases and the Adversary Proceeding.................................................. 11

ARGUMENT...................................................................................................................... 12

I.     THE PRIMING NOTES TRANSACTION WAS PERMITTED UNDER THE TERMS OF THE 10.5% NOTES INDENTURE WITHOUT THE CONSENT OF EACH HOLDER, AND SUMMARY JUDGMENT SHOULD THEREFORE BE GRANTED TO DEFENDANTS........... 14

    A.    10.5% Noteholders Holding in Excess of a Majority of 10.5% Notes Consented to the Priming Notes Transaction ...................................................................................... 15

    B.    The Priming Notes Transaction did not Implicate any of the "Sacred Rights" Provisions in Section 9.02(d) of the 10.5% Notes Indenture ................................................. 17

II.    PLAINTIFFS' INTERPRETATION OF THE AGREEMENTS IS INCONSISTENT WITH THEIR UNAMBIGUOUS TERMS, AND THEIR REQUEST FOR SUMMARY JUDGMENT SHOULD BE DENIED................................................................................................................... 19

    A.    The Provisions Dealing with the Application of Proceeds of Collateral were not Amended in Any Manner, Directly or Indirectly, and Section 9.02(d)(10) was not Implicated..... 20

    B.    The Plaintiffs Overlook Certain Provisions of the 10.5% Notes Indenture that are Fatal to their Argument ...................................................................................................... 25

CONCLUSION................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*,
   415 F.3d 242 (2d Cir. 2005) ................................................................ 16

*Angelopoulos v. Del. Racing Ass'n*,
   668 F. Supp. 2d 631 (D. Del. 2009) ..................................................... 12

*Arkin Kaplan Rice LLP v. Kaplan*,
   991 N.Y.S.2d 597 (App. Div. 1st Dept. 2014) .................................... 19

*Ashwood Cap., Inc. v. OTG Mgmt., Inc.*,
   99 A.D.3d 1, 948 N.Y.S.2d 292 (2012) ......................................... 14, 18

*Audax Credit Opportunities Offshore v. Tmk Hawk Parent*,
   150 N.Y.S.3d 894 (Sup. Ct. 2021) ....................................................... 24

*Buckingham v. Buckingham*,
   126 A.D.3d 553 (1st Dep't 2015) ........................................................ 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................. 12

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*,
   773 F.3d 110 (2d Cir. 2015) ................................................................ 14

*Dine Brands Glob., Inc. v. RMH Franchise Holdings, Inc. (In re RMH Franchise Holdings, Inc.)*,
   590 B.R. 655 (Bankr. D. Del. 2018) .................................................... 13

*Fisher v. SD Prot. Inc.*,
   948 F.3d 593 (2d Cir. 2020) ................................................................ 14

*Friedman v. Airlift Intern., Inc.*,
   44 A.D.2d 459 (1974) ........................................................................... 16

*Greylock Glob. Opportunity Master Fund Ltd. v. Province of Mendoza*,
   04 Civ. 7643 (HB), 2005 U.S. Dist. LEXIS 1742 (S.D.N.Y. Feb. 8, 2005) ................................. 15, 26

*In re La Paloma Generating Co.*,
   595 B.R. 466 (Bankr. D. Del. 2018) .................................................... 13

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
   No. 21 CIV. 3987 (KPF), 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ........................................ 18, 23

*Lipper Holdings v. Trident Holdings (In re Lipper Holdings)*,
   1 A.D.3d 170 (1st Dep't 2003) ............................................................ 26

*Marin v. Constitution Realty, LLC*,
  71 N.E.3d 530 (N.Y. 2017) .................................................................................................. 27

*Mesabi Metallics Co. v. Cleveland-Cliffs Inc. (In re Essar Steel Minn. LLC)*,
  590 B.R. 109 (Bankr. D. Del. 2018) ..................................................................................... 13

*Ray v. Twp. of Warren*,
  626 F.3d 170 (3d Cir. 2010) ................................................................................................. 13

*RM 14 FK Corp. v. Bank One Tr. Co.*,
  37 A.D.3d 272 (1st Dep't 2007) ........................................................................................... 27

*In re Safety-Kleen Corp.*,
  380 B.R. 716 (Bankr. D. Del. 2008) ..................................................................................... 13

*In re Stock Bldg. Supply, LLC*,
  433 B.R. 460 (Bankr. D. Del. 2010) ..................................................................................... 13

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
  No. 18-4044 (BCM), 2021 U.S. Dist. LEXIS 64017 (S.D.N.Y. Mar. 31, 2021) ................. 14

*U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*,
  730 F.3d 88 (2d Cir. 2013) ................................................................................................... 14

*UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*,
  128 N.Y.S.3d 823 (Sup. Ct. 2020) ....................................................................................... 27

*Wilder v. World of Boxing LLC*,
  310 F. Supp. 3d 426 (S.D.N.Y. 2018) .................................................................................. 27

## Statutes

28 U.S.C. § 157(b) ...................................................................................................................... 3

28 U.S.C. § 1334 .......................................................................................................................... 3

28 U.S.C. § 1408 .......................................................................................................................... 3

28 U.S.C. § 1409 .......................................................................................................................... 3

## Other Authorities

Fed. R. Civ. P. 56(a) .................................................................................................................. 12

The ad hoc group of beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold a supermajority of both the 10.5% Notes and the 10.875% Notes (each as defined below) (the "Ad Hoc Noteholder Group"), by its undersigned counsel, respectfully submits this memorandum of law in support of *The Ad Hoc Noteholder Group's Cross-Motion for Summary Judgment* (the "Cross-Motion"), filed concurrently herewith, and in opposition to the *Ad Hoc Group of Non-Consenting Noteholders' Motion for Summary Judgment* [A.P. Doc. No. 4][2] (the "Plaintiffs' Motion"), pursuant Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to the above-captioned adversary proceeding (the "Adversary Proceeding") by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and in support thereof respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs purchased their 10.5% Notes[3] after the issuance of the senior 10.875% Notes, with complete knowledge of the terms of the agreements underlying the Priming Notes Transaction.  Plaintiffs then came late to the TPC restructuring process and, frustrated by not being invited to join the Ad Hoc Noteholder Group and become sponsors of the backstop of the two proposed rights offerings, brought this Adversary Proceeding to challenge the transaction that closed with supermajority noteholder consent over 16 months ago in February 2021.  In so doing, Plaintiffs have fabricated an argument designed to disrupt the Chapter 11 proceedings and threaten the Debtors and Ad Hoc Noteholder Group members in an effort to bully their way into the restructuring transactions.  The argument advanced by the Plaintiffs that the 10.875% Notes should

---

[2]      This Motion refers to docket entries in Case No. 22-10493 (CTG) as "Doc. No. __" and in Adv. Pro. No. 22-50372 as "A.P. Doc. No. __."

[3]      Capitalized terms used in the Preliminary Statement are defined in the Statement of Undisputed Facts, below, and those not otherwise defined herein shall have the meanings ascribed to such terms in the Plaintiffs' Motion.

be subordinated to the 10.5% Notes because they were issued without the consent of the Plaintiffs is meritless and should be rejected as the baseless and transparent leverage play that it is.

2.      The 10.5% Notes Indenture is crystal clear that TPC had the capacity to incur and secure the 10.875% Notes and the flexibility to make those notes senior to the 10.5% Notes upon the consent of only a majority of the 10.5% Noteholders.  Indeed, the "sacred right" in section 9.02(d)(10) of the 10.5% Notes Indenture, upon which Plaintiffs' argument is based, protects the 10.5% Noteholders only from actual changes to the ABL ICA or the 10.5% Notes Indenture that alter the payment of Collateral proceeds between the ABL and the 10.5% Notes, or between the 10.5% Noteholders as to each other – none of which occurred.   As discussed more fully below, the issuance of the 10.875% Notes simply primed the entirety of the 10.5% Notes with respect to the Collateral.  There were no amendments or modifications to the ABL ICA in any respect, and the changes to the 10.5% Notes Indenture made as part of the Priming Notes Transaction not only did not adjust the payment of Collateral proceeds, but were actually accretive to the 10.5% Noteholders in that they cemented noteholder protections and broadly limited TPC's ability to incur additional debt and take other actions that might be detrimental to the 10.5% Noteholders as a potential restructuring unfolded.

3.      And further, section 9.02(e) of the 10.5% Notes Indenture is crystal clear that with the consent of at least two-thirds of the holders of the 10.5% Notes, TPC could make any change to the 10.5% Notes Indenture that modifies the ABL ICA and other security documents in a manner that was adverse in any material respect to the 10.5% Noteholders, or otherwise eliminates the Collateral for the 10.5% Notes in its entirety.  Even if such changes had been made (and they were not), the issuance of the 10.875% Notes was approved by more than two-thirds of the holders of

the 10.5% Notes.

4.       Nevertheless, Plaintiffs completely ignore the facts and the clear terms of the 10.5%

Notes Indenture and ABL ICA in asserting their claims.  There are simply no facts nor any

reasonable reading of the 10.5% Notes Indenture that supports Plaintiffs' position.  Accordingly,

the Ad Hoc Noteholder Group's cross-motion for summary judgment should be granted, Plaintiffs'

summary judgment motion should be denied, and this Adversary Proceeding should be dismissed

in its entirety.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  This is

a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408

and 1409.

## STATEMENT OF UNDISPUTED FACTS

**A.     Issuance of the 10.5% Notes and Entry Into the ABL ICA**

6.       On August 2, 2019, TPC Group Inc. ("TPC") issued the 10.5% senior secured notes

(the "10.5% Notes", and the holders of such notes, the "10.5% Noteholders"), in an aggregate

principal amount of $930 million.  The terms of the 10.5% Notes are governed by that certain

Indenture, dated as of August 2, 2019 (the "10.5% Notes Indenture"), among TPC, the guarantors

from time to time thereto, and U.S. Bank National Association, as Trustee and Collateral Agent

("U.S. Bank" or "10.5% Notes Trustee").  See A.P. Doc. No. 5, Ex. A.

7.       That same day, Bank of America, N.A., as administrative agent and collateral agent

for the lenders under that certain Amended and Restated Credit Agreement, dated as of August 2,

2019 (the "ABL Representative"), which governs the Debtors' asset-based revolving loan facility

(the "ABL"), and the 10.5% Notes Trustee entered into that certain Intercreditor Agreement (the

"ABL ICA"), which agreement governs the relationship between the 10.5% Noteholders, via the 10.5% Notes Trustee, on the one hand, and the ABL Representative, on the other. See A.P. Doc. No. 5, Ex. B.

8.      Both the 10.5% Notes Indenture and the ABL ICA are governed by New York law. See A.P. Doc. No. 5, Ex. A at § 14.08; A.P. Doc. No. 5, Ex. B at § 10.7.

9.      Cerberus and Bayside, together, are beneficial holders of approximately 9.7% of the 10.5% Notes. See Verified Statement Pursuant to Bankruptcy Rule 2019, dated June 2, 2022, at Ex. A [Doc. No. 74-1].

10.     As of the Petition Date, the members of the Ad Hoc Noteholder Group held more than 80% of the principal amount of the outstanding 10.5% Notes, in the aggregate. See Verified Statement of the Ad Hoc Noteholder Group, dated June 1, 2022 [Doc. No. 44] (the "AHG Verified Statement").

**B.      Issuance of the 10.875% Notes and Entry into the Supplemental Indenture and the Noteholder ICA**

11.     Following the issuance of the 10.5% Notes, TPC faced a significant liquidity need as a result of numerous factors, including an explosion that occurred on November 27, 2019 at TPC's Port Neches, Texas facility, the 2020 oil and gas market crash, and the COVID-19 pandemic. See Declaration of Robert A. Del Genio in support of Debtors' Chapter 11 Petition and First Day Motions [Doc. No. 27] (the "Del Genio Declaration") at ¶¶ 53-60, 66.

12.     To address this liquidity need, on February 2, 2021, TPC issued 10.875% senior secured notes (the "10.875% Notes," and the holders of such notes, the "10.875% Noteholders") in an aggregate principal amount of $153 million.[4] See id. at ¶¶ 35, 66. The terms of the 10.875%

---

[4]      Subsequent to entering into the 10.875% Notes Indenture, in March 2022, an additional $51.5 million in 10.875% Notes were issued. See Del Genio Declaration at ¶ 36.

Notes are governed by that certain Indenture, dated as of February 2, 2021 (the "10.875% Notes Indenture"), among TPC, the guarantors from time to time thereto, and U.S. Bank, as Trustee and Collateral Agent (the "10.875% Notes Trustee").  See A.P. Doc. No. 5, Ex. C.

13.    In connection with the issuance of the 10.875% Notes, TPC, the 10.5% Notes Trustee, and the guarantors of the 10.5% Notes entered into a Supplemental Indenture, dated as of February 2, 2021, with respect to the 10.5% Notes (the "Supplemental Indenture"), which amended certain terms of the 10.5% Notes Indenture.  See A.P. Doc. No. 5, Ex. D.

14.    Additionally, because both the 10.5% Notes and the 10.875% Notes are secured by liens on the same collateral, the 10.875% Notes Trustee, as Senior Priority Agent, and the 10.5% Notes Trustee, as Junior Priority Notes Agent, entered into that certain Intercreditor Agreement, dated February 2, 2021 (the "Noteholder ICA"), a new agreement governing the relationship and priority between 10.5% Noteholders and the 10.875% Noteholders.  See A.P. Doc. No. 5, Ex. F. Among other things, the Noteholder ICA provides that the liens on common collateral granted to the Senior Priority Agent have priority over the liens granted to the Junior Priority Agent and contains a proceeds waterfall that prioritizes payments to the 10.875% Notes over the 10.5% Notes. See id. at §§ 2.1, 4.1.  The 10.875% Notes Trustee also joined the ABL ICA as a "Notes Representative" pursuant to a Collateral Agent Joinder Agreement.  See Hurt Declaration (as defined below), Exs. 34 and 35.

15.    More than a supermajority (66 2/3%) of the then-existing 10.5% Noteholders affirmatively consented to the entry into, and directed the 10.5% Notes Trustee to execute, the Supplemental Indenture and the Noteholder ICA (the "Priming Notes Transaction") by executing various Consent(s) of Noteholders letters (the "Consent Letters").  See A.P. Doc. No. 5, Ex. G; Hurt Declaration at ¶¶ 10, 40.  Such Consent Letters were provided to the 10.5% Notes Trustee,

which then executed the Supplemental Indenture and the Noteholder ICA and did not raise any concerns regarding the effectiveness of such consents. See id. at ¶ 41. Indeed, section 9.02(b) of the 10.5% Notes Indenture provides, among other things, that the 10.5% Notes Trustee will execute an amended or supplemental indenture "upon the filing with the [10.5% Notes] Trustee of evidence satisfactory to the [10.5% Notes] Trustee of the consent of the Holders[.]" See A.P. Doc. No. 5, Ex. A at § 9.02(b). Each signatory represented that (a) it was the beneficial owner or the investment manager or advisor representing the beneficial owners and with authority to act for such beneficial owners, of a certain outstanding aggregate principal amount of the 10.5% Notes, (b) it had not transferred its positions in the 10.5% Notes held as beneficial owner since the record date, and (c) each Consent Letter had been duly authorized, executed, and delivered and constituted valid and binding obligations. See A.P. Doc. No. 5, Ex. G.

16.     Each Consent Letter also contained one or more of the following: (i) the signature of the beneficial owner and/or investment adviser; (ii) a certification and confirmation from the bank holding the 10.5% Notes; (iii) a stamp or seal providing a guarantee and authorized signature guaranteeing ownership of the 10.5% Notes; and (iv) a certified letter or account summary from the bank holding the 10.5% Notes verifying ownership of such. See id. Certain consents were medallion stamped by the DTC participant of the beneficial holders. Id. After receiving such consents, and raising no issues therewith, the 10.5% Notes Trustee executed and delivered to TPC the Supplemental Indenture and Noteholder ICA. See Hurt Declaration at ¶ 41.

17.     As of the Petition Date, the members of the Ad Hoc Noteholder Group held approximately 92% of the principal amount of the outstanding 10.875% Notes in the aggregate. See AHG Verified Statement.

**C.    Provisions of the 10.5% Notes Indenture Relevant to the Issuance of the 10.875% Notes and Entry into the Supplemental Indenture and the Noteholder ICA**

**(1)    Amendment Provisions**

18.    Section 9.02 of the 10.5% Notes Indenture sets forth the requisite consent thresholds for an amendment to the agreement.

19.    First, section 9.02(a) of the 10.5% Notes Indenture provides that the Indenture may be amended or supplemented with the consent of a simple majority of the 10.5% Noteholders:

> Except as provided in this Section 9.02, the Issuer, the Guarantors and the Trustee and, if applicable, the Collateral Agent, may amend or supplement this Indenture (including, without limitation, Sections 4.08 and 4.12 hereof) and the Notes or the Note Guarantees ***with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class*** (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, any Security Document or the Notes or the Note Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes).

<u>See</u> A.P. Doc. No. 5, Ex. A at § 9.02(a) (emphasis added).

20.    Second, section 9.02(e) of the 10.5% Notes Indenture provides that a supermajority of holders are required to effectuate an amendment that (i) has the effect of releasing all or substantially all Collateral or (ii) modifies the ABL ICA in a manner adverse to the 10.5% Noteholders:

> ***Any amendment to, or waiver of, the provisions of this [10.5% Notes] Indenture***, any Security Document or any other indenture governing Permitted Additional Pari Passu Obligations ***that has the effect of releasing all or substantially all of the Collateral from the Liens*** securing the Notes ***or otherwise modifies the [ABL ICA]*** or other Security Documents ***in any manner adverse in any material respect to the Holders will require the consent of the holders of at least 66- 2/3% in aggregate principal amount*** of the Notes and any Permitted Additional Pari Passu Obligations then outstanding.

Id. at § 9.02(e).

21.     Third, section 9.02(d) of the 10.5% Notes Indenture provides that certain "sacred rights" provisions cannot be amended, supplemented, or waived without "the consent of each Holder affected thereby."  Id. at § 9.02(d).  Plaintiffs place in issue section 9.02(d)(10), which provides that "without the consent of each Holder affected thereby, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non−consenting Holder) . . . (10) make any change in the provisions in the [ABL ICA] or this [10.5% Notes Indenture] dealing with the application of proceeds of Collateral that would adversely affect the Holders."  Id. at § 9.02(d)(10).

22.     The provision of the 10.5% Notes Indenture that deals with the application of proceeds of collateral is section 6.10, entitled "Priorities."  Id. at § 6.10.  Section 6.10(a) specifically provides for a waterfall for proceeds collected pursuant to Article 6.  Id. at § 6.10(a).  Such waterfall ensures that each of the holders of 10.5% Notes is paid on a *pari passu* basis in the event the 10.5% Notes Trustee receives proceeds from the exercise of remedies.  Id.  With respect to the ABL ICA, the provision that deals with the application of proceeds of collateral is section 4.1(a), which is entitled "Application of Proceeds of Senior Collateral."  See A.P. Doc. No. 5, Ex. B at § 4.1(a).  Section 4.1(a) provides for a waterfall for proceeds of Senior Collateral as between the ABL Representative, on the one hand, and each Notes Representative, on the other.  These are the only provisions in the 10.5% Notes Indenture and the ABL ICA that deal with the application of proceeds.

**(2)     Secured Debt Capacity**

23.     Section 4.07 of the 10.5% Notes Indenture expressly contained basket capacity for the incurrence of additional secured debt (like the 10.875% Notes).  See A.P. Doc. No. 5, Ex. A at

§ 4.07. In particular, (i) section 4.07(b)(1) provides for the incurrence of debt not to exceed the greater of $300 million and the Borrowing Base (as defined in the 10.5% Notes Indenture) as of the date of the incurrence of indebtedness, and (ii) section 4.07(b)(15) provides for the incurrence of debt not to exceed the greater of $50 million and 5.0% of Total Assets (as defined in the 10.5% Notes Indenture). See id.

24.      The Supplemental Indenture amended section 4.07(d) of the 10.5% Notes Indenture to note that $113 million of the 10.875% Notes was incurred under the debt basket provided in section 4.07(b)(1) and $40 million was incurred under section 4.07(b)(15). See A.P. Doc No. 5, Ex. D at § 4.07(d).

**D.      Additional Provisions of the ABL ICA Relevant to the Issuance of the 10.875% Notes and Entry into the Supplemental Indenture and the Noteholder ICA**

25.      Similar to the 10.5% Notes Indenture, the ABL ICA also contemplates the issuance of additional debt. See A.P. Doc. No. 5, Ex. B at § 10.5. In particular, the ABL ICA is drafted as an agreement between the ABL Representative, the 10.5% Notes Trustee, "***each additional representative in respect of Additional Debt from time to time party hereto pursuant to Section 10.5(b)***" and each of the Grantors (as defined therein) party thereto. See id. at Recitals (emphasis added). Section 10.5(b), in turn, provides that new representatives of either ABL Obligations or Notes Obligations may join the agreement in accordance therewith. See id. § 10.5(b).

26.      Here, on the same date as the issuance of the 10.875% Notes, the 10.875% Notes Trustee joined the ABL ICA as a "Notes Representative" pursuant to a Collateral Agent Joinder Agreement, in accordance with section 10.5(b) of the ABL ICA. See Hurt Declaration, Ex. 34 and 35.

**E.      Certain Additional Provisions of the Supplemental Indenture Relevant to the Cross-Motion and Plaintiffs' Motion**

27.      As further pertinent here, the Supplemental Indenture amended the 10.5% Notes

Indenture to include a clause (f) to section 9.02, which governs amendments, supplements, or waivers concerning lien subordination and provides as follows:

> Notwithstanding the foregoing in this Section 9.02, no amendment, supplement or waiver to the Indenture or any other Note Document shall subordinate the Lien securing the Notes Obligations to any other Lien (and the Trustee shall not enter into any intercreditor agreement providing for such subordination) without the consent of the holders of at least 66- 2/3% in aggregate principal amount of the Notes then outstanding.

See id. at § 9.02(f).

28.     Additionally, the Supplemental Indenture amended section 12.01(c) the 10.5% Notes Indenture to clarify that "the liens and security interests granted to the Collateral Agent pursuant to the Security Documents and all rights and obligations of the Trustee and Collateral Agent hereunder in respect of the Collateral", as well as "the exercise of any right or remedy by the Trustee and the Collateral Agent hereunder in respect of the Collateral", were both subject to the Noteholder ICA, in addition to the ABL ICA.  See id. at § 12.01(c).

## F.     Certain Additional Provisions of the Noteholder ICA Relevant to the Cross-Motion and Plaintiffs' Motion

29.     As noted above, the Noteholder ICA provides that the liens on common collateral granted to the Senior Priority Agent have priority over the liens granted to the Junior Priority Agent and that the proceeds waterfall would prioritize payments to the Senior Priority Claims over the Junior Priority Claims.  See A.P. Doc. No. 5, Ex. F. at §§ 2.1, 4.1.

30.     The Noteholder ICA also provides that, "solely as among the Secured Parties" (meaning, the noteholders and collateral agents under the 10.875% Notes Indenture and the 10.5% Notes Indenture), to the extent of a conflict between the ABL ICA and the Noteholder ICA, the Noteholder ICA controls.  See A.P. Doc. No. 5, Ex. F. at § 8.17(b).

> Notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Secured Parties hereunder is subject to the provisions of the ABL [ICA]. As between the ABL Secured Parties (as defined in the ABL [ICA]) on the one hand

> and the Secured Parties on the other, in the event of any conflict between the terms of the ABL [ICA] and the terms of this [Noteholder ICA], the terms of the ABL [ICA] shall govern and control.  Solely as among the Secured Parties, in the event of any conflict between this [Noteholder ICA] and the ABL [ICA], the terms of this [Noteholder ICA] shall control.

See id.  Accordingly, the rights between the ABL Secured Parties and the noteholders remained governed by the ABL ICA.

31.     Like the ABL ICA, the Noteholder ICA does not govern the rights and priorities between the different 10.5% Noteholders, nor does it govern the rights and priorities between the different 10.875% Noteholders.  Such provisions are governed by their respective indentures.

**G.     The Chapter 11 Cases and the Adversary Proceeding**

32.     On June 1, 2022, TPC and certain affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

33.     On June 2, 2022, Plaintiffs initiated this Adversary Proceeding by filing their *Complaint for Declaratory Judgment* [A.P. Doc No. 1] (the "Complaint") against TPC.  It seeks declaratory relief  and alleges, among other things, that the 10.5% Notes Indenture was breached by TPC and that, as a result, the 10.875% Notes are not senior in the priority waterfall to the 10.5% Notes with respect to the 10.5% Notes held by Plaintiffs.

34.     That same day, Plaintiffs filed Plaintiffs' Motion.  Plaintiffs' Motion asserts that Plaintiffs are entitled to judgment in their favor as a matter of law.  See Plaintiffs' Motion, ¶ 7.

35.     On June 9, 2022, TPC filed a *Counterclaim for Declaratory Judgment* [A.P. Doc. No. 15], *Motion for Summary Judgment* with respect to the Counterclaim [A.P. Doc. Nos. 16, 17], and a *Motion to Dismiss the Complaint for Declaratory Judgment* [A.P. Doc. Nos. 18, 19] ("TPC's MTD").  The Ad Hoc Noteholder Group is supportive of TPC's MTD.

36.     On June 9, 2022, the Court entered an *Order Granting Ad Hoc Group of Non-Consenting Noteholders' Motion for Expedited Hearing on Motion for Summary Judgment* [A.P. Doc. No. 22], which sets forth a briefing and hearing schedule for Plaintiffs' Motion and TPC's Motion.

37.     On June 10, 2022, the Ad Hoc Noteholder Group filed an *Emergency Motion to Intervene* [A.P. Doc. No. 28], requesting a court order authorizing the Ad Hoc Noteholder Group to intervene as a defendant in the Adversary Proceeding.  That order was granted, on consent of the parties.  [A.P. Doc. No. 38].  Contemporaneously with the filing of this Cross-Motion, the Ad Hoc Noteholder Group filed its *Answer and Affirmative Defenses to the Complaint*.

38.     On June 17, 2022, TPC filed a *Brief in Opposition to Plaintiffs' Motion for Summary Judgment* (the "TPC Opposition Brief"), as well as the accompanying *Declaration of Zul Jamal*, *Declaration of Patrick Hurt* (the "Hurt Declaration"), and *Declaration of Barry A. Ihrke*.  The Ad Hoc Noteholder Group joins in and supports the TPC Opposition Brief.

## ARGUMENT

39.     Rule 56 of the Federal Rules, made applicable to the Adversary Proceeding by Rule 7056 of the Bankruptcy Rules, provides that a court must grant summary judgment when there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, where a defendant is the moving party, such a burden may be met by showing that the evidence fails to support a plaintiff's case.  *See Angelopoulos v. Del. Racing Ass'n*, 668 F. Supp. 2d 631, 633 (D. Del. 2009) (granting defendant's motion for summary judgment where plaintiff failed to make a sufficient showing on an essential element of claim); *In*

*re Stock Bldg. Supply, LLC*, 433 B.R. 460, 463 (Bankr. D. Del. 2010) ("If the moving party does not bear the burden of proof at trial, then the moving party has met its burden under Rule 56 by demonstrating the absence of evidence to support the non-moving party's case.") (internal citations and quotations omitted).  When deciding a motion for summary judgment, courts "view the facts and draw inferences in the light most favorable to the nonmoving party." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010).

40.     Where, as here, contract claims are at issue, summary judgment is appropriate where the language of the applicable contracts is unambiguous.  *See Mesabi Metallics Co. v. Cleveland-Cliffs Inc. (In re Essar Steel Minn. LLC)*, 590 B.R. 109, 115 (Bankr. D. Del. 2018) ("In a contract case, summary judgment is appropriate where the contract language is clear and unambiguous.") (citing *Tamarind Resort Assocs. v. Gov't of V.I.*, 138 F.3d 107, 110 (3d Cir. 1998)); *Dine Brands Glob., Inc. v. RMH Franchise Holdings, Inc. (In re RMH Franchise Holdings, Inc.)*, 590 B.R. 655 (Bankr. D. Del. 2018) (same).  The fact that parties assert different meanings for the same contractual provisions does not render a contract ambiguous.  *See In re La Paloma Generating Co.*, 595 B.R. 466, 470 (Bankr. D. Del. 2018) ("A contract is not ambiguous merely because the parties offer different constructions of the same term."); *In re Safety-Kleen Corp.*, 380 B.R. 716, 736 (Bankr. D. Del. 2008) ("A contract is not ambiguous simply because the parties assert different meanings for a contractual provision.").

41.     As demonstrated herein, a plain reading of the applicable agreements leads to the conclusion that Plaintiffs have failed to establish that their causes of action merit judgment in their favor as a matter of law.  To the contrary, and for the reasons described below, the undisputed facts and law clearly establish that judgment in Defendants' favor is warranted.

I.    **THE PRIMING NOTES TRANSACTION WAS PERMITTED UNDER THE TERMS OF THE 10.5% NOTES INDENTURE WITHOUT THE CONSENT OF EACH HOLDER, AND SUMMARY JUDGMENT SHOULD THEREFORE BE GRANTED TO DEFENDANTS**

42.    Under New York law, "words and phrases in a contract should be given their plain meaning and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 113-14 (2d Cir. 2015) (internal citations and quotations omitted); *see also U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 98 (2d Cir. 2013) ("[C]ourts applying New York law construe a contract so as to give full meaning and effect to all of its provisions.") (internal citations and quotations omitted); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18-CV-4044 (BCM), 2021 U.S. Dist. LEXIS 64017, at *51 (S.D.N.Y. Mar. 31, 2021) ("'[T]he interpretation of Indenture provisions is a matter of basic contract law.' Under New York law . . . courts must construe a contract 'so as to give full meaning and effect to all of its provisions.'") (internal citations omitted). As the Second Circuit explained, "[i]f the terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 606 (2d Cir. 2020) (internal quotations omitted).

43.    Particularly where a contract was "negotiated at arms' length by sophisticated, counseled businesspeople . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. [C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7, 948 N.Y.S.2d 292 (2012) (internal citations and quotations omitted). Instead, courts must focus on "what the parties intended, but only to the extent that they

evidenced what they intended by what they wrote." *Id.* (internal citations and quotations omitted). When construing whether an amendment was made with sufficient consents, courts have routinely held that, unless specifically enumerated as a sacred right, amendments reflecting the consent of the lesser thresholds specified in the applicable agreements are valid. *See, e.g., Greylock Glob. Opportunity Master Fund Ltd. v. Province of Mendoza*, No. 04 Civ. 7643 (HB), 2005 U.S. Dist. LEXIS 1742, at *17-26 (S.D.N.Y. Feb. 8, 2005) (declining to read a unanimous consent right for amendments that have the effect of violating other provisions in the agreement, where, like here, the agreement only included limited circumstances where unanimous consent is required).

44.    It is not disputed that pursuant to section 9.02(a) of the 10.5% Notes Indenture, the indenture could be amended or supplemented with a majority of noteholders unless the amendment or supplement implicated one of the clearly-enumerated "sacred rights" provisions in section 9.02(d).  A.P. Doc. No. 5, Ex. A at § 9.02(a).[5]  Accordingly, for the reasons set forth below, the plain terms of the 10.5% Notes Indenture permitted the Priming Notes Transaction with the consent of only a majority of the noteholders.

## A.    10.5% Noteholders Holding in Excess of a Majority of 10.5% Notes Consented to the Priming Notes Transaction

45.    The Priming Notes Transaction was implemented with the consent of 10.5% Noteholders holding in excess of 67% of the 10.5% Notes, thereby satisfying the majority consent requirement in the 10.5% Notes Indenture.  *See* A.P. Doc. No. 5, Ex. G.  The Plaintiffs attempt to argue that by receiving the consents of a supermajority of the *beneficial holders* of the 10.5% Notes, TPC failed to obtain the consent of any "Holders" because such term is defined in the 10.5%

---

[5]    This result was certainly not to be unexpected.  For example, the ABL ICA plainly contemplated the incurrence of additional debt since it is expressly drafted as an agreement between, among others, the ABL Representative, the 10.5% Notes Trustee, and "each additional representative in respect of Additional Debt from time to time party hereto pursuant to Section 10.5(b)".  See A.P. Doc. No. 5, Ex. B at Recitals, § 10.5 (emphasis added).  The 10.5% Notes Indenture plainly contemplated this result as well, as it provided debt capacity for additional secured debt.  *See* A.P. Doc. No. 5, Ex. A at §§ 4.07(b)(1), (b)(15).

Notes Indenture as "a Person in whose name [the 10.5% Notes are] registered in the register maintained by the Registrar." This argument is baseless.

46.    The Consent Letters provided to the Trustee each contained representations and warranties that the signatory was the beneficial owner or the investment manager or advisor representing the beneficial owners and with authority to act for such beneficial owners, and that such owners held and had not transferred their respective positions. *See id.* Each Consent Letter also provided one or more of the following: (i) the signature(s) of the beneficial owner and/or investment adviser; (ii) a certification and confirmation from the bank holding the 10.5% Notes; (iii) a stamp or seal providing a guarantee and authorized signature guaranteeing ownership of the 10.5% Notes; or (iv) a certified letter or account summary from the bank holding the 10.5% Notes verifying ownership of the 10.5% Notes. *Id.*[6]

47.    The Trustee also did not (i) raise any issues or question regarding the sufficiency or effectiveness of the consents, (ii) request the Consent Letters provide specific signature pages reflecting the identity and specific consent of the registered holders of the 10.5% Notes in question, or (iii) otherwise suggest that a written consent from Cede & Co. was necessary to effectuate the documents and transactions.  Accordingly, the Trustee deemed the Consent Letters satisfactory under section 9.02(b) of the 10.5% Notes Indenture, and following receipt of the Consent Letters, the Trustee, as requested by TPC and as directed by a supermajority of 10.5% Noteholders, executed the Supplemental Indenture and Noteholder ICA. *See* Hurt Declaration at ¶¶ 10, 40, 41.

---

[6]    Notably, Plaintiffs have not disputed that beneficial holders of a supermajority of 10.5% Notes executed the Consent Letters.  In similar circumstances, courts refuse to enforce the meaningless distinction between beneficial and registered ownership and require the reissuance of the consents, as such exercise would be a "completely wasteful repetition of proceedings that have already occurred." *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245-6 (2d Cir. 2005) (holding that the fact that a beneficial owner only received permission from the registered holder to sue after initiating the lawsuit did not render such permission ineffective); *see also Friedman v. Airlift Intern., Inc.*, 44 A.D.2d 459, 461 (1974) (rejecting defense that "that these bonds are registered in the name of a nominee, not the plaintiff herself," as "this fact is of no significance" where there was no dispute over ownership).

48.     Moreover, if Plaintiffs are correct in their interpretation that a "Holder" is only the registered owner (Cede & Co) then (i) Plaintiffs would not have standing to sue, because they admit they are , too, beneficial holders, *see* Complaint at ¶¶ 16, 17, and (ii) Plaintiffs could not be affected by any of the transactions they claim to have harmed them, because they are not "Holders" as defined by the 10.5% Notes Indenture that could be "adversely affected."

**B.     The Priming Notes Transaction did not Implicate any of the "Sacred Rights" Provisions in Section 9.02(d) of the 10.5% Notes Indenture**

49.     The foundation of Plaintiffs' argument is that the subordination of the 10.5% Notes to the 10.875% Notes falls within section 9.02(d)(10) of the 10.5% Notes Indenture because the "2021 Intercreditor Agreement dramatically changes the priority of the [10.5% Notes] with respect to the application of the proceeds of Collateral." Plaintiffs' Motion at ¶ 46. Plaintiffs are incorrect in their reading of section 9.02(d)(10) and the Priming Notes Transaction did not implicate any "sacred right."

50.     Section 9.02(d)(10) of the 10.5% Notes Indenture provides that "without the consent of each Holder affected thereby, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non−consenting Holder) . . . (10) make any change in **the provisions** in the [ABL ICA] or this [10.5% Notes Indenture] **dealing with the application of proceeds** of Collateral that would adversely affect the Holders." *Id.* at § 9.02(d)(10) (emphasis added). Accordingly, by its unambiguous terms, section 9.02(d)(10) applies only to payment waterfalls for the distribution of collateral, and the *only provisions* in the 10.5% Notes Indenture and the ABL ICA "dealing with the application of proceeds of Collateral" are (x) section 4.1(a) of the ABL ICA (which deals with the priorities between the 10.5% Noteholders (via the 10.5% Notes Trustee), on the one hand, and the ABL Representative, on the other hand), and (y) section 6.10 of the 10.5% Notes Indenture (which deals with the "Priorities" among the 10.5%

Noteholders themselves).  As a result, section 9.02(d)(10) does not apply to priorities between two different tranches of notes; for example, priorities between the 10.875% Noteholders and the 10.5% Noteholders.

51.    Reading it in the only way that it can correctly be read, section 9.02(d)(10) was not implicated by the entry into the Supplemental Indenture because no changes were made to the requirement that all 10.5% Noteholders be paid ratably, and no right of a 10.5% Noteholder was altered as it relates to the rights of any other 10.5% Noteholder.  The relative priority between the ABL and the 10.5% Notes also remained the same before and after the Priming Notes Transaction.

52.    Importantly, if parties to the 10.5% Notes Indenture had truly intended to limit the incurrence of priority indebtedness without the consent of all noteholders, they could have included an express covenant in the 10.5% Notes Indenture preventing the incurrence of priming debt, similar to what was ultimately included in the Supplemental Indenture in section 9.02(f) – a provision that benefits all 10.5% Noteholders and expressly sets forth the consent threshold needed to subordinate the liens securing the 10.5% Notes.  *See* A.P. Doc. No. 5, Ex. D at § 9.02(f). However, because the 10.5% Notes Indenture did not contain such a prohibition, it would be inappropriate to now read such language into the 10.5% Notes Indenture.  *See LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21 CIV. 3987 (KPF), 2022 WL 953109, at *9 (S.D.N.Y. Mar. 29, 2022) ("*Serta*") (rejecting a party's allegation that a "sacred rights" provision applied broadly so as to prohibit amendments to a loan agreement without unanimous consent, and instead finding that such a unanimous consent requirement to be limited to the sacred rights specifically enumerated and that anti-subordination was not a sacred right because the *pro rata* sharing provision only applied to the same class of debt, which was unchanged by the addition of a new class of debt governed by separate agreements); *Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 99

A.D.3d at 8–9 (affirming the dismissal of a breach of contract claim and noting that "it is not for the court to imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms."); *Arkin Kaplan Rice LLP v. Kaplan*, 991 N.Y.S.2d 597, 600 (App. Div. 1st Dept. 2014) ("[T]here is no basis to interpret [] parties' agreement as impliedly stating something that they did not specifically include.").

53.     Additionally, the Priming Notes Transaction did not require the consenting 10.5% Noteholders to amend debt and lien baskets to implement the transaction (another action that could have been undertaken by a bare majority) because at the time of the Priming Notes Transaction, TPC had sufficient debt and lien capacity to incur the 10.875% Notes pursuant to the 10.5% Notes Indenture.  Likewise, since the definition of Permitted Liens and the various other provisions of the 10.5% Notes Indenture that governed the application of liens did not limit the priority of the liens that could secure the indebtedness, the 10.875% Notes were able to be issued senior in priority to the liens securing the 10.5% Notes.  *See* A.P. Doc. No. 5, Ex. A at §§ 4.07(b)(1), (b)(15).[7]

54.     Based on the foregoing reasons, the Priming Notes Transaction required only the consent of a majority of 10.5% Noteholders, which TPC obtained pursuant to the Consent Letters. Summary judgment should therefore be granted in Defendants' favor.

## II.     PLAINTIFFS' INTERPRETATION OF THE AGREEMENTS IS INCONSISTENT WITH THEIR UNAMBIGUOUS TERMS, AND THEIR REQUEST FOR SUMMARY JUDGMENT SHOULD BE DENIED

55.     As noted above, Plaintiffs' argument is premised on the incorrect assertion that the lien subordination of the 10.5% Notes to the 10.875% Notes falls within the ambit of section

---

[7]     The change to section 4.07(d) reflected in the Supplemental Indenture merely clarifies the specific baskets that the 10.875% Notes fall within. *See id.* at § 4.07(d).  It did not create debt capacity in order to incur the 10.875% Notes, since sufficient capacity already existed.

9.02(d)(10) of the 10.5% Notes Indenture. Plaintiffs go to great lengths to contort the plain reading of the applicable agreements to fit their narrative. Those attempts fail; Plaintiffs' motion for summary judgment should be denied.

**A.    The Provisions Dealing with the Application of Proceeds of Collateral were not Amended in Any Manner, Directly or Indirectly, and Section 9.02(d)(10) was not Implicated**

56.    Plaintiffs contend that the Priming Notes Transaction was impermissible because the 2021 Intercreditor Agreement dramatically changed the priority of the 10.5% Notes with respect to the application of the proceeds of Collateral. However, as previously discussed, although the Noteholder ICA provides for the subordination of the liens securing the 10.5% Notes to the 10.875% Notes, it does not amend, supplement, or waive the provisions in the 10.5% Notes Indenture or the ABL ICA dealing with the application of proceeds of collateral – which is what the "sacred right" in section 9.02(d)(10) prevents against absent unanimous consent. Indeed, neither section 6.10 of the 10.5% Notes Indenture (which guaranteed *pari passu* treatment among the 10.5% Notes), nor the collateral waterfall in section 4.1(a) of the ABL ICA (which provided the 10.5% Notes priority over the ABL on Notes Priority Collateral), were amended, supplemented or waived in any manner that would implicate section 9.02(d)(10) in any respect.[8] As a result, the Priming Notes Transaction did not require the consent of Plaintiffs (actually, of their predecessors, who were the holders of the 10.5% Notes at the time of the transaction) – rather, only the consent of a bare majority of 10.5% Noteholders was required.

57.    Plaintiffs also incorrectly argue that the entry into the Noteholder ICA was "effectively an amendment to the [ABL ICA] because it subverted the waterfall in the [ABL ICA]

---

[8]    The minor change to section 6.10 reflected in the Supplemental Indenture was to clarify that the make-whole due under the 10.5% Notes Indenture was included within the payment waterfall. This change, of course, was merely a clarification that benefited all 10.5% Noteholders, and in no way modified the priority scheme of the 10.5% Noteholders.

to the waterfall in the [Noteholder ICA]" and thus was a change to the provisions of the ABL ICA dealing with the application of the proceeds of Collateral in a manner that adversely affected Plaintiffs. Plaintiffs' Motion at ¶ 44. Contrary to Plaintiffs' assertions, the entry into the Noteholder ICA is not an amendment of the ABL ICA. The priorities governed by the ABL ICA pertain solely to those as between the ABL Representative, on the one hand, and *each* Notes Representative (*i.e.*, for both the 10.875% Notes and the 10.5% Notes), on the other. The primary effect of the ABL ICA, expressed in various provisions throughout the agreement, is that the ABL Representative has priority with respect to ABL Facility Priority Collateral vis-à-vis both Notes Representatives, and the Notes Representatives have priority with respect to the Notes Priority Collateral vis-à-vis the ABL Representative. Although the Noteholder ICA subordinates the liens securing the 10.5% Notes to the 10.875% Notes, it does not amend, supplement, or waive— directly or indirectly—any provisions in the ABL ICA dealing with the application of proceeds of collateral. Instead, the priorities between the ABL Representative, on the one hand, and the Notes Representatives, on the other hand, are completely unchanged.

58. Indeed, the only language in the Noteholder ICA that Plaintiffs point to as purportedly amending the ABL ICA—the provision that provides that the Noteholder ICA controls in a conflict between the Noteholder ICA and the ABL ICA—applies solely to conflicts concerning the priorities between the 10.875% Notes and the 10.5% Notes, and does not implicate the ABL Priority Collateral. See Plaintiffs' Motion at ¶ 20; A.P. Doc. No. 5, Ex. F at § 8.17(b). But, priorities between the 10.875% Notes and the 10.5% Notes are not governed by the waterfall in ABL ICA, and there are no contractual provisions in the ABL ICA (and certainly none that Plaintiffs point to) that provide otherwise. Thus, the subordination provisions in the Noteholder ICA do not "effectively" amend the ABL ICA by changing the provision of the ABL ICA that deal

with the application of proceeds.

59.    Plaintiffs also look for support for their arguments by pointing to section 12.01(c) of the 10.5% Indenture, which they erroneously contend is the waterfall provision dealing with the application of proceeds of collateral, and which was amended as part of the Supplemental Indenture.  Prior to the amendment, section 12.01(c) provided as follows:

> *Intercreditor Agreement.* The Security Documents, the Trustee, the Collateral Agent and the Holders are bound by the terms of the Intercreditor Agreement and each Holder of a Note, by accepting such Note, agrees to all the terms and provisions of the Intercreditor Agreement and the other Security Documents. Notwithstanding anything to the contrary, (i) the liens and security interests granted to the Collateral Agent pursuant to the Security Documents and all rights and obligations of the Trustee and Collateral Agent hereunder in respect of the Collateral are expressly subject to the Intercreditor Agreement and (ii) the exercise of any right or remedy by the Trustee and the Collateral Agent hereunder in respect of the Collateral is subject to the limitation and provisions of the Intercreditor Agreement. In the event of any conflict or inconsistency between the terms of the Intercreditor Agreement and the terms of this Indenture or any Security Document, the terms of the Intercreditor Agreement, shall govern.

*Id.* at § 12.01(c).  Section 12.01(c) was subsequently amended in the Supplemental Indenture to include reference to both the ABL ICA and the Noteholder ICA.  However, section 12.01(c) (as amended) merely references what is already true and binding outside of the 10.5% Notes Indenture: that the 10.5% Notes Trustee is party to the Noteholder ICA.  That section generally acknowledges the capital structure of the note issuer and the other agreements by which the 10.5% Notes Trustee is bound, but it does not in any way relate to, or provide for a waterfall dealing with, the "application of the proceeds of Collateral", as Plaintiffs suggest, which is squarely addressed by section 6.10(a) of the 10.5% Notes Indenture.

60.    The mere reference in section 12.01(c) to the ABL ICA and Noteholder ICAs, without more, does not change that result.  Simply put, Plaintiffs cannot invoke section 9.02(d)(10) by improperly reading an anti-subordination provision into section 12.01(c) of the 10.5% Notes

Indenture where one did not exist. *See, e.g., Serta* at *10 (refusing to extend unanimous consent requirements to protect against subordination because provision was not specifically enumerated as a sacred right); *Buckingham v. Buckingham*, 126 A.D.3d 553, 557 (1st Dep't 2015) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used.") (citing *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (1st Dep't 2008), *aff'd*, 13 N.Y.3d 398 (2009)).

61.    Plaintiffs are also incorrect in their reliance upon the definition of "Permitted Liens", which they claim is yet another provision dealing with the application of proceeds of collateral that purportedly was changed to adversely affect the 10.5% Noteholders. *See* Plaintiffs' Motion at ¶¶ 21, 22, 47, 53.  It is not.  First, this defined term is not a provision dealing with the application of proceeds of collateral, because such term is not incorporated into section 6.10(a) of the 10.5% Notes Indenture.  Second, the term was not amended in a manner that adversely affected the 10.5% Noteholders.  Although Plaintiffs complain that they were harmed by a purported exemption of the 10.875% Notes from the ABL ICA, they are wrong – the amendment to the definition of "Permitted Liens" in the 10.5% Notes Indenture simply clarified that the 10.875% Notes Indenture is not an *ABL Agreement* under the ABL ICA, but instead is an "Additional Notes Agreement" under the ABL ICA.  The Supplemental Indenture simply clarified the nature of the joinder of the 10.875% Notes to ABL ICA, as was permitted by the 10.5% Notes Indenture and ABL ICA.

62.    Plaintiffs also boldly assert, without *any* support in *any* of the documents underlying the Priming Notes Transaction, that the 10.5% Notes Indenture and the ABL ICA require that any new debt issued must be junior in priority to the 10.5% Notes.  Yet, there is no provision in either the 10.5% Notes Indenture or ABL ICA that mandates that the 10.5% Notes

will have senior status over such new debt.  The parties to the 10.5% Notes Indenture knew how to limit priority debt if that is what was intended; indeed, several provisions in the agreement govern the parameters for the issuance of *pari passu* debt, and the Supplemental Indenture includes an anti-subordination provision that was not present in the 10.5% Notes Indenture.  *See* A.P. Doc. No. 5, Ex. D at § 9.02(f).  An amendment to the 10.5% Notes Indenture or the ABL ICA was not required to issue the 10.875% Notes senior in priority to the 10.5% Notes.

63.    Plaintiffs' reliance upon *Audax Credit Opportunities Offshore v. Tmk Hawk Parent*, 150 N.Y.S.3d 894 (Sup. Ct. 2021) ("*TriMark*") is completely misplaced.  *TriMark* involved amendments to a provision concerning the "application of proceeds" *(id.* at *11-12), but, as explained in detail above, no such provision is actually at issue here. Moreover, the *TriMark* decision relied upon language in the applicable sacred rights provision referring to amendments, waivers or modifications to such sacred rights "***pursuant to an agreement or agreements***."  *Id.* at *11 (emphasis added).  Such language, which Plaintiffs carefully omit from their brief, is absent from section 9.02(d)(10) which, to the contrary, is only triggered by "an amendment, supplement or waiver" that makes a "change" in the provisions of *either* the ABL ICA or 10.5% Notes Indenture.  Thus, while the specific language in *TriMark* enabled the court to look beyond the credit agreement, notwithstanding the absence of any amendment to the applicable "sacred rights" provision, *see id.*, here, the only applicable provisions impacting the specific sacred rights protected by section 9.02(d)(10) are section 4.1(a) of the ABL ICA and section 6.10 of the 10.5% Notes Indenture.  Additionally, in *TriMark*, unlike here, the conduct at issue included certain lenders elevating their loans into new loans that had a priority over other loans that were originally issued under the same credit agreement.  As discussed above, in the Priming Notes Transaction, all rights of all 10.5% Noteholders were left untouched as they pertained to one another, and the

only substantive changes made to the 10.5% Notes Indenture were beneficial to all 10.5%

Noteholders in that they cemented noteholder protections and limited the Debtors' ability to incur

additional indebtedness and take other actions that could be adverse to the 10.5% Notes.

**B.     The Plaintiffs Overlook Certain Provisions of the 10.5% Notes Indenture that are Fatal to their Argument**

64.     Notably, Plaintiffs ignore a pertinent provision of the 10.5% Notes Indenture that

obliterates their arguments even further than they already have been.  Section 9.02(e) – which

immediately follows section 9.02(d)(10), upon which Plaintiffs solely rely – permits, with the

consent of a supermajority of the 10.5% Noteholders, an amendment to, or waiver of, provisions

of the 10.5% Notes Indenture that modifies the ABL ICA "*in any manner adverse in any material

respect to the Holders.*"  *Id.* at § 9.02(e).  As a result, any transaction that had the effect of

amending the ABL ICA would be permissible so long as a supermajority of holders consented to

such transaction, and it is undisputed that a supermajority of 10.5% Noteholders consented to the

Priming Notes Transaction.

65.     Section 9.02(e) of the 10.5% Notes Indenture also expressly permits the complete

*release* of all liens upon a supermajority vote by 10.5% Noteholders.  If the Plaintiffs' position

with respect to section 9.02(d)(10) was accurate, the consent of 100% of the 10.5% Noteholders

would be necessary to subordinate the liens on the 10.5% Notes to debt expressly permitted to be

incurred under the 10.5% Notes Indenture, but the very same liens could be completely released,

such that the 10.5% Notes would no longer be secured at all, in connection with a similar debt

issuance with the consent of a supermajority of the 10.5% Noteholders.  Therefore, it defies logic

that the 10.5% Notes Indenture could mean that a supermajority vote of the 10.5% Noteholders

could release all liens, but that unanimous consent was required to *subordinate* those same liens.

And further, it is unreasonable to broadly read section 9.02(d)(10) to mean that no provision

whatsoever concerning *any lien or intercreditor agreement* could be added to or changed in the 10.5% Notes Agreement without the consent of each affected noteholder.  *See, e.g.,* Plaintiffs' Motion at ¶ 47.  If that were correct, section 9.02(d)(10) would apply so broadly as to eliminate the note issuer's bargained-for flexibility to amend the indenture in various ways, including changing lien baskets and increasing non-guarantor debt capacity (*i.e.*, which would affect the residual value of pledged equity), as well as the ability of majority holders to rescind an acceleration or waive an existing default or event of default (*i.e.*, acceleration, defaults and events of default all give rise to the ability of noteholders to exercise rights with respect to collateral, so a waiver or recession of any such provision (which a majority can clearly undertake) could constitute a waiver of the rights of holders to receive proceeds of collateral following such action). *See Lipper Holdings v. Trident Holdings (In re Lipper Holdings)*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd.") (internal citations omitted); *Greylock*, 2005 U.S. Dist. LEXIS 1742, at *22-24 ("To interpret the language . . . as an additional restriction to the specifically delineated exceptions to majority vote . . . is nonsensical . . . .  It is unlikely . . . that a contract would list four exceptions in one section of a contract and provide for a fifth, narrowly tailored exception, elsewhere in the contract.").

66.     Accordingly, the Plaintiffs utterly fail to square their broad interpretation of section 9.02(d)(10) with section 9.02(e).  As they know, which is why they didn't even address section 9.02(e) in their complaint or motion, doing so would create a direct conflict between section 9.02(d)(10) and 9.02(e), which simply cannot be the case when the 10.5% Notes Indenture is so clear.  Although contracts must be read so as to give *each* provision meaning and avoid direct conflicts, Plaintiffs' interpretation of the pertinent agreements would have this Court do just the opposite.  *See Greylock*, 2005 U.S. Dist. LEXIS 1742, at *19 ("[C]ontractual provisions should be

interpreted as to avoid rendering provisions of a contract superfluous, redundant, or obsolete."); *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 441 (S.D.N.Y. 2018) ("The courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms.") (internal citations omitted).

67.     Section 9.02(d)(10) must be read strictly and in accordance with its plain terms to only apply to section 6.10 of the 10.5% Notes Indenture and section 4.1(a) of the ABL ICA.  *See UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*, 128 N.Y.S.3d 823, 826 (Sup. Ct. 2020) ("The words actually used in the Indentures are ultimately dispositive."); *RM 14 FK Corp. v. Bank One Tr. Co.*, 37 A.D.3d 272, 273-75 (1st Dep't 2007) (dismissing a complaint where plaintiff's consent was not required on the basis that it was not the court's place to read into the contract a provision "which the parties have neglected to specifically include").

68.     Thus, contrary to Plaintiffs' claims, the plain words of the pertinent agreements underlying the Priming Notes Transaction permitted the issuance of the 10.875% Notes.  Plaintiffs purchased the 10.5% Notes long after the Priming Notes Transaction occurred, when they had full knowledge of the clear and unambiguous terms of the various documents, and their tardy challenge to the priority status of the 10.875% Notes based on a manufactured reading of section 9.02(d)(10) utterly fails.  The 10.5% Notes Indenture is "complete, clear and unambiguous on its face," and it "must be enforced according to the plain meaning of its terms."  *Marin v. Constitution Realty, LLC*, 71 N.E.3d 530, 534 (N.Y. 2017) (internal citations and quotations omitted).  As noted in the Preliminary Statement, this Adversary Proceeding has nothing to do with the priority of the 10.875% Notes and everything to do with the desire of Plaintiffs to be parties to the backstop of the rights offering that is part of the Debtors' plan of reorganization and their willingness to make any argument they can, regardless of how baseless, to attempt to gain leverage to do so.  This Court

cannot countenance such a transparent effort and can take up issues associated with the Debtors'

plan, if any, as part of the plan process.

## **CONCLUSION**

69.     For the foregoing reasons, the Ad Hoc Noteholder Group respectfully requests that

its Cross-Motion be granted and Plaintiffs' Motion be denied, along with such other and further

relief as this Court deems just and proper.

Dated: June 17, 2022          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
     Wilmington, Delaware

/s/ *Matthew B. Lunn*
Matthew B. Lunn, Esq. (No. 4119)
Robert F. Poppiti, Jr., Esq. (No. 5052)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 576-3312
Email:  mlunn@ycst.com
       rpoppiti@ycst.com

*Counsel to Intervenor Defendant*
*The Ad Hoc Noteholder Group*


Kristopher M. Hansen, Esq.
Kenneth Pasquale, Esq.
Jonathan D. Canfield, Esq.
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: krishansen@paulhastings.com
      kenpasquale@paulhastings.com
      joncanfield@paulhastings.com

*Counsel to Intervenor Defendant*
*The Ad Hoc Noteholder Group, solely with respect to the*
*claims asserted by plaintiff Cerberus Capital Management,*
*L.P.*