# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Audax Credit Opportunities Offshore Ltd., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TMK Hawk Parent, Corp., *et al.*, <br><br> Defendants. | Index No. 565123/2020 <br><br> Justice Joel M. Cohen <br> IAS Part 3 <br><br> Motion Sequence Nos. 2, 3, 4, 5 <br><br> ORAL ARGUMENT REQUESTED |

## **PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Date: February 19, 2021

Jennifer Selendy
Faith Gay
Andrew R. Dunlap
Ryan W. Allison
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
Email: jselendy@selendygay.com
        fgay@selendygay.com
        adunlap@selendygay.com
        rallison@selendygay.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................6

    A.    TriMark's Leveraged Loan.....................................................................6

    B.    TriMark's Financial Strain ....................................................................7

    C.    Defendants' Uptiering Scheme...............................................................8

    D.    The Scheme Documents.......................................................................10

    E.    Plaintiffs Sue to Protect Their Bargained-For Rights .........................15

ARGUMENT........................................................................................................16

I.    Plaintiffs Have Standing ..............................................................................16

II.    Plaintiffs Plead Viable Declaratory Judgment Claims ...................................20

    A.    The Amended Agreement Lacked Approval by Required Lenders ....................20

    B.    The Uptiering Scheme Lacked Plaintiffs' Consents and Infringed Certain Sacred Rights.................................................................................24

        1.    The Scheme Constituted an "Agreement" or Set of "Agreements" Under Section 9.02(b)...............................................24

        2.    The Scheme Included the Amended Agreement and Violated Plaintiffs' Sacred Rights .......................................................27

        3.    Plaintiffs Were "Directly and Adversely Affected" by the Agreements Effectuating the Scheme......................................29

    C.    The Scheme Released the Collateral Securing the First Lien Debt Without Plaintiffs' Consent .................................................................32

III.    Plaintiffs Plead Viable Breach of Contract Claims ........................................35

IV.    Plaintiffs Plead Viable Good Faith and Fair Dealing Claims ..........................37

V.    Plaintiffs Plead Viable Tortious Interference Claims Against the Equity Sponsors.........42

    A.    The Equity Sponsors Intentionally Procured TriMark's Breaches of Contract ............................................................................................42

i

B.       The Equity Sponsors, Who Control TriMark, Were But-For Causes of TriMark's Breaches of Contract ........................................................................45

C.       The Affirmative Defense of Economic Justification Is Not a Basis to Dismiss Plaintiffs' Tortious Interference Claims ..................................................47

VI.    Plaintiffs Plead Viable Voidable Transaction Claims .......................................................50

A.       New York Law Applies to Plaintiffs' UVTA Claims.........................................50

B.       Plaintiffs Plead a Transfer and a Diminution of Assets .....................................53

C.       Defendants Perpetrated an Intentional Voidable Transaction Not a Mere Preference ...........................................................................................................54

D.       Plaintiffs Plead Intent to Hinder, Delay, or Defraud Creditors ..........................55

CONCLUSION.......................................................................................................................60

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*127 W. 25th LLC v. Artek Sewing Supplies, Inc.*,
    2010 WL 10076320 (Sup. Ct. N.Y. Cty. June 25, 2010) .....................................................49

*40 W. 67th St. Corp. v. Pullman*,
    100 N.Y.2d 147 (2003).......................................................................................................50

*57th St. Arts, LLC v. Calvary Baptist Church*,
    52 A.D.3d 425 (1st Dep't 2008) .........................................................................................44

*ABN AMRO Bank, N.V. v. MBIA Inc.*,
    17 N.Y.3d 208 (2011).........................................................................................................40

*Aetna Cas. & Surety Co. v. Merchants Mut. Ins. Co.*,
    84 A.D.2d 736 (1st Dep't 1981) .........................................................................................44

*Ahmed Elkoulily, M.D., P.C. v. N.Y. State Catholic Healthplan, Inc.*,
    153 A.D.3d 768 (2d Dep't 2017) .......................................................................................40

*Algomod Techs. Corp. v. Price*,
    Index No. 110464/2006 (Sup. Ct. N.Y. Cty. Feb. 8, 2007)................................................43

*Am. Int'l Grp., Inc. v. Bank of Am. Corp.*,
    712 F.3d 775 (2d Cir. 2013) ..............................................................................................21

*Auer v. Robbins*,
    519 U.S. 452 (1997) ...........................................................................................................22

*Avnet, Inc. v. Deloitte Consulting LLP*,
    187 A.D.3d 430 (1st Dep't 2020).......................................................................................51

*Barnhart v. Thomas*,
    540 U.S. 20 (2003) .............................................................................................................21

*Batchelder v. Council Grove Water Co.*,
    131 N.Y. 42 (1892) ............................................................................................................17

*Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*,
    2016 WL 2622013 (W.D.N.Y. May 5, 2016)....................................................................48

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou
    Grp., LLC)*,
    396 B.R. 810 (Bankr. S.D.N.Y. 2008) ..............................................................................58

iii

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*,
   259 F. Supp. 3d 16 (S.D.N.Y. 2017)...................................................................49

*BGC Partners, Inc. v. Avison Young (Can.) Inc.*,
   2016 WL 3902277 (Sup. Ct. N.Y. Cty. July 15, 2016).........................................46

*Bitsight Techs., Inc. v. SecurityScorecard, Inc.*,
   143 A.D.3d 619 (1st Dep't 2016).....................................................................26

*Black Car & Livery Ins., Inc. v. H&W Brokerage, Inc.*,
   2006 WL 176660 (Sup. Ct. Nassau Cty. Jan. 23, 2006) .....................................44

*Black Diamond Commercial Fin., L.L.C. v. Murray Energy Corp.* (*In re Murray Energy Holdings Co.*),
   616 B.R. 84 (Bankr. S.D. Ohio 2020) ...................................................... 24, 31, 33

*Boehner v. Heise*,
   734 F. Supp. 2d 389 (S.D.N.Y. 2010) ................................................................44

*Bonanni v. Straight Arrow Publishers, Inc.*,
   133 A.D.2d 585 (1st Dep't 1987)................................................................. 45, 46

*Bos. Trading Grp., Inc. v. Burnazos*,
   835 F.2d 1504 (1st Cir. 1987)..........................................................................55

*Brause v. First Nat'l Real Estate Tr.*,
   25 A.D.2d 624 (1st Dep't 1966) .......................................................................49

*Burrowes v. Combs*,
   25 A.D.3d 370 (1st Dep't 2006) ................................................................. 44, 46

*Camperlino v. Bargabos*,
   96 A.D.3d 1582 (4th Dep't 2012) ....................................................................29

*Cantor Fitzgerald Assocs. v. Tradition N. Am.*,
   299 A.D.2d 204 (1st Dep't 2002).....................................................................46

*Capital Z Fin. Servs. Fund II, L.P. v. Health Net, Inc.*,
   43 A.D.3d 100 (1st Dep't 2007) .......................................................................51

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (2004)................................................................................. 43, 44

*CDR Créances S.A. v. Euro-Am. Lodging Corp.*,
   2005 WL 6234585 (Sup. Ct. N.Y. Cty. Feb. 16, 2005)........................................46

*Celano v. Citigroup Tech., Inc.*,
   2020 WL 4604799 (Sup. Ct. N.Y. Cty. Aug. 11, 2020)........................................44

iv

*Churchill Real Estate Holdings LLC v. CBCS Washington St. LP*,
   171 A.D.3d 426 (1st Dep't 2019) ........................................................................42

*Coder v. Arts*,
   213 U.S. 223 (1909) ...........................................................................................55

*Collins v. E-Magine*,
   291 A.D.2d 350 (1st Dep't 2002) ........................................................................49

*Continental AFA Dispensing Co. v. AFA Polytek, B.V. (In re Indesco Int'l, Inc.)*,
   451 B.R. 274 (Bankr. S.D.N.Y. 2011) ................................................................26

*Cortland St. Recovery Corp. v. Bonderman*,
   31 N.Y.3d 30 (2018).........................................................................................16

*Corwin v. KKR Fin. Holdings LLC*,
   125 A.3d 304 (Del. 2015)....................................................................................50

*Cronkite v. FDIC*,
   1993 WL 372750 (1st Cir. 1993) ........................................................................35

*Curacao Oil N.V. v. Trafigura Pte. Ltd.*,
   2020 WL 3494685 (Sup. Ct. N.Y. Cty. Feb. 3, 2020) ........................................40

*In re Cushman Bakery*,
   526 F.2d 23 (1st Cir. 1975)..................................................................................58

*Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*,
   2006 WL 668441 (Del. Ch. Mar. 8, 2006) ................................................... 16, 17

*D & L Holdings, LLC v. RCG Goldman Co., LLC*,
   287 A.D.2d 65 (1st Dep't 2001) .........................................................................38

*Dalton v. Educ. Testing Serv.*,
   87 N.Y.2d 384 (1995)....................................................................................37, 38

*Darabont v. AMC Net. Entm't LLC*,
   2020 WL 1852644 (Sup. Ct. N.Y. Cty. Apr. 10, 2020) .................................39, 40

*Davimos v. Halle*,
   60 A.D.3d 576 (1st Dep't 2009) ..........................................................................25

*Davis v. Scottish Re Grp. Ltd.*,
   2014 WL 7475035 (Sup. Ct. N.Y. Cty. Oct. 14, 2014).......................................44

*De Vos v. Lee*,
   2010 WL 277070 (E.D.N.Y. Jan. 19, 2010) ........................................................53

v

*Demetre v. HMS Holdings Corp.*,
127 A.D.3d 493 (1st Dep't 2015)......................................................................41

*DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*,
80 A.D.3d 448 (1st Dep't 2011) ................................................... 16, 25, 47

*DOTS, LLC v. Capstone Media (In re DOTS, LLC)*,
533 B.R. 432 (Bankr. D.N.J. 2015)...................................................................54

*Due Pesci Inc. v. Threads for Thought, LLC*,
2012 WL 987605 (Sup. Ct. N.Y. Cty. Feb. 6, 2012) ......................... 43, 45, 46, 49

*E. 41st St. Assocs. v. 18 E. 42nd St., L.P.*,
248 A.D.2d 112 (1st Dep't 1998)......................................................................23

*E.F. Hutton Int'l Assocs. Ltd. v. Shearson Lehman Bros. Holdings, Inc.*,
281 A.D.2d 362 (1st Dep't 2001).......................................................................49

*Eastman Kodak Co. v. Altek Corp.*,
936 F. Supp. 2d 342 (S.D.N.Y. 2013) ................................................................36

*Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc'y, FSB*,
2018 WL 1947405 (Sup. Ct. N.Y. Cty. Apr. 25, 2018) ................................. 16, 19

*Emmet & Co. v. Catholic Health E.*,
37 Misc. 3d 854 (Sup. Ct. N.Y. Cty. 2012) ................................................. 17, 19

*ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*,
95 A.D.3d 498 (1st Dep't 2012) ................................................................. 18, 24

*Feldbaum v. McCrory Corp.*,
1992 WL 119095 (Del. Ch. June 2, 1992)...........................................................19

*Felsen v. Sol Cafe Mfg. Corp.*,
24 N.Y.2d 682 (1969)......................................................................................49

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
414 F.3d 325 (2d Cir. 2005) ..................................................................... 51, 52

*Flushing Sav. Bank v. Parr*,
81 A.D.2d 655 (2d Dep't 1981) ........................................................................59

*Forman v. Guardian Life Ins. Co. of Am.*,
76 A.D.3d 886 (1st Dep't 2010) ................................................................. 17, 18

*Foster v. Churchill*,
87 N.Y.2d 744 (1996).......................................................................... 47, 48, 49

vi

*Frank Crystal & Co. v. Dillmann*,
    84 A.D.3d 704 (1st Dep't 2011) ................................................46

*GCA Advisors, LLC v. Onion, Inc.*,
    2019 WL 3526119 (Sup. Ct. N.Y. Cty. Aug. 2, 2019) .....................49

*Geltzer v. Fleck* (*In re ContinuityX, Inc.*),
    569 B.R. 29 (Bankr. S.D.N.Y. 2017) ......................................54

*Genger v. Genger*,
    76 F. Supp. 3d 488 (S.D.N.Y. 2015) ...............................25, 26

*Gerffert Co. v. Fratelli Bonella, SRL*,
    2015 WL 6127078 (Sup. Ct. Nassau Cty. Oct. 7, 2015) ...............44

*Goldstein v. Columbia Diamond Ring Co., Inc.*,
    366 Mass. 835 (1975) ..........................................................55

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    98 N.Y.2d 314 (2002) .........................................................16

*Gowan v. Patriot Grp., LLC* (*In re Dreier LLP*),
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ....................................55

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
    74 A.D.3d 413 (1st Dep't 2010) ......................................26, 35

*Greylock Glob. Opp. Master Fund Ltd. v. Province of Mendoza*,
    2005 WL 289723 (S.D.N.Y. Feb. 8, 2005)...............................31

*Havana Cent. NY2 LLC v. Lunney's Pub, Inc.*,
    49 A.D.3d 70 (1st Dep't 2007) ..............................................47

*Henneberry v. Sumitomo Corp. of Am.*,
    2005 WL 1036260 (S.D.N.Y. May 3, 2005) ............................44

*Hirsch v. Food Res., Inc.*,
    24 A.D.3d 293 (1st Dep't 2005) .............................................49

*Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Capital, Inc.*,
    175 A.D.3d 1175 (1st Dep't 2019).........................................29

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
    2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019) .................47, 48, 49

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    679 F. Supp. 2d 395 (S.D.N.Y. 2009) .....................................49

vii

*JCMC Flatiron, LLC v. Princeton Holdings LLC,*
   2014 WL 4937854 (Sup. Ct. N.Y. Cty. Sept. 28, 2014) ......................................................37

*Jered Contracting Corp. v. N.Y.C. Transit Auth.,*
   22 N.Y.2d 187 (1968)...........................................................................................................58

*Johnson v. Cestone,*
   162 A.D.3d 526 (1st Dep't 2018)........................................................................................49

*Kass v. E. Air Lines, Inc.,*
   1986 WL 13008 (Del. Ch. Nov. 14, 1986) .........................................................................39

*Kass v. Kass,*
   91 N.Y.2d 554 (1998)...........................................................................................................33

*Kassover v. Prism Venture Partners, LLC,*
   53 A.D.3d 444 (1st Dep't 2008) .........................................................................................49

*Katz v. Oak Indus.,*
   508 A.2d 873 (Del. Ch. 1986)......................................................................................24, 39

*Kimso Apts., LLC v. Rivera,*
   180 A.D.3d 1033 (2d Dep't 2020) ................................................................................44, 46

*King Penguin Opp. Fund III, LLC v. Spectrum Grp. Mgmt. LLC,*
   187 A.D.3d 688 (1st Dep't 2020).......................................................................................38

*Kirke La Shelle Co. v. Paul Armstrong Co.,*
   263 N.Y. 79 (1933) .......................................................................................................37, 38

*Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.,*
   35 A.D.3d 317 (1st Dep't 2006) .........................................................................................47

*Kuhns v. Ledger,*
   202 F. Supp. 3d 433 (S.D.N.Y. 2016) ................................................................................49

*L.Y.E. Diamonds, Ltd. v. Gemological Inst. of Am., Inc.,*
   169 A.D.3d 589 (1st Dep't 2019)........................................................................................44

*Lanzi v. Brooks,*
   43 N.Y.2d 778 (1977)......................................................................................................55, 57

*Larchmont Pancake House v. Bd. of Assessors,*
   33 N.Y.3d 228 (2019)...........................................................................................................30

*Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.,*
   136 A.D.3d 52 (1st Dep't 2015) ....................................................................................25, 36

*Leon v. Martinez*,
  84 N.Y.2d 83 (1994).................................................................................16

*Levine v. Yokell*,
  258 A.D.2d 296 (1st Dep't 1999)...............................................................47

*In re LIBOR-Based Fin. Instruments Antitr. Litig.*,
  2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015).............................................42

*M.J. & K. Co. v. Matthew Bender & Co.*,
  220 A.D.2d 488 (2d Dep't 1995)................................................................46

*Macy's Inc. v. J.C. Penney Corp.*,
  45 Misc. 3d 274 (Sup. Ct. N.Y. Cty. 2014)..............................................43

*Madison Third Bldg. Cos. v. Berkey*,
  30 A.D.3d 1146 (1st Dep't 2006)...............................................................46

*Manti's Transp., Inc. v. C.T. Lines, Inc.*,
  68 A.D.3d 937 (2d Dep't 2009)..................................................................38

*MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*,
  2015 WL 764665 (S.D.N.Y. Jan. 9, 2015).................................................29

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995).....................................................................................50

*Matlick v. AmTrust Fin. Servs., Inc.*,
  2020 WL 1294669 (Sup. Ct. N.Y. Cty. Mar. 16, 2020)...........................19

*McBirney v. Paine Furniture Co.*,
  2003 WL 21094555 (Mass. Super. Mar. 31, 2003)..................................53

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994)...................................................................................27

*MeehanCombs Glob. Credit Opps. Funds, LP v. Caesars Entm't Corp.*,
  80 F. Supp. 3d 507 (S.D.N.Y. 2015).........................................................24

*Meer Enters., LLC v. Kocak*,
  173 A.D.3d 629 (1st Dep't 2019)...............................................................46

*Meshel v. Resorts Int'l of N.Y.*,
  160 A.D.2d 211 (1st Dep't 1990)...............................................................44

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
  84 N.Y.2d 430 (1994)...........................................................................23, 34

ix

*Mill Fin., LLC v. Gillett*,
    122 A.D.3d 98 (1st Dep't 2014) ........................................................42

*Ministers & Missionaries Benefit Bd. v. Snow*,
    26 N.Y.3d 466 (2015)........................................................... 50, 51, 52

*MLRN LLC v. U.S. Bank N.A.*,
    2019 WL 5963202 (Sup. Ct. N.Y. Cty. Nov. 13, 2019).......................18

*Moran v. Erk*,
    11 N.Y.3d 452 (2008)........................................................................40

*Morris v. N.Y. Dep't of Taxation & Fin.*,
    82 N.Y.2d 135 (1993)........................................................................44

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
    2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002)...................................51

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
    87 N.Y.2d 614 (1996)................................................................. 42, 44

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
    2020 WL 3411267 (Sup. Ct. N.Y. Cty. June 19, 2020) ................. 31, 36

*Novelty Crystal Corp. v. PSA Inst. Partners, L.P.*,
    49 A.D.3d 113 (2d Dep't 2008) ........................................................19

*O'Neill v. Cohen*,
    2015 WL 9592610 (Sup. Ct. N.Y. Cty. Dec. 18, 2015) .......................44

*Obra Pia Ltd. v. Seagrape Inv'rs LLC*,
    2020 WL 5751195 (S.D.N.Y. Sept. 25, 2020)...................................51

*Octagon Credit Inv'rs, LLC v. NYDJ Apparel LLC*,
    Index No. 656677/2017 (Sup. Ct. N.Y. Cty. 2017) ...........................38

*In re Part 60 Put-Back Litig.*,
    169 A.D.3d 217 (1st Dep't 2019).......................................................30

*Paulicopter – Cia. Paulista v. Bank of Am., N.A.*,
    2019 WL 1405343 (Sup. Ct. N.Y. Cty. Mar. 27, 2019) ......................49

*People's United Bank v. Whitford Dev., Inc.*,
    2013 WL 2169346 (Sup. Ct. N.Y. Cty. May 13, 2013) ................. 25, 26

*Peter R. Friedman, Ltd. v. Tishman Speyer Hudson Ltd. P'ship*,
    107 A.D.3d 569 (1st Dep't 2013).......................................................49

x

*Project Gamma Acquisition Corp. v. PPG Indus., Inc.*,
    2009 WL 1764481 (Sup. Ct. N.Y. Cty. June 11, 2009) ......................................49

*Pursuit Inv. Mgmt. LLC v. Alpha Beta Capital Partners, L.P.*,
    127 A.D.3d 580 (1st Dep't 2015)..........................................................................46

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
    23 N.Y.3d 549 (2014)............................................................................................31

*RBC Capital Mkts., LLC v. Educ. Loan Tr. IV*,
    2011 WL 6152282 (Del. Ch. Dec. 6, 2011).........................................................19

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288 (1st Dep't 2003)....................................................................39, 40

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    13 N.Y.3d 398 (2009)............................................................................................29

*Roselink Inv'rs, L.L.C. v. Shenkman*,
    386 F. Supp. 2d 209 (S.D.N.Y. 2004) ..................................................................51

*Rudman v. Cowles Commc'ns, Inc.*,
    30 N.Y.2d 1 (1972) ...............................................................................................26

*Segal v. Signal Equity Partners*,
    2007 WL 2815484 (Sup. Ct. N.Y. Cty. July 20, 2007).......................................49

*Sharp Int'l Corp. v. State Street Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ..............................................................................54, 55

*Silva v. GVF Cannery, Inc. (In re GVF Cannery, Inc.)*,
    188 B.R. 651 (Bankr. N.D. Cal. 1995).................................................................35

*Silva v. Wells Fargo Bank, N.A. (In re GVF Cannery, Inc.)*,
    202 B.R. 140 (N.D. Cal. 1996) .......................................................................32, 33

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011) ...................................................................54

*Sims v. First Consumers Nat'l Bank*,
    303 A.D.2d 288 (1st Dep't 2003)..........................................................................41

*Spectacolor Inc. v. Banque Nationale de Paris*,
    207 A.D.2d 726 (1st Dep't 1994)..........................................................................49

*StarVest Partners II, L.P. v. Emportal, Inc.*,
    101 A.D.3d 610 (1st Dep't 2012)..........................................................................42

xi

*Stout St. Fund I, L.P. v. Halifax Grp., LLC*,
    148 A.D.3d 744 (2d Dep't 2017) ................................................................. 55, 56

*Summit Affiliates, Inc. v. Am. Trading Real Estate Props., Inc.*,
    1995 WL 17962416 (Sup. Ct. N.Y. Cty. Feb. 1, 1995) ...................................... 44

*TBS Enters., Inc. v. Grobe*,
    114 A.D.2d 445 (2d Dep't 1985) ...................................................................... 25

*In re Tele/Resources, Inc.*,
    21 B.R. 358 (Bankr. S.D.N.Y. 1982) ................................................................ 35

*This Is Me, Inc. v. Taylor*,
    157 F.3d 139 (2d Cir. 1988) .............................................................................. 26

*Trahan v. Lazar*,
    457 F. Supp. 3d 323 (S.D.N.Y. 2020) ............................................................... 47

*Tri-Star Lighting Corp. v. Goldstein*,
    151 A.D.3d 1102 (2d Dep't 2017) .................................................................... 42

*Turtur v. Rothschild Registry Int'l, Inc.*,
    26 F.3d 304 (2d Cir. 1994) .......................................................................... 51, 52

*U.S. Bank N.A. v. Triaxx Asset Mgmt. LLC*,
    2019 WL 4744220 (S.D.N.Y. Aug. 26, 2019) ................................................... 49

*Ullmannglass v. Oneida, Ltd.*,
    86 A.D.3d 827 (3d Dep't 2011) ........................................................................ 45

*Ultramar Energy v. Chase Manhattan Bank*,
    191 A.D.2d 86 (1st Dep't 1993) ....................................................................... 55

*United Natural Foods, Inc. v. Goldman Sachs Grp., Inc.*,
    2020 WL 2135803 (Sup. Ct. N.Y. Cty. May 5, 2020) ....................................... 40

*United States v. Carlin*,
    948 F. Supp. 271 (S.D.N.Y. 1996) .................................................................... 59

*Vandenberg, Inc. v. Townhouse 84, LLC*,
    2011 WL 5903736 (Sup. Ct. N.Y. Cty. Mar. 24, 2011) ..................................... 44

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) ......................................................................................... 29

*W. & S. Life Ins. Co. v. U.S. Bank N.A.*,
    2020 WL 6534496 (Sup. Ct. N.Y. Cty. Nov. 5, 2020) ....................................... 18

xii

*W.W.W. Assocs., Inc. v. Giancontieri*,
 77 N.Y.2d 157 (1990) ........................................................................ 23, 34

*Wall St. Assocs. v. Brodsky*,
 257 A.D.2d 526 (1st Dep't 1999) .................................................................. 56

*Walnut Place LLC v. Countrywide Home Loans, Inc.*,
 2012 WL 1138863 (Sup. Ct. N.Y. Cty. Mar. 28, 2012) ....................................... 17

*Washington Ave. Assocs., Inc. v. Euclid Equip., Inc.*,
 229 A.D.2d 486 (2d Dep't 1996) .............................................................. 44, 46

*Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*,
 554 B.R. 635 (S.D.N.Y. 2016)................................................................. 56, 57

*Wells Fargo Bank, N.A. v. ADF Operating Corp.*,
 50 A.D.3d 280 (1st Dep't 2008) ............................................................. *passim*

*Westmoreland Coal Co. v. Entech, Inc.*,
 100 N.Y.2d 352 (2003)........................................................................... 33

*White Knight of Flatbush, LLC v. Deacons of the Dutch Congregation of
 Flatbush*,
 159 A.D.3d 939 (2d Dep't 2018) .................................................................. 46

*White Plains Coat & Apron Co. v. Cintas Corp.*,
 8 N.Y.3d 422 (2007)............................................................................. 49

*Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.*,
 2006 WL 358270 (N.D. Ga. Feb. 15, 2006) ..................................................... 39

*Wiesen v. Verizon Comm'cns Inc.*,
 2018 WL 4698019 (Sup. Ct. N.Y. Cty. Oct. 1, 2018)........................................... 46

*William C. Atwater & Co v. Panama R.R. Co.*,
 246 N.Y. 519 (1927)............................................................................. 34

**Statutes**

11 U.S.C. § 547 ................................................................................... 54

DCL § 270(a)(1) .................................................................................. 57

DCL § 270(b)(1) .................................................................................. 53

DCL § 270(h)(4) .................................................................................. 57

DCL § 273(a)(1) ........................................................................ 50, 52, 56, 58

xiii

DCL § 273(a)(2) ........................................................................................................53

DCL § 273(b)(1) .......................................................................................................57

DCL § 273(b)(10) .....................................................................................................58

DCL § 273(b)(3) .......................................................................................................57

DCL § 276 ................................................................................................................52

DCL § 279 ..........................................................................................................50, 52

Mass. Uniform Fraudulent Transfer Act § 5(a)(2)....................................................53

## Rules

1st Cir. Local Rule 36.0(c) ........................................................................................35

CPLR 3016(b)............................................................................................... 55, 57, 58

CPLR 3211 ................................................................................................... 15, 16, 57

## Other Authorities

2019 N.Y. Sess. Laws ch. 580 ..................................................................................52

2019 N.Y. A.B. 5622, Committee Report (Feb. 16, 2019) .......................................53

Black's Law Dictionary (10th ed. 2014)...................................................... 19, 25, 27

30 N.Y. Jur. 2d Creditors' Rights § 385 (2011) .......................................................55

Oxford English Dictionary (3d ed. 2004)..................................................................36

xiv

Plaintiffs[1] respectfully submit this memorandum of law in opposition to the motions to dismiss filed by Defendants TMK Hawk Parent, Corp. ("TriMark"), Defendant Lenders,[2] Centerbridge Partners, L.P. ("Centerbridge"), and Blackstone Tactical Opportunities Fund L.P. ("Blackstone," together with Centerbridge, the "Equity Sponsors," and together with TriMark, Defendant Lenders, and Centerbridge, "Defendants").

## PRELIMINARY STATEMENT

This case concerns Defendants' scheme to enrich one group of lenders in a syndicate at the expense of others and to protect the interests of TriMark's Equity Sponsors, in patent breach of the controlling credit agreement. A syndicate of lenders made leveraged loans to TriMark under a credit agreement (the "Original Agreement"),[3] which guaranteed that all lenders would share pro rata in the loans' benefits and losses and have priority claims to the collateral above anyone else in the event of a liquidation. When they bought their loans, Plaintiffs and Defendant Lenders signed on to the Original Agreement, relying on its core contractual protections of these pro rata and priority rights.

In violation of the plain language of the amendment provisions set forth in the Original Agreement, Defendants secretly amended the agreement (the "Amended Agreement")[4] to eviscerate key bargained-for lender protections, stripping dozens of pages of protective covenants.

---

[1] The term "Plaintiffs" refers to the entities listed in Schedule 1 appended to the Complaint. Dkt. 1 ("Compl."), at 54-55.

[2] The term "Defendant Lenders" refers to the entities listed in Schedule 2 appended to the Complaint. Compl. at 56-59.

[3] The term "Original Agreement" refers to the First Lien Credit Agreement, issued on August 28, 2017 and amended on September 27, 2017. Dkt. 23.

[4] The term "Amended Agreement" refers to the Second Amendment To The First Lien Credit Agreement, Consent And Waiver, dated as of September 14, 2020. Dkt. 24.

Defendants invoked those illegal amendments to have TriMark bestow a windfall on Defendant Lenders by exchanging their first lien debt for new "super senior" debt on a dollar-for-dollar basis even though the first lien debt was then trading below 80 cents on the dollar. This new "super senior" tranche is purportedly entitled to be paid in full before Plaintiffs' first lien debt is paid at all, gutting the value of Plaintiffs' loans. As a parting gift, Defendants also purported to strip the remaining first lien lenders, including Plaintiffs, of standing to sue unless they first post tens of millions of dollars in escrow and act through a new administrative agent handpicked by Defendants, ███████████████████████████████████. Plaintiffs have sued to obtain a declaration that the Amended Agreement is void and to hold Defendants accountable.

In moving to dismiss Plaintiffs' claims, Defendants employ misdirection. They imply that their scheme was par for the course in the leveraged loan market—in fact, it is a radical assault on the market's standard contractual terms and customs, virtually unheard of before 2020 when the stress of the COVID-19 pandemic provoked a few high-risk attempts by lenders to trick courts into letting them out of the contractual bargains they made. Defendants also assert that the contracts permitted the relevant transactions—but the Original Agreement neither allowed the deal nor allowed Defendants to rewrite the material provisions of the contract without Plaintiffs' consent.

Most gallingly, Defendants pretend that the deal was necessary because TriMark needed new liquidity—but TriMark could have obtained liquidity from all lenders lawfully under the Original Agreement, and it did not even *try* to do so. Indeed, when a group of lenders approached TriMark about negotiating a lawful refinancing arrangement, the company *denied* that it needed new liquidity and *refused* even to explore refinancing with the group on equal terms. At the very same time, TriMark was *secretly engineering* a windfall for Defendant Lenders that also benefited its Equity Sponsors. The only point of refinancing as TriMark did—in secret, with only Defendant

2

Lenders, and overpaying more than $67 million above the market price—was to enrich Defendants at Plaintiffs' expense. Neither the contracts nor basic concepts of good faith and fair dealing allow this.

Defendants present no valid reason to dismiss any of Plaintiffs' claims.

*First*, Plaintiffs have standing. Defendants have no basis to assert that new "no-action" clauses in the Amended Agreement can require Plaintiffs to sue only through an administrative agent and only after posting an unusually large bond in an amount determined solely by that agent, whom Defendants have agreed to indemnify for actions taken in bad faith. New York law provides that "no-action" clauses cannot prevent individual lenders from suing to vindicate the types of consent rights implicated here, so Plaintiffs can seek a declaration that the Amended Agreement is void. Moreover, because the Amended Agreement—including its no-action clauses—is void, Plaintiffs can bring their remaining claims under the Original Agreement. Even if the Amended Agreement were otherwise valid (it is not), the new no-action clauses are unenforceable because they would require Defendants' handpicked agent—who facilitated the scheme—to prosecute claims that implicate its own conduct. *Infra* § I.

*Second*, Plaintiffs plead valid declaratory judgment claims that the Amended Agreement is void in its entirety, on three grounds.

Section 9.02(b) of the Original Agreement requires approval for most amendments by "Required Lenders," which excludes any lenders holding loans "subject to Section 9.04(g)." Defendant Lenders could not be Required Lenders, as they had already committed their loans to TriMark in self-styled "Open Market Purchase Agreements" pursuant to Section 9.04(g) when they executed the Amended Agreement. Defendants' argument that this definition excludes only loans

3

already assigned to TriMark or its affiliates cannot be reconciled with the plain language of the Original Agreement, including the definition of "Required Lenders." *Infra* § II.A.

Section 9.02(b) of the Original Agreement also requires that any amendment adopted through an "agreement or agreements" that implicate a defined "sacred right" have the consent "of each Lender directly and adversely affected" by the agreement. Defendants' scheme is an agreement, effectuated through fourteen interrelated documents, executed on the same day, concerning the same subject matter. This agreement implicated two of Plaintiffs' sacred rights: It modified Section 4.02 of the Collateral Agreement to alter the application of proceeds of collateral, and it reduced the principal amounts of Defendant Lenders' loans. The agreement directly and adversely affected Plaintiffs by subordinating their debt and gutting the value of their loans. *Infra* § II.B.

The Amended Agreement also released substantially all collateral securing Plaintiffs' loans by reducing their expected recovery in the event of liquidation to zero, which independently triggered Plaintiffs' consent rights under Section 9.02(b). *Infra* § II.C.

*Third*, Defendants hardly contest Plaintiffs' claims that TriMark and Defendant Lenders breached the Original Agreement. They do not address at all Plaintiffs' claims that Defendants violated numerous provisions of Articles II and VI. They half-heartedly argue that part of the Scheme was permitted as an "open market purchase" under Section 9.04(g), but Plaintiffs allege that the deal was not done at arms' length or at a market price, raising disputed issues of fact that cannot be resolved on a motion to dismiss. *Infra* § III.

*Fourth*, Plaintiffs also plead viable claims for breach of the implied covenant of good faith and fair dealing. Those claims do not, as Defendants contend, try to imply new terms into the Original Agreement; they seek to enforce the implied term in every agreement that parties cannot actively deny their counterparties the fruits of a contract—as Defendants did here by torpedoing

4

the value of Plaintiffs' loans and throwing up new barriers to Plaintiffs' bringing suit for the harms caused to them. Defendants' assertions that they could not breach the implied covenant if they technically complied with the contract is wrong as a matter of law. It is precisely when there is no breach of contract that the implied covenant protects contract parties from rapacious and bad faith conduct. Defendants' argument that one of Plaintiffs' implied covenant claims duplicates their contract claims ignores that Plaintiffs predicate their covenant claims on fundamentally different conduct than is at issue in their breach of contract claims. *Infra* § IV.

*Fifth*, Plaintiffs plead valid claims for tortious interference with the Original Agreement by the Equity Sponsors. The Equity Sponsors had specific knowledge of the Original Agreement, and the Amended Agreement shows that they knew the scheme would violate the Original Agreement. Plaintiffs plead the requisite causation by alleging that the Equity Sponsors used their ownership and control of TriMark to induce TriMark and Defendant Lenders to enter the scheme to Plaintiffs' detriment. And the Equity Sponsors cannot invoke the affirmative defense of economic justification at the pleading stage, as Plaintiffs allege that the scheme was not in TriMark's best economic interest—especially as alternative refinancing that would not have required TriMark to breach the Original Agreement was likely available. *Infra* § V.

*Finally*, Plaintiffs plead valid voidable transaction claims under New York law, which Defendants agreed would govern any dispute related to the collateral securing TriMark's first lien debt. Contrary to Defendants' assertions, Plaintiffs' claims arise from an actionable transfer that, if set aside, would entitle them to access the collateral on a basis equal to Defendant Lenders. Defendants' arguments regarding diminution in value and preference law are irrelevant because Plaintiffs plead a claim of intentional voidable transactions. Plaintiffs' claims rely on three, well-established badges of fraud—Defendants' scheme involved transfers and obligations to insiders;

5

the transfers and obligations at issue were concealed from Plaintiffs; and Defendants' scheme occurred upon TriMark's incursion of a substantial debt. *Infra* § VI.

The Court should deny Defendants' motions in their entirety.

## BACKGROUND

### A.    TriMark's Leveraged Loan

In August 2017, Centerbridge and Blackstone acquired 59.8% and 26.8% equity interests, respectively, in TriMark, a food service equipment distributor, in a leveraged buyout financed by an $820 million loan (the "Leveraged Loan") issued to TriMark by several large financial institutions. Compl. ¶¶ 40-41. Each of those institutions then syndicated partial interests in the Leveraged Loan to other market participants ("Lenders"). Compl. ¶ 41.

The Leveraged Loan had two tranches—First Lien and Second Lien—both secured by the same TriMark collateral (the "Collateral"). Compl. ¶ 42. The First Lien tranche of $585 million (the "First Lien Debt"), which consisted of $560 million of initial draw commitments and $25 million of delayed draw commitments, had priority over the Second Lien tranche in the event of a default—meaning TriMark had to pay Lenders who held interests in the First Lien tranche (the "First Lien Lenders") before it paid anything to Lenders who held interests in the Second Lien tranche. Compl. ¶ 43.[5] The First Lien Lenders' rights and obligations were governed by, among other documents, the Original Agreement. Compl. ¶ 60.

Plaintiffs and Defendant Lenders acquired First Lien Debt after issuance and so became First Lien Lenders. Compl. ¶ 43.

---

[5] TriMark also took out a revolving loan of $150 million through a separate credit facility known as an "Asset Based Loan" (the "ABL Facility") over which the First Lien and the Second Lien both had priority except as to certain "ABL Priority Collateral." Compl. ¶ 43 n.5.

6

### B.    TriMark's Financial Strain

In the early spring of 2020, TriMark's business came under strain as state and local governments across the country halted indoor restaurant dining in response to the COVID-19 pandemic. Compl. ¶ 45. Public reports indicate that TriMark's revenues plummeted, and its debt ratings were downgraded. *Id.* The secondary trading price of TriMark's First Lien Debt fell to the high 70s cents on the dollar by August 2020. *Id.*

In the late spring and summer of 2020, a group of First Lien Lenders, including several Defendant Lenders and several Plaintiffs, formed a committee to speak with TriMark about whether it needed additional liquidity and, if so, to explore potential pro rata refinancing options, as contemplated by the Original Agreement. Compl. ¶ 46. Despite public reports suggesting its financial outlook was grim, TriMark denied to the committee, and later to the public markets, that it had any near-term cash issue, required additional liquidity, or had spoken to outside financing sources. *Id.* On a lender update call on September 1, 2020, TriMark executives Marie Ffolkes and Chad Brooks said: "[O]ur liquidity remain[s] strong," and "TriMark does have plenty of liquidity." *Id.*

Yet, at or about the same time, Defendants—including Centerbridge, Blackstone, and Defendant Lenders Ares, Blackrock, GSO, and Sculptor—were huddled in a back room, cooking up a deal with TriMark that would provide some new liquidity to the company by breaching the Original Agreement, benefitting Defendant Lenders and Equity Sponsors, and causing Plaintiffs substantial losses. *Id.* Upon information and belief, this scheme was chiefly hatched and led by TriMark's primary private equity sponsor, Centerbridge, and two Defendant Lenders, Oaktree and Ares, who induced TriMark and the other Defendant Lenders to enter the unlawful transaction. *Id.* As private equity sponsors of TriMark, Centerbridge and Blackstone certainly had concerns about the investment returns earned by their funds (and by their principals who hold interests in those

7

funds) that own TriMark if the pandemic resulted in a bankruptcy. More importantly, however, with the prospect of multiple pandemic-induced bankruptcies among their respective portfolio companies, both Centerbridge and Blackstone had strong interests in finding additional debt financing that would not require them to make additional equity investments in TriMark, whose business was likely viewed as especially vulnerable to pandemic-related restrictions. *See* Compl. ¶ 53. Blackstone also had a unique interest in the Scheme because its affiliates, the Blackstone Lenders, were among the First Lien Lenders. Compl. ¶ 52.

### C.     Defendants' Uptiering Scheme

On September 14, 2020, without any advance notice to Plaintiffs, TriMark announced that it had entered a debt refinancing transaction (the "Uptiering Scheme" or "Scheme"). Compl. ¶ 47. The Scheme had three main components.

*First*, TriMark issued to undisclosed lenders $120 million in new "First-Out Super Senior Debt" pursuant to a new Super Senior Credit Agreement, Dkt. 57; *see* Compl. ¶ 48.

*Second*, TriMark issued $307.5 million in new "Second-Out Super Senior Debt" (together with the First-Out Super Senior Debt, the "Super Senior Debt") to Defendant Lenders (together with recipients of First-Out Super Senior Debt, the "Super Senior Lenders") in a dollar-for-dollar exchange for their existing $307.5 million face amount of First Lien Debt, which was automatically retired upon assignment back to TriMark. Compl. ¶ 49. Defendant Lenders instantly benefitted by increasing the value of their loans in this exchange, as the new Second-Out Super Senior Debt was worth approximately $67.65 million *more* than the aggregate market value of their First Lien Debt immediately prior to the Scheme. *Id.*

The Super Senior Debt was secured by the same Collateral as the First Lien Debt. Compl. ¶¶ 48, 50. Pursuant to a new Super-Priority Intercreditor Agreement, Dkt. 27, the Super Senior

Debt had priority over the First Lien Debt, effectively subordinating the remaining First Lien Lenders to the position of third lien lenders behind new higher priority loans. Compl. ¶ 50.[6]

*Third*, Defendant Lenders and TriMark purported to amend the Original Agreement to strip away all its protective covenants, leaving Plaintiffs and other First Lien Lenders without bargained-for protections for their investments. Compl. ¶ 51.

TriMark's Equity Sponsors, Centerbridge and Blackstone, pushed for and benefitted from the Uptiering Scheme. *See* Compl. ¶¶ 52-53. Rather than have TriMark seek refinancing from *all* First Lien Lenders, consistent with the company's contractual duties, or inject their own cash into the company, Centerbridge and Blackstone pushed a beggar-thy-neighbor debt refinancing strategy, offering participation only to Defendant Lenders, whose debt would be subordinated if they did not agree to the coercive Scheme. Compl. ¶¶ 52-53. Blackstone leveraged its seat on the board of directors of TriMark's operating company to secure a windfall for its affiliates, the Blackstone Lenders, which held First Lien Debt that was exchanged for Super Senior Debt. Compl. ¶¶ 22, 52. On information and belief, the Uptiering Scheme allowed Centerbridge and Blackstone to prop up their investors' impressions of a failing investment quickly, while also giving an option to them or Defendant Lenders to acquire Plaintiffs' loans at a depressed price. Compl. ¶ 53.

The Uptiering Scheme eviscerated the value of Plaintiffs' First Lien Debt. It effectively transformed their First Lien Debt into (at best) third lien debt, suddenly ranking below $427.5 million in new Super Senior Debt. Compl. ¶ 57. This significantly reduced Plaintiffs' likelihood of ever recovering on their First Lien Debt, with Standard & Poor's projecting that recovery for such Debt in a liquidation could drop as low as 0%. Compl. ¶ 58. When the market learned of the

---

[6] ███████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████.

9

Scheme, the market price of Plaintiffs' First Lien Debt dropped from approximately 78 to approximately 50 cents on the dollar. Compl. ¶ 59.

### D.    The Scheme Documents

Defendants entered the Uptiering Scheme through the execution of fourteen new documents on September 14, 2020, which consist primarily of contracts among TriMark, Defendant Lenders, and Alter Domus (US) LLC ("Alter Domus"). Compl. ¶ 47; Dkts. 23-33. In addition to the Super Senior Credit Agreement and the Super-Priority Intercreditor Agreement, these included the Amended Agreement; five so-called "Open Market Purchase Agreements," Dkts. 29-33; an amended Collateral Agreement, Dkt. 28, which governs the application of proceeds of any collection or sale of the Collateral; an Agency Reassignment Agreement, Dkt. 58; and an Agency Resignation Letter, Dkt. 59.[7]

The Scheme documents interlock and explicitly cross-reference each other. For example, (1) the Super Senior Credit Agreement ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████; Compl. ¶ 86; (2) the Open Market Purchase Agreements repeatedly reference the Amended Agreement and the Super Senior Credit Agreement, e.g., Dkt. 31 ¶¶ 3, 4; and (3) the Amended Agreement states that Defendant Lenders "have agreed" to amend the Original Agreement and "consent" to the Uptiering Scheme's transactions, Amended Agreement, Recitals, at 1.

---

[7] The other documents that facilitated the Uptiering Scheme were executed by TriMark to notify Lenders who held interests in the First Lien, Second Lien, and ABL Facility of the Super Senior Debt.

The Amended Agreement was the linchpin. It purportedly modified—in some instances, outright deleted—numerous provisions of the Original Agreement designed specifically to protect against transactions like the Scheme:

*Preferential Treatment.* Defendants purportedly gutted foundational provisions in the Original Agreement allowing TriMark to exchange debt or take on new debt only if the company did not favor any First Lien Lender over another. ██████████████████████████ ███████████████████████████████████████████████████████ Compl.

¶ 64. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ Compl. ¶ 74. In Section 2.20, the Original Agreement lets TriMark incur new debt only if it ranks equal in priority of payment and security or lower than existing First Lien Debt. Compl.

¶ 62. ████████████████████████████████████████████

███████████████████████████████████████████████. Compl. ¶ 74.

████████████████████████████████████████████████████████

██████████████████████. Compl. ¶ 63. ████████████████████

███████████████████████████████████████████████████████.

Compl. ¶¶ 63, 74.

*Protective Covenants.* Defendants purportedly erased dozens of pages of affirmative and negative covenants in the Original Agreement giving First Lien Lenders critical protections for their debt interests. Articles V and VI ███████████████████████████ ███████████████, restrictions on the use of proceeds, agreements not to incur additional liabilities and indebtedness, and agreements not to make certain investments. Compl. ¶¶ 66-68. Especially relevant here, in Sections 6.01 and 6.02 of the Original Agreement, TriMark covenants not to incur

11

new debt or new liens on the Collateral senior in right of payment or security to the First Lien Lenders' interests, such as the Super Senior Debt. Compl. ¶ 62. The Amended Agreement deletes Articles V and VI in their entirety. Compl. ¶ 68.

*Priority Rights to Collateral.* Defendants purportedly rewrote the First Lien Lenders' priority rights to collateral proceeds in a liquidation. Section 4.02 of the Collateral Agreement dictates that the Collateral Agent "shall apply" Collateral proceeds in a waterfall: first, to reimburse certain costs and expenses of the Collateral Agent; second, pro rata "to the payment in full of [the First Lien Debt]"; and third, to the Grantors. Collateral Agreement § 4.02. This structure is "[s]ubject to the terms of the Intercreditor Agreements," *id.*, a defined term incorporated from the Original Agreement, *id.* § 1.01(a); *see* Compl. ¶ 73. ██████████████████

████████████████████████████████████, which together ensure that First Lien Lenders have priority over other Lenders in rights to Collateral proceeds. ███

████████████████████████████████. Compl. ¶¶ 73-74.

*Debt Transfers.* Defendants also purportedly loosened key limits on how First Lien Lenders may transfer their debt to TriMark. In Section 9.04(g), the Original Agreement lets Lenders assign their First Lien Debt to TriMark only through a Dutch auction or an "open market purchase." Compl. ¶ 65. Although the term "open market purchase" is not defined, it is commonly understood in the industry to mean a transaction on the existing market where these loans trade daily, at arm's length, at the prevailing market price. Compl. ¶¶ 65, 74. Without making "open market purchase" a defined term, the Amended Agreement purports to change the plain language

12

of the phrase by including Defendants' "Open Market Purchase Agreements" and transactions "below or above par for cash, securities, or any other consideration with one or more Lenders that are not made available for participation of all Lenders," far broader than the common meaning of the term. Compl. ¶¶ 65, 74.

    *Indemnification and Litigation Rights.* Defendants purportedly rewrote narrow constraints on the First Lien Lenders' ability to sue directly to cover every conceivable cause of action, then massively burdened their ability to seek judicial redress under any circumstances. In Article VIII, the Original Agreement requires First Lien Lenders to bring suit through the Agent *only* "to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations." Compl. ¶ 74. In Section 9.18, the Amended Agreement purportedly precludes First Lien Lenders from "tak[ing] or institut[ing] *any* actions or proceedings, judicial or otherwise, for any … right or remedy or assert[ing] any other cause of action against" TriMark, Defendant Lenders, and others except through the Agent. *Id.* (emphasis added). Throwing up a further obstacle, in Section 9.03(f), the Amended Agreement purportedly permits the Agent to *refuse* to sue on the First Lien Lenders' behalf unless they post a bond for the full amount of all fees and expenses for the suit *plus* the full amount of any potential liability—all as estimated by the Agent in its sole discretion. *Id.* ███

███████████████████████████████████████████████████████████

████████████████████████████████████. Compl. ¶ 74. ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████ Compl. ¶ 74; *see* Compl.
¶¶ 71-72, ███████████████████████████████████, Compl. ¶ 71.

    Defendants needed to comply with Section 9.02(b) of the Original Agreement to adopt these amendments. Section 9.02(b) requires most amendments to the Original Agreement to be

consented to by, at a minimum, TriMark and certain "Required Lenders," a term defined as "[First Lien] Lenders having or holding more than 50.0% of the outstanding Term Loans" excluding "the total outstanding Term Loans subject to Section 9.04(g)," which is the provision that allows First Lien Lenders to assign their First Lien Debt to TriMark, Centerbridge, and Blackstone in Dutch auctions or open market purchases. Compl. ¶ 75.

Crucially, Section 9.02(b) also requires that "an agreement or agreements" between or among Trimark and any Required Lenders to amend the Original Agreement must have "the written consent of each Lender directly and adversely affected" by such agreement or agreements if it would impact certain foundational (or "sacred") rights under the Agreement. Such sacred rights ensure Lenders' pro rata and priority protections. Accordingly Section 9.02(b) prohibits agreements that among other things, (1) waive, amend, or modify Section 4.02 of the Collateral Agreement, explained above, or (2) reduce the principal amount of any Loan. Compl. ¶ 77. Any agreement that "release[s] all or substantially all the Collateral securing the Liens" also needs "the written consent of each Lender." Compl. ¶ 78.

Defendants purported to comply with Section 9.02(b) by claiming that Defendant Lenders were "Required Lenders," authorized to consent to the Amended Agreement on behalf of all First Lien Lenders. Defendant Lenders claimed to act as Required Lenders, however, only *after* they committed to participate in the Scheme by agreeing to execute the Scheme documents, including the self-styled "Open Market Purchase Agreements," which assigned their First Lien Debt to TriMark pursuant to Section 9.04(g) in exchange for Second-Out Super Senior Debt. At the time Defendant Lenders consented to the Amended Agreement, therefore, they knew they would never be governed by its egregious off-market terms because they were simultaneously exiting the First

14

Lien Lender class for the Super Senior Debt class. Defendants did not obtain consent from any other First Lien Lender, including Plaintiffs, to adopt the Amended Agreement. Compl. ¶¶ 75, 79.

Finally, given the new power the Amended Agreement granted the Agent to control potential suits filed against Defendants, TriMark and Defendant Lenders needed to find a pliable entity to cooperate with their Scheme. The original First Lien Administrative Agent, Barclays Bank PLC ("Barclays"), refused to participate in Defendants' misconduct. Compl. ¶¶ 60-61. So Defendants obtained Barclays's resignation, pursuant to the Agency Resignation Letter, Dkt. 59, and installed Alter Domus as the First Lien Administrative Agent in Barclays' stead, pursuant to the Agency Reassignment Agreement, Dkt. 58; *see* Compl. ¶ 61.[8] With Alter Domus acting as their hand-picked Agent for the First Lien Debt, Defendants completed the Uptiering Scheme. Compl. ¶ 61.

### E.    Plaintiffs Sue to Protect Their Bargained-For Rights

On November 7, 2020, Plaintiffs commenced this action by summons and complaint, bringing claims for (1) a declaratory judgment that the Amended Agreement is void because it was invalidly adopted; (2) breaches of the Original Agreement by TriMark; (3) breaches of the Original Agreement by Defendant Lenders; (4) breach of the implied covenant of good faith and fair dealing by TriMark and Defendant Lenders; (5) tortious interference with contract by Centerbridge and Blackstone; and (6) violations of the New York Uniform Voidable Transactions Act ("UVTA"). Dkt. 1. On January 8, 2021, TriMark, Defendant Lenders, Centerbridge, and Blackstone each filed a motion to dismiss pursuant to CPLR 3211. Plaintiffs now oppose.

---

[8] Alter Domus played a similar role as administrative agent in another uptiering scheme challenged in *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, Index No. 655175/2020 (Sup. Ct. N.Y. Cty.) (Masley, J.S.C.).

## ARGUMENT

"On a CPLR 3211 motion, the court must 'accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory.'" *DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*, 80 A.D.3d 448, 449 (1st Dep't 2011) (quoting *Leon v. Martinez*, 84 N.Y.2d 83, 87-88 (1994)). "Moreover, a motion to dismiss on the basis of a defense founded upon documentary evidence may be granted 'only where the documentary evidence utterly refutes [the complaint's] factual allegations, conclusively establishing a defense as a matter of law.'" *Id.* at 449-50 (alteration in original) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 326 (2002)).

## I.    PLAINTIFFS HAVE STANDING

Defendants object to Plaintiffs' standing on the sole basis that Section 9.18 and Article VIII of the Amended Agreement—so-called "no-action" clauses—require Lenders to sue exclusively through the Agent and only after posting a prohibitively expensive bond. TriMark MTD 9-11. As Defendants' cited authority instructs, however, "a no-action clause does not bar a claim by a minority lender to enforce its consent rights." *Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc'y, FSB*, 2018 WL 1947405, at *8 (Sup. Ct. N.Y. Cty. Apr. 25, 2018) (citing *Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*, 2006 WL 668441, at *7 (Del. Ch. Mar. 8, 2006) (no-action clauses "do not present an insuperable barrier to all suits not brought in strict conformity with their terms")). This makes sense. No-action clauses funnel to an agent or trustee those claims brought to vindicate lenders' collective rights—rights that benefit the entire lender class on a pro rata basis. *Cortland St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 43–44 (2018). Consent rights are not collective, as they do not "inure to all [lenders] pro rata to their ownership," *Cypress Assocs.*, 2006 WL 668441, at *7; they belong to each lender individually to ensure it can "vindicate

16

its minority rights." *Id.* The no-action clauses therefore cannot bar Plaintiffs' declaratory judgment claims to enforce their consent rights under Section 9.02(b) of the Original Agreement. And because the Amended Agreement was not adopted consistent with Section 9.02(b), it is invalid in full, *see infra* § II, which means its no-action clauses cannot bar Plaintiffs' other claims.[9]

Even if the Amended Agreement were otherwise valid (it is not), Plaintiffs would still have standing, because Defendants' adoption of the new no-action clauses violated the implied covenant of good faith and fair dealing. *See, e.g.*, *Forman v. Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886, 888 (1st Dep't 2010) (plaintiff pleaded violation of covenant of good faith and fair dealing where defendant allegedly "enter[ed] into an agreement preventing [plaintiff] from pursuing recovery" for its claims). The traditional purpose of no-action clauses is to organize lenders' claims by channeling them to a single entity controlled by the majority. *See, e.g.*, *Walnut Place LLC v. Countrywide Home Loans, Inc.*, 2012 WL 1138863, at *3 (Sup. Ct. N.Y. Cty. Mar. 28, 2012) (purpose of no-action clause is "to prevent individual bondholders from pursuing an individual course of action and thus harassing their common debtor and jeopardizing the fund provided for the common benefit" (alteration omitted) (quoting *Batchelder v. Council Grove Water Co.*, 131 N.Y. 42, 46 (1892))); *Emmet & Co. v. Catholic Health E.*, 37 Misc. 3d 854, 860-61 (Sup. Ct. N.Y. Cty. 2012) (no-action clauses prevent expensive lawsuits that are not supported by a substantial proportion of creditors and "centraliz[e] the prosecution of lawsuits whose benefits should properly accrue to all bondholders").

---

[9] Defendants' assertion that the no-action clause should survive even if the Amended Agreement were not adopted in accordance with Section 9.02(b) because it was not a "sacred right," TriMark MTD 10, misses the point: The Original Agreement does not proscribe merely "*amendments*" that alter sacred rights; it prohibits entire "*agreements*" between TriMark and Required Lenders that have the effect of altering sacred rights without the written consent of each directly and adversely affected Lender. *See infra* § II.B.1.

17

The new no-action clauses here, in contrast, functionally prohibit Lenders from suing at all: Lenders cannot direct the Agent to sue unless they first post a cash indemnity in escrow for all foreseeable "fees, costs and expenses" and "claims, obligations or liability, via counter-claims or otherwise"—as determined in the sole discretion of the new Agent handpicked, and indemnified for bad-faith acts, by entities the Lenders would sue (*i.e.*, TriMark and Defendant Lenders). Amended Agreement § 9.03(f); *see id.* § 9.18. No rational lender would agree to this. *Cf. ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 502-03 (1st Dep't 2012) (courts should not presume that parties intended to enter a harsh and commercially unreasonable contract). Defendants abandoned the traditional purpose of no-action clauses and abused the contract by purportedly amending the Original Agreement at the moment they exited it, benefitting themselves as non-parties while hampering the First Lien Lenders that remained. *See Forman*, 76 A.D.3d at 888.

Forcing Plaintiffs to comply with these no-action clauses would be absurd also because it would allow a potential wrongdoer to be the gatekeeper of Plaintiffs' claims. This Court and others have excused parties from complying with no-action clauses that would require the parties' representative to bring claims implicating its own conduct. *See W. & S. Life Ins. Co. v. U.S. Bank N.A.*, 2020 WL 6534496, at *3 (Sup. Ct. N.Y. Cty. Nov. 5, 2020) (Cohen, J.S.C.) (no-action clauses did not bar claims where demand on agent would be "tantamount to requiring that [the agent] bring claims implicating its own alleged misconduct"); *MLRN LLC v. U.S. Bank N.A.*, 2019 WL 5963202, at *8 (Sup. Ct. N.Y. Cty. Nov. 13, 2019) (requiring a nonparty to implicate its own misconduct "would be as 'absurd an application of the no-action clause' as demanding that [a defendant] sue itself" (collecting cases)). Plaintiffs allege here that, after Barclays refused to participate in their Scheme and resigned, Defendants appointed Alter Domus as Agent to facilitate the Scheme

18

and undertook to indemnify Alter Domus for acts taken in bad faith. *See, e.g.*, Compl. ¶¶ 61, 71-72. Alter Domus thus "is incapable of disinterestedly performing [the collective prosecution] duty," *Feldbaum v. McCrory Corp.*, 1992 WL 119095, at *7 (Del. Ch. June 2, 1992), and Plaintiffs must be excused from no-action clauses that would require them to rely on Alter Domus to prosecute this case on their behalf.

Defendants' authorities are not to the contrary. TriMark MTD 9-10. *Eaton Vance*, as noted, recognizes that no-action clauses do not preclude challenges to consent rights. 2018 WL 1947405, at *8. Though the court held the plaintiffs' other claims were barred by pre-amendment no-action clauses, *id.* at *7 n.16; *see also id.* *5, 10-11, the Original Agreement's pre-amendment no-action clause here allows Plaintiffs' individual claims.[10] Defendants' other authorities, which simply enforced valid no-action clauses, *Emmet & Co.*, 37 Misc. 3d at 858-61; *Feldbaum*, 1992 WL 119095, at *7-8; *RBC Capital Mkts., LLC v. Educ. Loan Tr. IV*, 2011 WL 6152282, at *5-7 (Del. Ch. Dec. 6, 2011), do not contradict that the Amended Agreement's no-action clauses are invalid and that the Original Agreement's no-action clause permits Plaintiffs' claims.

---

[10] Defendants do not seriously contend that the narrow "no action" clause in the Original Agreement would require Plaintiffs to assert their claims only through the Agent. TriMark half-heartedly argues the point in a footnote, TriMark MTD 10 n.4, but Plaintiffs do not seek to "realize upon any of the Collateral," Original Agreement at 170, which would require the "[c]onversion of noncash assets into cash assets," *Realization*, Black's Law Dictionary (10th ed. 2014). Nor do Plaintiffs seek to "enforce any Guarantee of the Secured Obligations." *See* Original Agreement at 170; *see also id.* at 43 ███████████. Rather, they sue primary obligors for breaches of contract. The permissive phrase in the original no-action clause on which Defendants' rely—"it being understood and agreed that all powers, rights and remedies under the Loan Documents *may* be exercised solely by the Administrative Agent," *id.* at 170 (emphasis added); *see* TriMark MTD 10 n.4—does not limit Lenders' rights; it merely recognizes the Agent's authority to act alone and sue on behalf of one or more Lenders in its discretion. *See, e.g.*, *Matlick v. AmTrust Fin. Servs., Inc.*, 2020 WL 1294669, at *8 (Sup. Ct. N.Y. Cty. Mar. 16, 2020) ("It is well-settled that 'may' (as opposed to 'shall' or even 'will') is a 'permissive term' that does not create an obligation." (citing *Novelty Crystal Corp. v. PSA Inst. Partners, L.P.*, 49 A.D.3d 113, 115 (2d Dep't 2008))).

19

## II.      PLAINTIFFS PLEAD VIABLE DECLARATORY JUDGMENT CLAIMS

Plaintiffs have more than adequately pleaded that they are entitled to a judgment declaring that the Amended Agreement is void because it was purportedly adopted without the approvals and consents required by Section 9.02(b) of the Original Agreement.

### A.      The Amended Agreement Lacked Approval by Required Lenders

The Amended Agreement is invalid in full because it lacked the approval of the "Required Lenders" as required by the unambiguous terms of Section 9.02(b) of the Original Agreement. Defendant Lenders were not, and could not be, "Required Lenders" for purposes of implementing the Scheme through Section 9.02(b). The Original Agreement defines "Required Lenders" as:

> Lenders having or holding more than 50.0% of the outstanding Term Loans and unused Commitments at such time; *provided that … the total outstanding Term Loans subject to Section 9.04(g)* and unused Delayed Draw Commitments of the Borrower or any Affiliate thereof (other than any Affiliated Debt Fund) … *be excluded for purposes of making a determination of Required Lenders*.

Original Agreement at 66 (emphases added); Compl. ¶ 75. This definition thus excludes, among other things, Term Loans held by Lenders whose interests are antagonistic to the First Lien Lender group as a whole because they are being assigned to the Borrower, the Equity Sponsors, or certain Affiliates of those entities as permitted by Section 9.04(g). When they purportedly consented to the Amended Agreement, Defendant Lenders were not Required Lenders, as they had already agreed and committed to assign their loans to TriMark through Section 9.04(g). Compl. ¶ 75. In fact, the Amended Agreement references these pre-existing commitments several times because the amendments were being made by Defendant Lenders in part as consideration to TriMark for the lucrative debt exchange under Section 9.04(g) and favored Defendant Lenders. *See, e.g.,*

████████ ; *id.,* Recitals § 10(a) (Amended Agreements takes effect "immediately prior to"

20

Case 22-50372-CTG    Doc 55-1    Filed 06/24/22    Page 37 of 77

Defendants' "Open Market Purchase Agreements"); *id.* § 9.04(g) (referencing "open market purchases … pursuant to … the Second Amendment Effective Date Open Market Purchase Agreements"). Because no other First Lien Lenders (*i.e.*, those whose Term Loans were not "subject to Section 9.04(g)) consented to it, the Amended Agreement thus lacked Required Lenders' approval and is void.

Defendants argue that the "Required Lenders" definition does not exclude their loans because the exclusionary phrase "Term Loans subject to Section 9.04(g)" purportedly is limited by the later phrase "of the Borrower or any Affiliate thereof (other than any Affiliated Debt Fund)." *TriMark MTD* 12. This ignores basic grammar and rules of contract construction. Under the "'rule of the last antecedent,' … a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). The phrase "of the Borrower" thus modifies only the phrase it immediately follows ("unused Delayed Draw Commitments") not the earlier phrase ("Term Loans subject to Section 9.04(g)"). Had the parties intended "of the Borrower" to modify all prior phrases, they would have preceded it with a comma. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013) ("When there is no comma, … the subsequent modifier is ordinarily understood to apply only to its last antecedent. When a comma is included, … the modifier is generally understood to apply to the entire series.").[11] In any event, there can be no "Term Loans ... of the Borrower" under the

---

[11] The Second Circuit illustrated the point: "For example, the statement, 'This basketball team has a seven-foot center, a huge power forward, and two large guards, who do spectacular dunks,' differs from the statement, 'This basketball team has a seven-foot center, a huge power forward, and two large guards who do spectacular dunks.' The first statement conveys that all four players do spectacular dunks. The latter statement conveys that only the guards do so." *Am. Int'l Grp.*, 712 F.3d at 782.

21

Original Agreement, because any Loans assigned to TriMark under Section 9.04(g) are immediately retired and cease to exist. *See* Original Agreement § 9.04(g)(7).

Defendants argue next that the "subject to Section 9.04(g)" exclusion applies only "*upon assignment*" of Term Loans pursuant to that Section, "and not a moment before." TriMark MTD 13. This ignores the contract's plain language. In common usage, "subject to" means likely or prone to be affected by, or "exposed; liable; prone; or disposed." *Auer v. Robbins,* 519 U.S. 452, 460-61 (1997) (brackets omitted) (broad interpretation of "subject to" was reasonable even when it applied to indefinite circumstances). Defendant Lenders' Term Loans became "subject to Section 9.04(g)" when Defendant Lenders committed to assign them to TriMark purportedly through an open market purchase—a commitment that was integral to the Scheme and existed when Defendant Lenders voted on the Amended Agreement. Because the amendments were part of the very consideration Defendant Lenders provided to TriMark for the related debt exchange, their Term Loans were plainly "subject to Section 9.04(g)" when the Amended Agreement was executed.[12]

Defendants' contrary interpretation cannot be unambiguously correct because it makes no sense. They insist that a Loan cannot be "subject to Section 9.04(g)" until the moment it is assigned in an open market purchase, TriMark MTD 13, yet acknowledge that, at the very moment a Loan is assigned to TriMark, Section 9.04(g) provides that it shall be "retired and immediately canceled," *id.* at 5, 12 (quoting Original Agreement § 9.04(g)(7)). And while a Loan assigned under Section 9.04(g) to the Equity Sponsors or certain of their affiliates is not automatically canceled, Section 9.04(g)(2) independently prohibits those entities from voting to amend the contract as

---

[12] The implication of Defendants' argument is that TriMark secured draconian amendments to the Original Agreement without any corresponding obligation by other Defendants to complete the Scheme. This is nonsense. Even if it were true, TriMark, which has a duty to its shareholders, would have been required to look to the open market for even better terms than it was negotiating with Defendant Lenders once they gifted it a new agreement stripped of all critical lender rights.

22

Required Lenders. Original Agreement § 9.04(g)(2). Defendants would thus exclude from voting as Required Lenders only TriMark (which already cannot hold Loans) and the Equity Sponsors and their affiliates (which already cannot vote on amendments). This reading is ridiculous, and it would render the "subject to Section 9.04(g)" exclusion superfluous, which "offends a basic tenet of contract construction." *E. 41st St. Assocs. v. 18 E. 42nd St., L.P.*, 248 A.D.2d 112, 114 (1st Dep't 1998).

Defendants' interpretation also conflicts with the clear intention of the parties to the Original Agreement to preclude any Lenders aligned with TriMark from voting to amend that contract. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162-63 (1990) (reading contract "as a whole" to determine meaning of single provision). After permitting the assignment of Loans to TriMark's Equity Sponsors under certain circumstances, Section 9.04(g) precludes from voting to amend the agreement both Equity Sponsors, Original Agreement § 9.04(g)(2), ███████████

██████████████████████████████████████████

███, which include almost every entity "directly or indirectly Control[led]" by Centerbridge or Blackstone, *id.* at 4 ("Affiliate" definition); *see also id.* at 5 ████████████████. The only entities related to the Equity Sponsors that Section 9.04(g)(2) does not prohibit from voting are those that "exercise[] independent discretion from the private equity business of the [Equity] Sponsors." *Id.* at 5 ("Affiliated Debt Fund" definition); *see also id.* at 56 ████████████

███████. These provisions reflect the parties' intention to permit only Lenders that are financially independent of TriMark to vote to amend the Original Agreement and undermine Defendants' contrary position that Defendant Lenders could act as Required Lenders despite having agreed with TriMark to execute the Scheme. *See W.W.W. Assocs.*, 77 N.Y.2d at 163 ("face of the contract reveal[ed] 'logical reason'" for provision); *cf. Metro. Life Ins. Co. v. Noble Lowndes Int'l,*

*Inc.*, 84 N.Y.2d 430, 436-37 (1994) (rejecting interpretation of contract that would undermine the parties' intent expressed clearly in other provisions of the contract); *ERC 16W Ltd.*, 95 A.D.3d at 503 (rejecting interpretation of contract that would "give one party an unfair and unreasonable advantage over the other, or … place one party at the mercy of the other").[13]

### B.    The Uptiering Scheme Lacked Plaintiffs' Consents and Infringed Certain Sacred Rights

Setting aside that Defendant Lenders were not Required Lenders, the Amended Agreement is void also because Plaintiffs did not consent to it. Section 9.02(b)(i) of the Original Agreement provides that the contract may be "waived, amended or modified" only (1) "pursuant to an agreement or agreements in writing," "<u>provided</u> that no such agreement shall" (2) implicate certain sacred rights (3) "without the written consent of each Lender directly and adversely affected thereby." The Scheme violated this critical provision.

#### 1.    The Scheme Constituted an "Agreement" or Set of "Agreements" Under Section 9.02(b)

The fourteen documents Defendants executed on September 14, 2020 to facilitate the Scheme constitute a single, integrated "agreement" under Section 9.02(b).

---

[13] Defendants' cited cases do not help them, TriMark MTD 14-15, as none examined whether lenders that committed to assign their loans to the borrower were precluded from voting to amend the credit agreement under a provision like the Required Lenders definition at issue here. *See MeehanCombs Glob. Credit Opps. Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 516-17 (S.D.N.Y. 2015) (court rejected argument based on statutory provision that excluded votes of persons owned or controlled by issuer); *Black Diamond Commercial Fin., L.L.C. v. Murray Energy Corp. (In re Murray Energy Holdings Co.)*, 616 B.R. 84, 98, 101-03 (Bankr. S.D. Ohio 2020) (court rejected argument not based on an exclusion of loans "subject to" an open market purchase provision but rather on a separate provision that, by its unambiguous terms, canceled loans only after assignment); *Katz v. Oak Indus.*, 508 A.2d 873, 881-82 (Del. Ch. 1986) (defendant made exchange offer to all bondholders, conditioned on their consent to amend indenture, and thus did not violate indenture's requirement that stated percentage of bondholders consent to such amendments).

24

Because Section 9.02(b) does not define "agreement," that term is given its "plain and ordinary meaning." *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 57 (1st Dep't 2015). "The term 'agreement,' although frequently used as synonymous with the word 'contract,' is really an expression of greater breadth of meaning and less technicality. ... In its colloquial sense, the term 'agreement' would include any arrangement between two or more persons intended to affect their relations ...." *Agreement*, Black's Law Dictionary (10th ed. 2014); *see also Lend Lease*, 136 A.D.3d at 57 ("[I]t is common practice ... to refer to the dictionary to determine the plain and ordinary meaning of words to a contract" for words the contract does "not define[.]"); *DKR Soundshore*, 80 A.D.3d at 450 (denying motion to dismiss based on dictionary definition of undefined phrase). Moreover, "it is a well-established rule of contract law that all contemporaneous instruments between the same parties relating to the same subject matter are to be read together and interpreted as forming part of one and the same transaction." *Davimos v. Halle*, 60 A.D.3d 576, 577 (1st Dep't 2009) (alteration omitted) (quoting *TBS Enters., Inc. v. Grobe*, 114 A.D.2d 445, 446 (2d Dep't 1985)).

The Uptiering Scheme is a single "agreement" for purposes of Section 9.02(b). TriMark issued new Super Senior Debt and exchanged some of it for Defendant Lenders' existing First Lien Debt pursuant to fourteen coordinated contracts, "executed on the same day, by the same parties," regarding "a common subject matter." *People's United Bank v. Whitford Dev., Inc.*, 2013 WL 2169346, at *2 (Sup. Ct. N.Y. Cty. May 13, 2013). The contracts cross-reference one another, and none would have "ma[de] any sense without the promises expressed in the other[s]." *Genger v. Genger*, 76 F. Supp. 3d 488, 497 (S.D.N.Y. 2015). No rational lender would have executed the Amended Agreement, which stripped all meaningful bargained-for protections, without first obtaining an enforceable promise from TriMark also to execute the components of the Scheme that

allowed Defendant Lenders to exit the First Lien Lenders group and become Super Senior Lenders, thereby avoiding the draconian amendments they left behind to govern the remaining First Lien Lenders. The contracts that facilitated the Scheme thus constitute a single agreement. *See Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) (guaranty "must be read in the context" of a simultaneously executed loan agreement); *People's United Bank*, 2013 WL 2169346, at *2 (two mortgages with the same subject matter executed the same day by the same parties "may be read together as a single unified, interdependent document"); *Genger*, 76 F. Supp. 3d at 497 (promissory note and indemnity, "designed to effectuate the same purpose," that cross-reference each other and make no sense without each other, must be "read together," even though executed on different dates by different parties (quoting *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1988))).

Defendants do not seriously dispute that these contracts are integrated. The closest they come is to cite in passing *Continental AFA Dispensing Co. v. AFA Polytek, B.V. (In re Indesco International, Inc.)*, 451 B.R. 274 (Bankr. S.D.N.Y. 2011) (cited at TriMark MTD 16-17), where two contracts were not integrated because they were executed years apart, they were supported by independent consideration, and integrating them would treat unilateral cross-default provisions as reciprocal. *Id.* at 288-89. That case is inapposite here, where the agreements were executed on the same day, interlock, refer to each other—saying that TriMark and Defendant Lenders "have agreed" to amend the Original Agreement—and make no sense without the others.[14]

---

[14] In the alternative, the term "agreement or agreements" under Section 9.02(b) is ambiguous, and its meaning cannot be resolved at the pleading stage. *See Bitsight Techs., Inc. v. SecurityScorecard, Inc.*, 143 A.D.3d 619, 620 (1st Dep't 2016) (declining to dismiss contract claim because definition of term "Confidential Information" was ambiguous); *see also Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972) ("Whether the parties intended to treat both agreements as mutually dependent contracts ... is a question of fact ....").

### 2. The Scheme Included the Amended Agreement and Violated Plaintiffs' Sacred Rights

Defendants' agreement—the Scheme—implicated at least two of Plaintiffs' sacred rights in Section 9.02(b)(i), each of which required Plaintiffs' consent to the entire agreement. First, the Scheme violated Plaintiffs' sacred priority protections by inserting the Super Senior Lenders above the First Lien Lenders in the order of distribution of Collateral without obtaining the requisite consents. Second, the Scheme violated Plaintiffs' sacred protection against the reduction in the principal amount of any Loan without their consent.

### a. The Scheme Gave Defendant Lenders Priority over Plaintiffs in Receiving the Proceeds of Collateral Without Plaintiffs' Consent

The Scheme triggered the consent requirement in Section 9.02(b)(i)(D) because it "amend[ed] or modif[ied] ... Section 4.02 of the Collateral Agreement in a manner that … by its terms alter[ed] the order of application of proceeds" of Collateral.[15] By amending or modifying that section to grant Defendant Lenders priority over Plaintiffs in access to Collateral proceeds, the Scheme breached a core sacred right of the Original Agreement, and the Amended Agreement is thus void.

Defendants violated Section 9.02(b)(i)(D) by amending or modifying the definition of 

,[16] a contract that purportedly applies Collateral proceeds to repay Defendant Lenders'

---

[15] An "amend[ment]" is "[a] formal and [usually] minor revision or addition proposed or made to ... [an] instrument." *Amendment*, Black's Law Dictionary (10th ed. 2014). A "modifi[cation]" similarly requires only a minor change. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("[E]very dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion.").

[16] Amended Agreement at 52.

27

Super Senior Debt before repaying Plaintiffs' First Lien Debt.[17] ███████████████████████

███████████████████████████████, *see* Collateral Agreement § 1.01(a);

Compl. ¶ 73, it "amend[ed]" or "modif[ied]" Section 4.02 of the Collateral Agreement to alter the

application of Collateral proceeds by putting the new Super Senior Lenders ahead of the First Lien

Lenders*, see* Collateral Agreement § 4.02; Amended Agreement at 52; Super-Priority Intercreditor

Agreement §§ 2.1, 2.2, 4.1.[18] No Defendant disputes that amending the Collateral Agreement in

this way, without Plaintiffs' consent, renders the Amended Agreement void.[19]

> ### b.    The Scheme Reduced the Principal Amount of Defendant Lenders' Loans Without Plaintiffs' Consent

Defendants' Scheme also triggered the consent requirement in Section 9.02(b)(i)(B) be-

cause it "reduce[d] the principal amount of any Loan." Specifically, the Scheme reduced the prin-

cipal amount of the First Lien Debt previously held by Defendant Lenders to zero by assigning it

to TriMark, at which point it was automatically canceled. Compl. ¶¶ 7, 77, 87; *see also* Original

Agreement § 9.04(g)(7).

---

[17] Super-Priority Intercreditor Agreement §§ 2.1, 2.2, 4.1.

[18] ████████████████████████████████████████████████

████████████████████. Therefore, even if the Court reads "agreement" in a narrow,
technical sense to mean "contract" (it should not), it was a single agreement that amended or
modified Section 4.02 of the Collateral Agreement in a manner that, by its terms, altered the order
of application of proceeds.

[19] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████.

Defendants assert that Section 9.02(b)(i)(B) is not implicated because the Scheme reduced the principal amount of Defendant Lenders' First Lien Loans, not Plaintiffs' Loans. TriMark MTD 17-18. Defendants apparently wish that the Original Agreement provided that the consent of the affected Lenders is required only if the challenged "agreement" had the effect of reducing the principal amount of the affected Lenders' Loans. But that is not what the contract says. Section 9.02(b)(i)(B) expressly applies to "*any* Loan," Original Agreement § 9.02(b)(i)(B) (emphasis added), which the Agreement defines ██████████████████████████████████████ ████████████████████████ *id.* at 53. The court may not rewrite the contract to say otherwise. *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (courts may not add terms to a contract); *Camperlino v. Bargabos*, 96 A.D.3d 1582, 1583 (4th Dep't 2012) ("[C]ourts may not by construction … distort the meaning of [the contract terms] used and thereby make a new contract for the parties under the guise of interpreting the writing." (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004))).

### 3. Plaintiffs Were "Directly and Adversely Affected" by the Agreements Effectuating the Scheme

Defendants' Scheme "directly and adversely affected" Plaintiffs, triggering Section 9.02(b)(i)'s consent requirement. Original Agreement § 9.02(b)(i).

For debt transactions, there is a consensus among "courts applying New York law ... that a material, adverse effect may arise when [an act] ... increases the risk of loss" on a loan. *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, 2015 WL 764665, at *15 (S.D.N.Y. Jan. 9, 2015) (collecting cases); *accord Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Capital, Inc.*, 175 A.D.3d 1175, 1177 (1st Dep't 2019). The adverse effect caused by an increase in a loan's risk of loss also directly affects the lender. Although the term "direct" is not defined in the Original Agreement, in determining whether to award punitive damages, courts have

29

interpreted conduct as "directed to the plaintiff" when it "materially and adversely affect[s]" the plaintiff's "interests in the … loans in question." *In re Part 60 Put-Back Litig.*, 169 A.D.3d 217, 226 (1st Dep't 2019), *rev'd on other grounds*, 2020 WL 7497993 (N.Y. Dec. 22, 2020). Likewise, in the tax context, a "tax assessment has a direct adverse effect on [a person's] pecuniary interest" when the person's "property is rendered so much the less valuable to him and worth so much the less in the market" because of the assessment. *Larchmont Pancake House v. Bd. of Assessors*, 33 N.Y.3d 228, 233-34 (2019) (cleaned up).

By those standards, the Scheme "directly and adversely" affected Plaintiffs. It subordinated Plaintiffs' claims to the proceeds of TriMark's Collateral to those of the Super Senior Lenders. Compl. ¶ 73. Consistent with TriMark's claims of financial distress, *see* TriMark MTD 1, 6, this subordination greatly increased the risk of loss on Plaintiffs' First Lien Debt and the secondary trading value of Plaintiffs' loans cratered—effects that Plaintiffs experienced directly and were adverse to their interests. *See* Compl. ¶¶ 7, 56-59, 77, 88.

Defendants argue that Plaintiffs must show that they were directly and adversely affected by specific *amendments* to the Original Agreement, TriMark MTD 15-18, but that is not what the contract requires. Section 9.02(b)(i) allows amendments or modifications only through a written "agreement" or "agreements," and provides that "no such *agreement* shall ... without the written consent of each Lender directly and adversely affected *thereby* ... reduce the principal amount of any Loan" or "waive, amend or modify … Section 4.02 of the Collateral Agreement." Original Agreement § 9.02(b)(i) (emphases added). As a matter of standard usage, "thereby" refers back to "agreement." It is thus the effect of the *agreement* on the Lender that matters, not merely the effect of amendments included in that agreement.

30

Defendants are not helped by citations to cases premised on differently worded contracts. TriMark MTD 15-17. The contract in *Murray Energy* required the consent of each lender "directly and adversely affected" by the "*amendment, modification, termination, or consent*" itself—not by the *agreement* to amend the contract. Selendy Aff. Ex. A § 10.5(b) (emphasis added).[20] The contract in *North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267 (Sup. Ct. N.Y. Cty. June 19, 2020), similarly referred to the effects of "any *waiver, amendment or modification*" itself—not of an agreement to amend the contract. Selendy Aff. Ex. B § 9.02(b)(A) (emphasis added). And *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005), bears no resemblance to this case because the terms of the debt were unmodified there but were upended here. *Id.* at *7. If anything, the narrower protections in those contracts indicates that the drafting parties' decision to include a much broader protection in the Original Agreement was deliberate. *See generally Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").

Defendants cannot avoid a plain reading of Section 9.02 by mischaracterizing it. They assert that Plaintiffs believe "Section 9.02's requirement … applies not only to amendments but to *any purportedly related transaction* that may follow an amendment," and to modifications of "multiple other provisions" of the Original Agreement that are not sacred rights. TriMark MTD 16. Not so. Plaintiffs argue simply that their consent was required because (1) the plain language of Section 9.02 requires consent by any Lender "directly and adversely" affected by an "agreement

---

[20] "Selendy Aff." refers to the Affirmation of Jennifer Selendy in Opposition to Defendants' Motions to Dismiss, dated February 19, 2021.

or agreements" that also implicates the enumerated sacred rights; and (2) the Scheme was an agreement that directly and adversely affected them and also implicated sacred rights. If the Scheme did not directly and adversely affect Plaintiffs, or did not implicate sacred rights, then Plaintiffs' consent would not have been required. Because their consent was required but not obtained, however, the Amended Agreement is void in full.

### C. The Scheme Released the Collateral Securing the First Lien Debt Without Plaintiffs' Consent

Section 9.02(b)(v) of the Original Agreement also prohibits any waivers, amendments, or modifications to the contract that "release all or substantially all the Collateral securing the Liens ... without the written consent of each Lender." In the Scheme, Defendants encumbered the Collateral securing the First Lien Debt with new Super Senior Liens that secured debt of a greater value than the remaining First Lien Debt. Compl. ¶¶ 1, 4, 48-50, 56-57, 62, 88, 96. This reduced Plaintiffs' expected recovery in the event of liquidation to zero, effecting a release of Collateral. *See* Compl. ¶ 58.

Here, as "in many cases, … subordination of a lien is functionally equivalent to a full release." *Silva v. Wells Fargo Bank, N.A.* (*In re GVF Cannery, Inc.*), 202 B.R. 140, 144 (N.D. Cal. 1996). In *Silva*, a farmer (Silva) entered an agreement to sell tomatoes to GVF Cannery. He received a lien on GVF's inventory but signed a subordination agreement that provided for subordination of his lien to the security interest of Wells Fargo. When GVF Cannery entered bankruptcy, Silva initiated an adversary proceeding against Wells Fargo to enforce his lien. He argued that the subordination was an unenforceable release or waiver. Wells Fargo responded that there was no release or waiver because "Silva did not unequivocally relinquish any rights as a creditor by subordinating his producer's lien." *Id.* It echoed Defendants' argument here in contending that "his lienholder priority was merely 'suppressed' until GVF's obligation to Wells Fargo was satisfied

32

and after that it would simply 'spring … back into the vacated first position.'" *Id.* (alteration in original); *see also* TriMark MTD 18 (arguing that Plaintiffs' "claims continue to rank ahead of [TriMark's] unsecured claims," although they are no longer first in line). The bankruptcy court found for Silva and the district court affirmed in relevant part because Wells Fargo's argument (like Defendants' position here) "fail[ed] to acknowledge that Silva did give up a right forever by subordinating his producer's lien—the right to be the first creditor in line." *Silva*, 202 B.R. at 144. The court thus held that "subordination of [Silva's] lien [was] functionally equivalent to a full release." *Id.* The same is true here.

Defendants argue that because the Scheme did not *formally* release the Collateral, Plaintiffs' consent was not required. TriMark MTD 18 (citing *Murray Energy*). But "[a] written contract will be read as a whole ... as to give effect to its general purpose." *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (internal quotation marks omitted). The purpose of Section 9.02(b)(v) is to protect access to the Collateral by requiring unanimous consent to release it. The formalistic distinction urged by Defendants (and erroneously employed by the *Murray Energy* court) would be inconsistent with that purpose, allowing new liens to wipe out existing first-priority liens without unanimous consent. It would expose First Lien Lenders to the principal risk that the provision was designed to mitigate: the possibility of a bankruptcy without access to the Collateral. It would also fundamentally change the risk profile of the Loans: Lenders accepted the risk that a Loan's value might decrease if TriMark had difficulty repaying it or the Collateral lost value; they did *not* accept the risk of being stripped of all meaningful rights to access the Collateral without their consent. The fact that Plaintiffs' debt still ranks ahead of unsecured creditors means nothing when their expected recovery in a liquidation has been reduced to zero. *See* Compl. ¶ 58; *see also Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (in contract interpretation, "[f]orm should not prevail

over substance[,] and a sensible meaning of words should be sought" (quoting *William C. Atwater & Co v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927))).

The remainder of the Original Agreement further emphasizes the importance the parties attached to preventing the functional release of the Collateral and reveals the broad scope of Section 9.02(b)(v). *See W.W.W. Assocs.*, 77 N.Y.2d at 163 (identifying purpose of contractual provision by reference to other provisions); *Metro. Life Ins.*, 84 N.Y.2d at 436-37 (same). For example, the Original Agreement narrowly restricts the incurrence of additional debt or liens. Original Agreement §§ 6.01, 6.02; *see* Compl. ¶ 62. ███████████████████████████

███████████████████████████. *See* Original Agreement § 6.04 ██

███████████████████████; *id.* at 48 ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████. *Id.* § 6.05. ██████████

████████████████████████████████████████████████

███████████████████████████. *Id.* § 6.05(n) (emphasis added). The contract prohibits incremental debt facilities from ranking senior to the First Lien Debt. *Id.* § 2.20(b). And the contract sets a cap on such incremental facilities, which cap further limits TriMark's ability to extinguish the realistic possibility of the Lenders' accessing Collateral proceeds by incurring excessive obligations. *Id.* § 2.20(a); *see id.* at 44 ████████████████████.

The parties emphatically sought to avoid a situation in which TriMark could drown their Debt beneath further liabilities that would prevent TriMark from repaying the First Lien Debt and the Lenders from realizing upon the Collateral proceeds. Parties who took such extensive measures to ensure repayment and access to Collateral proceeds could not reasonably be understood to have intended a formalistic interpretation of "release" of Collateral that would allow clever drafting to

34

undermine their protections. *See Greenwich Capital*, 74 A.D.3d at 415 (rejecting "formalistic lit-eralism" that would "produce a result … contrary to the reasonable expectations of the parties"). Instead, Section 9.02(b)(v) functioned as a backstop to *prevent* TriMark from artfully evading the protections against the First Lien Lenders' loss of access to the Collateral that were enshrined elsewhere in the contract or amending the contract to eviscerate any such protections. Functional releases of Collateral, like the Scheme, were precisely what the provision was designed to pre-clude.[21]

## III.    PLAINTIFFS PLEAD VIABLE BREACH OF CONTRACT CLAIMS

Defendants do not, and cannot, seriously contest Plaintiffs' allegations that the Uptiering Scheme breached several provisions of the Original Agreement. Nor do they dispute that the Amended Agreement's extensive changes are a tacit admission that the Scheme could not have been lawfully achieved without those changes. A denial of Defendants' motions to dismiss the declaratory judgment claims should thus lead swiftly to a denial of their motions to dismiss the contract claims.

---

[21] Defendants' cited cases are off point. In *In re Tele/Resources, Inc.*, 21 B.R. 358 (Bankr. S.D.N.Y. 1982), *rev'd sub nom. Citibank, N.A. v. Tele/Res., Inc.*, 724 F.2d 266 (2d Cir. 1983), the court held that, under the Bankruptcy Code, a consensual subordination of a perfected security interest was not a release for purposes of the trustee's avoidance power. *Id.* at 362-64. Unlike here, no contractual right was at issue. In *Cronkite v. FDIC*, 1993 WL 372750 (1st Cir. 1993), an unpublished opinion with no precedential value, *see* 1st Cir. Local Rule 36.0(c), the court concluded for purely pragmatic reasons that a proposed "subordination" of a lien on one property would not guarantee that a bank received the fair market value of the "release" by sale of a different property. 1993 WL 372750, at *2. And the bankruptcy court's opinion in *Silva v. GVF Cannery, Inc. (In re GVF Cannery, Inc.)*, 188 B.R. 651 (Bankr. N.D. Cal. 1995), *aff'd in part, rev'd in part*, 202 B.R. 140, is irrelevant because, as discussed above, the district court's subsequent opinion in that case confirms that subordination may be functionally equivalent to a full release.

35

Defendants fail even to acknowledge—much less move to dismiss—Plaintiffs' claims based on breaches of Sections 2.11(a)(ii), (e)(i), and (f)(i), 2.18, 2.20(b), 2.25(a)(i), 6.01, and 6.02 of the Original Agreement. Compl. ¶¶ 96-98, 107.[22]

The most Defendants can muster is an argument that the Original Agreement permitted the Scheme because it supposedly involved open market purchases under Section 9.04(g). TriMark MTD 19-20. Nothing in Section 9.04(g) permitted Defendants to breach the provisions of Articles II and VI cited above, and in any event, their open market purchase argument is incorrect.[23] The term "open market purchase" in Section 9.04(g) is undefined and so is given its plain and ordinary meaning. See Lend Lease, 136 A.D.3d at 57. The plain reading is, as alleged, "a transaction on the open market, at arm's-length terms at the prevailing market price, which should approximate fair market value." Compl. ¶ 74; see also Eastman Kodak Co. v. Altek Corp., 936 F. Supp. 2d 342, 352 (S.D.N.Y. 2013) ("An open market refers to 'an unrestricted market in which any buyer or seller may trade freely, and where *prices are determined by supply and demand*.'" (emphasis added) (quoting Oxford English Dictionary (3d ed. 2004))). Plaintiffs clearly allege that the transfers of First Lien Debt at issue were not "at arm's length" or "at the prevailing market price," see Compl.

---

[22] Discovery may reveal that TriMark, Defendant Lenders, and Alter Domus also failed to satisfy other components of the Original Agreement when they engaged in the Uptiering Scheme. ███
███████████████████████████████████████████████████████
███████████████████████████████.

[23] Justice Masley's preliminary injunction decision in *Serta Simmons*, 2020 WL 3411267 (cited at TriMark MTD 19), is not to the contrary. The contract in *Serta* expressly *excluded* from the sacred rights consent requirement amendments made "in connection with any transaction permitted under Section[] … 9.05(g)," which permitted the borrower to engage in open market transactions. *Serta Simmons*, 2020 WL 3411267, at *2; *see also id.* at *4. Section 9.02(b) in the Original Agreement here lacks any similar exclusion. Justice Masley also recently acknowledged that her preliminary injunction decision did not require her to "decide[] a motion to dismiss," Selendy Aff. Ex. D at 19, and that at the time of her preliminary injunction ruling she "ha[d]n't seen the deal documents yet," *id.* at 26.

36

¶ 65, which is more than sufficient to state a claim that Defendants violated this provision, *see, e.g.*, *JCMC Flatiron, LLC v. Princeton Holdings LLC*, 2014 WL 4937854, at *5 (Sup. Ct. N.Y. Cty. Sept. 28, 2014)* (motion to dismiss denied because contract language was "reasonably susceptible of" plaintiff's interpretation).

## IV.    PLAINTIFFS PLEAD VIABLE GOOD FAITH AND FAIR DEALING CLAIMS

Defendants provide no reason to dismiss Plaintiffs' good faith and fair dealing claims. "[A] covenant of good faith and fair dealing" is "[i]mplicit in all contracts" and implies as contractual terms "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)*. This includes covenants (1) not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *id.* (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)*), (2) "not to act arbitrarily or irrationally in exercising … discretion," *id.*, and (3) not to engage in a selective debt exchange when coupled, as here, with amendments executed by the exiting lenders, *see* Selendy Aff. Ex. C at 21.

Plaintiffs allege that Defendants deprived them of the fruits of the Original Agreement by "gutting the value of [Plaintiffs'] loans," "destroy[ing] Plaintiffs' security" through uptiering, and exercising their purported discretion to amend the Original Agreement to eliminate substantially all creditor protections, including burdening Plaintiffs' right to bring suit. Compl. ¶¶ 68-74, 90, 115. Plaintiffs also allege that Defendants negotiated in secret to eviscerate "the Original Agreement to TriMark and Defendant Lenders' benefit," Compl. ¶ 116, and to issue new, Super Senior Debt on an exclusive basis while simultaneously denying to Plaintiffs and others that TriMark "had any near-term cash issue, required additional liquidity, or had spoken to outside financing sources," Compl. ¶ 46.

37

Defendants mischaracterize Plaintiffs' allegations as depending on the "secrecy of negotiations," arguing the implied covenant cannot create a "new term" requiring transparency. TriMark MTD 21-22.[24] In fact, Plaintiffs seek to enforce a term implied in the Original Agreement from the outset: that Defendants could not destroy or injure Plaintiffs' rights "to receive the fruits of the contract," namely its pro rata, covenant, litigation, and priority lien protections. *Dalton*, 87 N.Y.2d at 389 (quoting *Kirke*, 263 N.Y. at 87).[25] Defendants breached that implied term by agreeing to turn Plaintiffs' First Lien Debt into junior debt and amend the Original Agreement to Plaintiffs' detriment. Compl. ¶¶ 90, 115-16.

Justice Ramos commented that the same conduct breached the implied covenant in *Octagon Credit Investors, LLC v. NYDJ Apparel LLC*, Index No. 656677/2017 (Sup. Ct. N.Y. Cty. 2017). In that case, lenders asserted that a borrower and certain other, favored lenders breached the implied covenant by amending their governing credit agreement "to elevate the priority of the [favored lenders' loans] … over [the plaintiffs'] term loans." Selendy Aff. Ex. C at 7-8. Justice Ramos explained that "the reasonable commercial expectations of … lenders" are undermined, and the implied covenant breached, where "some of the lenders get[] together and say[] look, if we don't tell the other guys what we're doing, we can cut them out of the picture." *Id.* at 21. He

---

[24] For this reason, Defendants' Second Department case, *Manti's Transp., Inc. v. C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (2d Dep't 2009), is irrelevant.

[25] Defendants' cited cases on this point are inapposite. TriMark MTD 21-22. In one, there was no implied covenant claim because there was no contract. *King Penguin Opp. Fund III, LLC v. Spectrum Grp. Mgmt. LLC*, 187 A.D.3d 688, 690-91 (1st Dep't 2020) (also finding allegations speculative). In the other, the defendant did not breach the implied covenant by denying the plaintiff access to property to show prospective lenders where "it is common for purchasers of property to obtain financing without the lender visiting the property," *D & L Holdings, LLC v. RCG Goldman Co., LLC*, 287 A.D.2d 65, 73 (1st Dep't 2001), while transactions like the Scheme are *not* common but rather an affront to standard practice in the leveraged loan market, Compl. ¶¶ 1, 72.

38

was "really disturbed" that "a group of lenders, without notifying another group of lenders, on their own said look, we can do something for ourselves at the expense of our co-lenders," and he denied the defendants' motions to dismiss as a result. *Id.* at 26.[26]

Defendants next argue that the implied covenant cannot restrict "contractually permitted conduct" like their purported ability to amend the Original Agreement, TriMark MTD 22-23, but even an "unfettered contract right … may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement," *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (1st Dep't 2003). Even if Defendants could otherwise amend the Original Agreement, they could not do so in a way that destroyed Plaintiffs' security and arbitrarily burdened their ability to sue. *Darabont v. AMC Net. Entm't LLC*, 2020 WL 1852644, at *10 (Sup. Ct. N.Y. Cty. Apr. 10, 2020) (Cohen, J.S.C.) (even if contract gave defendant discretion to craft a definition of gross receipts without negotiation, it could not do so "arbitrarily, irrationally, or in bad faith so as to undermine Plaintiffs' right to benefit under the [contract]"); *see also Richbell*, 309 A.D.2d at 302 (implied covenant claim did not "negate [a party's] explicit rights under a

---

[26] Courts that find priming transactions lawful do so *only* if the borrower made the refinancing offer to *all* bondholders on equal terms. *Compare Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.*, 2006 WL 358270, at *2, 3 (N.D. Ga. Feb. 15, 2006) (concluding under New York law that defendants had breached the implied covenant through a selective exchange offer with incentive because "the principles of good faith and fair dealing are designed to avoid" debtors "manipulating the [exchange offer] process" by giving "preferential treatment" to a subset of bondholders), *with Katz*, 508 A.2d at 881 (cited at TriMark MTD 14) (amendments by exiting bondholders coupled with pro rata exchange offer did not breach implied covenant because "the incentive to consent is equally available to all members of each class of bondholders" and was "offered on the same terms to each holder of an affected security"); *Kass v. E. Air Lines, Inc.*, 1986 WL 13008, at *5 (Del. Ch. Nov. 14, 1986) ("had [the defendant] not made its offer to all bondholders on the same terms," the defendant would likely have breached the covenant of good faith and fair dealing). Here, Defendants neither made pro rata offers nor respected Plaintiffs' rights to the Collateral.

contract, but rather, [sought] imposition of an entirely proper duty to eschew … bad faith targeted malevolence in the guise of business dealings").

Defendants also argue, oddly, that Plaintiffs' allegations that the Scheme "'destroyed' their security interests are insufficient to state a claim" because Plaintiffs purportedly "concede" "no such outcome actually occurred" by alleging that "Defendants '*effectively* turn[ed] their First Lien Debt into junior debt.'" TriMark MTD 23 (alterations in original). But as Defendants concede in their next sentence, all Plaintiffs must allege is that Defendants did something that "will *have the effect* of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (emphasis added) (quoting *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008))*.* Plaintiffs have alleged such an effect has occurred and will occur, detailing how Defendants "torpedo[ed] the value of [Plaintiffs'] loans and substantially increas[ed] their risk of loss." Compl. ¶ 7; *see also* Compl. ¶¶ 56-59.

To the extent Defendants contend that they did not breach the implied covenant if they technically complied with the Original Agreement's express terms, they are wrong. TriMark MTD 23. That argument would render the implied covenant irrelevant—only *express* terms would matter—and would be contrary to law. *See, e.g.*, *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 228-29 (2011); *Richbell*, 309 A.D.2d at 302; *Darabont*, 2020 WL 1852644, at *10; *accord Ahmed Elkoulily, M.D., P.C. v. N.Y. State Catholic Healthplan, Inc.*, 153 A.D.3d 768, 770 (2d Dep't 2017) ("Technically complying with the terms of a contract while depriving the plaintiff of the benefit of the bargain may constitute a breach of the [implied] covenant …."). [27]

---

[27] None of Defendants' cited cases suggests that technical compliance with a contract's express terms can defeat an implied covenant claim. TriMark MTD 23 (citing *United Natural Foods, Inc. v. Goldman Sachs Grp., Inc.*, 2020 WL 2135803, at *4, 10, 13 (Sup. Ct. N.Y. Cty. May 5, 2020) (plaintiff not denied fruits by defendants exercising "Flex Provisions" concerning loan syndication because contract expressly authorized defendants "to exercise the Flex Provisions so long as they reasonably determined that such changes were necessary for a Successful Syndication" and plaintiff had not adequately alleged defendants did not reasonably so determine); *Curacao Oil N.V.*

Finally, Defendants incorrectly assert that Plaintiffs' implied covenant claim duplicates their breach of contract claims. TriMark MTD 21 (citing Second and Third Causes of Action).[28] Plaintiffs' implied covenant claim arises from different facts. The breach of contract claims arise under the Original Agreement and do not mention amendments, purported barriers to suit, secret negotiations, commercially reasonably conduct, Defendants' motives, or the effect of Defendants' conduct to destroy Plaintiffs' security and gut of the value of Plaintiffs' loans—all of which are core facts underlying Plaintiffs' implied covenant claim. *Compare* Compl. ¶¶ 92-112 (Breach of Contract claims), *with* Compl. ¶¶ 113-19 (Good Faith and Fair Dealing Claim).[29] That the implied covenant and breach of contract claims may share *some* facts does not make the claims duplicates.

Even if the claims did arise from the same operative facts (which is not the case), dismissal would be inappropriate unless the Court concludes the breach of contract claims are viable. *Sims v. First Consumers Nat'l Bank*, 303 A.D.2d 288, 290 (1st Dep't 2003) ("Since the issues in the instant case are still undeveloped in this pre-answer stage, both claims at this stage should stand."); *accord Demetre v. HMS Holdings Corp.*, 127 A.D.3d 493, 493-94 (1st Dep't 2015) (dismissal of

---

*v. Trafigura Pte. Ltd.*, 2020 WL 3494685 (Sup. Ct. N.Y. Cty. Feb. 3, 2020) (no implied covenant claim asserted)).

[28] Defendants also assert in passing that Plaintiffs' implied covenant claim duplicates "[Plaintiffs'] claims for declaratory relief," but fail to identify a single allegation in the two claims that is duplicative. TriMark MTD 21. In any event, Defendants implicitly concede that claims are not duplicative if they seek different relief, TriMark MTD 21, and Plaintiffs' declaratory judgment claim seeks a declaration that the Amended Agreement is not enforceable and void, but no damages, Compl. ¶ 91, while their implied covenant claim seeks damages and avoidance of the Super Senior Debt and Liens, Compl. ¶¶ 118-19.

[29] Defendants do not assert that Plaintiffs' implied covenant allegations in the First Cause of Action are duplicative of the breach of contract claims. *See* TriMark MTD 22 n.10 (addressing argument only to implied covenant claim in the First Cause of Action).

41

implied covenant claim as duplicative was "premature" because the contract claim was predicated on an ambiguous provision and, thus, "the issues [were] still undeveloped").[30]

## V.    PLAINTIFFS PLEAD VIABLE TORTIOUS INTERFERENCE CLAIMS AGAINST THE EQUITY SPONSORS

Defendants' arguments to dismiss Plaintiffs' tortious interference claims likewise are inadequate. "The elements of … tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of a third-party's breach of that contract without justification, and (4) damages." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 1102, 1105 (2d Dep't 2017); *see NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 620-21 (1996). Plaintiffs plead those elements against the Equity Sponsors here.

### A.    The Equity Sponsors Intentionally Procured TriMark's Breaches of Contract

Centerbridge and Blackstone manage and advise private funds that own Trimark. *See* Compl. ¶¶ 21, 22. Contrary to the Equity Sponsors' assertions, *see* Centerbridge MTD 9-12; Blackstone MTD 8-14, Plaintiffs adequately plead "intentional procurement" of Trimark's breach of the Original Agreement, which requirement is satisfied if the defendant had "knowledge of a specific contract and substantial certainty (*cf. Restatement (Second) of Torts* § 766 cmt. j) that [its] conduct would interfere with that contract," *In re LIBOR-Based Fin. Instruments Antitr. Litig.*, 2015 WL

---

[30] Defendants' cited authorities are factually inapposite and, at best, stand for the this principle, *Churchill Real Estate Holdings LLC v. CBCS Washington St. LP*, 171 A.D.3d 426, 427 (1st Dep't 2019) (concluding that the plaintiff had shown breach of contract); *Mill Fin., LLC v. Gillett*, 122 A.D.3d 98, 104 (1st Dep't 2014) (plaintiff stated a breach of contract), or for the basic proposition, irrelevant to this case, that there cannot be an implied covenant if there is no binding contract, *StarVest Partners II, L.P. v. Emportal, Inc.*, 101 A.D.3d 610, 613 (1st Dep't 2012).

42

6243526, at *81 (S.D.N.Y. Oct. 20, 2015); *see Macy's Inc. v. J.C. Penney Corp.*, 45 Misc. 3d 274, 306 (Sup. Ct. N.Y. Cty. 2014).

Plaintiffs allege that the Equity Sponsors had specific knowledge of the Original Agreement: Centerbridge and Blackstone funds own substantial controlling interests in TriMark, Compl. ¶ 40; they "cut a deal" with Defendant Lenders that led to the Uptiering Scheme, Compl. ¶ 46; and Centerbridge "abused its controlling stake in TriMark" by "push[ing] a beggar-thy-neighbor strategy" and coercing Defendant Lenders to participate in the Scheme, Compl. ¶ 53, which enabled Centerbridge to avoid injecting its *own* cash into TriMark to shore up its finances. Blackstone managed TriMark's conduct through its seat on the board of directors of TriMark's operating company, Compl. ¶ 22, and "used its insider power to favor its affiliated Lenders" by "caus[ing] TriMark to enter a deal that enriched [them] and damaged Plaintiffs," Compl. ¶ 52. Plaintiffs also allege that the Equity Sponsors were substantially certain that TriMark's conduct would breach the Original Agreement, based on the rampant changes in the Amended Agreement, which TriMark entered into at the Equity Sponsors' direction. Compl. ¶¶ 62-74. These allegations easily state a claim. *See Wells Fargo Bank, N.A. v. ADF Operating Corp.*, 50 A.D.3d 280, 280-81 (1st Dep't 2008) (plaintiff pleaded tortious interference claim where defendants' conduct as equity owners in contract party led to breach of contract); *Due Pesci Inc. v. Threads for Thought, LLC*, 2012 WL 987605, at *2-4 (Sup. Ct. N.Y. Cty. Feb. 6, 2012) (plaintiff pleaded tortious interference claim where company under common ownership and management with contract party participated in breaching conduct).

The Equity Sponsors' cited cases are not to the contrary. Several involved claims of tortious interference with prospective economic advantage, not with a binding contract, as here. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004); *Algomod Techs. Corp. v. Price*, Index No.

43

110464/2006 (Sup. Ct. N.Y. Cty. Feb. 8, 2007) (filed by Centerbridge at Dkt. 42); *Henneberry v. Sumitomo Corp. of Am.*, 2005 WL 1036260, at *2 (S.D.N.Y. May 3, 2005).[31] Others did not state claims for breach of contract, *Black Car & Livery Ins., Inc. v. H&W Brokerage, Inc.*, 2006 WL 176660, at *6-7 (Sup. Ct. Nassau Cty. Jan. 23, 2006), *aff'd*, 28 A.D.3d 595 (2d Dep't 2006), or did not involve tortious interference claims.[32] In still many others, the plaintiffs could not state convincing allegations of intentional procurement because the defendants did not own or control the breaching parties,[33] while here the Equity Sponsors did control TriMark, Compl. ¶¶ 21-22. And in *Davis v. Scottish Re Group Ltd.*, 2014 WL 7475035, at *12-14 (Sup. Ct. N.Y. Cty. Oct. 14, 2014), and *Gerffert Co. v. Fratelli Bonella, SRL*, 2015 WL 6127078, at *6-7 (Sup. Ct. Nassau Cty. Oct. 7, 2015), the plaintiffs failed to allege any actual connection between the equity owners' actions and the entity's alleged breaches of contract, while here Plaintiffs allege that the Equity Sponsors

---

[31] Centerbridge asserts without explanation that the "reasoning" of these prospective economic advantage cases should apply to tortious interference with contract, Centerbridge MTD 11 n.6, but its own cited authority dictates otherwise, *Carvel*, 3 N.Y.3d at 189-90 ("We have recognized that inducing breach of a binding agreement and interfering with a nonbinding 'economic relation' can both be torts, but that the elements of the two torts are not the same…. Where there has been no breach of an existing contract, but only interference with prospective contract rights, … [a] plaintiff must show more culpable conduct on the part of the defendant." (quoting *NBT*, 87 N.Y.2d at 621)).

[32] *Morris v. N.Y. Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993); *Meshel v. Resorts Int'l of N.Y.*, 160 A.D.2d 211, 213 (1st Dep't 1990); *Aetna Cas. & Surety Co. v. Merchants Mut. Ins. Co.*, 84 A.D.2d 736, 736 (1st Dep't 1981); *Celano v. Citigroup Tech., Inc.*, 2020 WL 4604799, at *2-3 (Sup. Ct. N.Y. Cty. Aug. 11, 2020).

[33] *See Boehner v. Heise*, 734 F. Supp. 2d 389, 404 (S.D.N.Y. 2010); *Kimso Apts., LLC v. Rivera*, 180 A.D.3d 1033, 1035-36 (2d Dep't 2020); *L.Y.E. Diamonds, Ltd. v. Gemological Inst. of Am., Inc.*, 169 A.D.3d 589, 591 (1st Dep't 2019); *57th St. Arts, LLC v. Calvary Baptist Church*, 52 A.D.3d 425, 426 (1st Dep't 2008); *Burrowes v. Combs*, 25 A.D.3d 370, 373 (1st Dep't 2006); *Washington Ave. Assocs., Inc. v. Euclid Equip., Inc.*, 229 A.D.2d 486, 487 (2d Dep't 1996); *O'Neill v. Cohen*, 2015 WL 9592610, at *2-4 (Sup. Ct. N.Y. Cty. Dec. 18, 2015); *Vandenberg, Inc. v. Townhouse 84, LLC*, 2011 WL 5903736, at *1-3 (Sup. Ct. N.Y. Cty. Mar. 24, 2011); *Summit Affiliates, Inc. v. Am. Trading Real Estate Props., Inc.*, 1995 WL 17962416 (Sup. Ct. N.Y. Cty. Feb. 1, 1995).

44

actively managed TriMark and played central roles in assessing and procuring refinancing plans, including the Scheme. Compl. ¶¶ 46, 52-53.

Centerbridge tries to characterize Plaintiff's tortious interference claims as a form of veil piercing, Centerbridge MTD 11, but this conflates alter ego liability and tortious interference liability, which "require different factual proofs." *Bonanni v. Straight Arrow Publishers, Inc.*, 133 A.D.2d 585, 587 (1st Dep't 1987). The former holds an entity's ownership liable for *all* the entity's obligations "if, disregarding the corporate form, [the owner] exercised such dominion and control over [the entity's] operations that the corporation became [the owner's] alter ego, a vehicle for purely personal rather than corporate ends." *Id.* The latter holds a defendant liable for inducing a party to a *particular* contract to breach a specific obligation, regardless of whether the defendant owns equity in the breaching party. *See, e.g.*, *Due Pesci*, 2012 WL 987605, at *2-4. An equity owner therefore may—as the Equity Sponsors did here—induce a breach of a specific contract obligation by playing an active and outsized role in a particular business decision but without exercising such pervasive dominion and control over the entity that the court must disregard the corporate form altogether. *See, e.g.*, *Wells Fargo Bank*, 50 A.D.3d at 280-81.

**B.    The Equity Sponsors, Who Control TriMark, Were But-For Causes of TriMark's Breaches of Contract**

Plaintiffs also plainly allege a causal connection between the Equity Sponsors' conduct and Plaintiffs' damages, despite Defendants' contrary assertions: The Equity Sponsors hatched the Scheme that injured Plaintiffs, induced Defendant Lenders to participate in that Scheme despite the ready availability of non-breaching options to raise additional liquidity, and by virtue of their ownership of, and control over, TriMark, caused the company to breach the Original Agreement. Compl. ¶¶ 46, 52-53. Those allegations are more than sufficient to place the Equity Sponsors on notice of Plaintiffs' claims and survive the pleading stage. *See, e.g.*, *Ullmannglass v. Oneida, Ltd.*,

45

86 A.D.3d 827, 829 (3d Dep't 2011) (plaintiff alleged but-for causation where defendants "advised" contract party "to terminate the contract"); *Wells Fargo Bank*, 50 A.D.3d at 281 (plaintiff alleged that equity owners' conduct was but-for cause of contract party's breach); *Madison Third Bldg. Cos. v. Berkey*, 30 A.D.3d 1146, 1146 (1st Dep't 2006) (plaintiff alleged but-for causation where defendants negotiated contracts on behalf of contract party in breach of a lease agreement); *Due Pesci*, 2012 WL 987605, at *6-7 (plaintiff alleged but-for causation where company under common management and ownership as contract party participated in breaching conduct).

In arguing the contrary, Centerbridge MTD 17-18; Blackstone MTD 14-16, Defendants cite no cases on point. Most of their cited authorities involved a defendant that did not own equity in, or exercise control over, the breaching party.[34] Their remaining cases either were dismissed on grounds other than but-for causation, *Meer Enters., LLC v. Kocak*, 173 A.D.3d 629, 630-31 (1st Dep't 2019) (plaintiff failed to plead breach of contract); *Frank Crystal & Co. v. Dillmann*, 84 A.D.3d 704, 706 (1st Dep't 2011) ("[P]laintiff had no contract …."); *Bonanni*, 133 A.D.2d at 587-88 (case involved alter ego liability not tortious interference); *CDR Créances S.A. v. Euro-Am. Lodging Corp.*, 2005 WL 6234585 (Sup. Ct. N.Y. Cty. Feb. 16, 2005) (plaintiff failed to plead breach of contract), *aff'd*, 40 A.D.3d 421, 422 (1st Dep't 2007), or support Plaintiffs because the

---

[34] *See Kimso Apts.*, 180 A.D.3d at 1035-36; *White Knight of Flatbush, LLC v. Deacons of the Dutch Congregation of Flatbush*, 159 A.D.3d 939, 941 (2d Dep't 2018); *Pursuit Inv. Mgmt. LLC v. Alpha Beta Capital Partners, L.P.*, 127 A.D.3d 580, 581 (1st Dep't 2015); *Burrowes*, 25 A.D.3d at 373; *Cantor Fitzgerald Assocs. v. Tradition N. Am.*, 299 A.D.2d 204 (1st Dep't 2002); *Washington Ave. Assocs.*, 229 A.D.2d at 487; *M.J. & K. Co. v. Matthew Bender & Co.*, 220 A.D.2d 488, 490 (2d Dep't 1995); *Wiesen v. Verizon Comm'cns Inc.*, 2018 WL 4698019, at *3-5 (Sup. Ct. N.Y. Cty. Oct. 1, 2018); *BGC Partners, Inc. v. Avison Young (Can.) Inc.*, 2016 WL 3902277, at *2 (Sup. Ct. N.Y. Cty. July 15, 2016), *aff'd*, 160 A.D.3d 407, 407 (1st Dep't 2018).

46

court declined to dismiss the tortious interference claims at the pleading stage, *Trahan v. Lazar*, 457 F. Supp. 3d 323, 360 (S.D.N.Y. 2020).[35]

### C.  The Affirmative Defense of Economic Justification Is Not a Basis to Dismiss Plaintiffs' Tortious Interference Claims

The Equity Sponsors also argue that Plaintiffs' tortious interference claims should be dismissed because they are entitled to an economic justification defense. Centerbridge MTD 12-17; Blackstone MTD 16-18. As an initial matter, Centerbridge's suggestion that the economic justification doctrine is a pleading requirement rather than an affirmative defense, *see* Centerbridge MTD 12 (quoting *Levine v. Yokell*, 258 A.D.2d 296 (1st Dep't 1999)), is foreclosed by their own cited authority, *Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996) (making clear the economic justification doctrine is a defense to tortious interference liability not an element of the claim).

At the pleading stage, the Equity Sponsors could prevail on their affirmative defense only if they could show that Plaintiffs' Complaint "conclusively establish[es]" their economic justification. *DKR Soundshore*, 80 A.D.3d at 450. They cannot. Under the economic justification doctrine, "a defendant [may] avoid liability for tortious interference with contract if the defendant acts to protect its own legal or financial stake in the breaching party's business." *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 2019 WL 1649983, at *16 (S.D.N.Y. Mar. 28, 2019) (brackets and internal quotation marks omitted). Contrary to Defendants' suggestion, Centerbridge MTD 12-13;

---

[35] Blackstone lobs in an argument that it cannot be the cause of TriMark's breaches because it owns only 26.8% of the company and thus purportedly "lack[s] control over Trimark." Blackstone MTD 15. But Blackstone controls at least one seat on the board of directors of TriMark's operating company, through which it exercises power over TriMark, *see* Compl. ¶ 22, and it played an active role in soliciting and evaluating refinancing plans that led to the Uptiering Scheme, *see* Compl. ¶¶ 46, 52. Plaintiffs need not allege that Blackstone was "the sole proximate cause of the alleged harm" to sustain their tortious interference claim, just that it was one of the but-for causes, *see* *Havana Cent. NY2 LLC v. Lunney's Pub, Inc.*, 49 A.D.3d 70, 72-73 (1st Dep't 2007) (quoting *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317, 318 (1st Dep't 2006)), and Plaintiffs have clearly done that.

Blackstone MTD 16-17, this defense is not triggered merely by the defendant owning an equity interest in the breaching party. The defense "only applies if the alleged interferer acted to protect its interest *in the breaching party's business*; an interferer acting to protect *its own* direct interests, rather than its interests in the breaching party, may not raise the economic interest defense." *Hudson Bay*, 2019 WL 1649983, at *16 (quoting *Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*, 2016 WL 2622013, at *11 (W.D.N.Y. May 5, 2016)); *accord Foster*, 87 N.Y.2d at 751 ("To the extent that respondents acted to preserve the financial health of an ailing [contract party], their actions were economically justified."); *Wells Fargo Bank*, 50 A.D.3d at 281 (economic interest defense did not apply because "defendants were not acting to protect their financial interests in" breaching party "but rather ... to profit themselves to the detriment of" breaching party).

Defendants cannot establish from the Complaint—let alone conclusively—that TriMark's decision not to consider contractually permitted refinancing arrangements and instead breach the Original Agreement was in TriMark's economic interest. While the Equity Sponsors argue that TriMark needed additional liquidity, *e.g.*, Centerbridge MTD 15, TriMark stated publicly just thirteen days before executing the Scheme that it did not, Compl. ¶ 46, thus creating a factual dispute that requires discovery. Even if TriMark did need to refinance, Defendants cannot explain why TriMark had to offer a lucrative refinancing deal selectively to Defendant Lenders—including Lenders managed by Blackstone's affiliates—in breach of the Original Agreement rather than to all First Lien Lenders on a pro rata basis in compliance with the contract. And while Defendants tout that TriMark secured $120 million in new liquidity, Centerbridge MTD 1, 4, 14-15; Blackstone MTD 4, 18, they fail to mention that it effectively *overpaid* Defendant Lenders by roughly $67 million, Compl. ¶ 49, making it far from obvious that this deal was either in TriMark's interest or the best deal it could secure at the time. These allegations are nowhere near enough for

48

Defendants to win dismissal based on an economic justification defense at the pleading stage. *See, e.g.*, *Due Pesci*, 2012 WL 987605, at *8 (declining to dismiss tortious interference claim because defendant did "not conclusively establish[] its economic justification defense").

The cases Defendants cite are inapposite. Centerbridge MTD 12-17; Blackstone MTD 16-18. Most recognized an economic interest defense when the interests of the interferer and the breaching party were *aligned*.[36] Here, by contrast, the Complaint alleges that the Equity Sponsors' and TriMark's interests *diverged*, *see* Compl. ¶¶ 46, 52-53, rendering the economic justification defense unavailable, *see* *Hudson Bay*, 2019 WL 1649983, at *16-17; *Wells Fargo Bank*, 50 A.D.3d at 281. Most of Defendants' other cases either did not involve an enforceable contract right, *Brause v. First Nat'l Real Estate Tr.*, 25 A.D.2d 624, 625 (1st Dep't 1966), held that the defendant had no economic interest in the breaching party, *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426-27 (2007), or erroneously shifted the burden to the plaintiff to plead that the defendant acted without economic justification, *Spectacolor Inc. v. Banque Nationale de Paris*, 207 A.D.2d 726, 726 (1st Dep't 1994); *Project Gamma Acquisition Corp. v. PPG Indus., Inc.*, 2009 WL 1764481 (Sup. Ct. N.Y. Cty. June 11, 2009). Defendants' remaining cases

---

[36] *U.S. Bank N.A. v. Triaxx Asset Mgmt. LLC*, 2019 WL 4744220, at *9 (S.D.N.Y. Aug. 26, 2019); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, 259 F. Supp. 3d 16, 31 (S.D.N.Y. 2017); *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 441-42 (S.D.N.Y. 2016); *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406-07 (S.D.N.Y. 2009); *Foster*, 87 N.Y.2d at 751; *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969); *Johnson v. Cestone*, 162 A.D.3d 526, 527 (1st Dep't 2018); *Peter R. Friedman, Ltd. v. Tishman Speyer Hudson Ltd. P'ship*, 107 A.D.3d 569, 570-71 (1st Dep't 2013); *Kassover v. Prism Venture Partners, LLC*, 53 A.D.3d 444, 449-50 (1st Dep't 2008); *Hirsch v. Food Res., Inc.*, 24 A.D.3d 293, 296-97 (1st Dep't 2005); *Collins v. E-Magine*, 291 A.D.2d 350, 351 (1st Dep't 2002); *E.F. Hutton Int'l Assocs. Ltd. v. Shearson Lehman Bros. Holdings, Inc.*, 281 A.D.2d 362, 362-63 (1st Dep't 2001); *GCA Advisors, LLC v. Onion, Inc.*, 2019 WL 3526119, at *1-2 (Sup. Ct. N.Y. Cty. Aug. 2, 2019); *127 W. 25th LLC v. Artek Sewing Supplies, Inc.*, 2010 WL 10076320, at *5-6 (Sup. Ct. N.Y. Cty. June 25, 2010); *Paulicopter – Cia. Paulista v. Bank of Am., N.A.*, 2019 WL 1405343, at *6 (Sup. Ct. N.Y. Cty. Mar. 27, 2019); *Segal v. Signal Equity Partners*, 2007 WL 2815484 (Sup. Ct. N.Y. Cty. July 20, 2007).

49

regarding the business judgment presumption applicable in corporate governance disputes do not show that the same presumption applies to tortious interference claims. *See* *40 W. 67th St. Corp. v. Pullman*, 100 N.Y.2d 147, 153 (2003); *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 313-14 (Del. 2015).

## VI.    PLAINTIFFS PLEAD VIABLE VOIDABLE TRANSACTION CLAIMS

Plaintiffs plead a valid claim under the UVTA. Under that statute, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor … if the debtor made the transfer or incurred the obligation … with actual intent to hinder, delay or defraud any creditor of the debtor." DCL § 273(a)(1). Such intent is manifest from the Complaint.

### A.    New York Law Applies to Plaintiffs' UVTA Claims

Defendants' brief argument that Massachusetts law governs this claim, TriMark MTD 24; DL MTD 7-8, is contradicted by the Original Agreement's New York choice-of-law clause. "[C]ourts will generally enforce choice-of-law clauses" because they are "a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship." *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 59 (1995)). Choice-of-law clauses supersede "New York's statutory conflict-of-laws principles" and "statutory choice-of-law directive[s]," such as DCL § 279, "even if [applying the statutory directive] results in the application of the substantive law of another state." *Ministers & Missionaries*, 26 N.Y.3d at 475. The similarity of the statute at issue in *Ministers & Missionaries* to the UVTA makes clear that the case's reasoning applies with full force here. *Compare id.* at 471 (declining to enforce statutory directive to apply "the law of the jurisdiction in which the decedent was domiciled at death" because of New York choice-of-law clause), *with* DCL § 279 (UVTA's directive to apply "the local law of the jurisdiction in which the debtor is located when the transfer is made or the

50

obligation is incurred"). Section 9.09(a) of the Original Agreement (unchanged in the Amended Agreement) provides that the contract is to be "construed in accordance with and governed by the law of the State of New York," with a carve-out for some matters not including voidable transfer claims, "regardless of the laws that might otherwise govern under applicable principles of conflicts of laws." This provision is fully enforceable. *Ministers & Missionaries*, 26 N.Y.3d at 468 (enforcing substantively identical choice-of-law provision that contract "shall be governed by and construed in accordance with the laws of the State of New York").

Choice-of-law clauses extend to claims sounding in tort that relate to a contract (as Plaintiffs' UVTA claims do here) where the parties intended the choice-of-law provision to govern any controversy arising out of or relating to the contract's subject matter. *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309-10 (2d Cir. 1994). In *Turtur*, for example, the Second Circuit held that New York law applied to a common law fraud claim that related to a subscription note, because the note provided that (1) it would be governed by New York law without giving effect to the principles of conflicts of laws; and (2) the parties consented to the jurisdiction of New York courts "to resolve any controversy or claim arising out of or relating to" the contract. *Id.* at 309.[37] The

---

[37] The First Department has adopted and applied *Turtur*'s analysis. *Capital Z Fin. Servs. Fund II, L.P. v. Health Net, Inc.*, 43 A.D.3d 100, 109-10 (1st Dep't 2007) (Delaware choice-of-law provision governed fraud claim relating to purchase agreement); *Avnet, Inc. v. Deloitte Consulting LLP*, 187 A.D.3d 430, 433 (1st Dep't 2020) (New York choice-of-law provision governed negligence claim relating to work order). Federal courts applying New York choice-of-law rules have also repeatedly applied *Turtur*. *E.g.*, *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2002 WL 31819207, at *10 (S.D.N.Y. Oct. 10, 2002) ("[C]ourts in the Second Circuit have interpreted the broad language of similar choice-of-law-cum-forum-selection clauses to mandate application of New York law to all claims, including fraud claims, arising out of a transaction."); *see also Obra Pia Ltd. v. Seagrape Inv'rs LLC*, 2020 WL 5751195, at *11 (S.D.N.Y. Sept. 25, 2020), *appeal filed*, No. 20-3713 (2d Cir. Oct. 26, 2020); *Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 226 (S.D.N.Y. 2004). Despite the Second Circuit's statement in *Finance One Public Co. v. Lehman Brothers Special Financing, Inc.*, 414 F.3d 325, 334 (2d Cir. 2005), that *Turtur* applied Texas law, the fact that the First Department has applied *Turtur* confirms that its

51

same is true here. The parties (1) agreed in Section 9.09(a) that the contract would be governed by

New York (with irrelevant exceptions); and (2) ████████████████████████

████████████████████████████████████████████

████████████████████ The Original Agreement thus makes plain that New York law applies to

Plaintiff's UVTA claim. *See Turtur*, 26 F.3d at 309-10.

The settled expectations of the parties to the Original Agreement further require the application of New York law. At the time of contracting in 2017, New York applied the Uniform Fraudulent Conveyance Act, which did not contain a choice-of-law provision, rather than the UVTA. *See* 2019 N.Y. Sess. Laws ch. 580, A. 5622 (enacting DCL § 279 effective April 4, 2020). The parties to the Original Agreement did not anticipate that a statutory choice-of-law provision, like new DCL § 279, would override their contractual selection of New York law. The UVTA should not be applied retroactively in this case to upset the parties' settled expectations about the scope of Section 9.09(a) when they adopted it. *See Ministers & Missionaries*, 26 N.Y.3d at 475 (prohibiting courts from "applying New York's statutory conflict-of-laws principles" when they would "interfere with, and ignore, the parties' intent, contrary to the basic tenets of contract interpretation").[38] Applying Massachusetts law to contravene the intent of the parties in that manner would

---

analysis governs here. *See also id.* (*Turtur's* "reasoning is persuasive and consistent with governing New York law").

[38] The definition of and remedies for a fraudulent conveyance under the Uniform Fraudulent Conveyance Act are substantively identical to the definition of and remedies for a voidable transaction under the UVTA. *Compare* DCL § 273(a)(1) (2020) ("A transfer made or obligation incurred by a debtor is voidable as to a creditor … if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor …."), *with* DCL § 276 (2006) ("Every conveyance made and every obligation incurred with actual intent … to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."). The parties, therefore, had every opportunity to choose the law of a jurisdiction other than New York to govern fraudulent conveyance or voidable transaction claims. They chose not to do so.

INDEX NO. 565123/2020

RECEIVED NYSCEF: 02/19/2021

undermine the purpose of the UVTA, namely, to make its application "more … predictable." 2019 N.Y. A.B. 5622, Committee Report (Feb. 16, 2019).

###    B.    Plaintiffs Plead a Transfer and a Diminution of Assets

Plaintiffs allege that Defendants transferred assets to Defendant Lenders in the form of Super Senior Liens on TriMark's proceeds and Collateral. Compl. ¶ 134. Defendants counter that the UVTA's definition of "asset" purportedly excludes collateral previously encumbered by other liens and that TriMark's proceeds and Collateral were previously encumbered property. TriMark MTD 24; DL MTD 13-15. Defendants are wrong. The UVTA's definition excludes property only "*to the extent* it is encumbered by a valid lien," DCL § 270(b)(1) (emphasis added), so that "a creditor may not maintain a fraudulent conveyance claim where the transferred property is encumbered by sufficient prior liens such that the creditor-plaintiff would not be entitled to reach *any* portion of the property if the conveyance were set aside." *De Vos v. Lee*, 2010 WL 277070, at *2 (E.D.N.Y. Jan. 19, 2010) (emphasis added) (collecting cases). If the Super Senior Liens were set aside here, Plaintiffs *could* reach the encumbered property—all First Lien Lenders would, once again, have equal access to TriMark's proceeds and Collateral. The Super Senior Liens thus are transfers subject to the UVTA.

Defendants also argue that the transfer of the Super Senior Liens did not diminish TriMark's assets because, "[b]y definition, a debtor receives dollar-for-dollar value when it borrows new money." DL MTD 14. This is irrelevant because Plaintiffs claim an intentional voidable transaction, which does not require them to allege that TriMark did not receive equivalent value.[39] *See*

---

[39] *McBirney v. Paine Furniture Co.*, 2003 WL 21094555, at *8 (Mass. Super. Mar. 31, 2003), is inapposite because it arose under Section 5(a)(2) of the Massachusetts Uniform Fraudulent Transfer Act, which is the equivalent of DCL § 273(a)(2)—which Plaintiffs do not invoke.

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc.* (*In re Allou Distribs., Inc.*), 446 B.R. 32, 63 (Bankr. E.D.N.Y. 2011).

### C.    Defendants Perpetrated an Intentional Voidable Transaction Not a Mere Preference

Defendants assert that Plaintiffs do not plead an intentional voidable transaction because at one point they describe the transfer of Defendant Lenders' First Lien Debt to TriMark as a "prepayment of debt through a debt exchange." DL MTD 10 (quoting Compl. ¶ 65). This is misleading. Plaintiffs allege that the debt exchange involved TriMark's paying Defendant Lenders far more than their debt was worth at the time. *See* Compl. ¶ 49. And this was only part of the Scheme. TriMark also issued Defendant Lenders $120 million in entirely *new* First-Out Super Senior Debt, along with Super Senior Liens' securing that debt in exchange for less-than-adequate consideration. Plaintiffs allege that Defendants did this to hinder, delay, and defraud them, *id.* ¶¶ 1, 4, 46, 48, 135, 137-41, while favoring lenders affiliated with Blackstone, one of TriMark's Equity Sponsors. These allegations easily state a UVTA claim. Defendant Lenders never address this portion of the Scheme and so concede that, at a minimum, $120 million of the Super Senior Debt and Liens represented a voidable transaction and not a preference.

Defendants are wrong that TriMark's issuance of Super Senior Liens was only a preferential transfer under preference law, including Section 547 of the Bankruptcy Code. DL MTD 10-13. Preference law applies only to *antecedent* debts "incurred prior to the alleged transfer," *Geltzer v. Fleck* (*In re ContinuityX, Inc.*), 569 B.R. 29, 34 (Bankr. S.D.N.Y. 2017) (explaining Section 547); the Super Senior Liens secured *new* debts. *Cf. DOTS, LLC v. Capstone Media* (*In re DOTS, LLC*), 533 B.R. 432, 438-40 (Bankr. D.N.J. 2015) (payments were not preferences when debts were not incurred prior to transfer). Defendants' cited cases thus are inapposite, as they all involved preferential cash payments applied to existing debts, *Sharp Int'l Corp. v. State Street Bank & Tr. Co.* (*In*

54

*re Sharp Int'l Corp.*), 403 F.3d 43 (2d Cir. 2005); *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987); *Goldstein v. Columbia Diamond Ring Co., Inc.*, 366 Mass. 835 (1975); *Ultramar Energy v. Chase Manhattan Bank*, 191 A.D.2d 86 (1st Dep't 1993), or the creation of a mortgage to secure existing debt, *Coder v. Arts*, 213 U.S. 223 (1909). Here, by contrast, TriMark issued new debt and granted new liens securing that debt. This was not a mere preference.

Defendants also misleadingly portray it as a per se rule that a transfer that prefers some creditors over others cannot establish a voidable transaction. DL MTD 10-11. In fact, "[a] preferential transfer to a creditor, even though based upon a bona fide antecedent, may be a vehicle of fraud, such as where it is made with actual intent to defraud, delay or hinder other creditors," *Gowan v. Patriot Grp., LLC* (*In re Dreier LLP*), 452 B.R. 391, 435 n.39 (Bankr. S.D.N.Y. 2011) (quoting 30 N.Y. Jur. 2d Creditors' Rights § 385 (2011))—and Plaintiffs allege that the transfers were intentionally fraudulent, Compl. ¶¶ 1, 4, 46, 48, 135, 137-41. This case is thus the opposite of *Sharp* (cited DL MTD 10-11), where the court dismissed a fraudulent transfer claim as a mere "preference between creditors" precisely because the preference "did *not* hinder, delay, or defraud either present or future creditors." *Sharp*, 403 F.3d at 56 (cleaned up) (emphasis added). The Scheme here hindered, delayed, and defrauded Plaintiffs by rendering their liens worthless. That the Scheme may have preferred Defendant Lenders cannot excuse Defendants' blatant fraud.

### D. Plaintiffs Plead Intent to Hinder, Delay, or Defraud Creditors

Despite Defendants' contrary arguments, DL MTD 15-18, the Complaint easily surpasses the pleading standard for a UVTA claim, including CPLR 3016(b)'s requirement that "the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of." *Lanzi v. Brooks*, 43 N.Y.2d 778, 780 (1977). "The requisite intent required by [the UVTA] need not be proven by direct evidence, but may be inferred from the circumstances surrounding the allegedly fraudulent transfer." *Stout St. Fund I, L.P. v. Halifax Grp.,*

55

*LLC*, 148 A.D.3d 744, 748-49 (2d Dep't 2017); *accord Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999).

The Scheme would have served no purpose without intent to hinder, delay, or defraud. Otherwise, the deal could have been offered to all Lenders on a pro rata basis. The whole point of the Scheme was to elevate Defendant Lenders' claims to the Collateral by hindering and delaying Plaintiffs' claims to that same Collateral, so Defendant Lenders could recover more, and Plaintiffs would recover less. It worked. Before the Scheme, Standard & Poor's believed that all of Tri-Mark's First Lien Lenders would collect 55% of the value of their First Lien Debt if TriMark were liquidated; after the Scheme, it projected Defendant Lenders would collect 95% of the value of their First-Out Super Senior Loans and 60% of the value of their Second-Out Super Senior Loans, while Plaintiffs would recover *nothing* on their now-subordinated First Lien Loans. Compl. ¶ 58 & n.9. "In describing 'actual intent,' courts frequently rely on … the Restatement (Second) of Torts," under which "the word intent is used to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are *substantially certain* to result from it." *Weisfelner v. Hofmann* (*In re Lyondell Chem. Co.*), 554 B.R. 635, 651 (S.D.N.Y. 2016). It is plain, then, that Defendants actually intended to "hinder" and "delay" Plaintiffs as creditors of Tri-Mark—the UVTA's standard for avoidance. DCL § 273(a)(1) (fraudulent intent is "actual intent to hinder, delay or defraud any creditor of the debtor").

On top of this evidence, claims of intentional voidable transactions are often proven by "badges of fraud, which are circumstances that accompany [voidable transactions] so commonly that their presence gives rise to an inference of intent." *Stout St. Fund I*, 148 A.D.3d at 749; *accord Wall St. Assocs.*, 257 A.D.2d at 529. Plaintiffs allege three badges of fraud, which amply support

56

the element of actual intent to hinder, delay, or defraud. *See, e.g.*, *Weisfelner*, 554 B.R. at 653 (three badges of fraud established fraudulent intent).

*First*, consistent with DCL § 273(b)(1), Plaintiffs plead that the Scheme involved transfers and obligations to an insider. Compl. ¶ 138. Plaintiffs describe (1) the precise property transferred to Defendant Lenders—the Super Senior Liens—and the precise obligations incurred by Tri-Mark—$120 million in First-Out Super Senior Debt and $307.5 million in Second-Out Super Senior Debt, Compl. ¶¶ 1, 48-49, 134; and (2) that Blackstone owns a 26.8% equity interest in Tri-Mark, Compl. ¶ 40, over the 20% threshold necessary to be an "affiliate" and thus an "insider" under the UVTA, DCL § 270(a)(1), (h)(4). Defendants are wrong that Plaintiffs must also pierce the corporate veil between Blackstone and Defendant Lenders, DL MTD 17; the UVTA dispenses with veil-piercing by defining an "insider" to include "an insider of an affiliate as if the affiliate were the debtor." DCL § 270(h)(4). Because Blackstone is a TriMark affiliate, therefore, any Blackstone insider (*e.g.*, a Blackstone partner or an entity in which Blackstone is a partner) is also a TriMark insider and thus subject to the UVTA, as is an insider of any entity that owns 20% or more of Blackstone (or an insider of any entity that owns 20% of such an entity). The details of Blackstone's relationships with the Blackstone Lenders are in Defendants' exclusive possession, and so require discovery. *See* CPLR 3211(d).

*Second*, consistent with DCL § 273(b)(3), Plaintiffs plead that the transfers and obligations were concealed. Compl. ¶ 140. Plaintiffs describe that many of them offered TriMark a chance for more liquidity but that TriMark intentionally misled Plaintiffs by denying that it sought additional financing—including in direct quotes by TriMark executives who denied that the company required additional liquidity—even as TriMark simultaneously and secretly negotiated the Scheme with Defendant Lenders. Compl. ¶ 46. This easily satisfies CPLR 3016(b). *Lanzi*, 43 N.Y.2d at 780

57

(CPLR 3016(b) "is not to be interpreted so strictly as to prevent an otherwise valid cause of action in situations where it may be 'impossible to state in detail the circumstances constituting a fraud'" (quoting *Jered Contracting Corp. v. N.Y.C. Transit Auth.*, 22 N.Y.2d 187, 194 (1968))). Defendants note that they disclosed the Scheme after consummating it, DL MTD 17-18, but do not dispute concealing the transfers at the time they agreed to them and cite no authority that subsequent disclosure excuses prior concealment. The one case they do cite, which says that nondisclosure is not a fraudulent transfer under the federal Bankruptcy Code, *In re Cushman Bakery*, 526 F.2d 23, 32-34 (1st Cir. 1975), is irrelevant here, where Defendants actively concealed the transfers, including through misrepresentations to creditors and the market.

*Third*, consistent with DCL § 273(b)(10), Plaintiffs plead that the Scheme occurred upon TriMark's incursion of a substantial debt. Compl. ¶ 141. The Scheme involved a total of $427.5 million in new debt owed by TriMark to Defendant Lenders, Compl. ¶¶ 1, 48-49, 134, a "substantial debt" by any measure. Defendants do not attempt to rebut these allegations. This amply pleads a claim of voidable transaction.

Plaintiffs' alleged badges of fraud alone establish their claim. But by focusing solely on the alleged badges of fraud, Defendants distort the UVTA. They attempt to turn the disjunctive "intent to hinder, delay or defraud," DCL § 273(a)(1), into a conjunctive "hinder, delay *and* defraud." But the law is clear that "[t]he malicious intent … is set forth in the disjunctive—a plaintiff may avoid the transfer where it was made with intent 'to hinder, delay, *or* defraud.'" *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Grp., LLC*), 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008), *aff'd in part and rev'd in part on other grounds sub nom. Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund LLC* (*In re Bayou Grp., LLC*), 439 B.R. 284 (S.D.N.Y. 2010). "[O]nly an actual intent to hinder and delay need be established, not an

58

actual intent to defraud." *United States v. Carlin*, 948 F. Supp. 271, 277 (S.D.N.Y. 1996); *accord*

*Flushing Sav. Bank v. Parr*, 81 A.D.2d 655, 656 (2d Dep't 1981). But aside from cursory refer-

ences to the "hinder, delay, or defraud" standard, Defendants do not dispute whether Plaintiffs

have pleaded intent to hinder or delay Plaintiffs' access to collateral. Nor could they. By creating

a tier of Super Senior Liens entitled to Collateral proceeds before the First Liens, Defendants hin-

dered Plaintiffs because it became vastly less likely Plaintiffs would collect on their Debt. Compl.

¶ 58. And they delayed Plaintiffs because Defendant Lenders would now get paid Collateral pro-

ceeds before Plaintiffs. Compl. ¶ 73. Because these were easily anticipated results of the Scheme,

they put the issue of intent beyond dispute.

     Defendants respond that TriMark acted only "to obtain new funds for its ongoing business

activities." DL MTD 15. But TriMark stated publicly that it did *not* require additional liquidity,

Compl. ¶ 46, which creates a factual dispute that requires discovery. And whether *some* refinanc-

ing deal might have legitimately provided TriMark with new funds, *this* refinancing Scheme hin-

dered, delayed, and defrauded Plaintiffs by rendering their liens effectively valueless and cutting

off any reasonable prospect that they could access the Collateral proceeds. By secretly negotiating

with insiders and issuing them liens that eliminated Plaintiffs' possibility of recovery in liquida-

tion, TriMark executed a voidable transaction that must be unwound.

59

## CONCLUSION

Defendants' motions should be denied.

Dated: New York, NY
      February 19, 2021

Respectfully submitted,

SELENDY & GAY PLLC

By:    */s/       Jennifer Selendy*
      Jennifer Selendy
      Faith Gay
      Andrew R. Dunlap
      Ryan W. Allison
      SELENDY & GAY PLLC
      1290 Avenue of the Americas
      New York, NY 10104
      Tel: 212-390-9000
      Email: jselendy@selendygay.com
            fgay@selendygay.com
            adunlap@selendygay.com
            rallison@selendygay.com

*Attorneys for Plaintiffs*

60

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Audax Credit Opportunities Offshore Ltd., *et al.*,

Plaintiffs,

v.

TMK Hawk Parent, Corp., *et al.*,

Defendants.

Index No. 565123/2020

Justice Joel M. Cohen
IAS Part 3

Motion Sequence Nos. 2, 3, 4, 5

ORAL ARGUMENT REQUESTED

## CERTIFICATE OF WORD COUNT COMPLIANCE

As a member of Selendy & Gay PLLC, I hereby certify that this memorandum of law is in compliance with Commercial Division Rule 17, as modified by this Court's February 11, 2021 Order. *See* Dkt. 53. The foregoing document was prepared using Microsoft Word, and the document contains 19,962 words as calculated by the application's word counting function.

Dated:   New York, New York
         February 19, 2021

/s/        *Jennifer Selendy*
           Jennifer Selendy

61