## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC., et al., | Case No. 22-10493 (CTG) |
| Debtors.[1] | Jointly Administered |
| | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P., | Adv. Pro. No. 22-50372 (CTG) |
| Plaintiffs, | |
| v. | |
| TPC GROUP INC., | |
| Defendant. | **Re: A.D.I. 15, 16, 17, 18, 19, 48, 49, 50, 54, 55, 60** |
| and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| Intervenor Defendant. | |

## TPC GROUP INC.'S CONSOLIDATED REPLY BRIEF (I) IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, MOTION TO DISMISS AND MOTION TO STRIKE SUMMARY JUDGMENT EVIDENCE, AND (II) IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE OR DISMISS AND MOTION TO DISMISS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

TPC Group, Inc. ("**TPC**") files this Reply Brief (i) in Support of its Motion for Summary Judgment [A.D.I. 16, 17], Motion to Dismiss [A.D.I. 18, 19] and Motion to Strike [A.D.I. 60], and (ii) in Opposition to Plaintiffs' Motion to Strike or Dismiss [A.D.I. 48] and Motion to Dismiss [A.D.I. 49].

## I.    INTRODUCTION

Plaintiffs argue that TPC's Counterclaim, filed on June 9, 2022 [A.D.I. 15] (the "**TPC Complaint**"), should be stricken and TPC's Motion for Summary Judgment and Motion to Dismiss denied based on a hyper-technical (and now-mooted) procedural issue and that Plaintiffs' claims avoid dismissal because compliance with the "no-action" clause was never required.  As explained below, both arguments are wrong. The Court should deny Plaintiffs' Motion to Strike or Dismiss and grant TPC's Motion for Summary Judgment and, in the alternative, Motion to Dismiss, rendering judgment in TPC's favor and dismissing Plaintiffs' noncompliant claims.

## II.    DISCUSSION

### A.    The Court Should Deny the Motion to Strike or Dismiss TPC's Complaint and Reject Plaintiffs' Argument that TPC's Summary Judgment Motion is Improper.

The Court should deny Plaintiffs' Motion to Strike or Dismiss the TPC Complaint and reject Plaintiffs' argument that TPC's Motion for Summary Judgment is improper based upon the TPC Complaint being an alleged "procedural nullity." The TPC Complaint, styled as a counterclaim, and TPC's accompanying Motion for Summary Judgment were filed pursuant to an agreed-upon, compressed schedule, which expressly provided for TPC's filing of a complaint prior to the filing of an answer.

Even if Plaintiffs' interpretation of the relevant procedural rules were sound, Plaintiffs themselves requested the expedited relief that necessitated styling the TPC Complaint as a counterclaim—and, in any event, TPC's filing of its answer repeating the counterclaim corrected

any alleged "procedural nullity." Plaintiffs' technical argument is merely an attempt to avoid their failure to abide by the "no-action" clause; it should be rejected as such.

Plaintiffs allege that the Federal Rules of Civil Procedure require that a counterclaim must "be stated in a pleading." *See* MSJ Resp. [A.D.I 50], ¶ 9. However, the Federal Rules do not state such a proposition so plainly. Instead, Federal Rule of Civil Procedure 13 states the opposite: an answer or other "pleading must state as a counterclaim . . . ." FED. R CIV. P. 13(a)(1). Here, neither the parties' agreements, as discussed below, nor the applicable rules, which allow 30 days to file an answer in an adversary proceeding,[2] required TPC to file an answer along with the agreed-upon filing of the TPC Complaint seeking affirmative relief against Plaintiffs.[3]

Indeed, the only reason that the TPC Complaint was filed in the present manner was because Plaintiffs *explicitly asked for it*. The TPC Complaint and TPC's accompanying Motion for Summary Judgment were filed pursuant to a compressed schedule agreed upon by Plaintiffs' prior counsel at Milbank LLP and entered by this Court *upon a motion filed by Plaintiffs* [A.D.I 6]. That schedule—which was drafted by Plaintiffs' prior counsel—expressly provides for, among other things, the Debtors filing their "Complaint against [Plaintiffs]" along with a "related summary judgment motion." Order [A.D.I. 21-1] at 3, ¶ 2. The schedule does not require TPC to file its "Complaint" alongside an answer, nor does it indicate that the anticipated summary judgment motion would be ineffective without an answer; instead, it set an agreed briefing schedule for that motion and set the motion for hearing on June 29. Arguing now that the TPC Complaint should have been filed as a formal complaint (which would have necessitated a whole new adversary proceeding) instead of the manner in which it was filed (within this adversary

---

[2] *See* FED. R. BANK. P. 7012.

[3] None of the cited cases cited involve expedited proceedings subject to an express and agreed-upon scheduling order, in which the parties agreed to the filing of a "Complaint."

proceeding) is inconsistent with the scheduling order's intent: ensuring the dispute is fully briefed on the expedited scheduled *requested by Plaintiffs*. Armed with new counsel, Plaintiffs now sing a different tune—indeed, their Motion to Strike does not even mention, let alone address, the agreed upon schedule, despite TPC's counsel reminding Plaintiffs' new counsel of it when this issue first arose. *See* Ex. 1, 6/17/2022 Email. There is no basis for Plaintiffs to complain about "procedural nullit[ies]" surrounding the filing of a complaint and summary judgment motion they expressly agreed should be filed, should be briefed, and should be heard by this Court on June 29.

In any event, Plaintiffs' argument is moot and Plaintiffs cannot demonstrate any prejudice with proceeding on all motions on June 29. When Plaintiffs' new counsel raised this procedural issue, TPC asked whether Plaintiffs wanted TPC to file an answer. *See* Ex. 1, 6/17/2022 Email. Tellingly, Plaintiffs were silent in response to this inquiry. Plaintiffs do not actually need an answer to their complaint for any substantive reason for the June 29 hearing—and their submission to this Court does not claim that they do. Nevertheless, TPC filed an answer incorporating the exact same complaint on June 22, 2022—well within the time allowed for filing a responsive pleading under the Federal Rules even if TPC had not filed its Motion for Summary Judgment and Motion to Dismiss, thereby altering the period to file its answer. *See* FED. R. BANKR. P. 7012(a) (a defendant shall serve an answer to a complaint within 30 days after the issuance of the summons); *id.* (extending the period of time to file an answer to after adjudication of a motion for summary judgment or motion to dismiss); *see also* Summons [A.D.I. 8] (issued on June 2, 2022, thereby providing TPC until July 5, 2022 to answer if TPC had not filed its Motion for Summary Judgment or Motion to Dismiss). This obviates the alleged "procedural nullity" and negates any possible prejudice (although none is alleged, much less established).

The Court should deny the Motion to Strike or Dismiss, and address TPC's Summary Judgment Motion on its merits as the parties agreed in the June 9, 2022 Scheduling Order.

**B.      The Court Should Dismiss Plaintiffs' Claims Because Section 6.06(a)—the 10.5% Notes Indenture's "No-Action" Clause—Bars Suit.**

The Court should also grant TPC's Motion for Summary Judgment, or in the alternative, its Motion to Dismiss. Dismissal of Plaintiffs' claims and judgment in TPC's favor is required under Section 6.06(a) of the 10.5% Notes Indenture, because Plaintiffs did not comply with ***any*** of the material terms of that "no-action" clause, which applies to Plaintiffs' claims.

**1.      Plaintiffs indisputably failed to comply with the "no-action" clause's plain language.**

Plaintiffs indisputably failed to comply with ***any*** of the no-action clause's requirements. There is no dispute that Plaintiffs: (1) do not own 25% of the face value of outstanding notes and did not have the support of such noteholders at the time of their filing; (2) failed to provide consent to the trustee as required by 6.06(a); (3) failed to provide the trustee adequate assurance of indemnity; and (4) failed to provide to the trustee and other noteholders sixty-days to assess their claims. *See generally* Plaintiffs' Resp. [A.D.I. 50].  As each is a requirement under Section 6.06(a) (which mandates satisfaction of ***all*** the above-listed prerequisites prior to seeking "any remedy" with respect to the 10.5% Notes or 10.5% Notes Indenture), dismissal is warranted. Plaintiffs' failure to meet these requirements, standing alone, should require dismissal of their claims.

**2.      Any "Consent Rights" exception does not apply because Plaintiffs' consent was not required for the challenged transaction.**

The Court should reject Plaintiffs' argument that compliance with the no-action clause was excused because "no-action clauses do not bar noteholders from enforcing their individual consent rights." First, Plaintiffs' argument overstates the relevant case law. Second, Plaintiffs' argument

4

fails because the challenged transaction did not require their consent, and thus, cannot have implicated any "consent right."[4]

As noted above, Plaintiffs do not allege satisfaction of the "no-action" clause, arguing instead that Section 6.06(a) is inapplicable to vindicating "sacred rights." Plaintiffs are mistaken. Section 6.06(a) does apply here, and Plaintiffs' failure to satisfy its terms mandates judgment in TPC's favor.

### a. New York law does not absolve Plaintiffs from the consequences of noncompliance with Section 6.06(a).

There is no basis under the plain language of the 10.5% Indenture or New York law for Plaintiffs' claim that Section 6.06(a) is inapplicable because Plaintiffs purportedly filed suit to vindicate their "sacred rights."

First, Plaintiffs assert that their claims deal with "individual consent rights," as opposed to claims "common to all bondholders." Plaintiffs' Resp. at 9-10. But surely Plaintiffs' argument— that the challenged transaction breached the 10.5% Notes Indenture—is a claim "common to all" holders of the 10.5% Notes. Simply because Plaintiffs (as opposed to at least 66 2/3% of the other holders of the 10.5% Notes) disagree with the transaction,[5] that does not make this case fall within an exception to the "no-action" clause. Allowing a plaintiff to overcome a "no-action" clause simply because it disagreed with the transaction at issue would create an exception to the

---

[4] Even assuming Plaintiffs were correct, and the issuance of the 10.875% Notes and complained-of amendments violated the 10.5% Notes Indenture and 2019 Intercreditor agreement, it is well-settled New York law that a claim for breach of an indenture is a matter of basic contract law. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982); *MBIA Ins. Corp. v. Patriarch Partner VII, LLC*, 950 F. Supp. 2d 568, 612 (S.D.N.Y. 2013); *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, No. 13 CIV. 1582 PAE, 2015 WL 4191419, at *18 (S.D.N.Y. July 10, 2015), aff'd, 837 F.3d 146 (2d Cir. 2016). Accordingly, the complained-of breach would, at most, provide Plaintiffs with a breach of contract claim and damages remedy against TPC. That breach of contract claim would be an unsecured claim in these chapter 11 cases and would provide no basis for objection to DIP financing provided by holders of the 10.875% Notes.

[5] Plaintiffs, of course, were not holders of the 10.5% Notes until months after the transaction.

enforcement of such clauses that would swallow the rule.

Moreover, Plaintiffs' primary authorities do not stand for the broad propositions cited by Plaintiffs—and they are factually distinguishable. Citing *Eaton Vance Management v. Wilmington Savings Fund Society FSB,* 171 A.D.3d 626, 626 (1st Dept. 2019), Plaintiffs argue that New York's Appellate division has "held" and "instructed that no-action clauses do not bar noteholders' claims to vindicate their individual consent rights." *See* Plaintiffs' Resp. at 10. But *Eaton Vance* neither "held" nor "instructed" any such thing. Instead, in two substantive paragraphs, it affirmed the trial court's dismissal of most of plaintiffs' claims—thereby, enforcing the "no-action clause"—except for certain contractual claims involving a transfer of all of the collateral, that, based on the specific contracts at issue, the defendants in the trial court had ***conceded*** required unanimous approval. *See Eaton Vance*, 171 A.D.3d at 626; *see also Eaton Vance Management v. Wilmington Sav. Fund Soc., FSB,* No. 654397/2017, 2018 WL 1947405, at *3 n.9 (N.Y. Sup. Ct. Apr. 25, 2018) ("As discussed herein, the J. Crew Defendants contend section 10.19 bars all of plaintiffs' claims except those based on the violation of their unanimous consent rights under section 10.01(e) and (f). It is undisputed that plaintiffs have standing to assert a direct claim for breach of contract for the alleged consent violation.").

Plaintiffs' other primary authority, *Cypress Associates, LLC v. Sunnyside Cogeneration Associates Project*, is similarly distinguishable. In *Cypress*, a majority of bondholders supported an amendment to an indenture requiring 80% approval, but one holder, who held enough bonds to block the approval (*i.e.*, over 20%), objected. The borrower "then, when that approval was not received, . . . searched through the Relevant Instruments and concluded that the Trustee had the unilateral authority to adopt the Amendment," and did so. *Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*, No. CIV.A. 1607-N, 2006 WL 668441, at *7 (Del. Ch. Mar. 8,

2006). As such, the Chancery Court held "it would be a futile exercise for Cypress to ask the majority of the Bondholders who disagree[d] with it to join with it in a suit to declare an Amendment they support[ed] invalid." *Id.*

That is not the case here. First, the challenged transaction was not, as in *Cypress*, a "do-over" of a transaction to which Plaintiffs had previously withheld their consent. Indeed, as discovery has confirmed, the Plaintiffs here began purchasing their bonds roughly six months *after* the publicly announced transaction. Second, as discussed below, TPC here obtained consent[6] from holders of more than 66-2/3% of the 10.5% Notes for the challenged transaction. Simple math, therefore, suggests it would not be "futile" for Plaintiffs to try to get support of the required 25% of noteholders to comply with the "no-action" clause.[7]

---

[6] Plaintiffs' argument that the consents should be rejected because each was signed by the beneficial holders, rather than the registered owner, should be rejected.  As set forth in TPC's response to Plaintiffs' Motion for Summary Judgment, the Consent Letters were consistent with section 9.02(b) of the 10.5% Notes Indenture and therefore accepted by the Trustee as "evidence satisfactory to the Trustee on the consent of the Holder."  Ironically, if Plaintiffs' argument were correct (which it is not), it would likewise deprive Plaintiffs of any standing to bring their claims, as Section 6.06(a) provides only a "Holder" can bring suit.

[7] Plaintiffs' other authority is also distinguishable. First, Plaintiffs cite *Blackrock Balanced Cap. Portfolio (FI) v. U.S. Bank Nat'l Ass'n*, 165 A.D.3d 526 (N.Y. App. Div. 2018) for the proposition that "once Plaintiffs' compliance with *any* portion of the No-Action Clause is excused, 'performance of the entire provision is excused.'" Plaintiffs' Resp. at 13. However, the actual quote from *Blackrock* refers only to excusal of compliance with a no-action clause's *demand* requirement. *See id.* at 528 ("Once performance of the ***demand requirement*** in the no-action clause is excused, performance of the entire provision is excused.") (emphasis added).  Demand was excused as futile in that case because plaintiffs brought suit against the trustee—an issue not at play here. Obviously, requesting the trustee consent to suiting itself would be futile, but the same is not true here. Second, and similarly, *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 567 (N.Y. 2014), does not support Plaintiffs.  That case recognized the "purpose of the no-action clause—to avoid duplicative suits and ***protect the majority interests*** by mandating that actions be channeled through the Trustee," would be "subverted" if it "serve[d] as an outright prohibition on a suit filed by a securityholder in the case where the Trustee ***is without authorization to act***." *Id.* at 566-67 (emphasis added). Plaintiffs have not alleged the Trustee is without authorization to act. *Quadrant*'s holding, therefore, lends them no aid.

**b. The "no-action" clause is enforceable because Plaintiffs' contractual rights were not impacted by issuance of the 10.875% Notes.**

Even if Plaintiffs were correct that "no-action" clauses do not trigger in lawsuits to vindicate consent rights, that would not afford them the protection they seek.

New York law requires enforcement of "no-action" clauses, even if a lender alleges it has been made been made worse off, unless the lender's contractual rights have been impacted or the trustee engaged in malfeasance. *Eaton Vance*, 2018 WL 1947405, at *8 ("If a divergence in lenders' interests was enough to overcome a no-action clause, such a basis to establish demand futility would routinely render no-action clauses ineffective. Unsurprisingly, New York courts have held that, even where one class of lenders is made worse off by a challenged transaction, so long as those lenders' contractual rights are not alleged to have been violated and the trustee is not alleged to have engaged is misfeasance or abdication of its responsibilities, the no-action clause will bar their suit.").

Here, to succeed, Plaintiffs must establish their contractual rights have been violated by the transaction.[8] That they cannot do, for at least the reasons below and the reasons stated in TPC's Opposition to Plaintiffs' Motion for Summary Judgment; thus, Section 6.06(a) bars their claim.

**i.    Section 9.02(d)(10) was not implicated in the transaction.**

Plaintiffs' primary argument is that Section 9.02(d)(10)—a "sacred right" provision that requires unanimous noteholder consent to "make any change in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders"—was violated when TPC issued the 10.875% Notes that are senior to the 10.5% Notes. *See* TPC MSJ Br. [A.D.I. 17-1], Ex. A § 9.02(d)(10).  In making this argument, Plaintiffs espouse a broad reading of Section 9.02(d)(10) that requires unanimous

---

[8] There is no allegation that the trustee has engaged in malfeasance or abdicated its responsibility.

consent any time senior debt is issued.  Plaintiffs' interpretation is flawed, for several reasons.

*First*, it is well settled under New York law that a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Greenwich Cap. Fin. Prod., Inc. v. Negrin,* 74 A.D.3d 413, 415 (N.Y. App. Div. 2010); *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503 (N.Y. App. Div. 2012) (recognizing the "longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided.") (*citing Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438 (N.Y. 1994)). Plaintiffs' interpretation of Section 9.02(d)(10)—*i.e.*, requiring unanimity for issuance of senior debt—defies commercial reasonableness and the language of the rest of the contract.

Here, the 10.5% Notes Indenture, in particular Section 4.07, contemplates at least nineteen different ways in which the Company is allowed to incur additional indebtedness and provides no indication that unanimous noteholder consent is required for the company to utilize these provisions. *See* TPC MSJ Br., Ex. A § 4.07(b)(1)-(19). Specifically, the 10.875% Notes is indebtedness that is permitted under Sections 4.07(b)(1) and 4.07(b)(15) of the 10.5% Notes Indenture. *See* TPC MSJ Br., Ex. B., § 4.07(d).  Sections 4.07(b)(1) and 4.07(b)(15) allow TPC to (i) incur debt not to exceed the greater of $300 million and the Borrowing Base (as defined in the 10.5% Notes Indenture) as of the date of the incurrence of indebtedness, *see* TPC MSJ Br., Ex. A § 4.07(b)(1), and (ii) incur debt not to exceed the greater of $50 million and 5.0% of Total Assets, *see id*. § 4.07(b)(15). Neither of those provisions require unanimous noteholder consent prior to incurring the new debt, nor do they require that the additional debt be junior or equal to the 10.5% Notes. In short, the reasonable expectations of the parties, and commercial reasonableness, provide

no support for the idea that the Company would need unanimous noteholder consent to issue the 10.875% Notes. In short, the reasonable expectations of the parties, and commercial reasonableness, provide no support for the idea that the Company would need unanimous noteholder consent to issue the 10.875% Notes.

*Second*, Plaintiffs' interpretation of Section 9.02(d)(10) contradicts the contractual principle of *ejusdem generis*—the canon of contract construction that the meaning of a word or phrase "is determined 'by the company it keeps'" and should be consistent with how other provisions in the same section are addressed. *Lend Lease (U.S.) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 58 (N.Y. App. Div. 2015), *aff'd on other grounds sub nom. Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675 (N.Y. 2017).

Here, none of the other "sacred rights" of the 10.5% Notes (*i.e.*, Section 9.02(d)(1-9)) address, in any capacity, the issuance of senior debt. For example, Section 9.02(d) requires unanimity where a change would "reduce the principal of or extend the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes" (9.02(d)(2)), "make any Note payable in money other than that stated in the Notes" (9.02(d)(5)), and/or "waive a Default or Event of Default in the payment of principal of, or premium, if any, or interest on, the Notes" (9.02(d)(4)). In other words, Section 9.02(d) does not purport to establish consent requirements for ***incurrence of new debt*** (which is covered more clearly elsewhere in the contract) and reading Section 9.02(d)(10) to require unanimity when senior debt is issued controverts *ejusdem generis*.

*Third*, Plaintiffs' reading of Section 9.02(d)(10) does not comport with plain language. Section 9.02(d)(10) says nothing of the issuance of senior debt.  Rather, it addresses changes to provisions "dealing with application of proceeds of collateral . . . ." meaning provisions dealing with the payment of money collected by the Trustee. The 10.5% Indenture and the 2019

10

Intercreditor Agreement explicitly contain such "waterfall" provisions, specifically Section 6.10 of the 10.5% Notes and Section 4.1 of the 2019 Intercreditor Agreement, which provide that the allocation of collateral proceeds is distributed in a waterfall.  *See* TPC MSJ Br., Ex. A § 6.10. (requiring payment "to Holders . . . ratably, without preference or priority of any kind"); TPC Opp. Br. [A.D.I. 40], Ex. N § 4.1. Even following complained-of transaction, any dollar received by the Trustee under the 10.5% Notes Indenture will be applied in the exact same manner as before the transaction—with each noteholder in their capacity as holder of the 10.5% Notes being paid "ratably, without preference or priority of any kind." Issuing senior debt does not effectuate a change in application of proceeds occurred. Plaintiffs' interpretation is wrong.

### ii.    Plaintiffs' overbroad reading of Section 9.02(d)(10) ignores Section 9.02(e).

In arguing that Section 9.02(d)(10) requires unanimous consent for any transaction that issued senior debt, Plaintiffs overlook that such changes are elsewhere contemplated by the contract.  Namely, Section 9.02(e) requires only super-majority (*i.e.*, 66 2/3%) consent for (1) "[a]ny amendment to, or waiver of, *the* provisions . . . that has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes," and (2) for any amendment or change that "otherwise modifies the Intercreditor Agreement or other Security Documents in any manner adverse in any material respect to the Holders . . . ." *See* TPC MSJ Br., Ex. A § 9.02(e).  Plaintiffs' claim that Section 9.02(d)(10) required unanimous consent for issuance of senior debt is commercially unreasonable and cannot be reconciled with Section 9.02(e).

"[I]t is well settled" under New York law "that a contract must be read as a whole to give effect and meaning to every term," and "in a way [that] reconciles all [of] its provisions, if possible." *New York State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.,* 78 A.D.3d 1566, 1567, (N.Y. App. Div. 2010); *accord Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Trust*

*Co. of N.Y.*, 94 N.Y.2d 398, 404 (N.Y. 2000) (rejecting interpretation that would render a provision "superfluous" as "unsupportable under standard principles of contract interpretation").

Plaintiffs' overbroad interpretation runs afoul of this principle and renders Section 9.02(e) meaningless.[9]  Plaintiffs have argued that Section 9.02(d)(10) is implicated any time a transaction is entered into that issued debt senior to the 10.5% Notes. However, Section 9.02(e) of the 10.5% Notes Indenture unambiguously provides for any change "that has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes" and that "otherwise modifies the Intercreditor Agreement or other Security Documents in any manner adverse in any material respect to the Holders" with just super-majority consent.  *See* TPC MSJ Br., Ex. A § 9.02(e). Requiring unanimity for issuance of senior debt and supermajority consent for "any amendment" can only be reconciled (as Plaintiffs contend) by having 9.02(e) operate as a "floor" (*i.e.*, supermajority consent required for *any* amendment) that 9.02(d)(10) then modifies (*i.e.*, adding an additional unanimity requirement for senior debt issuance).

But Plaintiffs' reconciliation does not work, as it ignores the first half of Section 9.02(e), requiring supermajority consent for amendments "that ha[ve] the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes." *See id.* § 9.02(e). Plaintiffs thus would require unanimous consent any time senior debt is issued but permit the ***release*** of all collateral underlying that debt with only super-majority consent. Such an absurd result runs afoul of the principles of contract interpretation and commercial reasonableness. *Rubin v. Baumann*, 148 A.D.3d 556, 556 (N.Y. App. Div. 2017) (recognizing that "a contract should not be interpreted to produce an absurd result").

---

[9] This argument also applies to Section 6.06(a), which allows a Holder to "pursue a remedy with respect to this Indenture or the Notes ***only if***" certain requirements are met. *See* TPC MSJ Br., Ex. A, 6.06(a). Enforcing, as Plaintiffs contend the Court should do, non-existent exceptions for a "sacred right" would render that clear language illusory—to the detriment of all holders.

                              **iii.**     *Trimark* **does not change the analysis that Section 9.02(d)(10)**
                                        **was not implicated in this transaction.**

Finally, Plaintiffs' reliance on the New York trial court decision in *Trimark* cannot transform this transaction into one which implicates any "sacred rights." *Lenders Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 72 Misc. 3d 1218(A), 150 N.Y.S.3d 894 (N.Y. Sup. Ct. 2021). While it is true that *Trimark* found there was a "plausible argument that the Liquidity Transaction required consent . . . because it 'alter[ed] the order of application of proceeds' by subordinating Plaintiffs' priority interest to the new Super-Senior Priority Intercreditor Agreement," the decision in *Trimark* is factually distinct for a number of reasons. *See id.* at **12. First, there is no indication that the *Trimark* indenture had a provision akin to Section 9.02(e).[10] For the reasons described above, the existence of Section 9.02(e) diminishes *Trimark*'s relevance here. Second, the *Trimark* indenture features language in the applicable "sacred rights" addressing amendments, waivers, or modifications to such sacred rights "pursuant to an agreement or agreements," which is lacking in the 10.5% Notes Indenture here. *See id*. at **11. But here, the trigger is limited to ***only*** to "an amendment, supplement or waiver" that changes the 2019 Intercreditor Agreement or 10.5% Notes Indenture. In other words, while the *Trimark* indenture contemplated looking beyond the specifically enumerated documents and provisions thereof, such is not the case here. Plaintiffs' reliance on *Trimark* is, resultantly, misplaced.[11]

---

[10] *Trimark* also involved the defendants amending the at-issue indenture in a manner that would restrict the plaintiffs' rights to challenge the transaction in Court. *See Trimark*, 72 Misc. 3d 1218(A), at **5-7. No similar allegations exist in this case, further distinguishing *Trimark*'s applicability.

[11] Plaintiffs also filed a Motion to Dismiss the TPC Complaint included as a counterclaim in TPC's answer, arguing only that TPC's counterclaim should be dismissed "for the same reason [the Court] should deny TPC's Motion to Dismiss." Plaintiffs' Resp. at 17. For the reasons set forth herein, the Court should deny Plaintiffs' Motion to Dismiss.

**C.  The Court Should Strike Plaintiffs' Deficient Summary Judgment Evidence.**

TPC also moves to strike as deficient the new evidence attached to Plaintiffs' reply in support of their Motion for Summary Judgment [A.D.I. 54]. Specifically, Plaintiffs filed in support of their latest brief a declaration of Oscar Shine [A.D.I. 55] which purports to attach a copy of the Consolidated Opposition to Defendants' Motions to Dismiss in *Trimark* and excerpts of the First Lien Term Loan Agreement purportedly filed in *Serta*. *See Bacchus LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21 CIV. 3987 (KPF), 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022). Both the declaration—and the exhibits it attaches—are hearsay that is not subject to any exception, as they are out-of-court statements offered to prove the truth of the matter asserted therein.  The exhibits are excerpts of briefing submitted in a different case.  Likewise, the declaration does not establish that the declarant has personal knowledge or was involved in the drafting of those documents or otherwise establish that such items were business records of Plaintiffs.  *Bank of New York Mellon v. Gordon,* 171 A.D.3d 197, 208 (N.Y. App. Div. 2019) (where declarant lacked personal knowledge of records, their "affidavit constituted inadmissible hearsay and lacked probative value"); *Badger v. Badger*, 88 N.Y. 546, 556 (N.Y. 1882) ("the unsworn declarations of persons knowing nothing of the facts in controversy" "amounts to bare hearsay"). New York law is clear: "inadmissible hearsay cannot support a motion for summary judgment." *Bergmann v. Spallane*, 129 A.D.3d 1193, 1197 (N.Y. App. Div. 2015); *see also, e.g.*, *Pichel v. Dryden Mut. Ins. Co.*, 117 A.D.3d 1267, 1271 (N.Y. App. Div. 2014) (determining that comments made by a claims adjuster and engineer with respect to the origination of at-issue plumbing backup were "inadmissible hearsay [and] . . . insufficient to support the motion for summary judgment") (alteration in original).

## III.       CONCLUSION

TPC respectfully requests this Court (i) deny Plaintiffs' Motion for Summary Judgment, (ii) grant judgment to TPC or, in the alternative, dismiss Plaintiffs' Complaint, (iii) strike the Declaration of Oscar Shine, and (iv) grant such other and further relief as it deems just and proper.

Dated: June 28, 2022
Wilmington, Delaware

/s/ Matthew O. Talmo

**BAKER BOTTS L.L.P.**
James R. Prince (admitted *pro hac vice*)
Kevin Chiu (admitted *pro hac vice*)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:     (214) 953-6500
Facsimile:     (214) 953-6503
Email: jim.prince@bakerbotts.com
          kevin.chiu@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
Scott R. Bowling (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
Telephone:     (212) 408-2500
Facsimile:     (212) 259-2501
Email: scott.bowling@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
David R. Eastlake (admitted *pro hac vice*)
Lauren N. Randle (admitted *pro hac vice*)
910 Louisiana Street
Houston, Texas 77002
Telephone:     (713) 229-1234
Facsimile:     (713) 229-1522
Email: david.eastlake@bakerbotts.com
          lauren.randle@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:     rdehney@morrisnichols.com
              cmiller@ morrisnichols.com
              dbutz@ morrisnichols.com
              mtalmo@ morrisnichols.com
              bloughnane@ morrisnichols.com

*Proposed Attorneys for Proposed Attorneys for Debtors*
*and Debtors in Possession.*

15