# Exhibit A

EXECUTION VERSION

# INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "<u>Agreement</u>"), dated as of August 2, 2019, among BANK OF AMERICA, N.A., as administrative agent and collateral agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "<u>ABL Representative</u>") for the ABL Secured Parties (as defined below), U.S. BANK NATIONAL ASSOCIATION, as trustee and collateral agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "<u>Existing Notes Representative</u>") for the Notes Secured Parties (as defined below), each additional representative in respect of Additional Debt from time to time party hereto pursuant to <u>Section 10.5(b)</u> and each of the Grantors (as defined below) party hereto.

## RECITALS

A.      TPC Holdings, Inc., a Delaware corporation ("<u>Parent</u>"), TPC Group Inc., a Delaware corporation ("<u>TPC</u>"), the other borrowers party thereto, certain other obligors party thereto, the ABL Representative and certain financial institutions are parties to that certain Amended and Restated Credit Agreement dated as of the date hereof (as further amended, supplemented or otherwise modified from time to time, the "<u>Existing ABL Agreement</u>"), pursuant to which such financial institutions have agreed to make revolving loans and extend other financial accommodations to TPC and certain other obligors thereunder from time to time.

B.      TPC, the Notes Representative, as trustee, and certain subsidiaries of TPC as guarantors are parties to the indenture dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "<u>Existing Notes Agreement</u>"), pursuant to which TPC has issued 10.50%  senior secured notes (together with any additional notes issued under the Existing Notes Agreement, the "<u>Notes</u>").

C.      Each of the Grantors is either a co-borrower under the Existing ABL Agreement or has agreed to guarantee the obligations of TPC and the other borrowers under the Existing ABL Agreement pursuant to an ABL Guarantee.

D.      Each Grantor has granted to the ABL Representative security interests in the ABL Collateral as security for payment and performance of the ABL Obligations.  Each Grantor has granted to the Existing Notes Representative security interests in the Notes Collateral as security for payment and performance of the applicable Note Obligations.

E.      The ABL Obligations are intended to be secured by first priority liens on the ABL Facility Priority Collateral and second priority liens on the Notes Priority Collateral (other than Real Property), and the Notes Obligations are intended to be secured by first priority liens on the Notes Priority Collateral and second priority liens on the ABL Facility Priority Collateral, such priorities and related rights to be established by this Agreement.

## AGREEMENTS

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which is expressly recognized by all of the parties hereto, the parties agree as follows:

**SECTION 1.**    *Definitions; Rules of Construction.*

1.1    <u>UCC Definitions</u>.  Terms defined in the Uniform Commercial Code are used herein as so defined, including, without limitation, the following:  Accounts, Chattel Paper, Commercial Tort Claims, Commodity Account, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments (as defined in Article 9 of the Uniform Commercial Code), Inventory, Investment Property, Letter of Credit, Letter of Credit Rights, Payment Intangible, Records, Securities Account and Supporting Obligations.

1.2    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"<u>ABL Agreement</u>" means the collective reference to (a) the Existing ABL Agreement, and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, replace, refinance or refund in whole the indebtedness and other obligations outstanding under the Existing ABL Agreement (regardless of whether such replacement, refunding or refinancing is a "working capital" facility, asset-based facility or otherwise), or any other agreement or instrument referred to in this clause (b) (unless such agreement or instrument expressly provides that it is not intended to be and is not an ABL Agreement hereunder) so long as (x) such agreement is designated by TPC as an ABL Agreement hereunder by written notice to the Notes Representatives (which notice shall include a certification that the incurrence of such additional indebtedness and related Liens (including the priority thereof) is permitted pursuant to the terms of the Notes Documents) and (y) the holders of such indebtedness so incurred or the ABL Representative on their behalf have agreed to be bound by this Agreement (a "<u>Replacement ABL Agreement</u>").  Any reference to the ABL Agreement hereunder shall be deemed a reference to any ABL Agreement then extant.

"<u>ABL Collateral</u>" means all assets, whether now owned or hereafter acquired by any Grantor, in which a Lien is granted or purported to be granted at any time by such Grantor to any ABL Secured Party as security for any ABL Obligation.  The ABL Collateral does not include Real Property (other than Fixtures).

"<u>ABL Creditors</u>" means, collectively, the "Lenders" and the other "Secured Parties", each as defined in the ABL Agreement or the other ABL Documents.

"<u>ABL DIP Financing</u>" has the meaning set forth in <u>Section 5.2(a)</u>.

"<u>ABL Documents</u>" means the ABL Agreement, each ABL Security Document, each ABL Guarantee and each other "Loan Document" as defined in the ABL Agreement.

"<u>ABL Facility Priority Collateral</u>" means all now owned or hereafter acquired Collateral consisting of the following:

(a)    all Accounts and all Payment Intangibles, including those for inventory that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, or for services rendered or to be rendered  (including unbilled accounts but, in each case excluding Accounts and Payment Intangibles arising solely from the sale, lease, license, assignment or other disposition of Notes Priority Collateral);

(b)    all Inventory;

2

(c)    all customer contracts (including exchange agreements and rights thereunder) and all business interruption insurance;

(d)    all intercompany and affiliate indebtedness of the Grantors and their Subsidiaries, in each case, that is unrelated to the sale, lease, assignment or other disposition of Notes Priority Collateral;

(e)    all Investment Property (other than Equity Interests owned by the Grantors and any present or future Subsidiary of TPC);

(f)    all General Intangibles (other than Equity Interests owned by the Grantors and any present or future Subsidiary of TPC and any Intellectual Property), Instruments, Letter of Credit Rights, Documents, Chattel Paper and Commercial Tort Claims, in each case to the extent arising from or relating to the other items of property included within the preceding clauses;

(g)    all Deposit Accounts (other than Deposit Accounts that contain only the identifiable Proceeds of the Notes Priority Collateral) with any bank or other financial institution (including all cash, cash equivalents, financial assets, negotiable instruments and other evidence of payment, and other funds on deposit therein or credited thereto, other than, in each case, to the extent constituting the identifiable Proceeds of Notes Priority Collateral);

(h)    all Securities Accounts (other than Securities Accounts that contain only the identifiable Proceeds of the Notes Priority Collateral) with any securities intermediary (including any and all Investment Property and all funds or other property held therein or credited thereto, other than, in each case, to the extent constituting the identifiable Proceeds of Notes Priority Collateral);

(i)    all Commodity Accounts (other than Commodity Accounts that contain only the identifiable Proceeds of the Notes Priority Collateral) with any commodities intermediary (including any and all commodity contracts and all funds and other property held therein or credited thereto, other than, in each case, to the extent constituting the identifiable Proceeds of Notes Priority Collateral);

(j)    all accessions to, substitutions for and replacements of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto; and

(k)    to the extent not otherwise included, all Proceeds (including without limitation, all insurance proceeds related to the above), Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

"ABL Guarantee" means any guarantee by any Grantor of any or all of the ABL Obligations.

"ABL Lien" means any Lien created by the ABL Security Documents.

"ABL Obligations" means (a) all principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all loans made pursuant to the ABL Agreement or any ABL DIP Financing by the ABL Creditors, (b) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the ABL Agreement, (c) all Bank Product Obligations and (d) all guarantee obligations, indemnities (other than Unasserted Contingent Obligations), fees, expenses and other amounts payable from time to time pursuant to the ABL Documents (including without limitation any

US 5968271

Post-Petition Interest), in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any Grantor, as Proceeds of Collateral, enforcement of any right of setoff or otherwise) is declared to be or avoided as a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Notes Secured Party, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Secured Parties and the Notes Secured Parties with respect to such amounts, be deemed to be reinstated and outstanding as if such payment had not occurred.

"ABL Obligations Payment Date" means, subject to Section 5.5, the first date on which (a) the ABL Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the ABL Documents), (b) all commitments to extend credit under the ABL Documents and documents relating to Bank Products have been terminated, and (c) there are no outstanding letters of credit or similar instruments issued under, or Bank Product Obligations secured by, the ABL Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the ABL Documents). Notwithstanding the foregoing, if substantially concurrently with the ABL Obligations Payment Date, Grantors enter into any refinancing or replacement of any ABL Agreement which refinancing or replacement is permitted hereby and under the Notes Documents and the ABL Representative has delivered a written notice thereof to the Notes Representative which notice shall include a certification that the incurrence of such additional indebtedness and related Liens (including the priority thereof) is permitted pursuant to the terms of the Notes Documents) and so long as the holders of such indebtedness so incurred or the ABL Representative on their behalf have agreed to be bound by this Agreement, then such ABL Obligations Payment Date shall automatically be deemed not to have occurred for all purposes of this Agreement, and the obligations under such ABL Agreement and the related ABL Documents shall automatically be treated as ABL Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the administrative or collateral agent under such ABL Documents shall be the ABL Representative for all purposes of this Agreement. Upon receipt of such notice within such time period stating that Grantors have entered into such new ABL Agreement (which notice shall include the identity of the new administrative or collateral agent, such agent, the "New ABL Agent"), the Notes Representative shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) at the Grantors' expense as such New ABL Agent may reasonably request in order to provide to the New ABL Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.

"ABL Post-Petition Assets" has the meaning set forth in Section 5.2(b).

"ABL Representative" has the meaning set forth in the introductory paragraph hereof. In the case of any ABL Agreement (other than the Existing ABL Agreement), the ABL Representative shall be the Person identified as administrative agent or other representative in such ABL Agreement.

"ABL Secured Parties" means the ABL Representative, the ABL Creditors and any other holders of the ABL Obligations.

"ABL Security Documents" means the "Security Documents" as defined in the ABL Agreement, and any other documents that are designated under the ABL Agreement as "ABL Security Documents" for purposes of this Agreement.

"Access Period" means, with respect to any Real Property or Equipment constituting Notes Priority Collateral, the period, following the commencement of any Enforcement Action, which begins on the earlier of (a) the day on which the ABL Representative provides the Notes Representatives with the

written notice of its election to request access to such Real Property or Equipment constituting Notes Priority Collateral pursuant to <u>Section 3.4(c)</u> and (b) the day on which the ABL Representative receives written notice from any Notes Representative that such Notes Representative (or its agent) has obtained possession or control of such Real Property or Equipment constituting Notes Priority Collateral or has, through the exercise of remedies or otherwise, sold or otherwise transferred such Real Property or Equipment constituting Notes Priority Collateral to any third party purchaser or transferee, and ends on the earliest of (i) the day which is 180 days after such date (the "<u>Initial Access Date</u>") plus such number of days, if any, after the Initial Access Date that it is stayed or otherwise prohibited by law or court order from exercising remedies with respect to associated ABL Facility Priority Collateral, (ii) the date on which all or substantially all of the ABL Facility Priority Collateral associated with such Real Property or Equipment constituting Notes Priority Collateral is sold, collected or liquidated, (iii) the ABL Obligations Payment Date and (iv) the date on which the default which resulted in such Enforcement Action has been cured to the satisfaction of the ABL Representative or waived in writing.

"<u>Account Agreements</u>" means any lockbox account agreement, pledged account agreement, blocked account agreement, securities account control agreement, commodities account control agreement, credit card processing agreement or any similar deposit, commodity or securities account agreements among the ABL Representative and/or any Notes Representative and a Grantor and the relevant service provider, financial institution, depository or intermediary.

"<u>Additional Debt</u>" has the meaning set forth in <u>Section 10.5(b)</u>.

"<u>Additional Notes Agreement</u>" means any agreement for the incurrence of additional indebtedness that is permitted to be incurred and secured by the Notes Collateral pursuant to the terms of the ABL Agreement and Notes Agreements so long as (x) such agreement is designated by TPC as an Additional Notes Agreement hereunder by written notice to the ABL Representative and Notes Representatives (which notice shall include a certification that the incurrence of such additional indebtedness and related Liens (including the priority thereof) is permitted pursuant to the terms of the ABL Agreement and Notes Documents) and (y) the holders of such indebtedness so incurred or the Notes Representative on their behalf have agreed to be bound by this Agreement.

"<u>Additional Pari Passu Agreement</u>" as defined in the Existing Notes Security Agreement.

"<u>Bank Product</u>" means each and any of the following products, services or facilities extended to any Grantor or Subsidiary of a Grantor by an ABL Secured Party (or any of its affiliates) (or who were such Persons at the time entered into): (a) Cash Management Services (other than Cash Management Services the obligations under which constitute Notes Obligations); (b) products under Hedging Agreements (other than Hedging Agreements the obligations under which constitute Notes Obligations); (c) commercial credit card and merchant card services; and (d) other banking products or services, excluding loans and letters of credit.

"<u>Bank Product Obligations</u>" means, with respect to any Grantor, any and all obligations and liabilities of such Grantor owed to any ABL Secured Party (or any of its affiliates), whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all guarantees thereof and all renewals, extensions and modifications thereof and substitutions therefor) in connection with Bank Products.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code (11 U.S.C. §101 <u>et</u> <u>seq</u>.), as amended from time to time.

US 5968271

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Cash Management Services" means services relating to operating, collections, payroll, trust, or other depository or disbursement accounts or similar cash management arrangements, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

"Collateral" means, collectively, all ABL Collateral and all Notes Collateral.

"Collateral Agent Joinder Agreement" shall means the Collateral Agent Joinder Agreement substantially in the form annexed hereto as Annex 2 (or as otherwise agreed among the ABL Representative, the Designated Notes Representative and TPC).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute and any regulations promulgated thereunder.

"Common Collateral" means all Collateral that constitutes both ABL Collateral and Notes Collateral (it being understood that "Common Collateral" is intended to exclude any assets of Parent in which a lien is granted or purported to be granted at any time to any ABL Secured Party as security for any ABL Obligations).

"Comparable Security Document" means, in relation to any Senior Collateral subject to any Senior Security Document, that Junior Security Document that creates a security interest in the same Senior Collateral, granted by the same Grantor, as applicable.

"Control Representative" has the meaning set forth in Section 2.6(a).

"Copyrights" means all rights, title, and interests in or relating to the following: (a) all copyrights and all mask work, database and design rights, whether or not registered or published and all applications and registrations thereof; (b) all renewals of any of the foregoing; (c) the right to sue for past, present, and future infringements of any of the foregoing; and (d) all rights corresponding to any of the foregoing throughout the world.

"Designated Notes Representative" means (a) at any time there is only one series of Notes Obligations, the Notes Representative for such series and (b) at any time there is more than one Series of Notes Obligations, the "Applicable Authorized Representative" (or any similar term) (as defined in any pari passu intercreditor agreement governing the intercreditor arrangements solely among the Notes Secured Parties).

"Enforcement Action" means, with respect to the ABL Obligations or the Notes Obligations, the exercise of any rights and remedies against, or to realize upon, any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the ABL Documents or the Notes Documents, or applicable law, including without limitation the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, but excluding (a) the imposition of any default rate or late fee and (b) so long as no other Enforcement Action has been taken, the collection or application of, or the delivery of any activation notice under Account Agreements with respect to, funds from time to time on deposit in any Deposit Account, Commodity Account or Securities Account representing ABL Facility Priority Collateral.

US 5968271

"Equity Interests" means (a) in the case of a corporation, corporate stock, (b) in the case of an association, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited and however designated, whether voting or non-voting), and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, the issuing Person.

"Existing ABL Agreement" has the meaning set forth in the Recitals of this Agreement.

"Existing Notes Agreement" has the meaning set forth in the Recitals of this Agreement.

"Existing Notes Representative" has the meaning set forth in the Recitals of this Agreement.

"Existing Notes Security Agreement" means the Security Agreement dated as of the date hereof (as amended, supplemented or otherwise modified from time to time) among TPC, the other Grantors and the Existing Notes Representative.

"Governmental Authority" means any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, central bank, or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for any governmental, judicial, investigative, regulatory or self-regulatory authority (including any supra-national bodies such as the European Union or European Central Bank).

"Grantor" means TPC and each Subsidiary of TPC that is now or hereafter becomes a party to any ABL Document or any Notes Document. All references in this Agreement to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor in any Insolvency Proceeding.

"Hedging Agreement" means any "swap agreement" as defined in Section 101(53B)(A) of the Bankruptcy Code, including any agreement relating to any swap, cap, floor, collar, option or forward, or combination thereof or similar transaction, with respect to interest rate, foreign exchange, currency, commodity, credit or equity risk.

"Initial Access Date" shall have the meaning assigned to such term in the definition of "Access Period".

"Insolvency Proceeding" means any case or proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law or whether voluntary or involuntary.

"Intellectual Property" means, collectively, all rights, priorities and privileges relating to intellectual property, including all Copyrights, Patents, Trademarks, Trade Secrets and IP Licenses and any other intellectual property rights, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"IP License" means all licenses granting any right to exploit any Intellectual Property.

"Junior Collateral" means with respect to any Junior Secured Party, any Collateral on which it has a Junior Lien.

"<u>Junior Documents</u>" means, collectively, with respect to any Junior Obligations, any provision pertaining to such Junior Obligation in any Loan Document or any other document, instrument or certificate evidencing or delivered in connection with such Junior Obligation.

"<u>Junior Liens</u>" means (a) with respect to any ABL Facility Priority Collateral, all Liens securing or purporting to secure the Notes Obligations, and (b) with respect to any Notes Priority Collateral, all Liens securing or purporting to secure the ABL Obligations.

"<u>Junior Obligations</u>" means (a) with respect to any ABL Facility Priority Collateral, all Notes Obligations and (b) with respect to any Notes Priority Collateral, all ABL Obligations.

"<u>Junior Obligations Payment Date</u>" means (a) as it relates to the Notes Priority Collateral, the ABL Obligations Payment Date and (b) as it relates to the ABL Facility Priority Collateral, the Notes Obligations Payment Date.

"<u>Junior Representative</u>" means (a) with respect to any ABL Obligations or any ABL Facility Priority Collateral, each Notes Representative and (b) with respect to any Notes Obligations or any Notes Priority Collateral, the ABL Representative.

"<u>Junior Secured Parties</u>" means (a) with respect to the ABL Facility Priority Collateral, all Notes Secured Parties and (b) with respect to the Notes Priority Collateral, all ABL Secured Parties.

"<u>Junior Security Documents</u>" means, with respect to any Junior Secured Party, the Security Documents that secure the Junior Obligations.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, assignment, assignation, debenture, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Lien Priority</u>" means with respect to any Lien of the ABL Representative or Notes Representative in the Common Collateral, the order of priority of such Lien specified in <u>Section 2.1</u>.

"<u>Loan Documents</u>" means, collectively, the ABL Documents and the Notes Documents.

"<u>New ABL Agent</u>" has the meaning set forth in the definition of "ABL Obligations Payment Date".

"<u>New Notes Agent</u>" has the meaning set forth in the definition of "Notes Obligations Payment Date".

"<u>Notes Agreement</u>" means the collective reference to (a) the Existing Notes Agreement, (b) any Additional Notes Agreement and (c) any other credit agreement, loan agreement, note agreement, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, replace, refinance or refund in whole or in part the indebtedness and other obligations outstanding under the Existing Notes Agreement, any Additional Notes Agreement or any other agreement or instrument referred to in this clause (c) (unless such agreement or instrument expressly provides that it is not intended to be and is not a Notes Agreement hereunder) so long as (x) such agreement is designated by TPC as Notes Agreement

US 5968271

hereunder by written notice to the ABL Representative and Notes Representatives (which notice shall include a certification that the incurrence of such additional indebtedness and related Liens (including the priority thereof) is permitted pursuant to the terms of the ABL Agreement and Notes Documents) and (y) the holders of such indebtedness so incurred or the Notes Representative on their behalf have agreed to be bound by this Agreement (a "Replacement Notes Agreement"); provided, that to the extent more than one Notes Agreement is outstanding, no credit agreement, loan agreement, note agreement, indenture or other agreement or instrument shall constitute a Notes Agreement unless the Notes Representative has received an intercreditor agreement governing the intercreditor arrangements solely among the Notes Secured Parties reasonably satisfactory to it from the applicable representative thereunder. Any reference to the Notes Agreement hereunder shall be deemed a reference to any Notes Agreement then extant.

"Notes Collateral" means all assets, whether now owned or hereafter acquired by any Grantor, in which a Lien is granted or purported to be granted at any time by such Grantor to any Notes Secured Party as security for any Notes Obligation.

"Notes DIP Financing" has the meaning set forth in Section 5.2(b).

"Notes Documents" means the Notes Agreements, each Notes Security Document, each Notes Guarantee, each Additional Pari Passu Agreement (as defined in the Existing Notes Security Agreement) and each other "Senior Secured Notes Document" defined in the Existing Notes Agreement (or any similar term in any other Notes Agreement).

"Notes Guarantee" means any guarantee by any Grantor of any or all of the Notes Obligations.

"Notes Lien" means any Lien created by the Notes Security Documents.

"Notes Obligations" means (a) all principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all indebtedness under the Notes Agreements, the Notes, each Additional Pari Passu Agreement (as defined in the Existing Notes Security Agreement) and any Notes DIP Financing by the Notes Secured Parties, (b) all obligations and liabilities of any Grantor owed to any Notes Secured Party (or any of its affiliates) in connection with any Hedging Agreements and Cash Management Services (other than Hedging Agreements and Cash Management Services the obligations under which constitute ABL Obligations) and (c) all guarantee obligations, indemnities (other than Unasserted Contingent Obligations), fees, expenses and other amounts payable from time to time pursuant to the Notes Documents (including without limitation any Post-Petition Interest), in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Notes Obligation (whether by or on behalf of any Grantor, as Proceeds of security, enforcement of any right of setoff or otherwise) is declared to be or avoided as a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Secured Party, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Secured Parties and the Notes Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"Notes Obligations Payment Date" means, subject to Section 5.5, the first date on which (a) the Notes Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the Notes Documents), (b) all commitments to extend credit under the Notes Documents have been terminated, and (c) there are no obligations in respect of Hedging Agreements or Cash Management Services secured by the Notes Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the Notes Documents).  Notwithstanding the foregoing, if substantially concurrently with the Notes

Obligations Payment Date, Grantors enter into any refinancing or replacement of any Notes Agreement which refinancing or replacement is permitted hereby and under the ABL Documents and each Notes Document then extant and the Notes Representative has delivered a written notice thereof to the ABL Representative and Notes Representative (which notice shall include a certification that the incurrence of such additional indebtedness and related Liens (including the priority thereof) is permitted pursuant to the terms of the ABL Agreement and Notes Documents) and so long as the holders of such indebtedness so incurred or the Notes Representative on their behalf have agreed to be bound by this Agreement, then such Notes Obligations Payment Date shall automatically be deemed not to have occurred for all purposes of this Agreement, and the obligations under such Notes Agreement and the related Notes Documents shall automatically be treated as Notes Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent under such Notes Documents shall be a Notes Representative for all purposes of this Agreement. Upon receipt of such notice within such time period stating that Grantors have entered into a new Notes Agreement (which notice shall include the identity of the new collateral agent, such collateral agent, the "New Notes Agent"), the ABL Representative shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) at the Grantors' expense as such New Notes Agent may reasonably request in order to provide to the New Notes Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.

"Notes Post-Petition Assets" has the meaning set forth in Section 5.2(a).

"Notes Priority Collateral" means all now owned or hereafter acquired Notes Collateral consisting of the following:

(a)     Deposit Accounts, Securities Accounts and Commodity Accounts that contain only proceeds of items (b) through (i) below;

(b)     all present and future Equity Interests owned by the Grantors and of each present and future Subsidiary of TPC;

(c)     all Equipment;

(d)     all Fixtures;

(e)     all Real Property;

(f)     all Intellectual Property;

(g)     all other Notes Collateral other than the ABL Facility Priority Collateral;

(h)     all accessions to, substitutions for and replacements of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto; and

(i)     to the extent not otherwise included, all Proceeds (including without limitation, all insurance proceeds relating to the above and any identifiable proceeds of items (a) through (h) of this definition contained in any Deposit Accounts, Securities Accounts and Commodity Accounts that otherwise constitute ABL Facility Priority Collateral), Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

US 5968271

"Notes Representative" means the Existing Notes Representative and, in the case of any Notes Agreement (other than the Existing Notes Agreement), the Notes Representative shall be the Person identified as administrative agent or other representative in such Notes Agreement.

"Notes Security Documents" means the Existing Notes Security Agreement, the other "Security Documents" as defined in the Existing Notes Agreement (or any similar term in any other Notes Agreement) and any documents that are designated under any Notes Agreement as "Notes Security Documents" for purposes of this Agreement.

"Notes Secured Parties" means the Notes Representatives, the "Holders" as defined in the Existing Notes Agreement, the other "Secured Parties" as defined in the Existing Notes Security Agreement (or any similar term of any Notes Agreement) and any other holders of the Notes Obligations.

"Parent" has the meaning set forth in the Recitals to this Agreement.

"Patents" means all rights, title, and interests in or relating to: (a) any and all issued patents and patent applications; (b) all letters patents and design letters patents; (c) all reissues, divisions, continuations, extensions, and continuations-in-part thereof; (d) all rights to sue for past, present, and future infringements thereof; and (e) all rights corresponding to any of the foregoing throughout the world.

"Person" means any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"Post-Petition Interest" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding (or would accrue but for the commencement of an Insolvency Proceeding), whether or not allowed or allowable in any such Insolvency Proceeding.

"Priority Collateral" means the ABL Facility Priority Collateral or the Notes Priority Collateral, as applicable.

"Proceeds" means (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Common Collateral, and (b) whatever is recoverable or recovered when any Common Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Purchase Option Triggering Event" means the earliest to occur of: (a) an Insolvency Proceeding; (b) acceleration of the maturity of the ABL Obligations by the ABL Representative as a result of an event of default under the ABL Documents; or (c) a payment default under the ABL Agreement that has not been cured or waived within 30 days of the occurrence of such payment default.

"Real Property" means any right, title or interest in and to real property, including any fee interest, leasehold interest, easement, or license and any other right to use or occupy real property, including any right arising by contract.

"Recovery" has the meaning set forth in Section 5.5.

"Replacement ABL Agreement" has the meaning set forth in the definition of "ABL Agreement."

"Replacement Notes Agreement" has the meaning set forth in the definition of "Notes Agreement."

US 5968271

"<u>Requirement of Law</u>" means any law (statutory or common), ordinance, treaty, code, directive, decree, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority.

"<u>Secured Obligations</u>" means the ABL Obligations and the Notes Obligations.

"<u>Secured Parties</u>" means the ABL Secured Parties and the Notes Secured Parties.

"<u>Security Documents</u>" means, collectively, the ABL Security Documents and the Notes Security Documents.

"<u>Senior Collateral</u>" means with respect to any Senior Secured Party, any Collateral on which it has a Senior Lien.

"<u>Senior Documents</u>" means, collectively, with respect to any Senior Obligation, any provision pertaining to such Senior Obligation in any Loan Document or any other document, instrument or certificate evidencing or delivered in connection with such Senior Obligation.

"<u>Senior Liens</u>" means (a) with respect to the ABL Facility Priority Collateral, all Liens securing or purporting to secure the ABL Obligations and (b) with respect to the Notes Priority Collateral, all Liens securing or purporting to secure the Notes Obligations.

"<u>Senior Obligations</u>" means (a) with respect to any ABL Facility Priority Collateral, all ABL Obligations and (b) with respect to any Notes Priority Collateral, all Notes Obligations.

"<u>Senior Obligations Payment Date</u>" means (a) as it relates to the ABL Facility Priority Collateral, the ABL Obligations Payment Date and (b) as it relates to the Notes Priority Collateral, the Notes Obligations Payment Date.

"<u>Senior Representative</u>" means (a) with respect to any ABL Facility Priority Collateral, the ABL Representative and (b) with respect to any Notes Priority Collateral, the Notes Representative.

"<u>Senior Secured Parties</u>" means (a) with respect to the ABL Facility Priority Collateral, all ABL Secured Parties and (b) with respect to the Notes Priority Collateral, all Notes Secured Parties.

"<u>Senior Security Documents</u>" means with respect to any Senior Secured Party, the Security Documents that secure the Senior Obligations owing to such Senior Secured Party.

"<u>Subsidiary</u>" means any entity more than 50% of whose voting securities or Equity Interests are owned by TPC or any combination of Grantors (including indirect ownership through other entities in which Grantors own directly or indirectly more than 50% of the voting securities or Equity Interests).

"<u>Trade Secret</u>" shall mean all rights, title and interests in or relating to trade secrets.

"<u>Trademarks</u>" means all rights, title, and interests in or relating to the following:  (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, together with all goodwill associated therewith, all registrations, applications and recordations thereof; (b) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (c) all rights corresponding to any of the foregoing throughout the world.

"Unasserted Contingent Obligations" means, at any time, ABL Obligations or Notes Obligations, as applicable, for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest and premium (if any) on, and fees and expenses relating to, any ABL Obligation or Notes Obligation, as applicable, and (b) with respect to ABL Obligations contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit or in respect of Bank Products) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of ABL Obligations or Notes Obligations, as applicable, for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.3     Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented, modified, refinanced, replaced, renewed or otherwise extended (subject to any restrictions on such amendments, amendments and restatements, restatements, supplements, modifications, refinancings, replacements, renewals and extensions set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2.**  *Lien Priority.*

2.1     Lien Subordination.  Notwithstanding the date, manner or order of grant, attachment or perfection of any Junior Lien in respect of any Collateral or of any Senior Lien in respect of any Collateral and notwithstanding any provision of the UCC, any applicable law, any Security Document, any alleged or actual defect or deficiency in any of the foregoing or any other circumstance whatsoever, the Junior Representative, on behalf of each applicable Junior Secured Party, in respect of such Collateral hereby agrees that:

(a)     any Senior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be and shall remain senior in all respects and prior to any Junior Lien in respect of such Collateral (whether or not such Senior Lien is subordinated to any Lien securing any obligation); and

(b)     any Junior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to any Senior Lien in respect of such Collateral.

2.2    <u>Prohibition on Contesting Liens</u>.  In respect of any Collateral, the Junior Representative, on behalf of each applicable Junior Secured Party, in respect of such Collateral agrees that it shall not, and hereby waives any right to:

(a)    contest, or support any other Person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, perfection, validity or enforceability of any Senior Lien on such Collateral or the allowability of any Senior Obligations; or

(b)    demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or similar right which it may have in respect of such Collateral or the Senior Liens on such Collateral, except to the extent that such rights are expressly granted in this Agreement.

2.3    <u>Nature of Obligations</u>.  Each Notes Representative on behalf of itself and the applicable Notes Secured Parties acknowledges that a portion of the ABL Obligations represents debt that is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the ABL Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the ABL Obligations may be increased, extended, renewed, replaced or refinanced, in each event, without notice to or consent by the Notes Secured Parties and without affecting the provisions hereof.  The ABL Representative on behalf of itself and the other ABL Secured Parties acknowledges that the terms of the Notes Obligations may be modified, extended or amended from time to time and that the aggregate amount of the Notes Obligations may be increased, extended, renewed, replaced or refinanced, in each event, without notice to or consent by the ABL Secured Parties and without affecting the provisions hereof.  The Lien Priorities provided in <u>Section 2.1</u> shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the ABL Obligations or the Notes Obligations, or any portion thereof.

2.4    <u>No New Liens</u>.  (a) Until the ABL Obligations Payment Date, no Notes Secured Party shall acquire or hold any Lien on any assets (other than Real Property which is not Fixtures) of any Grantor securing any Notes Obligation which assets are not also subject to the Lien of the ABL Representative under the ABL Documents, subject to the Lien Priority set forth herein.  If any Notes Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets (other than Real Property which is not Fixtures) of any Grantor securing any Notes Obligation which assets are not also subject to the Lien of the ABL Representative under the ABL Documents, subject to the Lien Priority set forth herein, then (i) the Notes Representative (or the relevant Notes Secured Party) shall, without the need for any further consent of any other Notes Secured Party and notwithstanding anything to the contrary in any other Notes Document be deemed to also hold and have held such Lien for the benefit of the ABL Representative as security for the ABL Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the ABL Representative in writing of the existence of such Lien and (ii) any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1; <u>provided</u> that this provision will not be violated with respect to any ABL Obligations under any ABL Document if the ABL Representative is given a reasonable opportunity to accept a Lien on any asset or property and the ABL Representative states in writing that the ABL Documents in respect thereof prohibit the ABL Representative from accepting a Lien on such asset or property or the ABL Representative otherwise expressly declines to accept a Lien on such asset or property.

(b)    Until the Notes Obligations Payment Date, no ABL Secured Party shall acquire or hold any Lien on any assets of any Grantor securing any ABL Obligation which assets are not also

14

subject to the Lien of the Notes Representatives under the Notes Documents, subject to the Lien Priority set forth herein (it being understood that only the ABL Secured Parties have Liens on the assets of Parent).  If any ABL Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Grantor securing any ABL Obligation which assets are not also subject to the Lien of the Notes Representatives under the Notes Documents, subject to the Lien Priority set forth herein, then (i) the ABL Representative (or the relevant ABL Secured Party) shall, without the need for any further consent of any other ABL Secured Party and notwithstanding anything to the contrary in any other ABL Document be deemed to also hold and have held such Lien for the benefit of the Notes Representative as security for the Notes Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the Notes Representatives in writing of the existence of such Lien and (ii) any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1; provided that this provision will not be violated with respect to any Notes Obligations under any Notes Document if the applicable Notes Representative is given a reasonable opportunity to accept a Lien on any asset or property and such Notes Representative states in writing that the applicable Notes Documents in respect thereof prohibit such Notes Representative from accepting a Lien on such asset or property or the applicable Notes Representative otherwise expressly declines to accept a Lien on such asset or property.

2.5    Separate Grants of Security and Separate Classification.    Each Secured Party acknowledges and agrees that (a) the grants of Liens pursuant to the ABL Security Documents and the Notes Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the Notes Obligations are fundamentally different from the ABL Obligations and should be separately classified in any plan of reorganization or similar dispositive restructuring plan proposed, confirmed, or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Notes Secured Parties in respect of the Common Collateral constitute claims in the same class (rather than separate classes of secured claims subject to the Lien Priority set forth herein), then the ABL Secured Parties and the Notes Secured Parties hereby acknowledge and agree that all distributions from the Collateral shall be made as if there were separate classes of ABL Obligation claims and Notes Obligation claims against the Grantors (with the effect being that, to the extent that the aggregate value of the ABL Facility Priority Collateral or Notes Priority Collateral, as the case may be, is sufficient (for this purpose ignoring all claims held by the other Secured Parties), the ABL Secured Parties or the Notes Secured Parties, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest that is available from each pool of Priority Collateral for each of the ABL Secured Parties and the Notes Secured Parties, respectively, before any distribution is made in respect of the claims held by the other Secured Parties from such pool of Priority Collateral, with the other Secured Parties hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them from such pool of Priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

2.6    Agreements Regarding Actions to Perfect Liens.  (a) Each of the ABL Representative and each Notes Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over, or is otherwise noted as a lienholder on any certificate of title constituting, Common Collateral pursuant to the ABL Security Documents or the Notes Security Documents, as applicable, the ABL Representative and each Notes Representative, as applicable, each agree to hold or control such Common Collateral as gratuitous bailee and as non-fiduciary agent for each Notes Representative or the ABL Representative, as applicable (such bailment and agency being intended, among other things, to satisfy the requirements of Sections 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC and applicable certificate of title laws),

15

solely for the purpose of perfecting the security interest (including any second-priority security interest) granted under the Notes Documents or the ABL Documents, as applicable, subject to the terms and conditions of this Section 2.6 (either the ABL Representative or the applicable Notes Representative in such capacity, the "Control Representative"). Nothing in this Section 2.6 shall be construed to impose any duty on the ABL Representative or any Notes Representative (or any third party acting on either such Person's behalf) or create any fiduciary relationship with respect to such Common Collateral or provide any Notes Representative, any other Notes Secured Party, the ABL Representative or any other ABL Secured Party, as applicable, with any rights with respect to such Common Collateral beyond those specified in this Agreement, the ABL Security Documents and the Notes Security Documents, as applicable, provided that subsequent to the occurrence of the ABL Obligations Payment Date (so long as the Notes Obligations Payment Date shall not have occurred), the ABL Representative shall (i) deliver to the Designated Notes Representative, at the Grantors' sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements to the extent required by the Notes Documents or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs; provided, further, that subsequent to the occurrence of the Notes Obligations Payment Date (so long as the ABL Obligations Payment Date shall not have occurred), each Notes Representative shall (A) deliver to the ABL Representative, at the Grantors' sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements to the extent required by the ABL Documents or (B) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs. Notwithstanding the foregoing, Account Agreements shall be subject to the procedures described in clause (b) below. The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the ABL Secured Parties and the Notes Secured Parties and shall not impose on the ABL Secured Parties or the Notes Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

(b)        The ABL Representative hereby agrees that after the ABL Obligations Payment Date and upon the written request of any Notes Representative, to the extent that the applicable Account Agreement is in full force and effect and has not been terminated, the ABL Representative shall continue to act as the Control Representative for each Notes Representative (solely for the purpose of perfecting the security interest granted under the Notes Documents and at the expense of the Grantors) with respect to the Deposit Account, Commodity Account or Securities Account that is the subject of such Account Agreement, until the earlier to occur of (i) 30 days after the ABL Obligations Payment Date and (ii) the date when an Account Agreement is executed in favor of the Notes Representative with respect to such Deposit Account, Commodity Account or Securities Account.

(c)        Until the Notes Obligations Payment Date, the ABL Representative agrees that to the extent it is in possession of any Common Collateral constituting Notes Priority Collateral, promptly upon the request of any Notes Representative at any time prior to the Notes Obligations Payment Date, the ABL Representative shall deliver to the Notes Representative any such Notes Priority Collateral held by it, and shall use commercially reasonable efforts to cause each ABL Creditor known to it to be holding such Notes Priority Collateral to deliver the same to the Notes Representative, together with any necessary endorsements without warranty or representation of any kind (or otherwise allow the Notes Representative to obtain control of such Notes Priority Collateral).

(d)        Until the ABL Obligations Payment Date, each Notes Representative agrees that to the extent it is in possession of any Common Collateral constituting ABL Facility Priority Collateral, promptly upon the request of the ABL Representative at any time prior to the ABL Obligations Payment Date, such Notes Representative shall deliver to the ABL Representative any such ABL Facility Priority Collateral held by it, and shall use commercially reasonable efforts to cause each Notes Secured Party known to it to be holding such ABL Facility Priority Collateral to deliver the same to the ABL

Representative, together with any necessary endorsements without warranty or representation of any kind (or otherwise allow the ABL Representative to obtain control of such ABL Facility Priority Collateral).

(e)　　The ABL Representative shall have no obligation whatsoever to the Notes Representatives or any Notes Secured Party to ensure that the Common Collateral is genuine or owned by any Grantor or to preserve rights or benefits of any person except as expressly set forth in this Section 2.6. The duties or responsibilities of the ABL Representative under this Section 2.6 shall be limited solely to holding or controlling the Common Collateral as gratuitous bailee and non-fiduciary agent in accordance with this Section 2.6 and delivering the Common Collateral upon the ABL Obligations Payment Date as provided in this Section 2.6. No Notes Representative shall have any obligation whatsoever to the ABL Representative or any ABL Creditor to ensure that the Common Collateral is genuine or owned by any Grantor or to preserve rights or benefits of any person except as expressly set forth in this Section 2.6. The duties or responsibilities of the Notes Representatives under this Section 2.6 shall be limited solely to holding or controlling the Common Collateral as gratuitous bailee and non-fiduciary agent in accordance with this Section 2.6 and delivering the Common Collateral upon the Notes Obligations Payment Date as provided in this Section 2.6. Each Junior Representative, on behalf of itself and the applicable Junior Secured Parties, hereby waives and releases the Senior Representative from all claims and liabilities arising pursuant to such Senior Representative's role under this Section 2.6 as gratuitous bailee and non-fiduciary agent with respect to the applicable Common Collateral.

**SECTION 3.**　*Enforcement Rights.*

3.1　Exclusive Enforcement.　Until the Senior Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Grantor, the Senior Secured Parties shall have the exclusive right to take and continue any Enforcement Action (including the right to credit bid their debt) with respect to the Senior Collateral, without any consultation with or consent of any Junior Secured Party, but subject to (a) the provisos set forth in Section 3.2, and (b) Section 3.3. Upon the occurrence and during the continuance of an event of default under the Senior Documents, the Senior Representative and the other Senior Secured Parties may take and continue any Enforcement Action with respect to the Senior Obligations and the Senior Collateral in such order and manner as they may determine in their sole discretion in accordance with the terms and conditions of the Senior Documents. Notwithstanding the foregoing, any Junior Representative may, subject to Section 3.2, take all such actions as it shall deem necessary to (i) perfect or continue the perfection of its Junior Liens or (ii) to create, preserve or protect (but not enforce) the Junior Liens on any Collateral.

3.2　Waivers.　Each Junior Representative, on behalf of itself and the applicable Junior Secured Parties, agrees that, until the Senior Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Grantor:

(a)　　they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien on any Senior Collateral that secures any Junior Obligation pari passu with or senior to, or to give any Junior Secured Party any preference or priority relative to, the Liens on the Senior Collateral securing the Senior Obligations;

(b)　　they will not, directly or indirectly, contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Senior Collateral by any Senior Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) in respect of the Senior Collateral by or on behalf of any Senior Secured Party;

17

(c)      they have no right to (i) direct either the Senior Representative or any other Senior Secured Party to exercise any right, remedy or power with respect to the Senior Collateral or pursuant to the Senior Security Documents in respect of the Senior Collateral or (ii) consent or object to the exercise by the Senior Representative or any other Senior Secured Party of any right, remedy or power with respect to the Senior Collateral or pursuant to the Senior Security Documents with respect to the Senior Collateral or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (c), whether as a junior lien creditor in respect of the Senior Collateral or otherwise, they hereby irrevocably waive such right);

(d)      they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any Senior Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, and no Senior Secured Party shall be liable for, any action taken or omitted to be taken by any Senior Secured Party with respect to the Senior Collateral or pursuant to the Senior Documents in respect of the Senior Collateral;

(e)      they will not commence judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, or attempt any action to take possession of any Senior Collateral, exercise any right, remedy or power with respect to, or otherwise take any action to enforce their interest in or realize upon, the Senior Collateral; and

(f)      they will not seek, and hereby waive any right, to have the Senior Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Senior Collateral;

provided that, in any Insolvency Proceeding commenced by or against any Grantor, the Junior Representative and the Junior Secured Parties may take any action against Common Collateral expressly permitted by Section 5; provided further that notwithstanding the limitations set forth in this Section 3.2, any Junior Secured Party may (A) file a proof of claim or statement of interest with respect to the Junior Obligations owed to it in any Insolvency Proceeding commenced by or against any Grantor, (B) take any action (not adverse to the priority status of the Liens on the Senior Collateral securing the Senior Obligations, or the rights of Senior Representative or any other Senior Secured Parties to undertake Enforcement Actions with respect to the  Senior Collateral) in order to create, perfect, preserve or protect (but not enforce) its Lien in and to the Collateral, (C) file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the Junior Secured Parties, including any claims secured by the Collateral, if any, (D) vote on any plan of reorganization or similar dispositive restructuring plan and make any filings and motions that are, in each case, not inconsistent with the provisions of this Agreement, (E) join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Senior Collateral initiated by Senior  Representative  to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay or otherwise interfere with an Enforcement Action by Senior Representative (it being understood that neither Junior Representative nor any Junior Secured Party shall be entitled to receive any proceeds thereof unless otherwise expressly permitted herein), (F) subject to Section 3.3, file any pleadings, objections, motions or agreements that assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case not inconsistent with or prohibited by the terms of this Agreement, (G) make a cash bid on all or any portion of the Senior Collateral in any foreclosure proceeding or action, (H) credit bid on all or any portion of the Senior Collateral, provided the Senior Obligations Payment Date occurs prior to or in connection with any such credit bid, and (I) engage consultants, valuation firms, investment bankers, and perform or engage third parties to perform audits, examinations and appraisals of the Senior Collateral for the sole purpose of valuing the Senior Collateral

and not for the purpose of marketing or conducting a disposition of such Senior Collateral, in each case in accordance with the Junior Security Documents.

      3.3    <u>Rights as an Unsecured Creditor; Judgment Creditors</u>.

      (a)    Each Notes Representative and other Notes Secured Parties may exercise rights and remedies as unsecured creditors generally against any Grantor in accordance with the terms of the Notes Documents and applicable law so long as doing so is not, directly or indirectly, inconsistent with or prohibited by the terms of this Agreement. In the event that any Notes Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the ABL Liens and the ABL Obligations) to the same extent as all other Liens securing the Notes Obligations are subject to the terms of this Agreement.

      (b)    ABL Representative and other ABL Secured Parties may exercise rights and remedies as unsecured creditors generally against any Grantor in accordance with the terms of the ABL Documents and applicable law so long as doing so is not, directly or indirectly, inconsistent with or prohibited by the terms of this Agreement. In the event that any ABL Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Notes Liens and the Notes Obligations) to the same extent as all other Liens securing the ABL Obligations are subject to the terms of this Agreement.

      3.4    <u>Cooperation; Sharing of Information and Access</u>.  (a) Each Notes Representative, on behalf of itself and the applicable Notes Secured Parties, agrees that each of them shall take such actions as the ABL Representative shall reasonably request in connection with the exercise by the ABL Secured Parties of their rights set forth herein in respect of the ABL Facility Priority Collateral.  The ABL Representative, on behalf of itself and the other ABL Secured Parties, agrees that each of them shall take such actions as any Notes Representative shall reasonably request in connection with the exercise by the Notes Secured Parties of their rights set forth herein in respect of the Notes Priority Collateral.

      (b)    In the event that the ABL Representative shall, in the exercise of its rights under the ABL Security Documents or otherwise, receive possession or control of any books and records of any Grantor which contain information identifying or pertaining to the Notes Priority Collateral, the ABL Representative shall promptly notify each Notes Representative of such fact and, upon request from any Notes Representative and as promptly as practicable thereafter, either make available to such Notes Representative such books and records for inspection and duplication or provide to such Notes Representative copies thereof.  In the event that any Notes Representative shall, in the exercise of its rights under the Notes Security Documents or otherwise, receive possession or control of any books and records of any Grantor which contain information identifying or pertaining to any of the ABL Facility Priority Collateral, such Notes Representative shall promptly notify the ABL Representative of such fact and, upon request from the ABL Representative and as promptly as practicable thereafter, either make available to the ABL Representative such books and records for inspection and duplication or provide the ABL Representative copies thereof.  Until the ABL Obligations Payment Date, each Notes Representative hereby irrevocably grants the ABL Representative a non-exclusive worldwide license or right to use, to the maximum extent permitted by applicable law and to the extent of such Notes Representative's interest therein, exercisable without payment of royalty or other compensation, to use any of the Intellectual Property incorporated in or relating to the ABL Facility Priority Collateral and now or hereafter owned by, licensed to, or otherwise used by the Grantors in order for the ABL Representative and the other ABL Secured Parties to collect, purchase, use, market, repossess, possess, store, assemble, manufacture, process, sell, transfer, distribute or otherwise dispose of any asset included in the ABL Facility Priority

Collateral in connection with the liquidation, disposition or realization upon the ABL Facility Priority Collateral in accordance with the terms and conditions of the ABL Security Documents and the other ABL Documents.  Nothing contained in this <u>Section 3.4</u> shall restrict the rights of the Notes Representative from selling, assigning or otherwise transferring any of the Grantors' Intellectual Property; provided, that the Notes Representative agrees that any sale, transfer or other disposition of any of the Grantors' Intellectual Property (whether by foreclosure or otherwise) will be subject to the ABL Representative's rights as set forth in this <u>Section 3.4</u>.

(c)     If any Notes Representative, or any agent or representative of any Notes Representative, or any receiver, shall, after the commencement of any Enforcement Action, obtain possession or physical control of any of the Notes Priority Collateral (or sells or otherwise transfers any of the Notes Priority Collateral to a third party purchaser or transferee without first obtaining possession or physical control), such Notes Representative shall promptly notify the ABL Representative in writing of that fact, and the ABL Representative shall, within five Business Days thereafter, notify each Notes Representative in writing as to whether the ABL Representative desires to exercise access rights under this Agreement during the Access Period.  In addition, if the ABL Representative, or any agent or representative of the ABL Representative, or any receiver, shall obtain possession or physical control of any of the Notes Priority Collateral in connection with an Enforcement Action, then the ABL Representative shall promptly notify each Notes Representative that the ABL Representative is exercising its access rights under this Agreement and its rights under <u>Section 3.4</u> under either circumstance.  Upon delivery of such notice by the ABL Representative to each Notes Representative, the parties shall confer in good faith to coordinate with respect to the ABL Representative's exercise of such access rights during the Access Period, with such access rights to apply to any Real Property or Equipment constituting Notes Priority Collateral access to which is reasonably necessary to enable the ABL Representative to complete or continue performance under Grantor contracts, collect Accounts, convert ABL Facility Priority Collateral consisting of raw materials and work-in-process into saleable finished goods and/or to transport such ABL Facility Priority Collateral to a point where such conversion can occur, to otherwise prepare ABL Facility Priority Collateral for sale and/or to remove, arrange or effect the sale of ABL Facility Priority Collateral.  Consistent with the definition of Access Period, access rights will apply to differing parcels of Real Property or items of Equipment constituting Notes Priority Collateral at differing times, in which case, a differing Access Period will apply to each such parcel of Real Property and each such item of Equipment.  During any pertinent Access Period, the ABL Representative and its agents, representatives and designees shall have a non-exclusive right to have access to, and a rent-free right to use, the relevant Real Property or Equipment constituting Notes Priority Collateral for the purposes described above.

(d)     The ABL Representative shall take proper and reasonable care of any Notes Priority Collateral that is used by the ABL Representative during the Access Period and shall repair at its expense (without waiving any rights of reimbursement from the Grantors) and replace any damage (ordinary wear-and-tear excepted) caused by any act or omission of the ABL Representative or its agents, representatives or designees and leave such Notes Priority Collateral in a condition substantially similar (ordinary wear and tear excepted) to the condition of such Notes Priority Collateral immediately prior to the date of commencement of the use thereof by the ABL Representative and the ABL Representative shall indemnify and hold harmless each Notes Representative and the Notes Secured Parties for any actual injury or damage to Persons or property (ordinary wear and tear excepted) directly caused by the acts or omissions of Persons under its control; <u>provided</u>, <u>however</u>, that the ABL Representative and the ABL Creditors will not be liable for any diminution in the value of Notes Priority Collateral caused by the absence of the ABL Facility Priority Collateral therefrom.  The ABL Representative shall comply with all applicable laws in connection with its use or occupancy or possession of the Notes Priority Collateral. The ABL Representative, for itself and on behalf of the ABL Secured Parties, hereby acknowledges that, during the period any Notes Priority Collateral shall be under control or possession of any Notes

US 5968271

Representative or the other Notes Secured Parties, such Notes Representatives and other Notes Secured Parties shall not be obligated to take any action to protect or to procure insurance with respect to any ABL Facility Priority Collateral that may be located on or in the Notes Priority Collateral, it being understood that the Notes Representatives and other Notes Secured Parties shall have no responsibility for loss or damage to the ABL Facility Priority Collateral (other than as a result of the gross negligence or willful misconduct of such Notes Representative and/or the other Notes Secured Parties or their agents) and that risk of loss or damage to the ABL Facility Priority Collateral shall remain with ABL Representative and the ABL Secured Parties.

(e)     The ABL Representative and each Notes Representative shall cooperate and use reasonable efforts to ensure that their activities during the Access Period as described above do not interfere materially with the activities of the other as described above, including the right of each Notes Representative to show the Notes Priority Collateral to prospective purchasers and to ready the Notes Priority Collateral for sale.  Consistent with the definition of the term Access Period, if any order or injunction is issued or stay is granted or is otherwise effective by operation of law that prohibits the ABL Representative from exercising any of its rights hereunder, then the Access Period granted to the ABL Representative under this <u>Section 3.4</u> shall be stayed during the period of such prohibition and shall continue thereafter for the number of days remaining as required under this <u>Section 3.4</u>.  If any Notes Priority Collateral is sold or otherwise transferred to a third party purchaser or transferee, the Notes Representative shall expressly condition such sale or other transfer on such purchaser's or transferee's agreement to grant the ABL Representative the access rights otherwise applicable pursuant to this Agreement.

3.5     <u>No Additional Rights For the Grantors Hereunder</u>.  Except as provided in <u>Section 3.6</u> hereof, if any ABL Secured Party or Notes Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Grantor shall be entitled to use such violation as a defense to any action by any ABL Secured Party or Notes Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or Notes Secured Party.

3.6     <u>Actions Upon Breach</u>.  (a) If any ABL Secured Party or Notes Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Grantor or the Common Collateral, such Grantor, with the prior written consent of the ABL Representative or any Notes Representative, as applicable, may interpose as a defense or dilatory plea the making of this Agreement, and any ABL Secured Party or Notes Secured Party, as applicable, may intervene and interpose such defense or plea in its or their name or in the name of such Grantor.

(b)     Should any ABL Secured Party or Notes Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any ABL Secured Party or Notes Secured Party (in its own name or in the name of the relevant Grantor), as applicable, may obtain relief against such ABL Secured Party or Notes Secured Party, as applicable, by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by each of the ABL Representative on behalf of each ABL Secured Party and each Notes Representative on behalf of each applicable Notes Secured Party that (i) the ABL Secured Parties' or Notes Secured Parties', as applicable, damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Notes Secured Party or ABL Secured Party, as applicable, waives any defense that the Grantors and/or the Notes Secured Parties and/or ABL Secured Parties, as applicable, cannot demonstrate damage and/or be made whole by the awarding of damages.

**SECTION 4.**    *Application of Proceeds of Senior Collateral; Dispositions and Releases of Lien; Notices and Insurance.*

      4.1    <u>Application of Proceeds</u>.

      (a)    <u>Application of Proceeds of Senior Collateral</u>.    Subject to clauses (d) and (e) below, whether or not any Insolvency Proceeding has been commenced by or against any Grantor, the Senior Representative and Junior Representative hereby agree that all Senior Collateral, and all Proceeds thereof, received by either of them in connection with the collection, sale or disposition of Senior Collateral constituting an Enforcement Action shall be applied:

      <u>first</u>, to the payment of costs and expenses (including reasonable attorneys' fees and expenses and court costs) of the Senior Secured Parties in connection with such Enforcement Action,

      <u>second</u>, to the payment of the Senior Obligations in accordance with the Senior Documents until the Senior Obligations Payment Date,

      <u>third</u>, to the payment of the Junior Obligations in accordance with the Junior Documents until the Junior Obligations Payment Date, and

      <u>fourth</u>, the balance, if any, to the Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

      (b)    <u>Limited Obligation or Liability</u>.    In exercising remedies, whether as a secured creditor or otherwise, the Senior Representative shall have no obligation or liability to the Junior Representative or to any Junior Secured Party, regarding the adequacy of any Proceeds or for any action or omission, save and except solely for an action or omission that breaches the express obligations undertaken by each party under the terms of this Agreement.

      (c)    <u>Segregation of Collateral; Turnover</u>.    Until the occurrence of the Senior Obligations Payment Date, whether or not an Insolvency Proceeding has been commenced by or against any Grantor, any Senior Collateral that may be received by any Junior Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the Senior Representative, for the benefit of the Senior Secured Parties, in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct and each Junior Secured Party hereby authorizes the Senior Representative to make any such endorsements as agent for the Junior Representative (which authorization, being coupled with an interest, is irrevocable).

      (d)    <u>Mixed Collateral Proceeds</u>.    Notwithstanding anything to the contrary contained above or in the definition of ABL Facility Priority Collateral or Notes Priority Collateral, in the event that proceeds of Common Collateral are received from (or are otherwise attributable to the value of) a sale or other disposition of Common Collateral that involves a combination of ABL Facility Priority Collateral and Notes Priority Collateral where the respective values are not otherwise agreed among the parties, the portion of such proceeds that shall be allocated as proceeds of ABL Facility Priority Collateral for purposes of this Agreement shall be an amount equal to the book value of such ABL Facility Priority Collateral (except in the case of Accounts which amount shall be equal to the face amount of such Accounts).    In addition, notwithstanding anything to the contrary contained above or in the definition of ABL Facility Priority Collateral or Notes Priority Collateral, to the extent proceeds of Common Collateral are proceeds received from (or are otherwise attributable to the value of) the sale or disposition of all or substantially all of the Equity Interests of any Subsidiary of TPC which is a Grantor or all or substantially all of the assets of any such Subsidiary where the respective values are not otherwise agreed among the

US 5968271

parties, such proceeds shall constitute (1) first, in an amount equal to the face amount of the Accounts constituting ABL Facility Priority Collateral and the book value of all other ABL Facility Priority Collateral owned by such Subsidiary at the time of such sale, ABL Facility Priority Collateral and (2) second, to the extent in excess of the amounts described in preceding clause (1), Notes Priority Collateral.

(e)    Account Agreements.  Each Notes Representative, on behalf of itself and the applicable Notes Secured Parties, agrees that prior to the commencement of an Enforcement Action all funds deposited and applied to the ABL Obligations shall be treated as ABL Facility Priority Collateral and waives any claim that such payments made to the ABL Representative and the ABL Secured Parties are proceeds of or otherwise constitute Notes Priority Collateral unless (i) the ABL Representative has actual knowledge to the contrary, (ii) within five Business Days after the date on which such funds are applied to the ABL Obligations, the Notes Representative delivers written notice to the ABL Representative stating that the funds so applied contained identifiable proceeds of Notes Priority Collateral payable to Notes Representative for repayment of the Notes Obligations or (iii) the ABL Representative or any Notes Representative has commenced an Enforcement Action.  After the commencement and during the continuation of an Enforcement Action, the ABL Representative and the Notes Representative shall cooperate in good faith to identify the proceeds of Common Collateral (it being agreed that after the commencement of an Enforcement Action, all identifiable Proceeds of Notes Priority Collateral shall constitute Notes Priority Collateral).

(f)    Certain Proceeds.  The ABL Representative, for itself and on behalf of the ABL Secured Parties, and each Notes Representative, for itself and on behalf of the applicable Notes Secured Parties, further agree that prior to commencement of an Enforcement Action, all Proceeds of Common Collateral, whether or not deposited in an account subject to a deposit account control agreement or a securities account control agreement, shall not (as between the ABL Representative, the Notes Representative, the ABL Secured Parties and the Notes Secured Parties) be treated as Proceeds of Common Collateral for purposes of determining the relative priorities in the Common Collateral.

(g)    Permitted Actions.  Nothing in this Agreement shall prohibit the receipt by any Notes Representative or any Notes Secured Party of the required payments of interest, principal and other amounts owed in respect of the Notes Obligations so long as such receipt is not the direct or indirect result of the exercise by such Notes Representative or any Notes Secured Party of rights or remedies as a secured creditor (including set-off) with respect to ABL Facility Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them.  Nothing in this Agreement shall prohibit the receipt by the ABL Representative or any ABL Secured Party of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not the direct or indirect result of the exercise by the ABL Representative or any ABL Secured Party of rights or remedies as a secured creditor (including set-off) with respect to Notes Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them.

4.2    Releases of Liens.  Upon any release, sale or disposition of Senior Collateral (i) permitted pursuant to the terms of the Senior Documents or with the consent of the Senior Secured Parties that results in the release of the Senior Lien on any Senior Collateral, or (ii) any sale or other disposition pursuant to any Enforcement Action by the Senior Representative (other than release of the Senior Lien due to the occurrence of the Senior Obligations Payment Date), the Junior Lien on such Senior Collateral (excluding any portion of the proceeds of such Senior Collateral remaining after the Senior Obligations Payment Date occurs) shall be automatically and unconditionally released to the same extent as the Senior Lien with no further consent or action of any Person.  The Junior Representative shall, at the Grantors' expense, promptly execute and deliver such release documents and instruments and shall take such further actions as the Senior Representative shall request to evidence any release of the Junior Lien described in this Section 4.2.  The Junior Representative hereby appoints the Senior Representative and any officer or

duly authorized person of the Senior Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Junior Representative and in the name of the Junior Representative or in the Senior Representative's own name, from time to time, in the Senior Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).  Until the Senior Obligations Payment Date occurs, to the extent that the Senior Secured Parties have released any Lien on Senior Collateral and any such Lien is later reinstated, then the Junior Secured Parties shall be granted a Junior Lien on any such Senior Collateral.

4.3    Insurance.  Proceeds of Common Collateral include insurance proceeds and therefore the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds.  The ABL Representative shall have the sole and exclusive right, as against the Notes Representatives, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of ABL Facility Priority Collateral.  Each Notes Representative shall have the sole and exclusive right, as against the ABL Representative, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of Notes Priority Collateral.  If, and to the extent of, any loss under an insurance policy that covers both ABL Facility Priority Collateral and Notes Priority Collateral, the ABL Representative and the Notes Representative shall work jointly in good faith to adjust or settle under the applicable insurance policy.  To the extent any insurance proceeds are received for business interruption, such proceeds shall first be applied to the ABL Obligations and then to the Notes Obligations. Each of the Notes Representative and ABL Representative shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1 (including the turn over provisions set forth in Section 4.1(c) with respect to any insurance proceeds received thereby in contravention of Section 4.1(a)).

**SECTION 5.**    *Insolvency Proceedings.*

5.1    Filing of Motions.  Until the Senior Obligations Payment Date has occurred, the Junior Representative agrees on behalf of itself and the applicable Junior Secured Parties that no Junior Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case in respect of any of the Senior Obligations, including, without limitation, with respect to the determination of any Liens or claims held by the Senior Representative (including the validity, allowability, and enforceability thereof) or any other Senior Secured Party in respect of any Senior Collateral or the value of any claims of such parties under Section 506(a) or Section 506(b) of the Bankruptcy Code or otherwise, except as expressly permitted herein.

5.2    Financing Matters.  (a) If any Grantor becomes subject to any Insolvency Proceeding in the United States at any time prior to the ABL Obligations Payment Date, and if the ABL Representative or the other ABL Secured Parties desire to consent (or not object) to the use of ABL Facility Priority Collateral constituting cash collateral under the Bankruptcy Code or to provide financing to any Grantor under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Grantor by any third party secured by all or a portion of the ABL Facility Priority Collateral (any such financing, "ABL DIP Financing"), then each Notes Representative agrees, on behalf of itself and the applicable Notes Secured Parties, that each such Notes Secured Party (i) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such ABL DIP Financing on the grounds of a failure to provide "adequate protection" for such Notes Representative's Lien on the Notes Collateral to secure the Notes Obligations or on any other grounds

24

(and, except as provided in <u>Section 5.4</u>, will not request any adequate protection solely as a result of such ABL DIP Financing) and (ii) will subordinate (and will be deemed hereunder to have subordinated) the Notes Liens on any ABL Facility Priority Collateral (A) to the Liens on any ABL Facility Priority Collateral securing such ABL DIP Financing (and such subordination will not alter in any manner the terms of this Agreement), (B) to any adequate protection Lien on any ABL Facility Priority Collateral provided to the ABL Secured Parties and (C) to any "carve-out" from any ABL Facility Priority Collateral for professional fees and customary fees and expenses agreed to by the ABL Representative or the other ABL Secured Parties and approved by the bankruptcy court, so long as (1) each Notes Representative retains its Lien on the Notes Collateral to secure the Notes Obligations (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and, as to the Notes Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the Bankruptcy Code and any Lien on the Notes Priority Collateral securing such ABL DIP Financing is junior and subordinate to the Lien of each Notes Representative on the Notes Priority Collateral, (2) all Liens on ABL Facility Priority Collateral securing any such ABL DIP Financing shall be senior to or on a parity with the Liens of the ABL Representative and the other ABL Secured Parties securing the ABL Obligations on ABL Facility Priority Collateral, (3) the proposed cash collateral use or ABL DIP Financing does not compel any Grantor to seek confirmation of or approval for any specific plan of reorganization or other plan of similar effect under the Bankruptcy Code or otherwise, (4) the ABL DIP Financing is otherwise not in violation of the terms of this Agreement and (5) if the ABL Representative receives a replacement or adequate protection Lien on post-petition assets of the debtor with respect to the ABL Obligations, and such replacement or adequate protection Lien is on any of the Notes Priority Collateral, (x) such replacement or adequate protection Lien on such post-petition assets which are part of the Notes Priority Collateral (the "<u>Notes Post-Petition Assets</u>") is junior and subordinate to the Lien in favor of each Notes Representative on the Notes Priority Collateral and (y) each Notes Representative also receives a replacement or adequate protection Lien on such Notes Post-Petition Assets of the debtor to secure the Notes Obligations that is senior to the Lien in favor of the ABL Representative on the Notes Priority Collateral.  In no event will any of the ABL Secured Parties seek to obtain a priming Lien on any of the Notes Priority Collateral and nothing contained herein shall be deemed to be a consent by the Notes Secured Parties to any adequate protection payments to any ABL Secured Party using Notes Priority Collateral (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code).

(b)     If any Grantor becomes subject to any Insolvency Proceeding in the United States at any time prior to the Notes Obligations Payment Date, and if any of the Notes Representatives or the applicable Notes Secured Parties desire to consent (or not object) to the use of Notes Priority Collateral constituting cash collateral under the Bankruptcy Code or to provide financing to any Grantor under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Grantor by any third party secured by all or a portion of the Notes Priority Collateral (any such financing, "<u>Notes DIP Financing</u>"), then the ABL Representative agrees, on behalf of itself and the other ABL Secured Parties, that each ABL Secured Party (i) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to such Notes DIP Financing on the grounds of a failure to provide "adequate protection" for the ABL Representative's Lien on the ABL Collateral to secure the ABL Obligations or on any other grounds (and, except as provided in <u>Section 5.4</u>, will not request any adequate protection solely as a result of such Notes DIP Financing) and (ii) will subordinate (and will be deemed hereunder to have subordinated) the ABL Liens on any Notes Priority Collateral (A) to the Liens on any Notes Priority Collateral securing such Notes DIP Financing (and such subordination will not alter in any manner the terms of this Agreement), (B) to any adequate protection Lien on any Notes Priority Collateral provided to the Notes Secured Parties and (C) to any "carve-out" from any Notes Priority Collateral for professional fees and customary fees and expenses agreed to by each Notes Representative or the applicable Notes Secured Parties and approved by the bankruptcy court, so long as (1) the ABL Representative retains its Lien on the ABL Collateral to secure the ABL Obligations (in each case,

25

including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and, as to the ABL Facility Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the Bankruptcy Code and any Lien on the ABL Facility Priority Collateral securing such Notes DIP Financing is junior and subordinate to the Lien of the ABL Representative on the ABL Facility Priority Collateral, (2) all Liens on Notes Priority Collateral securing any such Notes DIP Financing shall be senior to or on a parity with the Liens of each Notes Representative and the applicable Notes Secured Parties securing the Notes Obligations on Notes Priority Collateral, (3) the proposed cash collateral use or Notes DIP Financing does not compel any Grantor to seek confirmation of or approval for any specific plan of reorganization or other plan of similar effect under the Bankruptcy Code or otherwise, (4) the Notes DIP Financing is otherwise not in violation of the terms of this Agreement and (5) if any Notes Representative receives a replacement or adequate protection Lien on post-petition assets of the debtor with respect to the Notes Obligations, and such replacement or adequate protection Lien is on any of the ABL Facility Priority Collateral, (x) such replacement or adequate protection Lien on such post-petition assets which are part of the ABL Facility Priority Collateral (the "ABL Post-Petition Assets") is junior and subordinate to the Lien in favor of the ABL Representative on the ABL Facility Priority Collateral and (y) the ABL Representative also receives a replacement or adequate protection Lien on such ABL Post-Petition Assets of the debtor to secure the ABL Obligations that is senior to the Lien in favor of the Notes Representatives on the ABL Facility Priority Collateral.  In no event will any of the Notes Secured Parties seek to obtain a priming Lien on any of the ABL Facility Priority Collateral, and nothing contained herein shall be deemed to be a consent by the ABL Secured Parties to any adequate protection payments to any Notes Secured Party using ABL Facility Priority Collateral (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code).

(c)    All Liens granted to the Notes Representatives or the ABL Representative in any Insolvency Proceeding, whether as adequate protection, in connection with any ABL DIP Financing or Notes DIP Financing (as the case may be), or otherwise, are intended to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement.

5.3    Relief From the Automatic Stay.  Until the ABL Obligations Payment Date, each Notes Representative agrees, on behalf of itself and the applicable Notes Secured Parties, that none of them will seek (or support any other Person in seeking) relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any ABL Facility Priority Collateral, without the prior written consent of the ABL Representative.  Until the Notes Obligations Payment Date, the ABL Representative agrees, on behalf of itself and the other ABL Secured Parties, that none of them will seek (or support any other Person in seeking) relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any Notes Priority Collateral, without the prior written consent of the Notes Representatives. In addition, neither the Notes Representatives nor the ABL Representative shall seek any relief from the automatic stay with respect to any Common Collateral without providing 30 days' prior written notice to the other, unless otherwise agreed by both the ABL Representative and the Notes Representatives.

5.4    No Contest.  The Junior Representative, on behalf of itself and the applicable Junior Secured Parties, agrees that, prior to the Senior Obligations Payment Date, none of them shall contest (or support any other Person contesting) (a) any request by the Senior Representative or any Senior Secured Party for adequate protection of its interest in the Senior Collateral (unless in contravention of Section 5.2(a) or (b), as applicable), or (b) any objection by the Senior Representative or any Senior Secured Party to any motion, relief, action, or proceeding based on a claim by the Senior Representative or any Senior Secured Party that its interests in the Senior Collateral (unless in contravention of Section 5.2(a) or (b), as applicable) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the Senior Representative as

adequate protection of its interests are subject to the Lien Priority and the other terms and conditions of this Agreement.  The Senior Representative, on behalf of itself and the applicable Senior Secured Parties, agrees that none of them shall contest (or support any other Person contesting) any request by the Junior Representative, on behalf of itself and the applicable Junior Secured Parties, for adequate protection of its interest in the Junior Collateral in the form of an additional or replacement Lien thereon; provided that (A) (i) an adequate protection Lien shall also have been granted in favor of the Senior Secured Parties in respect of such Collateral and (ii) the Lien in favor of the Junior Secured Parties on such Collateral shall be subordinated to the Liens thereon securing and providing adequate protection for the Senior Obligations in accordance with the Lien Priority set forth in this Agreement.

       5.5    <u>Avoidance Issues.</u>  If any Senior Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Grantor, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a fraudulent or preferential transfer, any amount (a "<u>Recovery</u>"), whether received as proceeds of security, enforcement of any right of set-off, recoupment, or otherwise, then the Senior Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Obligations Payment Date shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Junior Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

       5.6    <u>Asset Dispositions in an Insolvency Proceeding</u>.  Neither the Junior Representative nor any other Junior Secured Party shall, in an Insolvency Proceeding or otherwise, oppose any sale or disposition of any Senior Collateral that is supported by the Senior Secured Parties, and the Junior Representative and each other Junior Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale of any Senior Collateral supported by the Senior Secured Parties and to have released their Liens on such assets; <u>provided</u> that (a) the proceeds of such sale or disposition are applied in accordance with the terms of this Agreement and (b) this <u>Section 5.6</u> shall not apply to any case of a sale or disposition of Real Property or Equity Interests constituting Notes Priority Collateral unless the ABL Representative has received at least 15 days' notice prior to the consummation of any such sale.

       5.7    <u>Other Matters</u>.  To the extent that the Senior Representative or any Senior Secured Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Junior Collateral, the Senior Representative agrees, on behalf of itself and the applicable Senior Secured Parties, not to assert any of such rights without the prior written consent of the Junior Representative; <u>provided</u> that if requested by the Junior Representative, the Senior Representative shall timely exercise such rights in the manner requested by the Junior Representative, including any rights to payments in respect of such rights.

       5.8    <u>Effectiveness in Insolvency Proceedings.</u>

       (a)    This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

US 5968271

(b)     If, in any Insolvency Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed or reinstated (in whole or in part) pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of the ABL Obligations and on account of the Notes Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Notes Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

5.9     <u>Certain Waivers</u>.

(a)     Each Junior Representative or any other Junior Secured Party waives any claim it may hereafter have against the Senior Representative or any Senior Secured Party arising out of the election of the Senior Representative or any Senior Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code in connection with the Senior Collateral in any Insolvency Proceeding.

(b)     The Junior Representative, on behalf of itself and the applicable Junior Secured Parties, agrees that, prior to the Senior Obligations Payment Date, none of them shall assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens on the Senior Collateral for costs or expenses of preserving or disposing of such Senior Collateral.

(c)     No Notes Representative nor any Notes Secured Party shall oppose or seek to challenge any claim by the ABL Representative or any ABL Secured Party for allowance in any Insolvency Proceeding of ABL Obligations consisting of Post-Petition Interest, to the extent of the value of the Lien on the ABL Facility Priority Collateral securing any ABL Secured Party's claim, without regard to the existence of the Lien of such Notes Representative on behalf of the applicable Notes Secured Parties on such Collateral. No ABL Representative nor any ABL Secured Party shall oppose or seek to challenge any claim by any Notes Representative or any applicable Notes Secured Party for allowance in any Insolvency Proceeding of Notes Obligations consisting of Post-Petition Interest, to the extent of the value of the Lien on the Notes Priority Collateral securing any Notes Secured Party's claim, without regard to the existence of the Lien of the ABL Representative on behalf of the ABL Secured Parties on such Collateral.

**SECTION 6.**   *Notes Documents and ABL Documents.*

(a)     Each Grantor and each Notes Representative, on behalf of itself and the applicable Notes Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Notes Documents inconsistent with or in violation of this Agreement.

(b)     Each Grantor and the ABL Representative, on behalf of itself and the ABL Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the ABL Documents inconsistent with or in violation of this Agreement.

(c)     In the event the Senior Representative enters into any amendment, waiver or consent in respect of any of the Senior Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Security Document (including any release of any Lien in favor of such Senior Secured Party) or changing in any manner the rights of any parties thereunder, in each case solely with respect to any Senior Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Security Document without the consent of or action by any Junior Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); <u>provided</u> that, (i) no such

28

amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Junior Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) no such amendment, waiver or consent with respect to any provision applicable to the Junior Representative under the Junior Documents shall be made without the prior written consent of the Junior Representative, and (iii) notice of such amendment, waiver or consent shall be given to the Junior Representative no later than 30 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7.**   *Purchase Option.*

7.1    Notice of Exercise.   Upon the occurrence of a Purchase Option Triggering Event and continuing for a period of 30 days thereafter, all or a portion of the Notes Secured Parties, acting as a single group, shall have the option at any time upon five (5) Business Days' prior written notice to the ABL Representative to purchase all, but not less than all, of the ABL Obligations from the ABL Secured Parties.  In connection with any exercise of the purchase option, the ABL Secured Parties may terminate outstanding Bank Products.  Such notice from such Notes Secured Parties to the ABL Representative shall be irrevocable.

7.2    Purchase and Sale.   On the date specified by the relevant Notes Secured Parties in the notice contemplated by Section 7.1 above (which shall not be less than five (5) Business Days, nor more than twenty (20) calendar days, after the receipt by the ABL Representative of the notice of the relevant Notes Secured Party's election to exercise such option), the ABL Secured Parties shall sell to the relevant Notes Secured Parties, and the relevant Notes Secured Parties shall purchase from the ABL Secured Parties, the ABL Obligations, provided that, the ABL Representative and the ABL Secured Parties shall retain all rights to be indemnified or held harmless by the Grantors and other obligors thereunder in accordance with the terms of the ABL Documents but shall not retain any rights to the security therefor. The purchase shall be made pursuant to assignment documentation prepared by the ABL Representative and its counsel and in form and substance reasonably satisfactory to all parties thereto.  For purposes of the ABL Documents, each Grantor hereby consents to any assignment effected pursuant to the purchase option.

7.3    Payment of Purchase Price.   Upon the date of such purchase and sale, the relevant Notes Secured Parties shall (a) pay to the ABL Representative for the benefit of the ABL Secured Parties as the purchase price for the ABL Obligations, the full amount of all the ABL Obligations then outstanding and unpaid at par (including principal, interest, Bank Product Obligations, fees and expenses, including reasonable attorneys' fees and legal expenses but specifically excluding any prepayment premium, termination or similar fees) and all costs and expenses (including attorneys' fees) incurred in connection with the exercise of this purchase option, and (b) furnish cash collateral to the ABL Representative in a manner and in such amounts as the ABL Representative determines is reasonably necessary to secure the ABL Representative, the ABL Secured Parties, letter of credit issuing banks and applicable affiliates in connection with any issued and outstanding letters of credit (but not in any event in an amount greater than that 105% of the aggregate undrawn face amount of such letters of credit) and Bank Products secured by the ABL Documents, (c) agree to reimburse the ABL Representative, the ABL Secured Parties and letter of credit issuing banks for any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) in connection with any commissions, fees, costs or expenses related to any issued and outstanding letters of credit as described above and any checks or other payments provisionally credited to the ABL Obligations, and/or as to which the ABL Representative has not yet received final payment, (d) furnish cash collateral to ABL Representative in a manner and in such amounts as the ABL Representative determines is reasonably necessary, and agree to reimburse the ABL Secured Parties and letter of credit issuing bank in respect of, indemnification obligations of the Grantors and other obligors under the ABL Documents and documents relating to Bank Products as to matters or circumstances

known to the ABL Representative at the time of the purchase and sale which would reasonably be expected to result in any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) to the ABL Secured Parties or letter of credit issuing banks, as applicable, and (e) agree to indemnify and hold harmless the ABL Secured Parties and letter of credit issuing bank from and against any loss, liability, claim, damage or expense (including reasonable fees and expenses of legal counsel) arising out of any claim asserted by a third party in respect of the ABL Obligations as a direct result of any acts by any Notes Secured Party occurring after the date of such purchase. Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account as the ABL Representative may designate in writing for such purpose.

7.4    <u>Limitation on Representations and Warranties</u>.  Such purchase shall be expressly made without representation or warranty of any kind by the ABL Representative or the ABL Secured Parties and without recourse of any kind, except that each ABL Secured Party shall represent and warrant (a) the amount of the ABL Obligations being purchased from it, (b) such ABL Secured Party owns the ABL Obligations free and clear of any Liens or encumbrances and (c) such ABL Secured Party has the right to assign such ABL Obligations and the assignment is duly authorized. The purchase shall be accompanied by a waiver by the Notes Secured Parties of all claims arising out of this Agreement and the transactions contemplated hereby as a result of exercising the purchase option.

7.5    <u>Resignation of ABL Representative</u>.  In the event that the Notes Secured Parties exercise and consummate the purchase option set forth in this <u>Section 7</u>, (a) the ABL Representative shall have the right, but not the obligation, to immediately resign as administrative agent and collateral agent under the ABL Documents, and (b) each Notes Representative shall have the right, but not the obligation, to require the ABL Representative to immediately resign as administrative agent and collateral agent under the ABL Documents.

7.6    <u>Application of Cash Collateral</u>.  With respect to any cash collateral held under <u>Section 7.3(b)</u> above, after giving effect to any payment made and applied to amounts coming due with respect to any letters of credit (or termination thereof without a drawing thereon) or any final payment of amounts under any Bank Products, the amount of any cash collateral then on deposit with the ABL Representative with respect to such obligations which exceeds the sum of (a) one hundred five percent (105%) of the aggregate undrawn amount of all then remaining outstanding letters of credit and (b) the aggregate amount of all then remaining Bank Products Obligations (as reasonably determined by the ABL Representative) shall promptly be returned to the Designated Notes Representative.

**SECTION 8.**    *Reliance; Waivers; etc.*

8.1    <u>Reliance</u>. The ABL Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement. The Notes Representative, on behalf of it itself and the applicable Notes Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the ABL Representative and the other ABL Secured Parties. The Notes Documents are deemed to have been executed and delivered and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement. The ABL Representative, on behalf of itself and the other ABL Secured Parties, expressly waives all notices of the acceptance of and reliance on this Agreement by the Notes Representatives and the other Notes Secured Parties.

8.2    <u>No Warranties or Liability</u>. Each Notes Representative and the ABL Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document or any other Notes Document. Except as otherwise provided in this Agreement, each Notes Representative

and the ABL Representative will be entitled to manage and supervise the respective extensions of credit to any Grantor in accordance with law and their usual practices, modified from time to time as they deem appropriate.

8.3    No Waivers.  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Grantor with the terms and conditions of any of the ABL Documents or the Notes Documents.

**SECTION 9.**    *Obligations Unconditional.*  For so long as this Agreement is in full force and effect, all rights, interests, agreements and obligations hereunder of the Senior Representative and the Senior Secured Parties in respect of any Collateral and the Junior Representative and the Junior Secured Parties in respect of such Collateral shall remain in full force and effect regardless of:

(a)    any lack of validity or enforceability of any Senior Document or any Junior Document and regardless of whether the Liens of the Senior Representative and Senior Secured Parties are not perfected or are voidable for any reason;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Obligations or Junior Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any Senior Document or any Junior Document;

(c)    any exchange, release or lack of perfection of any Lien on any Collateral or any other asset, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Obligations or Junior Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency Proceeding in respect of any Grantor; or

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of any Secured Obligation or of any Junior Secured Party in respect of this Agreement.

**SECTION 10.**    *Miscellaneous.*

10.1    Rights of Subrogation.  Each Notes Representative, for and on behalf of itself and the applicable Notes Secured Parties, agrees that no payment to the ABL Representative or any ABL Secured Party pursuant to the provisions of this Agreement shall entitle any Notes Representative or any Notes Secured Party to exercise any rights of subrogation in respect thereof until the ABL Obligations Payment Date.  Following the ABL Obligations Payment Date, the ABL Representative agrees to execute such documents, agreements, and instruments as any Notes Representative or any Notes Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the ABL Obligations resulting from payments to the ABL Representative by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the ABL Representative are paid by such Person upon request for payment thereof.  The ABL Representative, for and on behalf of itself and the ABL Secured Parties, agrees that no payment to any Notes Representative or any Notes Secured Party pursuant to the provisions of this Agreement shall entitle the ABL Representative or any ABL Secured Party to exercise any rights of subrogation in respect thereof until the Notes Obligations Payment Date.  Following the Notes Obligations Payment Date, each Notes Representative agrees to execute such documents, agreements, and instruments as the ABL Representative or any ABL Secured Party may reasonably request to evidence the transfer by subrogation

31

to any such Person of an interest in the Notes Obligations resulting from payments to such Notes Representative by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Notes Representative are paid by such Person upon request for payment thereof.

10.2    <u>Further Assurances</u>.  Each Notes Representative and the ABL Representative will, at the Grantors' expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the other party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Representative or any Notes Representative to exercise and enforce its rights and remedies hereunder; <u>provided</u>, <u>however</u>, that no party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this <u>Section 10.2</u>, to the extent that such action would contravene any law, order or other Requirement of Law or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this <u>Section 10.2</u>.

10.3    <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or any Notes Document, the provisions of this Agreement shall govern to the extent of such conflict.

10.4    <u>Continuing Nature of Provisions</u>.  Subject to <u>Section 5.5</u>, this Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the earlier of (a) the ABL Obligations Payment Date and (b) the Notes Obligations Payment Date.  This is a continuing agreement and the ABL Secured Parties and the Notes Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, any Grantor on the faith hereof.

10.5    <u>Amendments; Waivers</u>.  (a) No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the ABL Representative and each Notes Representative.  Each Grantor agrees that this Agreement may be amended or modified by the ABL Representative and each Notes Representative without the consent of any Grantor, <u>provided</u> that (i) no amendment or modification to limit or cap the amount of ABL Obligations or Notes Obligations beyond what is provided for in the ABL Documents or the Notes Documents (as applicable) may be made without the prior written consent of TPC and (ii) no Grantor shall be bound by any such amendment or modification that would impose, or have the effect of imposing, on any Grantor more restrictive covenants or greater obligations than those applicable to such Grantor under this Agreement or any other Loan Document immediately prior to such amendment or modification.

(b)        It is understood that without any action or consent of the ABL Representative or the Notes Representative, additional secured parties (or the administrative agent, collateral agent or other representative for the applicable holders) may become party hereto upon the designation of additional indebtedness or other obligations ("<u>Additional Debt</u>") of any of the Grantors as ABL Obligations or Notes Obligations, whether in connection with a refinancing of any then-existing ABL Obligations or Notes Obligations, or as a Replacement ABL Agreement or Replacement Notes Agreement or otherwise, in each case, by TPC in accordance with the provisions set forth in clause (b) of the definition of "ABL Agreement", the definition of "Additional Notes Agreement" or clause (c) of the definition of "Notes Agreement", as applicable, and delivering a Collateral Agent Joinder Agreement to the representatives then extant between such secured party and TPC.

Upon the delivery of the notice and certificate and the Collateral Agent Joinder Agreement as provided in Section 10.5(b) above, the obligations designated in such notice shall become ABL Obligations or Notes Obligations, as applicable, for all purposes of this Agreement.  The ABL Representative and each Notes Representative agree that, without the consent of any other ABL Secured Party or Notes Secured Party, they shall, at the sole cost and expense of the Grantors, enter into any supplemental agreement (which may take the form of an amendment and restatement of this Agreement) necessary (or, in the discretion of the ABL Representative and each Notes Representative, appropriate) to facilitate having Additional Debt of any of the Grantors become ABL Obligations or Notes Obligations under this Agreement, as applicable, provided, that such Additional Debt is permitted to be incurred by the ABL Agreement and the Notes Agreements then extant, and is permitted by said agreements to be subject to the provisions of this Agreement as ABL Obligations or Notes Obligations, as applicable.

10.6    Information Concerning Financial Condition of the Grantors.  The Notes Representative and the ABL Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding the financial condition of the Grantors or any other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Notes Obligations (except as otherwise provided in the ABL Documents and Notes Documents).  In the event the Notes Representative or the ABL Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

10.7    Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

10.8    Submission to Jurisdiction; Jury Trial Waiver.  (a) Each ABL Secured Party, each Notes Secured Party and each Grantor hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan, New York, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the any ABL Secured Party or Notes Secured Party may otherwise have to bring any action or proceeding against any Grantor or its properties in the courts of any jurisdiction.

(b)    Each ABL Secured Party, each Notes Secured Party and each Grantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.9.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)     EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

10.9     Notices.     Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five (5) days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section 10.9) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

10.10     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the ABL Secured Parties and Notes Secured Parties and their respective successors and assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.

10.11     Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

10.12     Severability.     Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

10.13     Other Remedies.  For avoidance of doubt, it is understood that nothing in this Agreement shall prevent any ABL Secured Party or any Notes Secured Party from exercising any available remedy to accelerate the maturity of any indebtedness or other obligations owing under the ABL Documents or the Notes Documents, as applicable, or to demand payment under any guarantee in respect thereof.

10.14     Counterparts; Integration; Effectiveness.     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto.

10.15     Additional Grantors.  TPC shall cause each Person that becomes a Grantor after the date hereof to become a party to this Agreement by execution and delivery by such Person of a Joinder Agreement in the form of Annex 1 hereto.

US 5968271

10.16   Force Majeure.  Other than with respect to obligations that can be performed by the payment of money, whenever a period of time is herein prescribed for action to be taken by either the ABL Representative or the Notes Representative, such Person shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war and terrorist acts or activities.

10.17   No Consequential Damages.   Neither the ABL Representative nor any Notes Representative shall be liable for any indirect, special or consequential damages (including but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

10.18   Notes Representative's Capacity.  For the avoidance of doubt, when acting hereunder the Notes Representative is acting solely in its capacity as trustee and as collateral agent under the Notes Documents, and in so doing, the Note Representative shall not be responsible for the terms or sufficiency of this Agreement for any purpose.  The Notes Representative shall have no duties or obligations under or pursuant to this Agreement other than such duties and obligations as may be expressly set forth in this Agreement as duties and obligations on its part to be performed or observed and no implied covenants shall be read into this Agreement against the Notes Representative; provided, however, that nothing in this Section 10.18 shall diminish the rights of the Notes Representative, in its capacity as trustee and collateral agent under the Existing Notes Agreement, and further provided that notwithstanding anything in this Agreement to the contrary, in connection with its execution of and performance under this Agreement, the Notes Representative, in any capacity, is entitled to all rights, privileges, immunities, protections, benefits and indemnities provided to it under the Notes Documents.

10.19   Certain Terms Concerning the ABL Representative and the Notes Representative. Neither of the ABL Representative nor the Notes Representative shall have any liability or responsibility for the actions or omissions of any other Secured Party, or for any other Secured party's compliance with (or failure to comply with) the terms of this Agreement.  Neither of the ABL Representative nor the Notes Representative shall have individual liability to any Person if it shall mistakenly pay over or distribute to any Secured Party (or the Parent or TPC) any amounts in violation of the terms of this Agreement, so long as the ABL Representative or the Notes Representative, as the case may be, is acting in good faith. Each party hereto hereby acknowledges and agrees that each of the ABL Representative and the Existing Notes Representative is entering into this Agreement solely in its capacity under the ABL Security Documents and the Notes Security Documents, respectively, and not in its individual capacity.  The ABL Representative shall not be deemed to owe any fiduciary duty to the Notes Representative or any other Notes Secured Party and, the Notes Representative shall not be deemed to owe any fiduciary duty to the ABL Representative or any other ABL Secured Party.

[Signature Pages Follow]

35

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BANK OF AMERICA, N.A.,**
as ABL Representative for and on behalf of the ABL Secured Parties

By:_____
Name:   Ajay Jagsi
Title:    Vice President

Address for Notices:

901 Main Street, 11th Floor
Mail Code: TX1-492-11-23
Attention: Ajay Jagsi
Telecopy No.: 214-209-4766


**U.S. BANK NATIONAL ASSOCIATION,**
as Existing Notes Representative

By:         _____
Name:    _____
Title:     _____

Address for Notices:

_____
_____
_____
Attention:_____
Telecopy No.:_____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BANK OF AMERICA, N.A.,**
as ABL Representative for and on behalf of the ABL
Secured Parties


By:_____
Name:  Ajay Jagsi
Title:   Vice President

Address for Notices:

901 Main Street, 11th Floor
Mail Code: TX1-492-11-23
Attention: Ajay Jagsi
Telecopy No.: 214-209-4766



**U.S. BANK NATIONAL ASSOCIATION,**
as Existing Notes Representative


By:
Name:  Michael K. Herberger
Title:   Vice President

Address for Notices:

U.S. Bank, N.A.
13737 Noel Road
Suite 800
Dallas, TX 75240
Attention: Corporate Trust Department
Telecopy No.: 972 581-1670

**TPC HOLDINGS, INC.**

By: _____
Name:  Andrew Grygiel
Title:    Vice President and Treasurer


**TPC GROUP INC.**
**TPC GROUP LLC**
**TP CAPITAL CORP.**
**TEXAS BUTYLENE CHEMICAL CORPORATION**
**TEXAS OLEFINS DOMESTIC-INTERNATIONAL**
**SALES CORPORATION**
**PORT NECHES FUELS, LLC**
**TPC PHOENIX FUELS LLC**


By: _____
Name:  Bart de Jong
Title:    Senior Vice President and
             Chief Financial Officer

**TPC HOLDINGS, INC.**

By: _____
Name:  Andrew Grygiel
Title:   Vice President and Treasurer


**TPC GROUP INC.**
**TPC GROUP LLC**
**TP CAPITAL CORP.**
**TEXAS BUTYLENE CHEMICAL CORPORATION**
**TEXAS OLEFINS DOMESTIC-INTERNATIONAL**
**SALES CORPORATION**
**PORT NECHES FUELS, LLC**
**TPC PHOENIX FUELS LLC**

By: _____
Name:  Bart de Jong
Title:   Senior Vice President and
         Chief Financial Officer

**ANNEX 1**

**JOINDER AGREEMENT**

THIS JOINDER AGREEMENT (this "Agreement"), dated as of _____ __, 20__, is executed by _____, a _____ (the "New Subsidiary") in favor of BANK OF AMERICA, N.A. ("ABL Representative") and U.S. BANK NATIONAL ASSOCIATION ("Notes Representative"), in their capacities as ABL Representative and Notes Representative, respectively, under that certain Intercreditor Agreement (the "Intercreditor Agreement"), dated as of August 2, 2019 among the ABL Representative, the Notes Representative, TPC Group, Inc. and each of the other Grantors party thereto. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Intercreditor Agreement.

The New Subsidiary, for the benefit of the ABL Representative and the Notes Representative, hereby agrees as follows:

1. The New Subsidiary hereby acknowledges the Intercreditor Agreement and acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Grantor under the Intercreditor Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Intercreditor Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Intercreditor Agreement.

2. The address of the New Subsidiary for purposes of Section 10.9 of the Intercreditor Agreement is as follows:

_____

_____

_____

3. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE NEW SUBSIDIARY HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Signature Page Follows]

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]


By:_____

Name:_____

Title:_____

**ANNEX 2**

**COLLATERAL AGENT JOINDER AGREEMENT**

[FORM OF] COLLATERAL AGENT JOINDER AGREEMENT NO. [ ] dated as of [ ], 20[ ] (the "Joinder Agreement") to the INTERCREDITOR AGREEMENT dated as of August 2, 2019 (the "Intercreditor Agreement"), among BANK OF AMERICA, N.A., acting in its capacity as administrative and collateral under the ABL Agreement (together with its successors and assigns in such capacity, the "ABL Representative") for the ABL Secured Parties, U.S. BANK NATIONAL ASSOCIATION, acting in its capacity as trustee and collateral agent (the "Existing Notes Representative") for the Notes Secured Parties, and TPC GROUP INC., a Delaware corporation ("TPC") and each other Grantor party thereto and each [Notes Representative] [ABL Representative] from time to time party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

B.    TPC proposes to issue or incur [Notes Obligations][ABL Obligations] and the Person identified in the signature pages hereto as the "[Notes Representative][ABL Representative][New ABL Agent]" (the "[Notes Representative] [ABL Representative] [New ABL Agent]") will serve as the collateral agent, collateral trustee or a similar representative for the additional secured parties in respect of the relevant Additional Debt. The [Notes Obligations][ABL Obligations] are being designated as such by TPC in accordance with Section 10.5(b) of the Intercreditor Agreement.

C.    The [Notes Representative][ABL Representative][New ABL Agent] wishes to become a party to the Intercreditor Agreement and to acquire and undertake the rights and obligations of [a "Notes Representative] [the ABL Representative]" thereunder. [Notes Representative][ABL Representative][New ABL Agent] is entering into this Joinder Agreement in accordance with the provisions of the Intercreditor Agreement in order to become [a Notes Representative][the ABL Representative] thereunder.

The [Notes Representative][ABL Representative][New ABL Agent] and TPC agree as follows:

1.    Accession to the Intercreditor Agreement. The [Notes Representative][ABL Representative][New ABL Agent] (a) hereby accedes and becomes a party to the Intercreditor Agreement as [a Notes Representative] [the ABL Representative] from time to time in respect of the relevant Additional Debt, (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of [a Notes Representative][the ABL Representative] under the Intercreditor Agreement. From and after execution of this Joinder Agreement, the Additional Debt shall be [Notes Obligations][ABL Obligations] for all purposes under the Intercreditor Agreement.

2.    SECTION 2. Representations, Warranties and Acknowledgement of the Additional Collateral Agent. [Notes Representative][ABL Representative][New ABL Agent] represents and warrants to each Notes Representative and ABL Representative that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as [a Notes Representative][the ABL Representative] and (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement (subject to the effects of bankruptcy, insolvency or similar laws effecting creditors' rights generally and general equitable principles).

3.      Counterparts. This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Joinder Agreement shall become effective when [the ABL Representative and] each Notes Representative shall have received a counterpart of this Joinder Agreement that bears the signature of the [Notes Representative][ABL Representative][New ABL Agent]. Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

4.      Benefit of Agreement. **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Intercreditor Agreement.**

5.      Governing Law.  THIS JOINDER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

6.      Severability. In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

7.      Notices. All communications and notices hereunder shall be in writing and given as provided in Section 10.9 of the Intercreditor Agreement. All communications and notices hereunder to the [Notes Representative][ABL Representative][New ABL Agent] shall be given to it at the address set forth under its signature hereto, which information supplements Section 10.9 of the Intercreditor Agreement.

8.      Expense Reimbursement. The Grantors agree to reimburse each Notes Representative and the ABL Representative for their reasonable and documented out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel.

IN WITNESS WHEREOF, the [ABL Representative][Notes Representative][New ABL Agent] and TPC have duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

**[_____], as [ABL REPRESENTATIVE][NOTES REPRESENTATIVE][NEW ABL AGENT]**

By: _____
Name:
Title:

Address for Notices:

_____
_____
_____
Attention: _____
Telecopy No.: _____


**TPC GROUP INC.**

By: _____
Name:
Title: