## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC, *et al.,* | Case No. 22-10493 (CTG) |
| Debtors,[1] | Jointly Administered |

| | |
|---|---|
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P | Adv. Pro. No. 22-50372 (CTG) |
| *Plaintiffs-Counterclaim Defendants,* | |
| v. | |
| TPC GROUP INC., | |
| *Defendant-Counterclaimant,* | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor-Defendant.* | |

## PLAINTIFFS-COUNTERCLAIM DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO INTERVENOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

NATURE AND STAGE OF THE PROCEEDINGS ................................................1

PRELIMINARY STATEMENT ........................................................................1

UNDISPUTED MATERIAL FACTS ...............................................................7

    A.    The Senior Secured Notes...............................................................7

    B.    Plaintiffs' Sacred Rights ................................................................8

    C.    The Usurping Notes .......................................................................9

    D.    Plaintiffs' Notice of Breaches to TPC .........................................11

    E.    TPC's Bankruptcy and the Cross-Holder DIP Proposal .........................12

    F.    Plaintiffs Sue to Vindicate Their Sacred Rights ....................................12

ARGUMENT .........................................................................................13

I.    TPC Breached Section 9.02(d)(10) by Amending the Original Indenture to
Change the Application of Collateral Proceeds Without the Consent of Each
Adversely Affected Senior Noteholder................................................................13

    A.    TPC's Amendments and Supplements Changed Provisions of the Original
Indenture Dealing with the Application of Collateral Proceeds .........................13

        1.    Section 9.02(d)(10) Applies to TPC's Amendments ................................13

        2.    TPC's Amendment of Section 12.01(c) Purportedly Imposed a
New Waterfall for Distributing Collateral Proceeds................................15

        3.    TPC's Amendment to the Definition of "Permitted Liens"
Purportedly Authorized the Issuance of New Notes That Were
Senior to the Senior Secured Notes in the Collateral Waterfall................18

        4.    TPC's New Collateral Waterfall in the 2021 Intercreditor
Agreement Collateral Waterfall Purportedly Supplemented the
Waterfall in Section 4.1 of the 2019 Intercreditor Agreement and
Section 6.10 of the Original Indenture.......................................................20

    B.    Section 9.02(a) Did Not Allow TPC to Act with Majority Consent Alone..........24

    C.    Section 9.02(e) Did Not Allow TPC to Act with Supermajority Consent
Alone...........................................................................................24

II.    The Registered Holders of Senior Notes Did Not Consent to the Amendments ...............28

III.   The No-Action Clause Does Not Bar Plaintiffs' Suit ........................................................29

CONCLUSION ..............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*,
　415 F.3d 242 (2d Cir. 2005)..............................................................28

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
　2021 WL 3671541 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) .................................. *passim*

*E. 41st St. Assocs. v. 18 E. 42nd St., L.P.*,
　248 A.D.2d 112 (1st Dep't 1998) ....................................................15, 16

*Eastman Kodak Co. v. Altek Corp.*,
　936 F. Supp. 2d 342 (S.D.N.Y. 2013)....................................................20

*ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*,
　95 A.D.3d 498 (1st Dep't 2012) .................................................16, 26, 27

*Fins. Restructuring Partners III, LT v. Riverside Banking Co.*,
　2014 WL 36078 (Sup. Ct. N.Y. Cty. Jan. 02, 2014)......................................28

*Friedman v. Airlift Int'l, Inc.*,
　44 A.D.2d 459 (1st Dep't 1974) ........................................................28

*Galli v. Metz*,
　973 F.2d 145 (2d Cir. 1992)............................................................25

*Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*,
　94 N.Y.2d 398 (2000) ..................................................................25

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
　2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ..............................................21

*MacKay Shields LLC v. Sea Containers, Ltd.*,
　300 A.D.2d 165 (1st Dep't 2002) ....................................................28, 29

*Metro. Life Ins. Co. v. Noble Lowndes Int'l*,
　84 N.Y.2d 430 (1994) ..................................................................26

*NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*,
　51 A.D.3d 52 (1st Dep't 2008) .........................................................20

*Patsis v. Nicolia*,
　120 A.D.3d 1326 (2d Dep't 2014) ........................................................3

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
   13 N.Y.3d 398 (2009) ................................................................................................14

*Tamarind Resort Assocs. v. Gov't of Virgin Islands*,
   138 F.2d 107 (3d Cir. 1998).........................................................................................3

*W.W.W. Assocs. v. Giancontieri*,
   77 N.Y.2d 157 (1990) ................................................................................................27

**Rules**

N.Y. C.P.L.R. 213..........................................................................................................28

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)..............................................................20, 21

Merriam-Webster Dictionary, https://www.merriam-webster.com/.............................13

## NATURE AND STAGE OF THE PROCEEDINGS

1.      On June 2, 2022, Plaintiffs-Counterclaim Defendants Cerberus Capital Management L.P. ("Cerberus") and Bayside Capital, Inc. ("Bayside," and together with Cerberus, "Plaintiffs") commenced this adversary proceeding against Defendant-Counterclaimant TPC Group Inc. ("TPC" or "Debtor") by filing their Complaint for Declaratory Judgment (the "Complaint"), A.D.I. 3, 9, and their Motion for Summary Judgment, A.D.I. 4. Subsequently, an Ad Hoc Group of Noteholders ("Intervenor") moved to intervene, A.D.I. 28, and on June 17, 2022, this Court granted its motion, A.D.I. 38. Later that day, TPC filed a Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, A.D.I. 40, and Intervenor filed a Cross-Motion for Summary Judgment, A.D.I. 44. Plaintiffs now respectfully submit this Consolidated Memorandum of Law as a Reply in Further Support of their Motion for Summary Judgment and as an Opposition to Intervenor's Cross-Motion for Summary Judgment.[2]

## PRELIMINARY STATEMENT

2.      Stripped of its blame-the-victim rhetoric, TPC's opposition boils down to a series of unblushing assertions that the Original Indenture and related Intercreditor Agreement do not mean what they plainly say. Having issued nearly a billion dollars of Senior Secured Notes in 2019 on the basis of a fundamental and unambiguous promise that Holders of those Notes could not be subordinated against their will, TPC did just that to a minority group of Holders and is now running from the plain language of the contracts it signed.

3.      In 2021, TPC executed a scheme to "prime" or "uptier" a minority group of holders of its Senior Secured Notes, in blatant violation of the Holders' "sacred rights" enshrined in the

---

[2] Capitalized terms not otherwise defined have the same meaning as in the Complaint. "D.I." refers to the docket in the main bankruptcy case (No. 22-10493 (CTG)); "A.D.I." refers to the docket in this adversary proceeding.

Original Indenture and reflected in the applicable 2019 Intercreditor Agreement. Desiring to raise funds and either unwilling or unable to do so with the support of all Holders, TPC issued new Usurping Notes with a senior claim on Collateral to a favored group of Noteholders. To that end, TPC purported to amend the Original Indenture and enter a new 2021 Intercreditor Agreement, establishing a different waterfall for the distribution of Collateral proceeds—one that ranked the Usurping Notes ahead of the Senior Secured Notes. Under the Original Indenture, TPC could have raised additional capital by issuing notes that ranked equal or junior in priority to the Senior Secured Notes, Original Indenture §§ 4.07(b), 4.10(a), but chose the priming scheme instead.

4.    TPC's purported amendments violated the "sacred right" reflected in Section 9.02(d)(10), which requires the consent of **each** adversely affected Holder to any "amendment, supplement, or waiver" that "make[s] any change in the provisions in the [2019] Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral." Put simply, Section 9.02(d)(10), ensures that if TPC wants to change the order in which Collateral proceeds are applied to its debts, it must obtain the consent of each Holder whose priority in the waterfall would be subordinated.

5.    Defendants breached this sacred right by changing the waterfall for the distribution of Collateral proceeds to subordinate Plaintiffs' Notes without their consent. Before TPC's scheme, the 2019 Intercreditor Agreement governed the Original Indenture, putting Senior Noteholders first in line for payment, and barring TPC from issuing new debt that ranked senior to the Senior Secured Notes without their consent. After the scheme, TPC changed the Original Indenture to make its Collateral subject to a new waterfall in the supplemental 2021 Intercreditor Agreement that ranks Usurping Notes ahead of Senior Secured Notes, and to let it issue new debt that ranked

above the Senior Secured Notes. As a result, Plaintiffs purportedly sit behind $238 million of Usurping Notes—which could grow to $323 million under the Cross-Holder DIP Proposal.[3]

6.      Because the terms of the Original Indenture are unambiguous, and the facts of TPC's scheme are undisputed, Plaintiffs moved for summary judgment. A.D.I. 4; *see generally, e.g.*, *Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.2d 107, 110 (3d Cir. 1998) ("[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment."); *Patsis v. Nicolia*, 120 A.D.3d 1326, 1327-28 (2d Dep't 2014). The opposition briefs filed by TPC and Intervenor say nothing to deter the Court from granting that motion.

7.      **First**, Section 9.02(d)(10) applied to TPC's amendments because those amendments not only purported to change provisions "dealing with" the application of Collateral proceeds; their entire purpose and effect was to alter the order in which Collateral proceeds would be distributed, to the detriment of the Holders. Defendants assert that Section 9.02(d)(10) is limited to amendments of specific waterfall provisions (Section 6.10 of the Original Indenture and Section 4.1 of the 2019 Intercreditor Agreement) and then only to changes that would alter the application of proceeds among the members of the class of Senior Noteholders. But the plain language of Section 9.02(d)(10) is far broader and clear on its face: It covers any amendments or supplements that make any adverse change in "provisions … **dealing with** the application of proceeds" (emphasis added). This language expressly encompasses TPC's changes, which amended and supplemented portions of the Original Indenture and the 2019 Intercreditor Agreement in ways that

---

[3] Plaintiffs estimate that the priming scheme has reduced their expected recovery in this reorganization severely, dropping it from 74.4% to 55.8%. By contrast, it has increased the recovery by the Usurping Noteholders only marginally, raising it from 74.4% to 76.7%.

changed, and thus "deal[t] with," the application of Collateral proceeds. TPC's cramped reading of Section 9.02(d)(10) cannot be reconciled with the plain language of the contract. Section I.A.1.

8.     **Second**, TPC breached Section 9.02(d)(10) by amending Section 12.01(c) of the Indenture. Section 12.01(c) makes all rights to the Collateral, including the application of Collateral proceeds, subject to the 2019 Intercreditor Agreement. After TPC's purported amendment, Section 12.01(c) instead purports to render the application of Collateral proceeds subject to the new, plural "Intercreditor Agreement**s**," defined to include the new 2021 Intercreditor Agreement (emphasis added). This change subjected the application of proceeds to the 2021 Intercreditor Agreement's new waterfall, placing the Usurping Notes ahead of the Senior Secured Notes. Defendants assert that Section 12.01(c) is not itself a waterfall provision (and thus does not "deal with" the application of Collateral proceeds), but Section 12.01(c) deals with the application of proceeds by making those proceeds subject to a Collateral waterfall in the 2019 Intercreditor Agreement. The amendment to Section 12.01(c) purported to impose the new waterfall. Without that amendment, the Usurping Notes could not have ranked senior to the Senior Secured Notes. The recent *TriMark* case, which rejected a similar argument in defense of another uptiering scheme, makes this clear. Section I.A.2.

9.     **Third**, TPC violated Plaintiffs' sacred right by amending the definition of "Permitted Liens," which the Original Indenture defined to include liens securing new debt issued under Section 4.07(b)(1) subject to the 2019 Intercreditor Agreement, to allow new debt issued under that provision **not** subject to that agreement. This amendment purportedly allowed TPC to issue Usurping Notes under Section 4.07(b)(1) that are not subject to the 2019 Intercreditor Agreement's waterfall, freeing them to be subject to the 2021 Intercreditor Agreement's new waterfall—and so rank senior to the Senior Secured Notes. Defendants assert that Section 9.02(d)(10) did not bar this

4

change because the definition of "Permitted Liens" does not directly address the application of Collateral proceeds. But the provision "deals with" the application of proceeds because it now purportedly allows holders of new debt to rank senior to the Senior Noteholders and is also incorporated into provisions directly addressing the application of proceeds. Without that amendment, the Usurping Notes would be subject to the 2019 Intercreditor Agreement's waterfall and could not be senior to the Senior Secured Notes. Section I.A.3.

10.      **Fourth**, TPC supplemented Section 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture by creating a new waterfall in its new 2021 Intercreditor Agreement that governed those provisions and ranked the Senior Secured Notes below the Usurping Notes. Defendants argue that Section 9.02(d)(10) does not reach TPC's admitted subordination of the Senior Noteholders—but it does. As common sense dictates and the *TriMark* case confirms, subordinating a noteholder necessarily alters the application of proceeds among the holders, for which Section 9.02(d)(10) requires unanimous holder consent. Defendants also assert that TPC always had the right to subordinate minority holders, but this simply is not so: Section 9.02(d)(10) always required unanimous consent for any supplement or amendment that changes the application of proceeds, and Section 4 of the Indenture always prohibited new senior debt. Were this not the case, then TPC would not have amended the Original Indenture as it did; it simply would have issued the Usurping Notes under the existing Indenture terms. Section I.A.4.

11.      **Fifth**, Section 9.02(a) did not allow TPC to make its amendments with only majority holder consent. Section 9.02(a) allows amendments with majority consent only if some other section of Section 9.02 does not apply—but here, Section 9.02(d)(10) requires unanimous consent for TPC's amendments and supplements here because they adversely affected holders and changed

provisions dealing with the application of Collateral proceeds. Specifically, Section 9.02(d) includes the unambiguous language: "However, without the consent of each Holder affected thereby, an amendment, supplement or waiver under this Section 9.02 may not …." This language expressly circumscribes TPC's ability to amend with majority consent with respect to the ten subjects set forth in Sections 9.02(d)(1)-(10). Section I.B.

12.    **Sixth**, contrary to Defendants' argument, Section 9.02(e) does not allow TPC to make its amendments with only supermajority consent. In Section 9.02(e), the Original Indenture includes a supermajority voting provision for the category of amendments to the Indenture, 2019 Intercreditor Agreement, and Security Documents that do not affect sacred rights but nonetheless adversely affect Holders or effect a release of Collateral. That section sets a **floor** of "at least" supermajority consent when an amendment adversely affects holders or effects a release of Collateral, but this does not conflict with Section 9.02(d), which requires unanimous consent for supplements or amendments that adversely affect holders and implicate one of the ten sacred rights, including by changing provisions that deal with the application of Collateral proceeds. This plain reading gives independent meaning to Section 9.02(d) and 9.02(e), while TPC's reading—that Section 9.02(e) allowed its amendments by supermajority vote despite Section 9.02(d)(10)— would render the individual consent right established in Section 9.02(d)(10) meaningless. TPC's reading would also be commercially unreasonable, allowing a supermajority to subordinate a minority at any time, something no rational minority holder would ever agree to. Section I.C.

13.    **Seventh**, setting aside the prohibition in Section 9.02(d)(10), TPC's amendments were improper because no Holder properly consented. The Original Indenture dictates that only the registered holder of the Notes can provide the necessary consents, but TPC received purported

consents from only the beneficial owners. Contrary to Defendants' arguments, the Trustee could not accept these invalid consents. Section I.D.

14.    **Finally**, the Original Indenture's "No-Action Clause" does not preclude Plaintiffs' suit to enforce their individual consent rights, as explained in Plaintiffs' recent brief in response to TPC's Motion to Dismiss and its purported counterclaims, A.D.I. 50.

15.    Because TPC's amendments and supplements breached the Original Indenture, the Court should grant Plaintiffs' motion for summary judgment, deny Intervenor's cross-motion, and grant Plaintiffs' requested relief, A.D.I. 3, at 16-18.

## UNDISPUTED MATERIAL FACTS

### A.    The Senior Secured Notes

16.    In August 2019, pursuant to the Original Indenture, TPC issued $930 million in principal of 10.5% Senior Secured Notes. *See* Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions ¶ 38, D.I. 27 ("Del Genio Decl."). Under the Original Indenture, TPC was prohibited from incurring additional debt unless it was equal or junior in priority to the Senior Secured Notes. A.D.I. 17, Ex. A ("Original Indenture") §§ 4.07(b)(1), 4.10(a). At the same time, U.S. Bank, as Trustee and Collateral Agent for the Senior Noteholders, and Bank of America, N.A., as Administrative Agent and Collateral Agent for the ABL Lenders, entered the 2019 Intercreditor Agreement. A.D.I. 51, Ex. A ("2019 Intercreditor Agreement" or "2019 ICA"), which, among other things, set forth a Collateral waterfall that guaranteed the Senior Secured Notes' first priority with respect to proceeds of the Notes Priority Collateral and second priority with respect to proceeds of the ABL Facility Priority Collateral.[4]

---

[4] The 2019 Intercreditor Agreement provides that "the Notes Obligations [of the Senior Secured Notes] are intended to be secured by first priority liens on the Notes Priority Collateral and second

B.      **Plaintiffs' Sacred Rights**

17.     Some amendments of the Original Indenture and related Security Documents are permitted under the Original Indenture without the consent of all holders, but Article 9 proscribes amendments, supplements or waivers that would subordinate the Senior Secured Noteholders by altering their first-priority right to Collateral proceeds. Article 9 describes the varying levels of consent required to amend or supplement documents relevant to the Senior Secured Notes, including the Original Indenture and the 2019 Intercreditor Agreement, or to waive rights therein. Some provisions can be amended without holder consent, others only with consent of a majority of holders, others only with a supermajority, and still others only with consent of **each** Senior Noteholder adversely affected by the amendment.

18.     Provisions that cannot be amended without the consent of each affected Holder are known as "sacred rights," because they grant each Holder an individual right to prevent the amendment. Section 9.02(d) identifies ten sacred rights—each concerning rights to, or priority of, payment—that cannot be amended without the consent of "each Holder affected thereby." Original Indenture § 9.02(d).

19.     The right to block amendments affecting the application of Collateral proceeds (the payment "waterfall") is a sacred right. Section 9.02(d)(10) of the Original Indenture provides:

> **[W]ithout the consent of each Holder affected thereby**, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any [Senior Secured] Notes held by a non-consenting Holder): …
>
> (10) **make any change** in the provisions in the [2019 Intercreditor Agreement] or this Indenture dealing with **the application of proceeds of Collateral** that would adversely affect the Holders.

---

priority liens on the ABL Facility Priority Collateral, such priorities and related rights to be established by this Agreement." 2019 ICA Recital E.

*Id.* (emphasis added). Section 4.1(a) of the 2019 Intercreditor Agreement, "Application of Proceeds of Senior Collateral," provides that, subject only to payment of certain costs and expenses, the Senior Noteholders get paid first from the proceeds of the Notes Priority Collateral and second from the ABL Facility Priority Collateral. 2019 ICA § 4.1(a). Amendments thus may not affect the Senior Noteholders' ratable claim on the Collateral proceeds without the consent of each affected Holder.

20.    Under the Original Indenture, Section 4.01(b)(1) allowed TPC to incur a defined amount of additional debt after the issuance of the Senior Secured Notes ("Permitted Debt"), but required that any liens securing such debt issued under Section 4.07(b)(1) (among the categories of so-called "Permitted Liens") must be "subject to the provisions of" the 2019 Intercreditor Agreement—including the Section 4.1(a) waterfall giving the Senior Secured Notes senior access to the proceeds of the Notes Priority Collateral and junior access to the proceeds of the ABL Facility Priority Collateral. Original Indenture §§ 1.01, 4.07(b)(1).

### C.    The Usurping Notes

21.    In February 2021, TPC issued $153 million in principal of 10.875% Usurping Notes pursuant to a new 10.875% indenture. Del Genio Decl. ¶ 35. Shortly before declaring bankruptcy in 2022, TPC issued another approximately $51.5 million in principal of Usurping Notes. Del Genio Decl. ¶ 36. To facilitate these issuances, TPC and U.S. Bank N.A. entered the 10.5% Supplemental Indenture, A.D.I. 5, Ex. D ("Supplemental Indenture"), purporting to amend the Original Indenture, and U.S. Bank N.A. (as Senior Priority Agent and Junior Priority Agent) entered the 2021 Intercreditor Agreement. A.D.I. 51, Ex. B ("2021 Intercreditor Agreement" or "2021 ICA").

22.    These amendments and supplements purport to change the application of Collateral proceeds to subordinate the Senior Secured Notes behind the Usurping Notes in at least three ways.

9

23.     **First**, the Supplemental Indenture purports to amend the Original Indenture to make the Senior Secured Notes subject to the 2021 Intercreditor Agreement, including its new waterfall scheme with respect to Collateral. The Supplemental Indenture purports to amend Section 12.01(c) of the Original Indenture to replace the reference to the 2019 Intercreditor Agreement with the new term "Intercreditor Agreements," defined to mean the 2019 Intercreditor Agreement **and** the 2021 Intercreditor Agreement. Supplemental Indenture § 12.01(c). This change purports to make the Senior Secured Notes subject to the 2021 Intercreditor Agreement's waterfall, which prioritizes payments to the Usurping Notes from the proceeds of Collateral before payment on the Senior Secured Notes. 2021 ICA § 4.1.

24.     **Second**, the Supplemental Indenture purports to amend the Original Indenture's definition of "Permitted Liens" to except at least $113 million of the Usurping Notes from the requirement that they be subject to the 2019 Intercreditor Agreement. Section 4.10(a) of the Original Indenture required that any new debt issued under Section 4.07(b)(1) (one of the Original Indenture's permitted debt baskets) be "Permitted Liens," defined to be "subject to the provisions of" the 2019 Intercreditor Agreement, including its waterfall giving the Senior Secured Notes senior access to the proceeds of the Notes Priority Collateral and junior access to the proceeds of the ABL Facility Priority Collateral. Original Indenture § 1.01. The Supplemental Indenture purports to amend the definition of "Permitted Liens" so that liens securing the Usurping Notes issued under Section 4.07(b)(1) now are **not** subject to the 2019 Intercreditor Agreement, Supplemental Indenture § 1.01, and so not subject to its waterfall.

25.     Section 4.07(d) of the Supplemental Indenture states that $113 million in aggregate principal of the Usurping Notes shall be treated as indebtedness incurred under Section 4.07(b)(1) and cannot later be reclassified. Supplemental Indenture § 4.07(d). On information and belief, TPC

also issued the approximately $51.5 million in principal amount of 2022 Usurping Notes pursuant to Section 4.07(b)(1) of the Supplemental Indenture.

26.     **Third**, even if there had been no changes to the Original Indenture, the supplemental 2021 Intercreditor Agreement purports to change the Senior Secured Notes' priority with respect to proceeds of Collateral relative to the Usurping Notes by supplementing Sections 3.1 and 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture. Section 2.1 of the new 2021 Intercreditor Agreement provides that any lien on "Common Collateral," inclusive of the Notes Priority Collateral and the ABL Facility Priority Collateral, securing the Usurping Notes "shall have priority over and be senior in all respects and prior to" any liens on the "Common Collateral" securing the Senior Secured Notes. Section 4.1 of the 2021 Intercreditor Agreement (titled "Application of Proceeds") provides that proceeds of Collateral, inclusive of the Notes Priority Collateral and the ABL Facility Priority Collateral, shall be applied to the Senior Secured Notes **only after discharge of the Usurping Notes**. And Section 3.1 of the 2021 Intercreditor Agreement provides that the Senior Priority Agent shall exercise all rights with respect to the Collateral until the Usurping Notes are paid in full. These supplements change Section 4.1(a) of the 2019 Intercreditor Agreement by subordinating the Senior Secured Notes to the Usurping Notes with respect to the proceeds of Collateral. They also change Section 3.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture by delaying the Trustee's receipt of proceeds for payment to the Senior Secured Noteholders.

###     D.     Plaintiffs' Notice of Breaches to TPC

27.     On March 31, 2022, counsel for the Ad Hoc Group of Non-Consenting Noteholders notified TPC's counsel in writing that TPC had violated Section 9.02(d)(10) of the Original Indenture. A.D.I. 5, Ex. H. TPC's counsel denied that TPC had breached Section 9.02(d)(10). On April 26, 2022, counsel for the Ad Hoc Group of Non-Consenting Noteholders wrote to the indenture

trustee for the Senior Secured Notes (the "Trustee"), describing TPC's breaches, and requesting that the Trustee not take instruction from the Usurping Noteholders. A.D.I. 17, Ex. D.

### E.    TPC's Bankruptcy and the Cross-Holder DIP Proposal

28.    On June 1, 2022, TPC and some of its affiliates filed a petition for relief under Chapter 11 of the Bankruptcy Code in this Court. D.I. 1. At the same time, TPC filed a Motion for Entry of Interim and Final Orders to approve the Cross-Holder DIP Proposal, which purports to allow $238 million of Usurping Notes to be rolled-up in to $323 million of debtor-in-possession financing. *See* D.I. 36. If granted, the Cross Holder DIP would lock in the Usurping Notes' subordination of the Senior Secured Notes and would shift value from the Non-Consenting Noteholders to the Usurping Note Holders. D.I 76 ¶ 3.

### F.    Plaintiffs Sue to Vindicate Their Sacred Rights

29.    On June 1, 2022, Plaintiffs commenced this adversary proceeding, seeking declarations that TPC breached Section 9.02(d)(10) of the Original Indenture; that the 2021 Transaction Documents are without force to the extent they would change the application of Collateral proceeds under the Original Indenture and the 2019 Intercreditor Agreement in a manner adversely affecting Senior Noteholders; that the application of proceeds of Collateral securing the Senior Secured Notes held by members of the Ad Hoc Group of Non-Consenting Noteholders must be determined solely by the Original Indenture and the 2019 Intercreditor Agreement; and that the consents obtained by TPC in connection with the 2021 Transaction Documents and the Usurping Notes are not valid. *See generally* Compl. ¶¶ 46-63.

## ARGUMENT

**I.    TPC Breached Section 9.02(d)(10) by Amending the Original Indenture to Change the Application of Collateral Proceeds Without the Consent of Each Adversely Affected Senior Noteholder**

30.    As Plaintiffs explained in their opening brief, A.D.I. 4 § I, TPC's priming scheme breached Section 9.02(d)(10) of the Original Indenture, which requires the consent of each affected Noteholder for any amendments of, or supplements to, the Indenture or 2019 Intercreditor Agreement that alter the provisions dealing with the application of Collateral proceeds and adversely affect Holders. TPC changed Section 12.01(c) and the Original Indenture's definition of "Permitted Liens," both of which breached the sacred rights of Section 9.02(d)(10), and either of which entitles Plaintiffs to summary judgment.

### A.    TPC's Amendments and Supplements Changed Provisions of the Original Indenture Dealing with the Application of Collateral Proceeds

#### 1.    Section 9.02(d)(10) Applies to TPC's Amendments

31.    Section 9.02(d)(10) of the Original Indenture enshrines a sacred right that prohibits any "amendment, supplement or waiver" that "makes any change in the provisions in the Intercreditor Agreement or th[e] Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders" unless TPC obtains "the consent of each Holder affected thereby." Section 9.02(d)(10) applied to, and prohibited, TPC's amendments of Section 12.01(c) and the definition of "Permitted Liens," because those provisions deal with the application of Collateral proceeds and the changes made by TPC adversely affected the Senior Noteholders. *See* Sections I.A.2-4, *infra*.

32.    TPC (at 18-19) and Intervenor (at 20) assert that Section 9.02(d)(10) covers only amendments to Section 6.10 of the Indenture and Section 4.1 of the 2019 Intercreditor Agreement.

But, by its plain text, Section 9.02(d)(10) is not limited to those provisions: It covers all amendments that make any adverse change in any portion of the Original Indenture or 2019 Intercreditor Agreement "dealing with" the application of Collateral proceeds.[5] The contracting parties could have cabined Section 9.02(d)(10) to specific sections, but they did not. *Cf. Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.* ("*TriMark*"), 2021 WL 3671541, at *8 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) (Joel M. Cohen, J.) (analyzing sacred right that required consent of adversely affected lenders to amendments that would "waive, amend, or modify (i) *Section 7.03* or (ii) *Section 4.02* of the Collateral Agreement in a manner that would by its terms alter the order of application of proceeds" (emphases added)); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (courts may not add terms to contract).

33.    TPC (at 18-19) asserts that Section 9.02(d)(10) is also limited to changes in the application of proceeds "among the holders of the [Original] Indenture" so, according to TPC, it could place Usurping Notes ahead of Senior Secured Notes so long as it did not affect distributions (1) between the Super Senior Noteholders and the ABL Lenders or (2) among the Senior Noteholders. But Section 9.02(d)(10) is not limited to such changes: It applies to any change in provisions in the Original Indenture or 2019 Intercreditor Agreement "**dealing with** the application of proceeds of Collateral that would adversely affect the Holders" (emphasis added). That broad language covers any amendments that would alter the order in which Collateral proceeds are to be distributed—whether among the Senior Secured Noteholders, between the Senior Secured Noteholders and the ABL Lenders, or between those classes and the purported new class of Usurping Noteholders. TPC's amendments changed provisions that dealt with the application of Collateral

---

[5] To "deal with" a subject means to concern, relate to, or "have as a subject." *See Deal With*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/deal%20with.

proceeds by purportedly ranking the Usurping Notes ahead of the Super Senior Notes, and those changes adversely affected the Senior Noteholders by subordinating their Notes to the Usurping Notes. *See TriMark*, 2021 WL 3671541, at *9 (rejecting argument that similar sacred right was not violated because a similar priming scheme placed new loans ahead of existing loans but maintained the same allocation of proceeds within the class of existing lenders).[6]

### 2.    TPC's Amendment of Section 12.01(c) Purportedly Imposed a New Waterfall for Distributing Collateral Proceeds

34.    TPC's purported amendment of Section 12.01(c) of the Original Indenture, and its related purported amendment of the definition of "Intercreditor Agreement," dealt with the application of Collateral proceeds. In Section 1.01, TPC changed "Intercreditor Agreement" to "Intercreditor Agreements"—plural—which it newly defined to include the 2021 Intercreditor Agreement. In Section 12.01(c), it changed "liens and security interests" and "rights and obligations … in respect of the Collateral" from being "expressly subject to the Intercreditor Agreement" to being "expressly subject to the Intercreditor Agreements"—and so made them subject to the new 2021 Intercreditor Agreement. Supplemental Indenture § 12.01(c). These amendments changed the distribution of Collateral proceeds from being subject to the 2019 Intercreditor Agreement's original waterfall for distributing proceeds—"first, to the [Senior Noteholders]," "second, to the [ABL Lenders]," and "third, to the Grantors," 2019 ICA § 4.1—to the 2021 Intercreditor

---

[6] In any event, Section 9.02(d)(10) does not govern only distributions **within** the class of Senior Noteholders—as Intervenor admits (at 11 (stating that the Intercreditor Agreements "do[] not govern the rights and priorities between the different 10.5% Noteholders" (emphasis added)). Section 9.02(d)(10)'s protections also include Section 4.1 of the 2019 Intercreditor Agreement, which governs distributions **among** different classes: the Senior Noteholders, the Junior Noteholders, and the Grantors. If Section 9.02(d)(10) were limited to ordering within the class of Senior Noteholders, as TPC suggests, then Section 9.02(d)(10)'s reference to "the Intercreditor Agreement" would be an impermissible nullity. *See E. 41st St. Assocs. v. 18 E. 42nd St., L.P.*, 248 A.D.2d 112, 114 (1st Dep't 1998).

Agreement's new waterfall—"<u>first</u>, to the [Usurping Noteholders]," "<u>second</u>, to the [Senior Note-holders], and "<u>third</u>, to the Grantors," 2021 ICA § 4.1.[7] This was a change in the Original Indenture "dealing with" the application of proceeds of Collateral, subject to Section 9.02(d)(10).

35.   Defendants assert (TPC at 20; Intervenor at 22) that TPC's amendment of Section 12.01(c) does not "relate to" or "address" the application of Collateral proceeds because Section 12.01(c) itself is not a waterfall provision. But the amendment of Section 12.01(c) imposes the rules of the new 2021 Intercreditor Agreement on the liens, security interests in, rights to, and obligations in respect of the Collateral, including the 2021 Intercreditor Agreement's waterfall. Without this amendment, the Collateral would still be subject to the 2019 Intercreditor Agreement's waterfall; the 2021 Intercreditor Agreement's waterfall putting the Usurping Notes ahead of the Senior Secured Notes would not apply.[8] The amendment thus changes provisions "dealing with" the application of Collateral proceeds, and so is subject to Section 9.02(d)(10). Were it otherwise, TPC could change the waterfall whenever it liked without consent of all adversely affected Noteholders by merely entering additional intercreditor agreements, impermissibly rendering Section 9.02(d)(10)'s sacred right a nullity. *E. 41st St. Assocs.*, 248 A.D.2d at 114; *see also ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503-03 (1st Dep't 2012) (rejecting commercially unreasonable interpretation of contract).[9]

---

[7] The 2021 Intercreditor Agreement does not address the ABL Collateral.

[8] The 2021 Intercreditor Agreement also purports to prohibit the Senior Secured Noteholders from challenging any DIP Financing by the Usurping Noteholders, even if the financing would "subordinate [the Senior Secured] Liens in the Common Collateral or any other collateral to such DIP Financing." 2021 ICA § 6.1. This provision, purportedly given effect by Section 12.01(c), deals with the application of Collateral proceeds and thus could not be imposed absent compliance with Section 9.02(d)(10).

[9] TPC also asserts (at 19-20) that the Original Indenture lets it issue additional debt and pledge the same assets as Collateral for different debts, and that "Section 12.01(c) is merely an administrative

36.     *TriMark* is squarely on point. There, a credit agreement included a nearly identical prohibition against "amend[ing] or modify[ing] … the Collateral Agreement in a manner that would by its terms alter the order of application of proceeds." 2021 WL 3671541, at *8. As here, the borrower had existing first-priority debt governed by a collateral waterfall "[s]ubject to the terms of the Intercreditor Agreements." *Id.* The borrower, TriMark, attempted a similar priming scheme by "chang[ing] the definition of 'Intercreditor Agreements' to include the new Super-Priority Intercreditor Agreement." *Id.* This change, the court held, "mean[t] the waterfall is now '[s]ubject to' Defendants' new super-senior tranches of debt." *Id.* at *9. The court denied defendants' motion to dismiss the minority lenders' complaint, holding that plaintiffs had sufficiently alleged that their sacred right was violated because the debtor "plac[ed] a[] tranche of debt above Plaintiffs' place in the waterfall, even if the order of distribution [among the plaintiffs, their agents, and more junior lenders] remain[ed] facially unaffected." *Id.* at *9.

37.     TPC (at 23-24) and Intervenor (at 24-25) fail to distinguish *TriMark*. TPC notes (at 23-24) that the *TriMark* plaintiffs sued promptly and the price of their debt fell in response to the priming scheme, and Intervenor asserts (at 24) that some *TriMark* lenders also elevated the priority of their existing loans, but those facts have no bearing on the *TriMark* court's ruling on the meaning of the sacred right or on the proper interpretation of the Original Indenture here. TPC also asserts (at 24) that the phrase in the *TriMark* credit agreement's amendment provision governing "an agreement or agreements" let the court look beyond the credit agreement there, while

---

provision" that effectuates its ability to do so. In fact, the Original Indenture does not allow TPC to incur new debt pledged on the existing Collateral without unanimous holder consent. *See infra* Section I.A.3. Even if it did, its amendment of Section 12.01(c) would still govern the relationship among different creditors secured by the same Collateral, thus "dealing with" the application of Collateral proceeds, and so would be subject to Section 9.02(d)(10).

such language is absent here. Even were this true,[10] Section 9.02(d)(10) expressly and unambiguously applies to amendments and supplements that change the Original Indenture or the 2019 Intercreditor Agreement, and so covers TPC's conduct.[11]

### 3.    TPC's Amendment to the Definition of "Permitted Liens" Purportedly Authorized the Issuance of New Notes That Were Senior to the Senior Secured Notes in the Collateral Waterfall

38.    TPC's purported amendments to the Original Indenture's definition of "Permitted Liens," as that term is used in Section 4.10(a), also changed provisions dealing with the application of Collateral proceeds. Section 4.10(a) prohibits TPC from "directly or indirectly, creat[ing,] incur[ring,] or assum[ing] any Lien (other than Permitted Liens) on any asset or property … that secures any Indebtedness." TPC thus could not put any new liens on the Collateral unless they were Permitted Liens. Before the uptiering, the Original Indenture defined "Permitted Liens" to include liens securing debt issued "pursuant to Section 4.07(b)(1)" provided they were "subject to the provisions of the [2019] Intercreditor Agreement," Original Indenture § 1.01, which gave first priority to the Senior Noteholders, 2019 ICA § 4.1. After the uptiering, TPC purportedly redefined

---

[10] It is not. The operative sacred rights provision in the *TriMark* credit agreement used the singular "no such agreement," 2021 WL 3671541, at *8; the *TriMark* plaintiffs argued that the documents effecting the uptiering scheme "constitute[d] a single integrated 'agreement,'" Pls.' Opp'n at 24-26, *TriMark*, Index. No. 565123/2020, Dkt. 78 (Sup. Ct. N.Y. Cty. Feb. 19, 2021), Shine Aff., Ex. A; and the *TriMark* court did not hold that the "agreement or agreements" language was key to its ruling.

[11] Intervenor notes (at 21) that the 2021 Intercreditor Agreement dealt with relations between the 10.875% Noteholders and the 10.5% Noteholders, while the 2019 Intercreditor Agreement dealt with relations between the 10.5% Noteholders and the ABL Lenders. But the amendments to the 2021 Intercreditor Agreement, which created a new waterfall, indisputably had the effect of changing the 2019 Intercreditor Agreement's waterfall, and so fall squarely within Section 9.02(d)(10). *See* 2021 ICA § 8.17(b) ("[A]s among the Secured Parties, in the event of any conflict between this Agreement and the ABL Intercreditor Agreement, the terms of this Agreement shall control.").

"Permitted Liens" so that "New Notes" (*i.e.*, the Usurping Notes) were not "subject to the provisions of the [2019] Intercreditor Agreement," Supplemental Indenture § 1.01, and so not subject to the 2019 Intercreditor Agreement's waterfall. This was a change to a provision in the Original Indenture "dealing with" the application of proceeds of Collateral, subject to Section 9.02(d)(10).[12]

39.     TPC asserts (at 20) that its amendment does not deal with application of Collateral proceeds because the definition of "Permitted Liens" does not discuss allocation of those proceeds. That is wrong. In fact, the definition expressly refers to the "relative priority" of claims to Collateral, and the amendment of that definition exempts New Notes from the 2019 Intercreditor Agreement's waterfall, allowing holders of New Notes to rank ahead of the Senior Secured Noteholders. And because the definition of "Permitted Liens" is incorporated into Section 4.10(a), which restricts TPC from applying proceeds to any new liens, amending the definition changed Section 4.10(a), which "deals with" the application of proceeds. *Cf. TriMark*, 2021 WL 3671541, at *8-9. TPC also asserts (at 20) that Section 4.07(b)(1), under which the Usurping Notes were issued, is simply an "administrative provision" for classifying debt. But Section 4.07(b)(1) authorizes TPC to issue new debt (not just classify it), and the amended definition of "Permitted Liens" purportedly allows it to issue such debt that ranks senior to Senior Secured Notes.

40.     Intervenor asserts (at 19, 23) that the amendment does not deal with the application of Collateral proceeds because the definition of "Permitted Liens" is not incorporated into Section 6.10(a) of the Original Indenture, which provides a waterfall for distribution of those proceeds.

---

[12] TPC purportedly gutted other critical provisions of Section 4.10(a). In the Original Indenture, Section 4.10(a) provided that TPC could "incur or suffer to exist Liens on assets not constituting Collateral, so long as [TPC] … provides that the [10.5%] Notes … shall be **equally and ratably secured** with (or **on a senior basis** to …) the Indebtedness … secured by such [new] Lien." Original Indenture § 4.10(a) (emphases added). In the uptiering, TPC struck the requirement that liens on additional Collateral rank equal or junior to the 10.5% Notes, facilitating the application of proceeds to more senior lenders. *See* Supplemental Indenture § 4.10(a).

But Section 6.10(a) is subject to the 2019 Intercreditor Agreement, and the amended definition of "Permitted Liens," as incorporated into Section 4.10(a), exempts New Notes from that Agreement. Intervenor also asserts (at 23) that this exemption did not harm Plaintiffs, but it plainly did, by purportedly allowing TPC to issue Usurping Notes that subordinated their Senior Secured Notes.[13] *See TriMark*, 2021 WL 3651541, at *9 (recognizing that subordination may trigger consent right for "adversely affected" lenders).

### 4. TPC's New Collateral Waterfall in the 2021 Intercreditor Agreement Collateral Waterfall Purportedly Supplemented the Waterfall in Section 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture

41. TPC supplemented Section 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture by creating a new waterfall in Section 4.1 of the 2021 Intercreditor Agreement that purportedly controls over the waterfall in the 2019 Intercreditor Agreement. The new waterfall supplemented Section 4.1—the 2019 Intercreditor Agreement's waterfall for applying proceeds—by purportedly establishing a new waterfall that displaced the 2019 Intercreditor Agreement's waterfall and put the Usurping Notes ahead of the Senior Secured Notes. 2021 ICA §§ 4.1, 8.17(b) (providing that 2021 Intercreditor Agreement controls over 2019 Intercreditor Agreement in case of a conflict). The new waterfall supplemented Section 6.10—the Original Indenture provision that dictates what happens "[i]f the Trustee collects any money," Original Indenture § 6.10—by providing that the Trustee purportedly cannot collect Collateral proceeds or

---

[13] *TriMark* directly refutes Intervenor's assertion (at 23) that changing the definition of "Permitted Liens" cannot affect a sacred right. As *TriMark* explains, changing the definition of a term that is used in a provision dealing with the application of proceeds itself changes the application of proceeds and may implicate a sacred right. 2021 WL 3671541, at *8-9. Accordingly, the amendment to the definition of "Permitted Liens" changed provisions dealing with the application of proceeds, such as Section 4.10(a), and thus implicated Section 9.02(d)(10).

enforce any rights with respect to Collateral until the Usurping Notes are discharged in full. 2021 ICA §§ 4.1, 3.1.[14]

42.    Remarkably, TPC asserts (at 21-23) that these are issues of "subordination," not application of proceeds, but subordination **is, by its very definition,** a matter of application of proceeds, because it deals with the order in which the proceeds of collateral will be applied among holders.[15] TPC (at 21) and Intervenor (at 18) cite *LCM XXII Ltd. v. Serta Simmons Bedding, LLC* ("*Serta*"), 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022), for the proposition that sacred rights do not prevent borrowers from subordinating a class of debt. But *Serta* did not hold that subordination is not protected by sacred rights; the *Serta* contract did not even have a sacred right concerning the application of collateral proceeds. *See* Shine Aff., Ex. B. *Serta* rather interpreted a specific contract's sacred right regarding "alter[ations of] the *pro rata* sharing of payments," 2022 WL 953109 at *9—rights to payment among members of a single lender class, *id.*[16] The sacred right at issue

---

[14] Section 9.02(d)(10) covers more than express amendments to provisions dealing with the application of proceeds. It provides that absent consent, "an *amendment, supplement or waiver* under this Section 9.02 may not … make any *change* in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds" (emphases added). Under New York law, "[t]he use of similar but different terms in a single contract 'strongly implies that the terms are to be accorded different meanings.'" *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 355 (S.D.N.Y. 2013) (quoting *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 51 A.D.3d 52, 60 (1st Dep't 2008)). A *change* under Section 9.02(d)(10) thus need not be a formal *amendment*. Instead, "amendment[s]" are a mere subset of "change[s]." *See* Black's Law Dictionary 98 (10th ed. 2014) (defining "amendment" as "a *change* made by addition, deletion, or correction; esp. an alteration in wording" (emphasis added)). When an amendment (*e.g.*, the amendment to Section 12.01(c)) or supplement (*e.g.*, the 2021 Intercreditor Agreement) effects a change in a provision dealing with the application of proceeds (*e.g.*, Section 6.10), the sacred right applies.

[15] Subordination means placement in a "lower rank" or "position." Black's Law Dictionary 1653. In this context, it plainly means being placed in a lower rank with respect to access to Collateral proceeds.

[16] The Original Indenture deals with pro rata sharing separately, in Section 6.10(a).

here, in contrast, deals with application of Collateral proceeds, and an amendment "alter[s] the order of application of proceeds by subordinating [lenders'] priority interest." *TriMark*, 2021 WL 3671541, at *9 (cleaned up). Simply put, Section 9.02(d)(10) is a sacred right against subordination—which TPC violated.[17]

43.    TPC again asserts (at 22) that no provision of the Original Indenture prevents a simple majority from subordinating existing debt, but that is exactly what Section 9.02(d)(10) does, by requiring consent of all affected Noteholders for changes to provisions that deal with the application of Collateral proceeds—including ones that subordinate holders in the Collateral waterfall. TPC asserts (at 22) that Section 10.5(b) of the 2019 Intercreditor Agreement allowed it to incur new debt without addressing subordination. But Section 10.5(b) specifically required that new debt be "permitted to be incurred by the ABL Agreement and the [10.5%] Notes Agreements" and "subject to the provisions of this [2019 Intercreditor] Agreement," including its waterfall giving the Senior Secured Notes senior priority. TPC was not authorized to issue the Usurping Notes, which violated that waterfall and claimed exemption from the 2019 Intercreditor Agreement, in breach of the Original Indenture.

44.    Intervenor asserts (at 20-21) that the 2021 Intercreditor Agreement did not "amend" the 2019 Intercreditor Agreement. This argument is wrong and irrelevant: Because TPC amended Section 12.01(c) of the Original Indenture to make it subject to the 2021 Intercreditor Agreement,

---

[17] TPC also asserts (at 22) that Section 9.02(d)(10) of the Original Indenture must not deal with subordination because TPC added a new Section 9.02(f) to the Supplemental Indenture that specifically allows subordination with supermajority consent. But what TPC decided to place in the Supplemental Indenture in 2021 says nothing about the intent of the parties who drafted the Original Indenture in 2019. This new provision does not show that the Original Indenture was "silen[t]" on subordination (*id.*); it shows that TPC believed it needed to amend the Original Indenture to permit a supermajority to subordinate a minority "[n]otwithstanding the foregoing in this Section 9.02" because Section 9.02(d)(10) the Original Indenture previously required unanimous consent for it to do so.

including its new waterfall for Collateral proceeds, that amendment changed a provision dealing with the application of Collateral proceeds and fell within the prohibition in Section 9.02(d)(10). Intervenor's argument is also unavailing because Section 9.02(d)(10) precludes any "supplement" that deals with the application of proceeds of Collateral and adversely affects Holders. The 2021 Intercreditor Agreement provided that its new waterfall controlled over the 2019 Intercreditor Agreement's old waterfall.[18] 2021 ICA § 8.17(b). This was a "supplement" that "change[d]" provisions of the 2019 Intercreditor Agreement dealing with the application of Collateral proceeds (even if it did not amend them directly), and so was subject to Section 9.02(d)(10). If Section 9.02(d)(10) did not reach this change, then its sacred right—ensuring consent of all affected Noteholders for changes to the application of Collateral proceeds—would be illusory.

45.    Finally, Intervenor asserts (at 23-24) that "there is no provision in either the [Original] Indenture or [the 2019 Intercreditor Agreement] that mandates that the [Senior Secured Notes] will have senior status over such new debt." This is demonstrably false. Section 12.01(c) made the Original Indenture subject to the 2019 Intercreditor Agreement, which gave the Senior Secured Notes first priority with respect to the Notes Priority Collateral and second priority with respect to the ABL Facility Priority Collateral, and Section 4.10(a) prohibited TPC from issuing new secured debt that ranked senior to those notes. By changing those provisions without the consent of all affected holders, TPC violated the sacred right of Section 9.02(d)(10).

---

[18] For this reason, Intervenor's claim (at 20-21) that the 2021 Intercreditor Agreement did not effect a change in the 2019 Intercreditor Agreement falls flat. The provision dictating that the later agreement purportedly controls in the event of conflict would have been entirely unnecessary if, as Intervenor suggests, the Agreements were unrelated.

**B.      Section 9.02(a) Did Not Allow TPC to Act with Majority Consent Alone**

46.      Contrary to TPC's (at 17-18) and Intervenor's (at 15) arguments, Section 9.02(a) did not permit TPC to amend the Original Indenture with only the support of holders of a majority of the aggregate principal balance of the Senior Secured Notes. Section 9.02(a) provides that, "Except as provided in this Section 9.02," parties to the Indenture "may amend or supplement this Indenture" with majority support. Section 9.02(d), in turn, governs any "amendment, supplement or waiver **under this Section 9.02**" (emphasis added). Section 9.02(a) thus allows for amendments with majority consent only if another portion of Section 9.02(d) (and/or 9.02(e)) does not apply, as Defendants concede (TPC at 17; Intervenor at 15). As explained in Section I.A, *supra*, Section 9.02(d)(10) applies here, and it requires the consent of "each Holder" adversely affected by TPC's amendments. Majority consent thus was insufficient to approve those amendments.

**C.      Section 9.02(e) Did Not Allow TPC to Act with Supermajority Consent Alone**

47.      Defendants are also wrong that Section 9.02(e) of the Original Indenture allowed TPC to amend that contract as it did with only supermajority consent. Section 9.02(e) requires that holders of "at least 66-2/3% in aggregate principal amount" of the Senior Secured Notes approve amendments of the Original Indenture and 2019 Intercreditor Agreement that have the effect of releasing all or substantially all the Collateral from the Liens securing the Senior Secured Notes, or otherwise modify the 2019 Intercreditor Agreement or Security Documents in a manner adverse to the noteholders. That plainly means that changes to these documents that adversely impact Holders require **at least** supermajority support, but more is required when those changes affect sacred rights enumerated in Section 9.02(d).

48.      TPC asserts without explanation (at 26) that Section 9.02(e) governs here because "Plaintiffs complain that the underlying Collateral upon which proceeds are paid has been released or changed and their rights have been adversely affected." This is false. Plaintiffs allege that TPC's

amendments altered the application of Collateral proceeds, Compl. ¶¶ 7-8, 12; they do not assert

that the amendments released the Collateral. Section 9.02(e), as it relates to amendments releasing

Collateral, thus does not apply.

49.     Defendants (TPC at 26; Intervenor at 25-26) next assert that reading Section

9.02(d)(10) to require consent of all affected Noteholders whenever TPC creates new senior liens

on Collateral would render "surplusage" Section 9.02(e)'s provision that a supermajority could

release those liens. Not so. Section 9.02(e) does not apply to the exclusion of Section 9.02(d).

Section 9.02(e) requires consent of "**at least**" a supermajority for amendments adverse to the hold-

ers, setting a **floor** for the consents required to approve such amendments; that is, supermajority

support is always necessary for such approvals, but is not always sufficient.[19] Section 9.02(d),

which applies to any amendment under Section 9.02, sets **additional** requirements of consent of

all affected Noteholders for a subset of adverse amendments, including those to the application of

Collateral proceeds in Section 9.02(d)(10).

50.     Plaintiffs' reading of Section 9.02 gives all its sub-sections independent meaning.

Under New York law, a contract interpretation "that gives a reasonable and effective meaning to

all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."

*Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (citation omitted); *accord Lawyers' Fund for Client*

*Prot. of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*, 94 N.Y.2d 398, 404 (2000) (rejecting inter-

pretation that would render a provision "superfluous" as "unsupportable under standard principles

of contract interpretation"). Plaintiffs' reading is reasonable and effective: Section 9.02(a) allows

---

[19] Intervenor (at 25) construes supermajority consent as a sufficient condition, not a necessary one, to suggest that a supermajority of holders can approve **any** amendments that inflict an adverse effect on minority holders. That is wrong. Section 9.02(e) requires that, if a change has any adverse effect on the holders, then, **at the very least**, a supermajority must consent to that change.

majority consent for amendments unless another provision of Section 9.02 requires more; Section 9.02(e) requires "at least" two-thirds' support for amendments that release all Collateral (an act that would affect all noteholders ratably) or amendments to the 2019 Intercreditor Agreement or Security Documents that are adverse to holders; and Section 9.02(d) requires consent of all affected holders for a subset of amendments, including changes to the application of Collateral proceeds as provided in Section 9.02(d)(10). Where, as here, TPC's amendments changed provisions of the Indenture and Intercreditor Agreement dealing with the application of Collateral proceeds, neither majority consent under Section 9.02(a) nor supermajority consent under Section 9.02(e) was sufficient; Section 9.02(d)(10) required consent of all affected holders.

51.     Defendants' interpretation, by contrast, would gut the sacred rights of Section 9.02(d). They contend that Section 9.02(e) allows all possible changes to the Original Indenture, 2019 Intercreditor Agreement, or Security Documents adverse to Holders with a supermajority vote, but this would nullify the ten items in Section 9.02(d) that expressly create consent rights for individual Holders. While Section 9.02(d) prohibits certain amendments without the individual consent of "each Holder affected," Defendants would allow a two-thirds supermajority to approve any of those amendments under Section 9.02(e). This would render the individual consent rights of Section 9.02(d)(10)—designed to protect the interests of minority investors—meaningless, which New York law would not allow. *See ERC 16W Ltd. P'ship*, 95 A.D.3d at 503-04.[20]

52.     Defendants' interpretation also contradicts commercial and common sense. "It is a longstanding principle of New York law that a construction of a contract that would give one party

---

[20] Even if TPC's uptiering scheme was merely a release of Collateral (it was not), reattaching that released Collateral to new liens is a change in the application of Collateral proceeds that requires unanimous consent under Section 9.02(d)(10). Section 4.10(a) would also require that liens on the reattached Collateral rank equal or junior to the 10.5% Noteholders' liens.

an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided." *Id.* at 502-03 (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438 (1994)). TPC asserts (at 21) that it is nonsensical that it would need the Senior Noteholders' unanimous consent to incur more senior debt, but it makes perfect sense: The Senior Noteholders purchased notes on the assurance that they would rank first in priority unless they agreed otherwise. If TPC could change that priority without the consent of all affected Senior Noteholders, then their seniority would be meaningless. Defendants' interpretation would effectively let a supermajority of noteholders subordinate minority holders whenever they like. No rational minority lender would agree to this, which would put minority senior lenders decidedly 'at the mercy" of the supermajority. *See id.* at 503-05.

53.     Finally, TPC (at 26 & Ex. 35) asserts that Plaintiffs' position contradicts a preliminary term sheet provided by their prior counsel on behalf of a different noteholder that "contemplated" releasing all liens with less than unanimous consent. That assertion is both wrong and irrelevant. Because Defendants (TPC at 15; Intervenor at 13, 27) agree that the Original Indenture and 2019 Intercreditor Agreement are unambiguous, they necessarily concede that consideration of extrinsic evidence of their meaning is inappropriate. *See W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990). In any event, Plaintiffs were not parties to that proposed financing arrangement, so this preliminary term sheet would reveal nothing about their drafters' intent. And TPC's characterization of the preliminary term sheet is inaccurate: It did not propose favoring some Secured Senior Noteholders over others (as TPC did here), it said nothing about the level of holder consent required, and it did not state or suggest that the proposed deal need not comply with Section 9.02(d)(10).

## II.    The Registered Holders of Senior Notes Did Not Consent to the Amendments

54.    TPC's amendments to the Original Indenture are invalid for the independent reason that no Holder properly consented to them. As Plaintiffs explained in their Motion (at 9), Section 9.02 of the Original Indenture provides that only "Holders" can consent to amend or supplement that contract, Original Indenture § 9.02, and Section 1.01 defines a "Holder" as the "Person in whose name a Note is registered in the register maintained by the Registrar." *Id.* § 1.01. Defendants do not dispute that the Super Senior Notes are registered in the name of Cede & Co., and that Cede & Co never consented to amend the Original Indenture. *See* TPC Opp. 8, 27-29; Interv. Mem ¶¶ 16, 45-48. Because Cede & Co., as Holder, did not consent to TPC's amendments, they are void.

55.    Defendants' responses are unavailing. They assert (TPC at 28; Intervenor at 16) that the Trustee found satisfactory the consents of beneficial owners, *see also* A.D.I. 41, Exs. 2-26 (attaching consents), but the Original Indenture does not let the Trustee determine which consents suffice—it mandates consent by "Holders," who are only the registered owners. Defendants note (TPC at 28; Intervenor at 1) that Plaintiffs did not object to the consents until recently, but the Original Indenture provides no contractual deadline for Plaintiffs to object, and they filed their claim here well within the applicable six-year statute of limitations, *see* N.Y. C.P.L.R. 213(2).

56.    Defendants also assert (TPC at 28-29; Intervenor at 16) that courts do not enforce distinctions between registered and beneficial owners when a party is undisputedly a beneficial owner, but their cited cases all concern beneficial owners' contractual standing to **sue** for payment, which is not at issue here. *See Fins. Restructuring Partners III, LT v. Riverside Banking Co.*, 2014 WL 36078 (Sup. Ct. N.Y. Cty. Jan. 02, 2014); *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242 (2d Cir. 2005); *Friedman v. Airlift Int'l, Inc.*, 44 A.D.2d 459 (1st Dep't 1974). None recognize a beneficial owner's contractual right to **consent** to an amendment of an indenture that explicitly requires the consent of registered owners.

57.     Even if those cases applied here (they do not), they would not help Defendants. In *Financials Restructuring Partners III* and *Allan Applestein*, the distinction between registered and beneficial owners did not matter because the registered owners had authorized the beneficial owners to act. 2014 WL 36078, at *8; 415 F.3d at 245. By contrast, here, Cede & Co. did not authorize the beneficial owners to consent to TPC's amendments. The final case, *Friedman*, did not involve an indenture that reserved rights to registered holders. Rather, the plaintiff in *Friedman* sued for interest on the underlying bonds. 44 A.D.2d 459 at 460. In *MacKay Shields LLC v. Sea Containers, Ltd.*, New York's First Department distinguished *Friedman* on that basis, and affirmed the basic principle that rights "expressly reserved" to registered holders cannot be exercised by beneficial owners. 300 A.D.2d 165, 166 (1st Dep't 2002). Without authorization from the registered owners, the First Department's binding holding in *MacKay Shields* applies here, barring beneficial owners from acting where the Original Indenture requires registered owners to do so. *Id.*[21]

## III.     The No-Action Clause Does Not Bar Plaintiffs' Suit

58.     Section 6.06(a) of the Original Indenture, its "No-Action Clause," does not bar Plaintiffs' suit. TPC argues (at 12-15) that it does, repeating arguments from its Motion to Dismiss and its Motion for Summary Judgment on its procedurally improper Counterclaim. *See* A.D.I. 15, 17, 19. TPC is wrong for the reasons stated in Plaintiffs' Consolidated Memorandum of Law in Opposition to TPC's Motion to Dismiss, in Support of Motion to Strike or Dismiss TPC's Counterclaims, and in Opposition to TPC's Motion for Summary Judgment. A.D.I. 50.

---

[21] TPC (at 29) suggests in passing that if Plaintiffs' argument is correct, then Plaintiffs would lack contractual standing to sue, citing Section 6.06(a) of the Indenture—the "No-Action Clause." For the reasons set forth in Plaintiffs' Consolidated Memorandum of Law in Opposition to TPC's Motion to Dismiss, in Support of Motion to Strike or Dismiss TPC's Counterclaims, and in Opposition to TPC's Motion for Summary Judgment, A.D.I. 50, the No-Action Clause does not apply here.

## <u>CONCLUSION</u>

The Court should grant Plaintiffs-Counterclaim Defendants' motion for summary judgment, declare void TPC's purported amendments of and supplements to the Original Indenture and 2019 Intercreditor Agreement, and deny Intervenor-Defendant's cross-motion for summary judgment.

Dated:   June 24, 2022

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By:   /s/ *Timothy P. Cairns*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Tel: 302-652-4100
Facsimile: 302-652-4400
ljones@pszjlaw.com
tcairns@pszjlaw.com

- and -

Jennifer Selendy (*pro hac vice*)
Andrew R. Dunlap (*pro hac vice*)
Oscar Shine (*pro hac vice*)
Max H. Siegel (*pro hac vice*)
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
jselendy@selendygay.com
adunlap@selendygay.com
oshine@selendygay.com
msiegel@selendygay.com

*Attorneys for the Ad Hoc Group of Non-Consenting Noteholders*