## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>TPC GROUP INC.*, et al.,*<br><br>   Debtors. | Chapter 11<br><br>Case No. 22-10493 (CTG)<br><br>(Jointly Administered) |
| BAYSIDE CAPITAL INC. and CERBERUS CAPITAL MANAGEMENT, L.P.,<br><br>   Plaintiffs/Counterclaim<br>   Defendants,<br><br>v.<br><br>TPC GROUP INC.,<br><br>   Defendant/Counterclaim Plaintiff,<br><br>-and-<br><br>THE AD HOC NOTEHOLDER GROUP,<br><br>   Intervenor Defendant. | Adv. Proc. No. 22-50372 (CTG)<br><br>**Related Docket Nos. 4, 16, 18, 43, 48, 49** |

## <u>MEMORANDUM OPINION</u>

There has been a flurry of litigation in recent years over transactions that seem to take advantage of technical constructions of loan documents in ways that some view as breaking with commercial norms.[1]  One example of such a transaction is sometimes described as an "uptier" transaction.  In its most aggressive form, such a transaction is one in which the debtor and a majority (but not all) holders of a syndicated debt issuance agree to enter into a new loan that is supported by a

---

[1] *See, e.g.*, Diane L. Dick, *Hostile Restructurings*, 96 Wash. L. Rev. 1333 (2021).  Materials from a recent symposium devoted to this topic can be found at: https://creditorcoalition.org/upcoming-symposium-intra-creditor-class-warfare/.

superior lien in the same collateral that secured the original debt.  Thereafter, the debtor repurchases the participating lenders' share in the prior (now junior) loan – effectively leaving behind the minority holders in a tranche of debt that is now junior to that held by the majority lenders.  While such a transaction would typically require an amendment to the original credit agreement or indenture, those documents are typically drafted to permit a majority (or, in some cases, a supermajority) of the holders to amend the agreement without the consent of the minority.

The transaction at issue in the motions now before the Court is somewhat less aggressive than the paradigmatic "uptier" transaction described above.  While the transaction at issue did involve the issuance of new debt that would be senior to the old, unlike the more aggressive "uptier" transactions, the majority holders here retained their positions in the old (now junior) loan, rather than selling those loans back to the debtors and thus exiting the junior tranche.[2]

The pending motions for summary judgment raise the question whether the transactions at issue comported with the terms of the applicable loan documents.  If they did not, the minority holders contend, the consequence would be that the new loans would be subject to the prior liens, making the new debt junior rather than senior to the old debt.  For the reasons described below, the Court concludes that the original loan documents did permit the majority holders to amend the loan

---

[2] In view of this distinction, the parties dispute whether the transaction at issue here is properly characterized as an "uptier" transaction.  But because that label has no particular legal significance, that is not an issue that the Court is properly called upon to resolve.

documents to provide for the subordination of the old debt to the new.  As a result, the debt now held by the majority holders is senior to that of the minority lenders.

### Factual and Procedural Background

Debtor TPC Group is a Texas-based petrochemical company.  Because this dispute turns primarily on the language of various agreements related to TPC's financing, the applicable contractual provisions of the relevant agreements are set forth in some detail, below.

### 1.    The 2019 10.5 Percent Notes

In August 2019, TPC raised $930 million by issuing senior secured notes that matured in 2024, bearing interest at 10.5 percent.[3]  Bayside Capital and Cerberus collectively hold approximately 10 percent of the 10.5% Notes.[4]  The Notes are governed by New York law.[5]  They are secured by a first lien on substantially all of the debtors' assets (but excluding assets held by certain bankruptcy-remote non-debtor subsidiaries) and a second lien on the assets (such as inventory and receivables) on which various asset-based lenders hold a first lien.

Syndicated loan agreements are commonly structured to permit a majority of the holders to make decisions designed to maximize the lenders' recoveries on the

---

[3] These notes will be referred to as the "10.5% Notes."  The indenture for these notes, referred to as the "2019 Indenture," can be found in the record at D.I. 5 Ex. A.  Items docketed in this adversary proceeding are cited as "D.I. __."  Items docketed in the main bankruptcy case, *In re TPC Group, Inc.*, No. 22-10493 (CTG) (Bankr. D. Del.), are cited as "Main Bankruptcy D.I. __."  U.S. Bank National Association serves as trustee and collateral agent under the 2019 Indenture.

[4] *See* Main Bankruptcy D.I. 74-1.  Bayside Capital, Inc. is referred to as "Bayside Capital."  Cerberus Capital Management, L.P. is referred to as "Cerberus."  Bayside Capital and Cerberus are referred to, collectively, as the "objecting noteholders."

[5] 2019 Indenture § 14.08.

loans, and thus prohibit individual holders from insisting on strict compliance with the loan terms in circumstances in which a majority believes it more appropriate to afford the borrower greater flexibility.  The 2019 Indenture is no exception.

Accordingly, § 6.05 of the indenture states that the holders "of a majority in aggregate principal amount of the then outstanding Notes may direct the time, place and method of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it."[6]  And perhaps more importantly for present purposes, § 9.02(a) allows, subject to specified exceptions described below, a majority of the holders to amend the indenture itself.  Subject to those exceptions (about which more will be said below), "the Issuer, the Guarantors and the Trustee … may amend or supplement this Indenture … and the Notes … with the consent of the Holders of at least a majority in the aggregate principal amount of the then outstanding Notes voting as a single class."[7]  In addition, again subject to certain exceptions, "any existing Default or Event of Default … or compliance with any provision of this Indenture … may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class."[8]

As noted, however, the indenture sets out certain exceptions to the right of the majority of holders to agree to an amendment.  Section 9.02(e), for example, states that any "amendment to, or waiver of, the provisions of this Indenture … that

---

[6] *Id.* § 6.05.

[7] *Id.* § 9.02(a).

[8] *Id.*

has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes … will require the consent of the holders of at least 66-2/3% in aggregate principal amount of the Notes."[9]  (The necessary implication, then, is that releasing collateral that is less than "all or substantially all" can be accomplished by an ordinary majority.)   Similarly, an amendment that "otherwise modifies the Intercreditor Agreement [described below] or other Security Document in any manner adverse in any material respect to the Holders" also requires the 66-2/3 percent supermajority.[10]

The indenture also specifies, however, certain amendments that cannot be made "without the consent of each Holder affected thereby."[11]  Section 9.02(d) thus sets forth certain rights, described by the parties and the caselaw as "sacred rights" (and sometimes referred to as "consent rights"), that may not be vitiated without the consent of each affected party.  The "sacred right" at issue here is set forth in Section 9.02(d)(10), which provides that without such consent "an amendment, supplement or waiver under this Section 9.02 may not … (10) make any change in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders."[12]

---

[9] *Id.* § 9.02(e).

[10] *Id.*

[11] *Id.* § 9.02(d)(10).

[12] Because, under the principle of *ejusdem generis*, the meaning of the relevant provision can be informed by the context provided by the other provisions, the full enumeration of "sacred rights" – those changes that cannot be made without the consent of every affected party – is set out below:

> (1) reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

While the intercreditor agreement is described further below, the provision of the indenture that, on its face, most directly "deal[s] with the application of proceeds of Collateral" is § 6.10(a), which sets out the "waterfall" for the trustee to pay out the funds it collects under the indenture.  Those funds shall be paid out, *first*, to pay the fees of the trustee or the collateral agent; *second*, "to Holders for amounts due and unpaid on the Notes for principal, premium and interest, ratably,

---

(2) reduce the principal of or extend the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (for the avoidance of doubt, repurchases of the Notes by the Issuer pursuant to Sections 4.08 and 4.12 hereof are not redemptions of the Notes);

(3) reduce the rate of or extend the time for payment of interest, including default interest, or premium on any Note;

(4) waive a Default or Event of Default in the payment of principal of, or premium, if any, or interest on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(5) make any Note payable in money other than that stated in the Notes;

(6) make any change in the provisions of this Indenture relating to waivers of past Defaults or impair the rights of Holders of Notes to receive payments of principal of, or interest of premium, if any, on the Notes;

(7) waive a redemption payment with respect to any Note (for the avoidance of doubt, any payment required by Sections 4.08 or 4.12 hereof is not a redemption payment);

(8) release any Guarantor that is a Significant Subsidiary of the Issuer from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture;

(9) make any change in the preceding amendment and waiver provisions; or

(10) make any change in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders.

*Id.* § 9.02(d).

without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium and interest, respectively"; and *third* to the "Issuer or to such party as a court of competent jurisdiction shall direct in writing."[13]  At the very least, any change to this provision of the indenture (such as a change to the requirement that any proceeds of collateral recovered by the trustee be paid to the holders on a "ratable" basis, meaning "in equal proportion to one's holdings") would require the consent of every adversely affected holder.

Finally, § 6.06 of the indenture, commonly referred to as a "no-action clause," imposes limitations on the ability of an individual holder to bring suit to enforce the indenture's terms.  While the full text of the no-action clause is set forth in the margin,[14] the most critical provision for current purposes is § 6.06(a)(2), which on its

---

[13] *Id.* § 6.10.

[14] The no-action clause reads as follows:

Section 6.06      <u>Limitation on Suits</u>.

(a) A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(1) such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2) Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested the Trustee in writing to pursue the remedy;

(3) such Holder or Holders offer and, if requested, provide to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4) the Trustee does not comply with the request within 60 days after receipt of the request and the offer of security or indemnity; and

face would preclude any lawsuit in the absence of a decision by the holders of 25 percent of the outstanding notes to pursue the claim.  As noted above, the plaintiffs who have initiated this action collectively hold approximately 10 percent of the applicable notes.

### 2.     The 2019 Intercreditor Agreement

At the same time that TPC issued the 10.5% Notes, it also entered into an asset-based revolving loan facility (referred to as the "ABL facility") with an availability of up to $200 million (subject to a borrowing base), under which Bank of America served as administrative agent and collateral agent.[15]  This facility was secured by a first lien on the debtors' accounts receivable, deposit accounts, inventory, and other assets, and a second lien on those assets that secure the 10.5% Notes.[16]  Because the holders of the 10.5% Notes also took a security interest in the same collateral – though, with respect to the accounts receivable, deposit accounts, etc., one that was junior to that held by the lenders under the ABL facility – the parties also entered into an intercreditor agreement setting forth the parties' respective rights.[17]

Section 4.1(a) of the 2019 Intercreditor Agreement thus explains that the holders of the 10.5% Notes are paid first out of the proceeds of the collateral as to

---

(5) during such 60-day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a written direction inconsistent with such request.

*Id.* § 6.06.

[15] Main Bankruptcy D.I. 27 ¶ 33.

[16] *Id.* ¶ 34.

[17] D.I. 5 Ex. B.  This agreement is referred to as the "2019 Intercreditor Agreement."

which those holders have a senior lien, with the lenders of the ABL facility being paid second. The priority of payment is reversed with respect to accounts receivable, deposit accounts, inventory, and other assets as to which the lenders under the ABL facility have a first lien. For that collateral, the proceeds are paid first to the lenders under the ABL facility, with the holders of the 10.5% Notes being paid second.

### 3.    The 2021 10.875 Percent Notes

As the first-day declaration explains, after the issuance of the 2019 Notes, the debtors' financial condition deteriorated. Many factors contributed to this, including an explosion at a TPC chemical plant in Port Neches, Texas, which caused the evacuation of tens of thousands of nearby residents; a decrease in the demand of the debtors' products at the outset of the pandemic; and outages in the company's boilers following Winter Storm Uri that curtailed the debtors' manufacturing capacity.[18]

To address its need for greater liquidity, in February 2021, TPC issued $153 million in new notes, maturing in 2024 and bearing interest at 10.875 percent.[19] The 10.875% Notes are governed by New York law.[20] In 2022, TPC issued an additional tranche of $51.5 million in 10.875 percent notes, on substantially the

---

[18] Main Bankruptcy D.I. 27 ¶¶ 53-59.

[19] These notes will be referred to as the "10.875% Notes." The indenture for these notes, referred to herein as the "2021 Indenture," can be found in the record at D.I. 5 Ex. C. As with the 10.5% Notes, U.S. Bank National Association serves as trustee and collateral agent under the indenture for the 10.875% Notes.

[20] 2021 Indenture § 14.08.

same term as those issued in 2021.[21]  The parties intended for these tranches of

10.875% Notes to be secured by the same collateral as the 10.5% Notes, but with a

lien that would become senior to the lien securing the 10.5% Notes, thus

necessitating various amendments to the 2019 Indenture and the 2019 Intercreditor

Agreement.[22]  Because, however, at the time of the 2021 transactions, the holders

under the 10.875% Notes also held a majority (indeed, a super-majority of more

than 67 percent) of the then-outstanding 10.5% Notes, they had the authority to

amend the 2019 Indenture in any way that did not violate a holder's "sacred rights"

set out in § 9.02(d) of that indenture.[23]

### 4.    The Supplemental Indenture and 2021 Intercreditor Agreement

The Supplemental Indenture contains amendments to the 2019 Indenture

intended to permit the issuance of the 10.875% Notes.[24]  The parties also entered

into a new intercreditor agreement.[25]  That agreement operates to subordinate the

---

[21] Main Bankruptcy D.I. 27 ¶ 36.

[22] By its terms, the 10.5% Notes contemplated that TPC might incur certain additional indebtedness.  *See* 10.5% Notes § 4.07.  The document amending the 2019 Indenture so as to authorize the issuance of the 10.875% Notes is referred to as the "Supplemental Indenture," and can be found in the record at D.I. 5 Ex. D.

[23] *See* D.I. 5 Ex. G (attaching consents from holders of a supermajority of the 10.5% Notes to 2021 transactions).  *See also* D.I. 41 ¶¶ 10, 40 (asserting that TPC obtained consents from the holders of 66.72% – $620.487 million of a total issuance of $930 million – of the outstanding 10.5% Notes).

[24] Among other things, the Supplemental Indenture operated to ensure that (a) the 2019 Indenture would be subject not only to the original 2019 Intercreditor Agreement, but also the 2021 Intercreditor Agreement; and (b) alters the definition of permitted liens to except certain of the new notes from the limitations on such liens contained in the 2019 Indenture. *See* Supplemental Indenture §§ 4.07(d); 12.01(c).

[25] This agreement is referred to as the "2021 Intercreditor Agreement" and can be found in the record at D.I. 5 Ex. F.

10.5% Notes to the 10.875% Notes with respect to the common collateral securing both sets of notes.[26]  The consents executed by more than 67% of the holders of the 10.5% Notes expressly authorized the entry into both the Supplemental Indenture and the 2021 Intercreditor Agreement.[27]

### 5.    TPC Group's bankruptcy filing and the initiation of this adversary proceeding

TPC Group and various of its affiliates filed voluntary chapter 11 petitions in this Court on June 1, 2022.  The debtors seek to enter into a debtor-in-possession loan with the same ad hoc group of noteholders that are the holders of the 10.875% Notes.  That DIP Loan would provide $85 million in new money but would also roll up $238 million that was outstanding on the petition date under 10.875% Notes. The economic impact of that rollup depends heavily on whether the 10.875% Notes are truly senior to the now almost $1.1 billion due under the 10.5% Notes.  To the extent the 10.875% Notes are senior and thus sit at the "top" of the debtors' "capital stack," then rolling up that debt (and thereby granting it administrative claim status in the bankruptcy case) has relatively little effect on other creditors.  If the value of the collateral would, in any event, go first to pay the 10.875% Notes, then as long as the value of the collateral exceeds the outstanding amount under those notes, granting those holders administrative claim status should operate only as "belt-and-suspenders" assurance that the holders of that debt are entitled to be paid in full under a plan.

---

[26] 2021 Intercreditor Agreement §§ 2.1, 4.1.

[27] *See* D.I. 5 Ex. G.

On the other hand, if (as the objecting noteholders contend) the legal consequences of the 2021 transaction was that the 10.875% Notes come in as junior to the 10.5% Notes, then rolling up $238 million of debt that might (depending on the ultimate value of the collateral) otherwise be treated as unsecured would make the DIP loan very expensive money indeed.    Accordingly, the Court agreed to consider the present summary judgment motions on an expedited basis such that the priority issue can be resolved before the Court considers whether to grant final approval to the DIP loan, a matter that is scheduled to be heard on July 15, 2022.[28] The Court thus entered a scheduling order providing for this summary judgment motion to be fully briefed by June 28, 2022 and set argument for the next day, June 29, 2022, with a view towards issuing this decision as promptly as possible thereafter to permit the parties to prepare for the July 15 hearing on final approval of the DIP loan.

### 6.    Procedural posture of this adversary proceeding

This adversary proceeding was initiated by the filing of a complaint by the objecting creditors seeking a declaratory judgment that, in effect, the 10.875% Notes would be junior to the 10.5% Notes.[29]    Along with the complaint, the objecting noteholders filed a motion seeking the entry of summary judgment.[30]

---

[28] While the Court granted interim authority for the debtors to borrow on a postpetition basis, that order expressly reserves the authority of the court to fashion any appropriate remedy in the event that final approval of the DIP is not granted.  *See* Main Bankruptcy D.I. 147 ¶ 2(d).

[29] D.I. 1, 3.

[30] D.I. 4.

Debtor responded to this with a flurry of pleadings.[31]  *First*, it filed a counterclaim against the objecting noteholders seeking a declaration that the lawsuit is barred by the no-action clause.[32]  *Second*, the debtor sought summary judgment with respect to that counterclaim.[33]  *Third*, the debtor moved to dismiss the objecting noteholders' lawsuit, also on the ground that it violated the no-action clause.[34]  *Fourth*, the debtor opposed the objecting noteholders' motion for summary judgment.[35]  And *fifth*, the debtor answered the objecting noteholders' complaint, which answer it combined with a counterclaim that was materially identical to the stand-alone counterclaim it filed previously.[36]

In addition, the ad hoc group of noteholders who are the holders of a supermajority of both the 10.5% Notes and the 10.875% Notes moved to intervene as a defendant.[37]  After that motion was granted on a consensual basis,[38] the ad hoc group answered the complaint[39] and filed an opposition to the objecting noteholders'

---

[31] While TPC Group, Inc. and various of its affiliates are debtors in the jointly administered bankruptcy cases, only the lead debtor, TPC Group, Inc., is named as a defendant in this adversary proceeding.

[32] D.I. 15.

[33] D.I. 16.

[34] D.I. 18.

[35] D.I. 40.

[36] D.I. 47.

[37] D.I. 28.  This group of intervening defendants is described as the "ad hoc group of noteholders."

[38] D.I. 38.

[39] D.I. 42.

motion for summary judgment that they combined with their own cross-motion for summary judgment on the claim as to which they intervened as defendants.[40]

The objecting noteholders then moved to strike TPC's initial counterclaim[41] on the ground that it needed to be filed along with an answer rather than on a standalone basis. The objecting noteholders also moved to dismiss the counterclaim that the debtor subsequently filed along with its answer on the ground that the counterclaim fails on the merits.[42]

All of these motions have now been fully briefed. As the Court noted at the June 29 argument, it is by no means clear that this plethora of motions was entirely necessary. The Court intends, in this Memorandum Opinion, to resolve the merits of the various summary judgment motions before it regarding the construction of the applicable agreements (D.I. 4, 16 and 43) – which all parties agree are now properly before the Court for disposition on a summary judgment record. The Court believes that the entry of summary judgment, consistent with this Memorandum Opinion, should largely, if not entirely, moot the remaining procedural disputes among the parties.

## Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b), as a dispute falling within the district court's "related to" jurisdiction, which has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing

---

[40] D.I. 43.

[41] D.I. 48.

[42] D.I. 49.

order of February 29, 2012.  This action, which relates to the relative priority of various creditors' claims against the bankruptcy estate, is a core matter under 28 U.S.C. § 157(b).

## Analysis

The parties' motions for summary judgment are brought under Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056.  A party seeking summary judgment is entitled to the entry of judgment if the movant can show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[43]  A moving party may rely on any material included in the summary judgment record, including documents, declarations, and other material.[44]  A party opposing a summary judgment motion on the ground that a material fact is genuinely disputed may point to the same kinds of record evidence in its opposition.[45]

Here, no party contends that there is a disputed question of fact requiring a trial.  Indeed, all parties agree that the question before the Court is a pure question of contractual interpretation that can be resolved on the undisputed factual record before the Court.

---

[43] Fed. R. Civ. P. 56(a).

[44] Fed. R. Civ. P. 56(c)(1) (identifying the types of "materials in the record" that may be cited in support of a motion for summary judgment).

[45] Fed. R. Civ. P. 56(c)(1) (noting that the identified materials may be cited by a "party asserting that a fact cannot be or is genuinely disputed").

All of the various agreements are governed by New York law.  Under New York law, a contract's "words should be given the meanings ordinarily ascribed to them."[46]    Contractual language "should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."[47]  Moreover, New York law is clear that "especially in the context of a commercial contract negotiated at arm's length by [] sophisticated [parties]," the role of the court, when confronted with a written contract that is "clear" and "complete," is simply to "enforce[] [the writing] according to its terms."[48]

The Court accordingly does not credit the various assertions that the objecting noteholders acquired their interests after the 2021 transaction and therefore should not be heard to complain that the transaction was an unlawful one. New York law is clear that "an assignee stands in the shoes of its assignor."[49]  The objecting creditors thus have the same legal rights – the right to insist that the 2019 Indenture be enforced according to its plain terms – as did the original holder. The current dispute therefore does not turn at all on whether one or another party might be cast as sympathetic or opportunistic.  It simply calls for the Court to read

---

[46] *In re DPH Holdings Corp.*, 553 B.R. 20, 27-28 (Bankr. S.D.N.Y. 2016).

[47] *Id.* (internal ellipses and citations omitted).  *See also Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) ("The cardinal principle for construction and interpretation of … all contracts … is that the intentions of the parties should control.  Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them.").

[48] *MLB Const. Servs. v. Dormitory Auth.*, 149 N.Y.S.3d 271, 276 (2021) (citations omitted).

[49] *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989); *see also In re KB Toys Inc.*, 736 F.3d 247, 254 (3d Cir. 2013) (a claim that would be subject to disallowance under § 502(d) in the hands of the original creditor is equally subject to disallowance after the claim is sold to a buyer).

16

and enforce the parties' agreements in accordance with their terms. Indeed, the robust secondary market for distressed syndicated debt, one that benefits buyers and sellers alike, depends on courts respecting the fact that the buyer of such debt acquires the same bundle of legal rights as were held by its predecessor.

## I. The no-action clause does not bar the objecting noteholders' challenge.

The debtor argues that the objecting noteholders' lawsuit for declaratory judgment fails on account of their failure to comply with the no-action clause contained in the 10.5% Notes.[50] In response, the objecting noteholders contend that New York law will enforce a no-action clause against an effort by an individual holder to enforce rights held by holders generally, but that a no-action clause should not be construed, under New York law, to apply to efforts to enforce rights afforded to an individual holder (such as an alleged violations of a holder's "sacred rights").

No one disputes that, as a general matter, no-action clauses serve a salutary purpose and are properly enforceable. The New York Court of Appeals decision in *Beal Savings Bank*,[51] for example, pointed to the reasons parties might agree that any action to enforce the collective rights of holders generally be enforceable only by a trustee or other agent of the collective group. Such a provision would permit the majority to decide whether to waive a default or otherwise make an accommodation to the borrower with a view towards maximizing the holders' ultimate recoveries. A contractual provision mandating collective rather than individual action "is meant

---

[50] *See* D.I. 17 at 6-12; D.I. 19 at 5-7; D.I. 40 at 12-15; D.I. 61 at 4-7.

[51] *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210 (N.Y. 2007).

to protect all Lenders in the consortium from a disaffected Lender seeking financial benefit perhaps at the expense of other debtholders."[52]

But the caselaw expresses a strong skepticism towards reading a no-action clause to preclude the enforcement of rights that an agreement expressly grants to individual holders. A decision by the Delaware Court of Chancery construing Utah law, *Cypress Associates, LLC v. Sunnyside Cogeneration Associates Project*,[53] pointed out the obvious "lack of fit" between a contractual provision that expressly granted a right to a minority group of holders and a separate provision that required the consent of the majority to enforce that right. "A provision … that is designed to limit suits on behalf of all holders unless a majority supports the suit arguably does not speak at all to claims under provisions … which are brought only for the benefit of the dissenting minority."[54]

New York courts, applying New York law, have expressly adopted the *Cypress Associates* analysis. For example, the court in *Eaton Vance*[55] relied on *Cypress* (although in a passage that may not have been necessary to the court's holding) for the proposition that "a no-action clause does not bar a claim by a

---

[52] *Id.* at 1219. *See also Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165 (N.Y. 2013) (holding that no-action clause applies only to claims under indenture agreement and does not bar individual suits to enforce common-law or statutory rights); *Cortland Street Recovery v. Bonderman*, 96 N.E.3d 191, 201 (N.Y. 2018) (explaining that no-action clause may prohibit individual holders, but not the indenture trustee, from bringing fraudulent conveyance claim).

[53] No. Civ. A. 1607-N (LES), 2006 WL 668441 (Del. Ch. Mar. 8, 2006).

[54] *Id.* at *6.

[55] *Eaton Vance Management v. Wilmington Savings Fund Society, FSB*, No. 654397/2017 (SWK), 2018 WL 1947405 (N.Y. Sup. Ct. Apr. 25, 2018).

minority lender to enforce its consent rights."[56]  Indeed, the court went on to explain that "it is undisputed that the  plaintiffs in this action do not lack standing to sue [by virtue of the no-action clause] for the alleged violation of their consent rights."[57]

That construction of the no-action clause makes sense.  *Cypress* and some of the other cases to which the parties cite[58] draw on an analogy to the doctrine of demand-futility as applicable to shareholder derivative suits.  Whether or not one views that analogy as instructive, those courts' reading of the no-action clause is well grounded in ordinary principles of contract construction.  In *Beal*, the New York Court of Appeals pointed to the familiar proposition that in cases involving the construction of commercial agreements, courts "should construe the agreements so as to give full meaning and effect to the material provisions"[59] and avoid constructions that would "render any portion meaningless."[60]

That principle is sufficient to resolve this question.  The 2019 Indenture contains, in § 9.02(d), an express grant of "sacred rights" to every individual holder. The obvious purpose of this provision is to ensure that these rights of individual holders cannot be taken away by an amendment to the indenture, regardless of how large or small those individual holders' share of the total outstanding indebtedness may be.  Such a provision would be rendered meaningless, however, if any action to

---

[56] *Id.* at *8.

[57] *Id.* at *9.

[58] *See, e.g., Feldbaum v. McCrory Corp.*, Civ. A. No. 11866 (LA), 1992 WL 119095 (Del. Ch. June 2, 1992).

[59] 865 N.E.2d at 1213 (internal citations and quotations omitted).

[60] *Id.*

enforce the right were subject to the provisions of the no-action clause, which (under

§ 6.06) would require 25 percent of the holders to demand that the trustee initiate

such a lawsuit and even then could be defeated if the holders of a majority so

instructed the trustee.  This is what *Eaton Vance* presumably means when it states

that the no-action clause should not be construed to apply to an effort by a minority

holder to enforce its consent rights.

In the end, counsel for the debtor acknowledges this much.  At argument on

the motion, counsel recognized that to the extent the amendments to the indenture

violated the rights of the objecting noteholders under § 9.02(d)(10) – which is the

objecting noteholders' principal merits argument – then "the no action clause would

not bar it."[61]  Accordingly, it does not appear that any party contends that the no-

action clause operates to preclude the objecting noteholders from advancing their

principal argument – that the amendments to the 2019 Indenture effected by the

Supplemental Indenture and the 2021 Intercreditor Agreement violated their rights

under § 9.02(d)(10).  The Court will accordingly turn to that argument.

## II.   The challenged transactions comport with the language of the applicable agreements.

### A.   Section 9.02(d)(10) does not prohibit subordination.

The central merits question is whether the adoption of the Supplemental

Indenture or the 2021 Intercreditor agreement violates § 9.02(d)(10) of the 2019

Indenture, which provides that "an amendment, supplement or waiver under this

---

[61] June 29, 2022 Hearing Tr. at 34.  *See also id.* at 35 (acknowledging that the no-action clause does not preclude objecting noteholders from bringing suit to enforce their right under the indenture to object to an amendment that "dealt with the application of the proceeds of collateral" which is one of the indenture's "sacred rights".).

Section 9.02 may not (with respect to any Notes held by a non-consenting Holder) …

make any change in the provisions of the Intercreditor Agreement or this Indenture

dealing with the application of proceeds of Collateral that would adversely affect the

Holders."

The basic dispute between the parties is over how broadly or narrowly to read

the term "dealing with the application of the proceeds of Collateral," and whether

the amendments to the 2019 Indenture made by the Supplemental Indenture

(including subjecting the 2019 Indenture to the 2021 Intercreditor Agreement) were

covered by that language.  The objecting noteholders read the language fairly

broadly, saying that a change that would put new debt ahead of them with respect

to the right to recover out of the collateral "deals with the application of proceeds of

Collateral."[62]

The debtor and the ad hoc group of noteholders read the applicable language

more narrowly.  As the ad hoc group of noteholders explain, the only provision of the

2019 Indenture that "deals with the application of proceeds of collateral" is § 6.10,

which addresses the waterfall for how the trustee should distribute monies it

receives under the indenture (including the distribution of proceeds of collateral).[63]

That provision states that, after the payment of the trustee's fees, such funds are to

be distributed "ratably" among holders.[64]  The ad hoc group of noteholders explains

that if the agreement were amended so that certain holders would be paid ahead of

---

[62] *See* D.I. 4 at 14-15.

[63] D.I. 44 at 17.

[64] 2019 Indenture § 6.10(a).

others out of the proceeds of collateral, such an amendment could not be effective, under § 9.02(d)(10), as against an adversely affected objecting holder.  But the ad hoc group of noteholders argues that so long as the proceeds of the collateral that comes into the hands of the trustee are to be distributed ratably among the noteholders, as remains the case after the adoption of the Supplemental Indenture, then the indenture has not been amended in any way that deals with the application of the proceeds of collateral.[65]

If one were simply looking at the words in isolation, reasonable arguments could be made on either side.  Consider the following directive: "[1] Amy will deliver four ice cream cones to Bob; [2] Bob will distribute the ice cream cones he receives equally to Charlie and Diane."  Would an amendment to the directive so that it instead provides "[1] Amy will deliver two ice cream cones to Bob," but otherwise left directive [2] unchanged be one that "deals with the allocation of ice cream"?  Again, if all one had to go on were the snippet of language itself, it seems that plausible arguments could be advanced on both sides.  Perhaps any change that affects how much ice cream either Charlie or Diane receives from Bob is one that "deals with the allocation of ice cream."  Alternatively, one might read the language "deals with the allocation of ice cream" to cover only the rules governing how Bob is to divide the ice cream he receives between Charlie and Diane.

---

[65] With respect to the 2019 Intercreditor Agreement, the ad hoc group of noteholders argues that the provision of the agreement that deals "with the application of proceeds of collateral" is 4.1(a), which is captioned "Application of Proceeds" and addresses the relative rights of the holders of the ABL facility and the holders of the 10.5% Notes with respect to the collateral in which both groups of holders assert liens.

On the objecting noteholders' side of this argument, the court in *Trimark*[66] expressed an openness to the former reading of such a clause. That case involved a paradigmatic "uptier" transaction that was challenged by the holders who were "left behind." They contended that the amendments to the agreement to authorize that transaction required their consent, under a clause that provided that an amendment could not revise certain provisions of the agreement "in a manner that would by its terms alter the application of proceeds" without "the written consent of each Lender directly and adversely affected thereby."[67]

The court noted that one "reasonable way" to read the provision is as a prohibition on subordination – to prohibit the parties "from placing any tranche of debt above Plaintiffs' place in the waterfall, even if the order of distribution" is not affected.[68] After the uptier transaction, the objecting holders "do not have the right to receive a dollar of collateral upon default until $427 million is paid back to the new cadre of super-senior lenders."[69] Even if the objectors' rights were not affected vis-à-vis the other holders in their same tranche, the objectors still "have a plausible argument that the [transaction] required their consent ... because it altered the application of proceeds by subordinating Plaintiffs' priority interest to the new Super-Priority Intercreditor Agreement."[70]

---

[66] *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, No. 565123/2020 (JMC), 2021 WL 3671541 (N.Y. Sup. Ct. Aug. 16, 2021) ("*Trimark*").

[67] *Id.* at **11.

[68] *Id.* at **12.

[69] *Id.*

[70] *Id.* (internal quotation marks omitted).

On the other hand, the *Trimark* court noted that an argument could also be made that "application of proceeds" refers "only to the Administrative Agent's application of proceeds among the categories covered by the agreement."[71]  The court explained that on this view, "the Administrative Agent's task remains the same before and after the amendment – it still applies the 'proceeds' (whatever is left of them) in the order specified" in the agreement.[72]

Because the court found that the objectors' reading to be a plausible one, it denied a motion to dismiss the objectors' complaint and allowed the litigation to proceed.[73]  The case ultimately settled, such that the Court did not reach a definitive construction of the language.

The *Trimark* court was certainly right that both constructions of the language at issue there were plausible based on the language in isolation.  But there are perhaps tools of construction, beyond the words themselves, that could provide guidance in choosing between them.  Specifically, New York law provides that contractual language must be understood through the lens of "the customs, practices, usages and terminology as generally understood in the particular trade or business."[74]

In the context of an indenture, the Court believes that the inclusion of express anti-subordination clauses are sufficiently commonplace that, under the

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156-157 (2d Cir. 2016).

customs and usages that are common in the trade, a provision providing for ratable distribution (in the absence of an express anti-subordination clause) would more naturally apply to distributions *within* a class, and not prohibit subordination of an entire class to another, different class.[75]  Indeed, it is telling that when the parties here adopted the Supplemental Indenture, they included such a standard clause. "Notwithstanding the foregoing in this Section 9.02, no amendment, supplement or waiver to the Indenture or any other Note Document shall subordinate the Lien securing the Notes Obligations to any other Lien (and the Trustee shall not enter into any intercreditor agreement providing for such subordination) without the consent of the holders of at least 66-2/3% in aggregate principal amount of the Notes then outstanding."[76]

In the circumstances of this case, however, even more telling context is provided by the other terms of the 2019 Indenture itself.  As described above, that agreement created a hierarchy of consents needed for particular amendments.  It generally provided for control by the majority; stated that a super-majority of two-thirds was required to release all or substantially all of the collateral; and then identified ten "sacred rights" that required unanimous consent (of affected holders).

---

[75] The U.S. District Court for the Southern District of New York reached a similar conclusion in *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022) ("[T]he court is unmoved by Plaintiffs' proffered interpretation of their sacred rights to *pro rata* payments.  The plain terms of Section 2.18 of the Agreement make clear that the first-lien lenders' rights to *pro rata* payments apply only to debt within the same 'Class,' *viz.*, among first-lien lenders.").

[76] Supplemental Indenture § 9.02(f).

The logic of that hierarchy would suggest that the matters included among the ten sacred rights would be actions that – at least from the perspective of an individual holder – would be more problematic or potentially prejudicial than the kinds of actions that can be taken simply with the approval of a simple or two-thirds majority.  Reading § 9.02(d)(10) to be limited to protecting the right to pro rata distributions would be consistent with this structure.  Surely an individual holder would be severely prejudiced if the other holders all agreed that they would be paid in full out of the distribution of the proceeds of collateral before that individual holder received any distribution.

Reading § 9.02(d)(10) to treat any subordination as violating a "sacred right," however, would be inconsistent with this hierarchy.  Subordination of a lien to that of another lender is a *less* drastic intrusion on the rights of an individual holder than simply releasing all of the collateral.  It would therefore create an anomaly to read the 2019 Indenture to permit a two-thirds majority to release all of the collateral but not to subordinate a lien to that of another lender.

As a commercial matter, there are ample reasons why a lender might agree to subordinate its lien to one in favor of a new lender.  In circumstances in which a borrower is facing a liquidity constraint, an old lender that is unwilling or unable to make a further loan might be very happy to subordinate its lien if that is the most cost-effective way for the borrower to attract new capital and thus avoid the greater threat to the lender's collateral that a default would precipitate.  As a matter of ordinary logic, an agreement to subordinate thus seems far *less* drastic than

releasing all of the collateral.  It therefore would not make sense to read the document to permit a two-thirds majority to take a *more* drastic action but give every holder the right to block the *less* extreme measure.

While counsel for the objecting noteholders, at argument, vigorously disputed the contention that a release of collateral is a more drastic action than the subordination of a lien to that of another lender,[77] the Court is persuaded that it is more drastic.  As such, the internal logic and hierarchy of the 2019 Indenture thus counsels strongly against reading § 9.02(d)(10) to provide that the subordination of a lien is a matter "dealing with application of the proceeds of Collateral" that would be treated as a "sacred right."

Nor does the fact that the Supplemental Indenture also made the 2019 Indenture subject to the 2021 Intercreditor Agreement alter the analysis.  The provision of the 2019 Intercreditor Agreement that addressed the allocation of proceeds (§ 4.1(a)) set forth the respective rights of the holders of the ABL facility and those of the holders of the 10.5% Notes.  While the 2021 transaction put additional debt ahead of *both* the 10.5% Notes and the ABL facility, nothing in those transactions affected the *relative* rights of those holders vis-à-vis each other.  As such, the change did not "deal with the allocation of proceeds of the Collateral" within the meaning of § 9.02(d)(10) of the 2019 Indenture.

In sum, contrary to the argument advanced by the objecting noteholders, the Court concludes that § 9.02(d)(10) of the 2019 Indenture is primarily directed at

---

[77] *See* June 29, 2022 Hearing Tr. at 40-41.

protecting the holders' rights to ratable treatment and should not be read as an anti-subordination provision in disguise. Indeed, simply as a commercial matter, the need to infuse a borrower with new money in order to protect the value of existing collateral might well provide a sound reason why lenders would agree that a majority (or, in the case of the Supplemental Indenture, a super-majority) may bind a class of holders to a decision to subordinate their lien.

As far as commercial norms go, to the extent that the objecting noteholders have anything to complain about from the 2021 transaction, that complaint is more with the fact that the objecting noteholders were not offered the opportunity to participate in the new loan than it is with the treatment of their old debt. But as counsel for the ad hoc group of noteholders indicated during the June 29 hearing, "there's nothing in the [2019 Indenture] that says I had the right to participate in some other financing."[78] And it is true that the debtors were free to make their own business decisions in deciding from whom to borrow new money. So while the various 2021 transactions may have violated what the *Trimark* court (perhaps aspirationally) called the "all for one, one for all" spirit of a syndicated loan,[79] the transactions did not violate the letter of the applicable agreements in a manner that gives rise to a claim by the objecting noteholders. There is nothing in the law that requires holders of syndicated debt to behave as Musketeers. To the extent such holders want to be protected against self-interested actions by borrowers and other holders, they must include such protections in the terms of their agreements.

---

[78] *Id.* at 74.

[79] *Trimark*, 2021 WL 3671541 at **1.

## B.    The consent letters received by TPC were effective to authorize the 2021 transactions.

The objecting noteholders also argue that the transactions were ineffective because the 2019 Indenture requires the consent of "Holders," which is defined as the "Person in whose name a Note is registered in the register maintained by the Registrar."[80]   But rather than obtaining consents from the "registered holders" of the notes, TPC obtained consents from the beneficial holders.   Those consents contained signatures of the beneficial holder and/or investment advisor, a certification of the holdings, a stamp or seal certifying ownership of the notes, and/or a certified letter or account summary.[81]

Section 9.02(b) of the 2019 Indenture, however, authorizes the Trustee to "join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture" when the Trustee receives "evidence satisfactory to the Trustee of the consent of the Holders."[82]   In the absence of an objection to the form of consent from the Trustee, the 2019 Indenture thus does not appear to authorize other holders to assert a claim that the form of authorization was improper.   And even if it did, in circumstances (such as here) where the distinction between registered and beneficial holders would elevate form over substance, New York

---

[80] 2019 Indenture § 1.01.

[81] *See* D.I. 5 Ex. G.

[82] 2019 Indenture § 9.02(b).

courts have declined to enforce it.[83]    The Court accordingly will not invalidate the 2021 transactions on this basis.

## Conclusion

For the reasons described above, the Court concludes that the Supplemental Indenture and the 2021 Intercreditor Agreement did not violate the rights of the objecting noteholders under the 2019 Indenture.  The parties are directed to settle appropriate forms of order that resolve the outstanding motions and provide for the entry of judgment.

Dated: July 6, 2022

_____

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[83] *See Friedman v. Airlift Intern., Inc.,* 355 N.Y.S.2d 613, 615 (1974); *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires,* 415 F.3d 242, 245-246 (2d Cir. 2005).