# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TPC GROUP INC.*, et al.*,<br><br>     Debtors. | Chapter 11<br><br>Case No. 22-10493 (CTG)<br><br>(Jointly Administered) |
| BAYSIDE CAPITAL INC. and CERBERUS CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>TPC GROUP INC.,<br><br>     Defendant/Counterclaim Plaintiff,<br><br>-and-<br><br>THE AD HOC NOTEHOLDER GROUP,<br><br>     Intervenor Defendant. | Adv. Proc. No. 22-50372 (CTG)<br><br>**Related Docket No. 78** |

## <u>OPINION DENYING MOTION FOR STAY</u>

This Court granted summary judgment in favor of the debtor and the Ad Hoc

Noteholder group in this adversary proceeding initiated by the objecting noteholders.[1]

---

[1] The plaintiffs in this action are Bayside Capital, Inc. and Cerberus Capital Management, L.P., referred to collectively as the "objecting noteholders." The debtor, TPC Group Inc., was named as a defendant, and is referred to as the "debtor." The Ad Hoc Noteholder Group intervened as a defendant. The Court's Memorandum Opinion setting forth its reasons for granting summary judgment is docketed at D.I. 72, is referred to as the "Memorandum Opinion," and cited as "Mem. Op."). The order granting summary judgment and disposing of a number of related motions is at D.I. 74. The entry of judgment itself is at D.I. 75.

The dispute is over the construction of an indenture governing $930 million in notes issued by the debtor in 2019.[2]   The fundamental question is whether a series of amendments to the 2019 Indenture, made in 2021 and seeking to authorize a new loan (in which the Ad Hoc Noteholder Group was the lender) that would come in senior to the 10.5% Notes, were consistent with the terms of the 2019 Indenture.  In its summary judgment decision, the Court concluded that the amendments did comport with the terms of the indenture.

As the Memorandum Opinion explained, that question plays an important role in the Court's decision whether to grant final approval to the debtor's motion to enter into a debtor-in-possession loan from the Ad Hoc Noteholder Group.[3]   Because the DIP loan would "roll up" the notes that purport to be senior to the 10.5% Notes, the question whether the notes are actually senior, or were (as the objecting noteholders contend) junior to the 10.5% Notes on account of a violation of 2019 Indenture, will play a significant role in the Court's decision whether to approve the DIP loan, which is set for hearing on July 15, 2022.  This is by no means the only issue that bears on whether to approve the DIP loan, but it is without question an important one.  And that is why the Court agreed to hear and resolve that issue on an expedited basis, such that the decision could be rendered in advance of the July 15 hearing.

---

[2] That indenture is referred to as the "2019 Indenture."  The $930 million in notes are referred to as the "10.5% Notes."

[3] *See* Mem. Op. at 11-12.

The objecting noteholders have appealed the entry of the declaratory judgment[4] and now seek a stay pending appeal.[5] The motion for a stay pending appeal seeks a stay both of the declaratory judgment and of any consideration of the motion to approve the DIP loan, pending appeal. At the Court's direction, the Debtor and the Ad Hoc Noteholders promptly responded to the motion.[6] For the reasons described below, this Court will deny the motion for a stay. It is doing so promptly, and without holding oral argument on the motion, in order to maximize the objecting noteholders' opportunity to seek and obtain a stay from the district court before this Court proceeds to consider the DIP loan on July 15.

## Jurisdiction

Like the adversary proceeding itself, this Court has jurisdiction over this motion under 28 U.S.C. § 1334(b), as a dispute falling within the district court's "related to" jurisdiction. To the extent the motion seeks to stay the Court's consideration of the debtor's motion to obtain debtor-in-possession financing, the district court "arising under" jurisdiction is also implicated. Both heads of jurisdiction have been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of February 29, 2012.

## Analysis

The instant motion is something of a procedural oddity – though the Court concludes that it is nevertheless procedurally appropriate. The odd thing about it is

---

[4] D.I. 76.

[5] D.I. 78.

[6] D.I. 86.

that the motion seeks a stay of an order granting declaratory judgment. As Judge McHugh noted in *United States v. Safehouse*,[7] it is not obvious that an order granting declaratory judgment – which does not mandate any particular action – is something that can even be stayed. Federal Rule of Bankruptcy Procedure 7062 (incorporating Federal Rule of Civil Procedure 62), which deals with stays pending appeal, is focused on stays of money judgments and injunctions, and does not appear to contemplate a stay of a declaratory judgment. But the Court in *Safehouse* nevertheless concluded that despite the "gap in Rule 62," in a case in which a declaratory judgment will have an obvious practical effect, it can properly be the subject of a stay.[8] In this case, the practical effect of the declaratory judgment is that it will inform the Court's consideration of the motion to approve the DIP loan. So particularly when brought in conjunction with a motion to stay the hearing to approve the DIP loan,[9] the Court concludes that the motion is an appropriate one.

The factors governing a motion for a stay pending appeal were set forth by the Third Circuit in *Revel*.[10] The most important considerations are the movant's likelihood of prevailing on the merits and whether the movant will suffer irreparable injury in the absence of a stay. If the movant's showing on those factors is sufficient, the court then weighs all four of the traditional stay factors – likelihood of success,

---

[7] 468 F. Supp. 3d 687 (E.D. Pa. 2020).

[8] *Id.*

[9] Fed. R. Bankr. P. 8007(e) expressly authorizes a stay of proceedings in the bankruptcy case.

[10] *See In re Revel AC Inc.*, 802 F.3d 558, 568 (3d Cir. 2015). *See also Nken v. Holder,* 556 U.S. 418, 434 (2009), *In re MTE Holdings*, No. 19-12269 (CTG), 2021 WL 4203339 (Bankr. D. Del. Sept. 15, 2021).

irreparable injury, injury to other parties, and the public interest. And this Court

noted in *MTE* that where a stay is sought from the court that issued the decision (as

Bankruptcy Rule 8007(a)(1) ordinarily requires in the first instance), the rendering

court ought to be sensitive to the fact that the judge that issues a decision is unlikely

to be an impartial arbiter of the correctness of that judge's own decision, and that

humility should counsel against denying a stay merely on the basis that the rendering

judge has reviewed his or her own decision and found it to be perfect.[11]

1.      **While the objecting noteholders are unlikely to prevail on the merits, the matter is sufficiently complex that the likelihood must be described as more than negligible.**

A careful review of the objecting noteholders' motion for a stay leaves the Court

with the firm impression that, while the Court's opinion may certainly have its

imperfections, its ultimate judgment is correct and unlikely to be reversed on the

merits. That said, following the principle this Court expressed in *MTE* that a court

ought to resist the human tendency to overrate the quality of one's own analysis, and

particularly in light of the complexity of the issues, the Court is not inclined to

describe the objecting noteholders' likelihood of success as negligible.

The 2019 Indenture generally allows for noteholders who hold a majority of the

outstanding indebtedness to agree to an amendment to the indenture itself. But

there are exceptions to that principle set forth in § 9.02 of the indenture. The central

merits issue is whether a provision of § 9.02(d)(10) that prohibits an amendment to

the indenture that "deals with the allocation of the proceeds of collateral" without the

---

[11] 2021 WL 4203339 at *3.

consent of each affected holder applies to 2021 transaction that subordinated the 10.5% Notes to the new notes issued at that time.

The Court concluded that it does not. The Court acknowledged that the words themselves, taken in isolation, would admit of such a construction.[12]  The Court concluded, however, that the better reading of the provision was that § 9.02(d)(10) should be read more narrowly to prohibit changes to the requirement that funds recovered by the trustee be distributed ratably to holders, rather than more broadly so that it also covered subordination.

The principal basis for the Court's conclusion was that the "hierarchy of consents" set forth in § 9.02 made it illogical to read § 9.02(d)(10) as applying to an amendment that would permit subordination. The reason for this is that § 9.02(e) provides that a two-thirds majority has the authority to agree to release all or substantially all of the collateral. And under any reading of § 9.02(d)(10) that was broad enough to cover subordination, it would *also* cover the release of collateral. But because we know from § 9.02(e) that a two-thirds majority could release all of the collateral, any reading of § 9.02(d)(10) that would require the consent of every holder for the release of collateral would conflict with § 9.02(e). The import of this construction is that § 9.02(d)(10) needs to be read more narrowly than the objecting noteholders contend. And as a matter of logic, it only made sense for § 9.02(d)(10), which would require unanimous consent, to apply to an amendment that would be *more* drastic or prejudicial to an individual noteholder than the release of collateral.

---

[12] Mem. Op. at 22, 24.

Such a reading, one that is fully consistent with the indenture's language, is readily apparent. "Deal[ing] with the application of proceeds of the collateral" could also be read to be addressed to the manner in which the trustee distributes any such proceeds it receives under the indenture. Section 4.10 of the indenture provides that such proceeds are to be distributed ratably. Reading § 9.02(d)(10) as treating the right to ratable treatment as a "sacred right" that cannot be amended away without the consent of each affected holder is thus fully consistent with the language and far more consonant with the overall structure and hierarchy of consents reflected in the indenture.

The objecting noteholders' argument as to why they are likely to prevail on the merits despite this hierarchy of consents is set forth on pages 16-19 of their stay motion.[13] These points demonstrate why they are unlikely to prevail on the merits. They argue that the requirement of two-thirds consent for the release of collateral in § 9.02(e) is the floor rather than a ceiling. That is, while two-thirds consent may be required under § 9.02(e), to the extent that an amendment releasing the collateral *also* deals with the allocation of collateral, the consent of every affected holder is required. That reading might make sense if the release of all collateral were sometimes but not always a matter dealing with the application of proceeds of collateral. But on the objecting noteholders' reading of § 9.02(d)(10), the release of all collateral would *always* require the consent of every affected holder. Such a reading

---

[13] D.I. 78.

would thus render § 9.02(e)'s two-thirds' requirement entirely superfluous and meaningless.  That is why their reading is the less persuasive one.[14]

They go on to argue that the release of collateral is not more drastic than subordination, because the release of collateral affects every holder equally while the subordination at issue here singled them out for disfavored treatment.[15]  But that is incorrect.  Subordinating one loan to another, just like releasing all collateral, is equally prejudicial to old lenders.  As it turns out, the debtor here entered into a new (senior) loan with a group of lenders that did not include the objecting noteholders (or their predecessors in interest).  But once a loan is subordinated, nothing in the indenture speaks to offering all holders the right to participate in a new loan.  It turns out that the lenders in the new loan were also holders of the 10.5% Notes.  But the question whether the subordination was a matter that "deals with the application of the proceeds of collateral" cannot turn on that fact.

The objecting noteholders are also incorrect to contend that the Memorandum Opinion conflicts with the New York Supreme Court's decision in *Trimark*.[16]  That is so for two reasons.  *First*, the *Trimark* court did not resolve the question whether, in the context of the agreement before it, the prohibition on subordination was or was not a "sacred right."  It found the language susceptible to either construction.  For that reason, the court denied a motion to dismiss.  This Court agrees with *Trimark*

---

[14] *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (contracts should generally be construed under New York law to avoid rendering provisions superfluous).

[15] D.I 78 at 17.

[16] *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, No. 565123/2020 (JMC), 2021 WL 3671541 (N.Y. Sup. Ct. Aug. 16, 2021) ("*Trimark*").

that the language of § 9.02(d)(10), read in isolation, could plausibly be construed either way.

And that underscores the *second* reason this Court's decision is not inconsistent with *Trimark*. The principal reason this Court construed § 9.02(d)(10) as it did was that such a construction was necessary to harmonize that provision with the two-thirds consent for release of collateral contained in § 9.02(e). There is nothing in the *Trimark* opinion, however, suggesting that the indenture at issue there contained such a provision.

In fairness, however, the objecting noteholders do point to language in this Court's Memorandum Opinion that goes a step beyond *Trimark*. The Memorandum Opinion stated that in view of industry customs and norms, language in an indenture addressing the "allocation of proceeds" of a collateral would not ordinarily be read as an anti-subordination provision.

The objecting noteholders are (at least partially) correct in their criticism of this Court's reference to industry customs and norms, which was an infelicitous way of making the point the Court intended to convey. As a matter of contract law, where a document is ambiguous on its face, a court may look to extrinsic evidence of industry customs and norms as a tool to resolve the ambiguity. But here, no party contended that the document was ambiguous, and no party presented extrinsic evidence that purported to prove up industry customs.

The point that the Court intended to make is the unremarkable one that in construing contract language, even without extrinsic evidence of custom and usage,

the context and subject of the agreement can help lend clarity to terms that might otherwise be ambiguous.[17]  For instance, the word "bark," in isolation, might refer either to the protective outer sheath of a tree or the sound made by a dog.  In discerning which meaning was intended by the parties, a court can look to the context of the agreement, giving the word one meaning in a contract to hire a dog trainer and another meaning in an agreement for the sale of lumber products.  The point the Court should have made is that, in the context of a leveraged loan agreement, one would not expect parties who intended to prohibit subordination to do so by restricting amendments that deal with the allocation of the proceeds of collateral.  It is true that this observation goes a step beyond the *Trimark* court's analysis.  But that has no effect on this Court's bottom-line conclusion, which is grounded primarily on the inclusion in this agreement of § 9.02(e), a provision that does not appear (from the *Trimark* opinion, at least) to have been contained in the indenture at issue there.

As it turns out, the summary judgment record before the Court did include material that might be described as evidence of "custom or usage" in the applicable trade.  As the Memorandum Opinion explained, after the new lenders and the debtor entered into the 2021 transaction, those parties (in the 2021 Supplemental

---

[17] *See generally Restatement (Second) of Contracts* § 212 cmt. d ("Analytically, what meaning is attached to a word or other symbol by one or more people is a question of fact. But general usage as to the meaning of words in the English language is commonly a proper subject for judicial notice without the aid of evidence extrinsic to the writing."); *Id.* § 220 cmt. b ("noting, in section addressing "usage" as an aid to construction, that "[w]here a usage of words is sufficiently well known, a court will take judicial cognizance of it without proof").

Indenture)[18] took steps to ensure that an ordinary majority could agree to having new money come in ahead of their new loan.[19]  They did that through the inclusion of a provision that would require a two-thirds majority for any amendment that would "subordinate the Lien securing the Notes Obligations to any other Lien."[20]  One could certainly treat this amendment as evidence that when parties to a syndicated loan want to prohibit subordination, they do so in express language.

In fairness, however, the Court did not intend to rely on this 2021 conduct by participants in the trade as extrinsic evidence of custom and usage to give meaning to an otherwise ambiguous document.  The language of the Memorandum Opinion referring to "custom and usage" is thus imprecise and confusing.  The Court takes responsibility for introducing that confusion, and but for the fact that the filing of the notice of appeal divests this Court of jurisdiction over the matter,[21] would amend the opinion to delete the offending reference to "custom and usage."  Because, however, the principal basis for the Court's conclusion was the structural one about the "hierarchy of consents" contained in the indenture, and because the point the Court made about "custom and usage" could have been properly expressed as the

---

[18] The Supplemental Indenture is contained in the record at D.I. 5 Ex. D, and is referred to as the "Supplemental Indenture."

[19] Mem. Op. at 25.

[20] Supplemental Indenture § 9.02(f).

[21] *See generally In re Syntax-Brillian Corp.*, No. 08-11407 (BLS), 2013 WL 153831, at *5 (Bankr. D. Del. Jan. 15, 2013) ("The filing of a notice of appeal is an event of jurisdiction significance—it confers jurisdiction on the court of appeals and divests the district court of its control over these aspects of the case involved in the appeal.") (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)).  *See also Thomas v. Northeastern Univ.*, 470 F.App'x 70, 71 (3d Cir. 2012) (stating that a timely appeal divests jurisdiction of the lower court).

commonplace point that the context of an agreement can help inform its meaning, the inclusion of this language does not give rise to a substantial likelihood that the objecting noteholders will prevail on the merits of their appeal.

In the end, for the reasons set out above, the Court's conclusion is that the objecting noteholders are unlikely to prevail on the merits of their appeal. But the arguments they make are colorable. The objecting noteholders are correct that during the argument, this Court described the issues presented in this case as "challenging" and "complex."[22] They are. And for that reason, for the purposes of considering this motion for a stay pending appeal, the Court will not treat the objecting noteholders' likelihood of success as being negligible.

## 2. The objecting noteholders have a substantial case for irreparable injury.

With respect to irreparable injury, the objecting noteholders make a persuasive argument that in the absence of a stay, they face a risk of irreparable injury. In the absence of contrary direction from the district court, this Court does in fact intend to proceed with a hearing on final approval of the DIP on July 15, which will proceed on the premise that this Court's declaratory judgment ruling is correct.

It is not certain that the loan will be approved – the Court intends to consider all of the parties' arguments at the July 15 hearing and there are potential bases for objecting to the loan that do not depend on the declaratory judgment ruling. And on the flip side, while the objection to the DIP loan would undoubtedly be stronger if the

---

[22] D.I. 78 ¶ 26.

10.5% Notes were senior to the debt that is proposed to be rolled up, a ruling in the declaratory judgment action in favor of the objecting noteholders would not *necessarily* mean that the DIP loan could not be approved.  For that reason, while a technical argument could perhaps be made that the declaratory judgment ruling does not itself threaten the objecting noteholders with irreparable injury and that the motion for a stay is premature unless and until the Court actually approves the DIP loan, this Court is disinclined to deny the motion on that basis.

There is little question but that, as a practical matter, the resolution of the declaratory judgment ruling increased the risk the objecting noteholders face that the DIP may be approved and that the 10.5% Notes will thus be placed behind the subsequent loans in priority.  And while that may be of little import if the declaratory judgment ruling is correct (because they would already be junior), the economic effect on the objecting noteholders could be substantial if a reviewing court were later to determine that the declaratory judgment ruling is incorrect.

Moreover, it is certainly true that if the DIP loan obtains final approval, it will be difficult to fashion relief for the objecting noteholders if their appeal from the declaratory judgment ruling is ultimately successful. While the objecting noteholders point to the doctrine of equitable mootness as the likely obstacle to their obtaining such relief, this Court does not read the Third Circuit caselaw to apply equitable mootness outside of the context of a confirmed plan.[23]  Rather than that judge-made doctrine, the challenge the objecting noteholders would encounter is statutory –

---

[23] *See In re Semcrude*, 728 F.3d 314 (3d Cir. 2013).

§ 364(e) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."[24]  In view of this statutory provision, the Court believes that the objecting noteholders are likely correct that to the extent they believe that their recovery on their holding of 10.5% Notes will be reduced by the approval of the DIP and its associated roll up, it is not clear that they will obtain meaningful relief, absent a stay, if they prevail on their appeal from the declaratory judgment ruling.

The opposition to the motion points to a number of cases stating that the ability to obtain relief on appeal does not count as irreparable injury.[25]  At least in the context of this case, this Court is not persuaded by that point.  Just as a matter of common sense, the reason that "irreparable injury" plays an important role in determining whether to grant a stay pending appeal is that there is no reason for a court to invoke equitable powers if the affected party can obtain an adequate remedy if it prevails on appeal.  The point of § 364(e), however, is to provide a measure of finality to orders approving post-petition financing by limiting a court's ability to grant remedies in the

---

[24] 11 U.S.C. § 364(e).

[25] D.I. 86 ¶ 35.

event the decision is reversed on appeal.  At least in the context of this case, in which

approval of the DIP would (on the objecting creditors' view of the world) allow

hundreds of millions of dollars of debt to leapfrog them in priority, and where it does

not appear that the subsequent reversal of that order on appeal would provide a basis

to restore the prior scheme of priority, the Court believes that the objecting

noteholders have a substantial case for irreparable injury.

### 3.    In balancing all of the factors, however, the Court concludes that the stay should be denied.

The Third Circuit explained in *Revel* that "[o]nce an applicant satisfies the first

two factors, the traditional stay inquiry calls for assessing the harm to the opposing

party and weighing the public interest."[26]  For the reasons described above, the Court

concludes that the objecting noteholders have satisfied the first two factors, and thus

turns to this balancing test.

In conducting that balance, a court should "weigh the likely harm to the

movant (absent a stay) (factor two) against the likely irreparable harm to the stay

opponent(s) if the stay is granted (factor three).  This is called the balancing of harms

or balancing of equities.  We also take into account where the public interest lies

(factor four)—in effect, how a stay decision has consequences beyond the immediate

parties."[27]

Despite the Court's conclusion that the objecting noteholders have some

prospect of prevailing on the merits (though the Court believes that unlikely) and

---

[26] *Revel*, 802 F.3d at 569 (internal quotation and citation omitted).

[27] *Id.*

that they have a substantial claim for irreparable injury, the Court believes that the overall weighing of the harms counsels against a stay.

The reason for that is fairly simple. The objecting noteholders have a stake of approximately 10 percent in a $930 million debt issuance. The potential injury the objecting noteholders face is thus a reduction in their percentage recovery on that debt.

That harm is swamped by the potential harm on the other side of the ledger. Bear in mind that in order to obtain approval of the DIP loan, the debtor will be required to make a showing that borrowing money "is necessary to preserve the assets of the estate."[28] That means that in any circumstance in which the DIP loan would otherwise be approved, blocking the loan will lead to the destruction of value. That would necessarily cause harm to the company's almost 500 employees, other creditors holding more than $1 billion in other funded debt, as well as the involuntary creditors who suffered injury when the debtors' facility in Port Neches, Texas exploded in November 2019.[29]

The opposition to the motion[30] explains in detail the harm that a stay of proceedings on the DIP motion would cause to the bankruptcy estate. The debtors' business is a volatile one that is highly dependent on access to capital. The failure to

---

[28] *In re L.A. Dodgers, LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011).

[29] *See In re TPC Group, Inc.*, No. 22-10493 (CTG) (Bankr. D. Del.), D.I. 27.

[30] D.I. 86 ¶¶ 37-48.

obtain final approval of the DIP would threaten relationships with vendors and suppliers, and thus risk very substantial destruction of value.

So without minimizing the potential economic harm that the objecting noteholders would face if they were to turn out to be correct on the merits but the Court approved the DIP loan before they were vindicated on appeal, the magnitude of that harm (especially when discounted by the fact that their likelihood of success on the merits, while more than negligible, remains low) is thoroughly overwhelmed by the harm that the debtor and its other creditors would suffer if a company that needs access to capital in order to fund its ongoing business operations had that spigot turned off by a stay that precluded the debtor from obtaining final approval of a DIP loan.

Finally, the Court does not believe that in the context of this dispute, which is primarily a commercial dispute between private parties, consideration of the public interest adds materially to the considerations described above.

In sum, because the balance of equities points strongly against the entry of a stay, the motion will be denied.  In order to maximize the objecting noteholders' opportunity to seek and obtain a stay from the district court, this Court has endeavored to resolve this motion promptly, and is therefore doing so without setting the motion for hearing.

The Court will enter a separate order denying the motion.

Dated: July 11, 2022

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE